IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br>          Plaintiff,<br><br>     vs.<br><br>DES MOINES AREA COMMUNITY<br>COLLEGE FOUNDATION,<br>          Defendant. | No. 4:24-cv-00227<br><br>**BRIEF IN SUPPORT OF MOTION**<br>**FOR PRELIMINARY INJUNCTION**<br><br>**EXPEDITED RELIEF REQUESTED**<br><br>ORAL HEARING REQUESTED |

John D. Gilbertson
Joshua J. Conley
ZARLEYCONLEY PLC
West Des Moines, Iowa
for DRAKE UNIVERSITY

TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 4

II. FACTS .................................................................................................................... 4

    A.  Drake University ............................................................................................ 4

        1. Drake's Standalone "D" ........................................................................ 5

            a)  The Vintage Drake "D" .................................................................. 5

            b)  The Modern Drake "D" .................................................................. 6

        2. Drake's Registered Marks ...................................................................... 6

            a)  The Academic "D" ......................................................................... 6

            b)  The Athletic "D" ............................................................................ 7

            c)  Marching Spike .............................................................................. 7

        3. Drake's Live Mascot—Griff—and his Jacket ........................................ 7

            a)  "Bring Drake to Drake" ................................................................. 8

            b)  "Mr. Drake" & the "Face of Drake Athletics" ........................... 9

        4. The Drake Colors .................................................................................. 10

        5. The Drake Seal ...................................................................................... 10

        6. Drake's Archive and Brand Guide ........................................................ 10

        7. The Drake Brand ................................................................................... 11

    B.  DMACC .......................................................................................................... 11

        1. DMACC's Former Brand ...................................................................... 12

        2. DMACC's Rebrand ............................................................................... 12

        3. Launch of DMACC's New Brand .......................................................... 14

        4. DMACC's Pre-Launch Investigation .................................................... 14

        5. Public Reaction to the Rebrand ............................................................. 14

        6. The Rotary Club Incident ...................................................................... 15

III. LEGAL STANDARDS ............................................................................................. 16

    A.  Threshold Inquiry for Injunctive Relief for Common Law Trademark Rights .......... 16

        1. Drake is Actually Using the Drake Brand ............................................. 16

        2. The Drake Brand Identifies Drake as the Provider of Goods and Services .......... 16

    B.  Preliminary Injunctive Relief ...................................................................... 17

IV. ARGUMENT ........................................................................................................... 17

A.  Drake is Likely to Succeed on the Merits of its Claims ................................... 17

1.  Drake is Likely to Prevail on its Lanham Act Claims ......................................... 18

    a)  The Drake Brand is Strong............................................................................... 18

        (1) The Drake Brand is Conceptually Strong........................................... 18

        (2) The Drake Brand is Commercially Strong ....................................... 19

    b)  DMACC's Rebrand is Virtually Identical to the Drake Brand ................. 19

    c)  Drake and DMACC Operate in Close Competitive Proximity ................. 21

    d)  DMACC's Conduct Implies Intent to Confuse or Mislead...................... 22

        (1) DMACC's Rebrand Defies Several Naming Conventions .............. 22

        (2) DMACC Misled Drake During Pre-Filing Communications........... 25

        (3) DMACC's Conduct Implies Reckless Disregard for Others' Rights 26

    e)  Actual Confusion ................................................................................................ 27

    f)  Degree of Care .................................................................................................... 28

    g)  Summary of SquirtCo. Factors Shows Drake is Likely to Succeed on the Merits ........................................................................................................... 30

2.  Drake is Likely to Prevail on its Unfair Competition and Dilution Claims.......... 30

    a)  Unfair Competition .......................................................................................... 30

    b)  Dilution ................................................................................................................ 32

B.  Drake is Incurring Irreparable Harm........................................................................ 33

1.  Irreparable Harm May Be Presumed ....................................................................... 33

2.  Drake's Irreparable Harm is Demonstrable ............................................................ 33

C.  The Balance of Hardships Favors Drake ................................................................. 36

D.  The Public Interest Justifies Preliminary Injunctive Relief ............................... 37

V.  CONCLUSION ..................................................................................................................... 37

## I.      INTRODUCTION

For over a century, Drake University has used a standalone "D" to denote its institution and the source of its goods and services.  For nearly its entire 143-year existence, Drake has presented its standalone "D" in a color scheme comprised of royal blues and whites.  In 2016, Drake adopted a light blue as a secondary color.

Last fall, Des Moines Area Community College ("DMACC") scrapped its 35-year-old identity in favor of a new one featuring a standalone "D" presented almost invariably in a royal/light blue color scheme virtually identical to Drake's.  The result is a brand identity so similar to Drake's that in light of the decades-long mutual awareness, history of collaboration, and close proximity of the two institutions, one wonders how it could be accidental.

Trial is years away.  DMACC's new brand identity is causing, and will continue to cause, irreparable erosion to Drake's reputation and goodwill if not preliminarily enjoined.  It does not serve the public interest to have two post-secondary educational institutions using the same symbolism to promote the same services to the same prospective student base in the same area.

## II.     FACTS

### A.   Drake University

Drake is a private university in Des Moines founded in 1881.  Drake consistently offers educational services that are recognized nationwide.  Drake was a top-ranked college by the Wall Street Journal's 2024 College Pulse Rankings, which assists in the search for the best value in higher education.  Exhibit 99.  Of the 400 institutions ranked, Drake is the highest-rated in Iowa and the only one in the top 100.  The New York Times recognized Drake as a top U.S. college for economic diversity.  Exhibit 100.

### 1.    Drake's Standalone "D"

Since at least 1902, Drake has consistently used a standalone "D" to signify the university and denote the source of its educational services, athletics, and ancillary goods and services.  The first and last lines of Drake's Fight Song (1929) are "Here's to the one who wears the 'D.'"  *See* Dkt. 1.1–2.[1]   The lyrics hang prominently inside the Knapp Center, a multi-purpose, premier D1 facility on campus that is home to Drake's basketball teams.  Dkt. 1.2.

#### a)    The Vintage Drake "D"

Drake has consistently used the standalone "D" in a block-style collegiate font (the "**Vintage Drake 'D'**").  Drake's yearbook covers feature the Vintage Drake "D."  Dkt. 1.3–5. Drake has used the Vintage Drake "D" on athletic uniforms since at least 1906.  Dkt. 1.6–9. Drake's letter jackets feature the Vintage Drake "D." Dkt. 1.10, 57, 60.  Drake's marketing and recruitment materials have historically featured the Vintage Drake "D."  *See, e.g.*, Dkt. 1.11–13.

Drake still uses the Vintage Drake "D" today, including on its athletic uniforms.  Dkt. 1.14– 18.  Complaint Exhibit 18 is a photograph of shorts worn by Drake basketball players during Drake's annual Des Moines' Hometown Team Weekend. The Des Moines Register described the uniforms as including the "traditional Drake block 'D.'"  Dkt. 1.18.  Drake also uses the Vintage Drake "D" on the floor in the Knapp Center.  Dkt. 1.19.

Drake maintains an active alumni group called the National D Club (the "**D Club**"). The D Club is comprised of Drake's athletic letter winners who support Drake Athletics.  The D Club's logo features a prominent block "D."  Dkt. 1.20.  The D Club presents the "Double D Award" to members for achievements in their professions and community service since earning their degrees.

---

[1] Images and photographs play a central role in this matter.  Drake's Complaint includes nearly 100 images as exhibits.  Dkt. 1, et seq.  For the sake of brevity, these images are not reproduced here.  Instead, reference is made to corresponding docket numbers for the image in a modified format for clarity (e.g., Dkt. 1.23–25 refers to Complaint Exhibit 23 through 25).  Additionally, exhibit numbering in this Motion is continuous with that of the Complaint.

The Double D Award plaque includes a pair of overlapping block Ds.  Dkt. 1.21.  Since its inception in 1968, the Double D Award has been presented to 257 recipients.

### b) *The Modern Drake "D"*

In addition to the Vintage Drake "D," Drake utilizes two versions of a modern standalone "D" to denote the source of its goods and services.  The **Academic "D"** is a stylized "D" with an extended arc positioned slightly away from the stem of the letter.  Dkt. 1.33.  The Academic "D" appears in official Drake communications, marketing materials, and its website.  Dkt. 1.22.

Drake University Athletics uses a slanted version of the Academic "D" (the "**Athletic 'D'**").  Dkt. 1.23, 34.  The Athletic D is sometimes accompanied by a depiction of Drake's bulldog mascot.  The exterior of the Knapp Center prominently features the Athletic "D," and Drake's football team emblazons it on players' helmets.  Dkt. 1.24–25.  Drake sells university merchandise featuring the Athletic "D" and showcases it midfield at Drake Stadium.  Dkt. 1.26–27.  The Athletic "D" is also used on Iowa personalized license plates.  Dkt. 1.28.

Drake is known as Des Moines' Hometown Team™.  The logo for this designation incorporates the Athletic "D" and has been licensed for use with Drake sponsorships, such as Confluence Brewing Company's "Bulldog" beer.  Dkt. 1.29–30.

### 2.    Drake's Registered Marks

Drake is the owner of three U.S. Trademark Registrations featuring a standalone "D."

### a) *The Academic "D"*

Drake owns U.S. Trademark Reg. No. 3,498,202 (i.e., the Academic "D").  Dkt. 1.33.  The Academic "D" is registered in connection with collegiate educational and athletic services in Class 41, clothing items in Class 25, and beverage containers and other goods in Class 21.  No portion of the mark is disclaimed.

6

#### b)    The Athletic "D"

Drake also holds U.S. Trademark Reg. No. 4,625,043 (i.e., the Athletic "D").  Dkt. 1.34.
The Athletic "D" is registered in connection with collegiate educational and athletic services in
Class 41, clothing items in Class 25, and beverage containers and other goods in Class 21.  No
portion of the Athletic "D" is disclaimed.

#### c)    Marching Spike

Drake's oldest registration is U.S. Trademark Reg. No. 1,567,283 ("**Marching Spike**")
Dkt. 1.32.  The mark registered in 1989 for use with collegiate educational and athletic services in
Class 41, and clothing items in Class 25.  The mark, shown below, features Drake's bulldog mascot
wearing a sweater prominently featuring the standalone Drake "D" in the vintage style on the
mascot's sweater.  No portion of the mark is disclaimed, including the "D."



*Excerpt of Dkt. 1.32*

### 3.    Drake's Live Mascot—Griff—and his Jacket

Since 1910, Drake's mascot has been an English Bulldog.  Over the years, Drake has
enlisted bulldogs from the Des Moines area to serve as its live mascots.  Drake's current live
mascot is Griff II (**"Griff"**) (below, right), who succeeded the original Griff I (below, left):

  

*Dkt. 1.35*          *Dkt. 1.36*

7

Griff plays an active role as Drake's student and brand ambassador, making regular and frequent in-person, digital, and print appearances in connection with graduations, alumni receptions, admissions materials, sporting events, charity functions, recruiting fairs, community outreach, social media, advertising, and other official Drake affairs.  Griff is named after John L. Griffith who organized the first Drake Relays.

Part and parcel of Griff's image is his custom-made letter jacket that features the Vintage Drake "D" (the **"Jacket"**).  Dkt. 1.37–38.  Griff frequently wears his Jacket in public on behalf of Drake.  *See* Dkt. 1.39–46.  Griff is transported to events in his "Griffmobile" wrapped in images of him in his Jacket.  Dkt. 1.47.  Griff's Jacket is such a recognizable symbol that Drake sells plush "mini-Griffs" wearing it.  Dkt. 1.48.  Also for sale are Griff bobbleheads wearing the Jacket (standing on the Athletic "D") and a Griff memoir.  Dkt. 1.49–50.

Griff's use of the Vintage Drake "D" is not limited to his Jacket; Griff frequently sports other outfits adorned with the symbol in appearances and marketing materials.  *See, e.g.*, Dkt. 1.51–56.  This is done to emphasize Drake's standalone "D" and evoke Drake's Marching Spike.

### a)    *"Bring Drake to Drake"*

The Jacket and its standalone "D" are so intrinsically associated with Drake University that when international superstar rapper, singer, and actor Aubrey Drake Graham (a.k.a. Drake) performed for a sold-out Wells Fargo Arena in 2016, arena staff, in collaboration with Drake's University Communications & Marketing Department ("UCM"), commissioned a custom-made Jacket that Drake (the rapper) wore onstage.  Dkt. 1.57.  After the show, the performer famously visited Drake's campus, where he was photographed in the Jacket atop Drake's monument signage (the "**Post**"), which garnered hundreds of thousands of social media impressions.  Dkt. 1.58.

Drake's visit gained widespread recognition for Drake University and its brand.  Drake University's Instagram following doubled in the two days after the Post.  Exhibit 101 at ¶ 7.

Additionally, visits to Drake's undergraduate programs webpage tripled and traffic to the campus visit webpage doubled. *Id*. at ¶ 8. Visitors to Drake's undergraduate application webpage more than doubled. *Id*. at ¶ 8.

The visit was no fluke, but the result of Drake (the university)'s "Bring Drake to Drake" campaign that made international headlines. Exhibit 102. In support, legendary Iowa t-shirt maker RAYGUN created a design (still available today) with Drake (the rapper)'s head superimposed on Marching Spike, which prominently features a standalone "D" on the rapper's chest. Dkt. 1.59.

### b)   *"Mr. Drake" & the "Face of Drake Athletics"*

Paul Morrison was a Drake alumnus who returned to Drake in 1945 to direct the Drake News Bureau. After retiring in 1986, Mr. Morrison continued as a volunteer historian for Drake's athletic department. Mr. Morrison was known on campus as "Mr. Drake" and was honored by renaming a portion of Forest Avenue in Des Moines, near Drake's campus, to Paul F. Morrison Way. Mr. Morrison often made public appearances wearing the Jacket. Dkt. 1.60.

Second only to Griff as the "Face of Drake Athletics" is Michael Admire. Mr. Admire serves as Director of Broadcasting and can usually be found courtside as a play-by-play broadcaster for Drake basketball games. Looking to connect his work with Drake's long history of excellence both on and off the court, Mr. Admire adopted a Vintage Drake "D" sweater—an homage to Marching Spike—as his uniform, both in front of and behind the camera. *See* Dkt. 1.61–65.

Griff, Drake (the rapper), Mr. Morrison, and Mr. Admire each demonstrate that the brandishing of a standalone "D" is ubiquitous with Drake University and its alumni, academics, athletics, as well as Drake's connection to the local community and the public generally.

### 4.    The Drake Colors

Since 2016, Drake has consistently used the following primary and secondary colors to denote the source of its goods and services (the "**Drake Colors**"):

 

The Drake Colors are present on Drake's website, recruiting and admission materials, Griffmobile, Drake's track where the world-famous Drake Relays take place (i.e., the Blue Oval™), fire hydrants on campus, and many other places. *See* Dkt. 1.66–70.  The intrinsic nature of the Drake Colors is reflected by RAYGUN offering a t-shirt featuring the Athletic "D" under the all-capitalized text:  DES MOINES LOOKS GREAT IN BLUE.  Dkt. 1.71.

### 5.    The Drake Seal

Since the 1900's, Drake has used an institutional seal (the "Drake Seal") to denote the source of its educational services. The Drake Seal features a traditional lamp of learning (or knowledge) illuminating an open book.  Dkt. 1.31.  The Drake Seal appears on numerous Drake materials, including diplomas, degrees, commencement programs, and official correspondence.

### 6.    Drake's Archive and Brand Guide

Drake maintains a public archive of historical materials, including yearbooks, photographs, marketing materials, student newspapers, commencement programs, and information on notable events and alumni (the "**Archive**").  Exhibit 101 at ¶ 10.  The historical imagery discussed herein is largely available in the Archive.  Use of the standalone "D" is seen throughout.

Drake also maintains a Brand Standards & Style Guide (the "**Brand Guide**") which sets forth some of the elements of Drake's brand, including fonts, colors (including Pantone codes for the Drake Colors), trademarks (including the Modern Drake "D"), and the parameters within which

such materials should be presented.  *Id*. at ¶ 11.  While publicly accessible, the Brand Guide is only intended for internal use by departments operating within Drake University.  *Id*. at 12.

### 7.    The Drake Brand

The "**Drake Brand**" is comprised of one or more of the devices, names, and symbols reflected in (1) the standalone "D," (2) the Vintage Drake "D," (3) the Academic "D," (4) the Athletic "D," (5) the Drake Colors, (6) Griff and his apparel; (7) the Jacket, (8) Marching Spike, and (9) the Drake Seal.  The preceding elements, both alone and in combination, are known as designating and symbolizing the goods and services of Drake University.

Drake has expended substantial time, money, and resources to develop, secure, and promulgate the Drake Brand.  The Drake Brand is distinctive to both the consuming public and Drake's trade.  As a result of Drake's expenditures and efforts, the Drake Brand has come to signify the high quality of Drake's post-secondary educational services, athletics, and ancillary goods and services, and has acquired incalculable distinction, reputation, and goodwill belonging exclusively to Drake.

### B.  DMACC

DMACC is a public community college that originated in the Des Moines area in 1966. DMACC presently operates six campuses and seven learning centers in central Iowa.  Exhibit 103. DMACC touts itself as the largest college in Iowa with the lowest tuition and fees of any college in the state.  Exhibit 104. DMACC partners with other educational institutions to offer four-year degrees.  Exhibit 103. During the 2022–23 academic year, DMACC served more than 72,000 students across its various levels of education.  *Id.*  Since 2015, DMACC has invested $100 million in new and renovated facilities.  *Id.*

### 1. DMACC's Former Brand

From 1988 to 2023, DMACC utilized the design seen in Dkt. 1.72 as its primary logo in connection with post-secondary educational and athletic services (the "Former Logo"). Its color scheme during this period was usually navy blue and red/orange ("Former Colors").



DMACC used its Former Logo and Former Colors on many official college materials, including its website, Facebook pages, campus buildings, and recruitment materials. *See* Dkt. 1.74–77. Drake is unaware of any time before October 2023 that DMACC used a standalone "D" to denote its name or the source of its goods and services. From 1966 to 1972, DMACC utilized institutional seals featuring the lamp of learning (without a book) encircled by the forms of education available at DMACC, e.g., technical, vocational, etc. *See* Dkt. 1.73. DMACC stopped using a seal in 1973 and has not used one since. *Id.*

### 2. DMACC's Rebrand

In late 2023, DMACC announced its first rebrand in 35 years (the "**Rebrand**"). The Former Logo was jettisoned for a prominent block-style collegiate "D" (the "**DMACC 'D'**"):



*Dkt. 1.78*

Since launch, DMACC has used the ™ symbol positioned to the lower right of the DMACC "D." *See* Dkt. 1.78. The ™ symbol is used to notify the public of a claim of trademark rights. DMACC also changed its color scheme, lightening its traditional primary navy blue to a royal blue, and

abandoning its red/orange secondary color in favor of a light blue (the "**New DMACC Colors**").
*See* Dkt. 1.78.  DMACC has also adopted an institutional seal (the "**New DMACC Seal**") to denote
the source of its educational services.  Dkt. 1.80.  The New DMACC Seal features a lamp of
learning, which for the first time in the institution's history is illuminating a book like the Drake
Seal.  *Id.*  DMACC has filed for federal registration of the DMACC "D" and New DMACC Seal.

DMACC's Rebrand was all developed internally.  Exhibit 105, at 2.  In a press release
announcing the Rebrand, President Rob Denson said the Rebrand is the result of several years of
research and collaboration, noting that much has changed in higher education since 1988:

> During that time, DMACC has nearly tripled in size, both in student enrollment and
> the number of facilities and locations we have; however, we've also worked hard
> to maintain our strong commitment to keeping costs down for students.  DMACC
> is dedicated to offering high-quality, accessible, and affordable education, with
> tuition and fees that are among the lowest in Iowa.

Exhibit 106, at 1.  Erica Spiller, DMACC's Vice President of Student Affairs, explained how the
Rebrand would help DMACC compete with other collegiate institutions:

> This brand change also relates to how we serve and support students.  People of all
> ages are choosing to attend DMACC based on the affordable, flexible and excellent
> education they receive here, along with a vibrant college experience.  DMACC is
> one of the largest undergraduate institutes in Iowa, and we want to embrace our
> collegiate atmosphere as we work to further connect with our students' needs and
> goals.

*Id.*  DMACC's Director of Marketing and Public Relations Todd Jones continued the theme:

> A brand is more than a slogan, logo, or new graphics; it's an overall identity and
> helps shape how a company, organization, or educational institution is perceived
> by the people it serves.  This is an important opportunity for DMACC to continue
> to grow and modernize while highlighting its reputation as one of the leading
> educational institutions in the state of Iowa.

*Id.*, at 2.

To paraphrase Mr. Jones: to modernize its image and perception, DMACC adopted a
vintage-style "D" that has been used by its closest neighbor for the last 100-plus years.

### 3.    Launch of DMACC's New Brand

DMACC's launch of its new brand has been all-encompassing.  DMACC splashes the DMACC "D" and New DMACC Colors on billboards, tractor trailers, online videos, college merchandise, social media, advertisements, recruitment materials, podiums, banners, wall coverings, and basketball courts.  *See, e.g.*, Dkt. 1.81–87.  DMACC ran at least one TV ad touting its Rebrand during the record-breaking Women's NCAA basketball championship game between South Carolina and the Iowa Hawkeyes, which drew 24 million viewers.  Exhibit 107.

DMACC also rolled out merchandise heavily featuring the DMACC "D" unaccompanied by "DMACC" and often presented in DMACC's New Colors.  *See* Dkt. 1.82–86.  According to DMACC's online bookstore, its 12 most popular items all feature the DMACC "D" unaccompanied by "DMACC."  Dkt. 1.87.

### 4.    DMACC's Pre-Launch Investigation

DMACC reviewed Drake's internal Brand Guide prior to announcing the Rebrand.  Dkt. 1.97, at 6.  Upon information and belief, during the several years of development, DMACC did not review the Archive nor obtain consent from or seek to apprise, discuss, or consult with Drake before launching the Rebrand.

### 5.    Public Reaction to the Rebrand

DMACC's rollout immediately generated comparisons to Drake.  Commenters on a Des Moines Register Facebook post announcing the Rebrand posted:

a.   "**DMACC** Bulldogs." (accompanied by the below image) (emphasis added).



b.  "Looks a lot like Drake."

c.  "Very similar to Drake."

d.  "Looks kinda familiar."

e.  "What a waste of time and effort and cost to make this change when it looks so similar to Drake.  Why?"

f.  ". . . it immediately reminded me of [Drake's] old logo ….  Like are they wanting to be called Des?  They have focused on the first letter of an acronym."

Dkt. 1.88.

The first comment on DMACC's own Facebook post about the Rebrand in November 2023 reads: "Isn't Drake University gonna be pissed you stole their D?" Dkt. 1.89.

### 6.    The Rotary Club Incident

Within months of the launch, the Rotary Club of Des Moines held a holiday event, a portion of which included partygoers sitting on Santa Claus's knee.  DMACC's Todd Jones, mentioned above, attended the event.    Santa Claus and Mr. Jones discussed the Rebrand and DMACC's updated logo, which was captured on video.  *See* Dkt. 1.90.  With Mr. Jones on his knee, Santa Claus gestured toward a projector screen showing the Athletic "D" side-by-side with the DMACC "D" with a "vs" between the two.  *Id.*  Santa Claus then stated:

> Santa noticed the colors, though, for the front of that logo look a lot like Drake University's logo.  So, I think I am going to have to give you this book on *Trademark and Copyright Infringement for Dummies.*

Amid laughter and applause from the crowd, a man dressed as an elf approached the stage and presented a copy of *Trademark and Copyright Infringement for Dummies* to Mr. Jones.  *Id.*  Mr. Jones without protest only said, "Thank you, Santa."  Mr. Jones is a Drake graduate.

15

## III.    LEGAL STANDARDS

### A.    Threshold Inquiry for Injunctive Relief for Common Law Trademark Rights

While immaterial to the question of infringement, some elements of the Drake Brand are not registered trademarks; thus, Drake's common law rights must be established.  15 U.S.C. § 1125(a).  Such rights arise from adoption and use of "a word, phrase, logo, or other device" to identify one's goods or services.  *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996).  The owner must then show retention of exclusive rights to the mark for those goods and services within the geographic area of their market penetration.  *See Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 578 F.2d 727, 730 (8th Cir. 1978).   Here, Drake must prove (1) it uses the unregistered elements of the Drake Brand in connection with educational services, athletics, and ancillary goods and services in the relevant geographic area, and (2) the Drake Brand identifies Drake as the provider of those services in the minds of consumers.  *First Bank*, 84 F.3d at 1044.

### 1.    Drake is Actually Using the Drake Brand

Examples of Drake's Use of the Drake Brand in connection with educational services, athletics, and ancillary goods and services can be seen in Dkt. 1.1–71.  *See* Section II(A) et seq.

### 2.    The Drake Brand Identifies Drake as the Provider of Goods and Services

Whether a common-law trademark is a source identifier for the mark's owner depends on the mark's distinctiveness.  *First Bank*, 84 F.3d at 1045.  Arbitrary, fanciful, and suggestive marks are inherently distinctive.  *Id.*  Descriptive marks must acquire distinctiveness.  *Id.*  Here, the dominant elements of the Drake Brand include a standalone "D" and the Drake Colors.  Neither can be considered descriptive or suggestive as they do not describe or suggest Drake's goods or services, or their qualities.   Drake's marks are thus arbitrary and inherently distinctive.  *Id.*  Even

if this were not the case, the Drake Brand has acquired distinctiveness given its longstanding and exclusive use in Central Iowa in connection with its services and goods. *See* Dkt. 1.1–71.

### B.  Preliminary Injunctive Relief

Preliminary injunctions seek to preserve the status quo—meaning "the last, peaceable, non-contested status of the parties"—to prevent irreparable injury to a party until the merits of an infringement claim can be adjudicated. *4 McCarthy on Trademarks & Unfair Competition* § 30:50 (5th ed.); *see also Moon Seed, LLC v. Weidner et al¸* No. 3:20-cv-104, 2021 WL 2627455 at *6 (S.D. Iowa April 22, 2021) (enjoining defendant pending resolution).  At times, a preliminary injunction is "an act of kindness to the party enjoined," because it prevents them from endeavoring further into a doomed enterprise. *McCarthy,* § 30:33.  The Lanham Act authorizes the issuance of a preliminary injunction in favor of a trademark owner regardless of whether the mark is registered with the United States Patent and Trademark Office. *See* 15 U.S.C. § 1116(a).

This Court has broad discretion when ruling on a preliminary injunction. *See Coca-Cola Co. v. Purdy*, 382 F.3d 774, 782 (8th Cir. 2004).  In determining whether to grant such relief, the Eighth Circuit requires consideration of the (1) probability of success on the merits; (2) threat of irreparable harm; (3) balance of the hardships an injunction imposes; and (4) public interest. *Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  No one factor is determinative, but balancing these factors is not a rigid exercise. *Id*.  "[T]he question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

## IV.  ARGUMENT

### A.  Drake is Likely to Succeed on the Merits of its Claims

The threshold inquiry for a preliminary injunction "is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371

(8th Cir. 1991) (citations omitted).  To show this, the movant need only show "probability of success." *Dataphase*, 640 F.2d at 113.  Importantly, the stronger the likelihood of success on the merits, the less weight need be given other factors.  *Id; see also Barret v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (success on the merits is the most significant factor).  Upon such a showing, irreparable harm is **presumed**.  15 U.S.C. §1116(a).

### 1.    Drake is Likely to Prevail on its Lanham Act Claims

Likelihood of confusion is the hallmark of a trademark infringement claim under the Lanham Act.  *See SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  The Eighth Circuit considers six non-exclusive factors in determining whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the defendant's mark; (3) the competitive proximity of the goods and services; (4) the defendant's intent to confuse or mislead; (5) incidents of actual confusion; and (6) the degree of care exercised by the purchaser.  *SquirtCo.*, 628 F.2d at 1091.  The relevant question in any trademark infringement action is whether there is a likelihood of confusion as to the origin, sponsorship, or approval of a party's goods or services with another's.  15 U.S.C. §§ 1114(1); 1125(a)(1).

### a)    *The Drake Brand is Strong*

The stronger the plaintiff's mark, the greater protection it receives and the greater the chance of confusion.  *Sensient Techs Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 763 (8th Cir. 2010).  The two relevant measurements of a mark's strength are its conceptual and commercial strength.  *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th Cir. 2014).

### (1)  The Drake Brand is Conceptually Strong

Conceptual strength is based on a mark's classification along a spectrum of increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.  *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F.Supp.3d 695, 712 (D. Minn. 2021).  Arbitrary marks are those

that do not suggest or describe the goods or services and therefore are inherently distinctive and automatically entitled to the highest levels of protection. *Duluth News-Tribune v. Measaby Publ'g Co.*¸ 84 F.3d 1093, 1096 (8th Cir. 1996).

The Drake Brand is arbitrary, inherently distinct, and entitled to the highest degree of protection as no part of it suggests or describes any characteristic of Drake's goods or services, or even its location (i.e., Des Moines, Iowa). DMACC has in fact acknowledged through its counsel that a standalone block-style "D" is distinctive in the context of educational services. *See* Exhibit 98 at ¶ 109–110 (describing DMACC's new logo as "consisting of a distinct 'D' design").

### (2) The Drake Brand is Commercially Strong

Commercial strength is based on recognition of the mark among customers and potential customers, which can be evidenced by advertising, sales, and press, among other factors. *Am. Dairy Queen*, 543 F.Supp.3d at 713. Here, Drake has used a standalone "D" to denote its name and educational services for over a century and the Drake Colors for nearly a decade. While precise revenue expenditures are unavailable at this early stage, it is easily inferred the Drake Brand is commercially strong given the sheer length and breadth of use, as well as a century's worth of tuition dollars. Drake has also received unsolicited press by such national publications as the Wall Street Journal and the New York Times as offering high quality educational services, referenced *supra*. The first *SquirtCo.* factor thus weighs decisively in Drake's favor.

### b) DMACC's Rebrand is Virtually Identical to the Drake Brand

When comparing two marks, courts consider the marks' visual, aural, and definitional attributes, i.e., the "sight, sound, and meaning" test. *See Luigino's, Inc. v. Stouffer Corp*, 170 F.3d 827, 830 (8th Cir. 1999). Rather than comparing common components of the marks, courts must evaluate the overall impression that the marks—in their entireties—are likely to make on consumers. *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 446 (8th Cir. 2018); *see also Duluth*

*News-Tribune*, 84 F.3d at 1099.  Courts must focus on common dominant elements; when the dominant components of the parties' marks are the same, confusion is more likely.  *Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg., Inc.*, 296 F.Supp.2d 983, 994 (S.D. Iowa 2003).  When the marks are identical and used for the same goods or services in the same geographic area, a likelihood of confusion is **presumed**.  *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1010 (8th Cir. 2011) (internal quotations omitted).

The most dominant aspect of DMACC's Rebrand is the DMACC "D" followed closely by the New DMACC Colors.  The DMACC "D" is virtually identical to the Vintage Drake "D," and conceptually identical to Drake's standalone "D."  Of course, the two standalone D's sound the same.  The New DMACC Colors are exceptionally similar to the Drake Colors:



The parties also offer their respective post-secondary educational services in the same immediate geographic area.  Three of six DMACC campuses and four of seven DMACC learning centers are located within an 8-mile radius around Drake.  Maps illustrating this proximity can be seen at Dkt. 1.91–92.  Most striking is the short distance from Drake to DMACC's Urban Campus, which is located a mere 1.2 miles down University Avenue.  Dkt. 1.93.

These commonalities place this factor firmly in Drake's favor and require a **presumption** of a likelihood of confusion.  *See Cmty. of Christ*, 634 F.3d at 1010 (internal quotations omitted).

### c)    *Drake and DMACC Operate in Close Competitive Proximity*

The competitive proximity factor favors a plaintiff if the parties' goods or services are sufficiently similar that it would be reasonable for consumers to believe they come from the same source. *Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2005). This is a particularly important factor as the greater the similarity, the greater the likelihood of confusion. *Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc.*, 758 F.Supp. 512, 524 (E.D. Mo. 1991), *aff'd*, 989 F.2d 985 (8th Cir. 1993). Goods or services are in competitive proximity if their sales outlets, trade channels, and customers are similar or overlap. *Roederer v. J. Garcia Carrion, S.A.*, 732 F.Supp.2d 836, 864 (D. Minn. 2010). Direct competition is not required for this factor to favor the plaintiff. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005).

Both institutions provide post-secondary educational services to traditional and non-traditional students. Drake is physically encircled by DMACC campuses and learning centers. Both Drake and DMACC advertise their educational services in, offer their educational services in, and draw prospective students from central Iowa. *See* Sections I(A)–(B). Drake (through its John Dee Bright College) and DMACC each offer two-year Associate of Arts degrees. Drake and DMACC (through its UNI@DMACC partnership) each offer four-year bachelor's degrees.

While competing in some areas, Drake and DMACC collaborate in others. For example, DMACC promotes its partnership with Drake, including its Articulation Agreements and Drake Admission Partnership Program ("DAPP"), which is for DMACC students who attend DMACC for at least a year before transferring to Drake to complete their bachelor's degree. Exhibit 108. DAPP includes guaranteed admission to Drake and transfer support after successful completion of DMACC coursework. *Id*.

This factor resolves in Drake's favor even without the striking visual similarities of DMACC's marks. *SquirtCo.*, 628 F.2d at 1091 ("[w]here the [services] are closely related, less similarity in the trademarks is necessary to support a finding of infringement.").

### d) DMACC's Conduct Implies Intent to Confuse or Mislead

An intent to confuse or mislead supports a likelihood of confusion finding because it is assumed the defendant can carry out its intentions successfully. *See, e.g., Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir. 1965). A defendant's adoption of a similar mark, particularly when there is a prior relationship between the parties, substantially increases the likelihood of an intent to deceive. *Insty*Bit, Inc. v. Poly-Tech Ind., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996).

> It is so easy for the honest businessman, . . . to select from the entire material universe [of]. . . symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

*Aveda Corp. v. Evita Mktg., Inc.*, 706 F.Supp. 1419, 1430 (D. Minn. 1989) (quoting *Florence Mfg. Co. v. J.C. Dowd & Co.*, 178 F.73, 75 (2d Cir. 1910)).

The parties are undoubtedly aware of each other given their proximity and partnership. *See* Exhibit 108; Dkt. 1.91–92. Again, Mr. Jones, who presumably spearheaded the Rebrand, holds a degree from Drake. These facts alone support an inference of intent. *Insty*Bit*, 95 F.3d at 671.

### (1) DMACC's Rebrand Defies Several Naming Conventions

The "D" in DMACC's new logo supposedly means "Des Moines." This raises suspicions regarding DMACC's intent, as it is rare[2] for "Des Moines" to be abbreviated by a standalone "D." The following table shows non-exhaustive instances where "DM" or "DSM" denotes Des Moines.

---

[2] Des Moines Area Regional Transit Authority (DART) is the only example counsel is aware of. It is self-apparent this was done for (1) pronunciation and (2) allusion to DART's speediness. DMACC can claim neither in its adoption of a standalone "D."



| | | | | |
|---|---|---|---|---|
| DSM Magazine | Des Moines Int'l Airport Code | Des Moines Int'l Airport Slogan | Greater Des Moines Partnership | Invest DSM |
| Des Moines Music Coalition | Des Moines West Side Chamber of Commerce | Fuse DSM – Your Chamber of Commerce | Catch Des Moines | Dam to DSM Half Marathon |
| IMT Des Moines Marathon | Des Moines Golf & Country Club | The Heart of Des Moines Coalition | Des Moines Area Religious Council | Des Moines Area Assoc. of Realtors |
| Des Moines Homebuilders Assoc. | Des Moines Youth Hockey Assoc. | Lift DSM | www.dsm.city<br>City of Des Moines Website | Des Moines Officials Association |

DMACC also diverged from standard naming conventions for Iowa institutions. It is atypical to use only one letter if the name or town consists of multiple words, as shown below.

| | | | | |
|---|---|---|---|---|
| Des Moines University | Iowa State University | University of Northern Iowa | Briar Cliff University | Grand View University |
| Northwest Iowa Community College | Eastern Iowa Community Colleges | Iowa Central Community College | Iowa Western Community College | Indian Hills Community College |
| | William Penn University | Buena Vista University | Des Moines Area Community College | |



Even where college names begin with the same letter, they avoid confusion by utilizing different color schemes.  Both the University of Iowa and Iowa State University occasionally utilize only an "I" to denote their names.  However, not only does "I" stand for the same word ("Iowa"), but both institutions utilize their own distinct colors schemes.



DMACC's new logo also uses a block-style font in all-capital letters, which is traditionally reserved for a university, which DMACC is not.  Examples include:



Simply put, it is not customary to abbreviate "Des Moines" as a single "D."  It is also not customary to abbreviate a college name using only the first letter of the first word in a multi-word name or city.  In the event two colleges *do* use the same letter, it is not customary to use the same colors, particularly if they are in the same state (let alone the same city, as in the present case).  Finally, it is not customary for a community college to use block-style all-capital letter font, as that font traditionally denotes a university.  DMACC has diverged from all of these.

Since its founding in the 1960s and until late last year, DMACC adhered to each of these norms. It abbreviated to DMACC with the DM standing for Des Moines, used a high contrast red/orange in conjunction with a navy blue, and presented its brand in a serif typeface. It is simply not credible that DMACC accidentally adopted a standalone "D" in block-style font in Drake's colors in contravention of all these norms. Diverging from standard practice, by definition, requires intention. The Court should find such intent here.

### (2) DMACC Misled Drake During Pre-Filing Communications

DMACC's intent to mislead is shown in correspondence during the *months* leading to this lawsuit. In response to an email from Drake President Marty Martin inquiring about DMACC ensuring the DMACC "D" would always be accompanied by the full abbreviation for DMACC, DMACC's President Rob Denson stated "**YES, we will only use the 'D' with 'DMACC' under it.**" Dkt. 1.97, at 4 (emphasis added). A week later, Mr. Denson emailed Mr. Martin again, stating, "[a]s further assurance, the actual [trademark application] we filed has the DMACC under it so **we will never use [the 'D'] without the DMACC**." Dkt. 1.97, at 3 (emphasis added). Mr. Denson doubled down on this statement the next day in another email to Mr. Martin: "[n]o one is confusing Drake and DMACC based on these very different "D" marks, **particularly as our "DMACC" will be present.** Dkt. 1.97 at 1 (emphasis added). In a letter from DMACC's counsel, who despite having ample opportunity to investigate this matter, stated unequivocally that DMACC's new logo "consist[s] of a distinct "D" design **always accompanied by the "DMACC" name**." Exhibit 98 at ¶ 14. (emphasis added).

At the time each of these statements were made, which occurred over months, DMACC was already using the prominent DMACC "D" without "DMACC." The usage was seen on campus, on merchandise, social media, and elsewhere. *See, e.g.*, Dkt. 1.81–87. It is without question that since launch of the Rebrand, DMACC has continuously used the DMACC "D" on

its own without "DMACC" being present and was doing so when DMACC's president and legal counsel gave assurances that would **never** happen.

The foregoing demonstrates either a reckless disregard and oversight as to how the DMACC brand is used, or an intent to deceive. DMACC cannot claim good faith ignorance of how its own marks are being used. *See Playboy Enters*, 354 F.3d at 1029 (finding evidence of defendant doing nothing to alleviate confusion, even when asked to do so, is evidence of an intent to confuse). Accordingly, this factor weighs strongly in Drake's favor.

### (3) DMACC's Conduct Implies Reckless Disregard for Others' Rights

Even absent intent, DMACC's adoption of the Rebrand was, at best, reckless. Any reasonably competent trademark search for DMACC's proposed (1) standalone "D" and (2) new colors would have returned references to the Drake Brand. This gives rise to two possible scenarios: DMACC conducted no such search, which would contribute to this case being exceptional under the Lanham Act, or DMACC did conduct a search, yet proceeded with the Rebrand anyway with full knowledge of Drake's rights. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 33 (1st Cir. 2002) (citing lack of a trademark search despite knowledge of plaintiff's mark as contributing to finding exceptionality). Either scenario demonstrates a marked lack of concern for other trademark rights holders. Given that the Rebrand was developed internally, DMACC has no one to blame but itself. Exhibit 105, at 2.

Drake is not the only institution whose marks DMACC has freely misappropriated. Last November (after the Rebrand), DMACC's Campus Recreation announced on its Facebook page that some intramural volleyball games were being rescheduled. Exhibit 109. Inexplicably, the post used an image from Denison University that featured Denison's registered trademark. Exhibit

110; *see also* Exhibit 111 (excerpt of letter from DMACC's own counsel, who cited Denison University's registration in response to a letter from Drake's counsel).



*Exhibit 109*                                    *Exhibit 110*

*Exhibit 111*

When viewed in the wider context of this dispute, the foregoing demonstrates either a pattern of intent to improperly co-opt others' trademarks, or, at the very least, an alarming lack of regard about doing so.  Both invoke the same concern, i.e. increasing the likelihood that confusion is occurring.  *Playboy Enters.*, 354 F.3d at 1028.  This factor weighs strongly in Drake's favor.

### e)    *Actual Confusion*

Actual confusion is perhaps the most effective way to prove a likelihood of confusion.  *See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).  Upon information and belief, actual confusion has occurred and will continue to occur.  *See* Exhibit 112. The public reaction set forth in Section II(B)(5) that immediately drew comparisons between the Rebrand and the Drake Brand further demonstrates that actual confusion is unquestionably occurring.  The extent of actual confusion has yet to be determined at this preliminary stage, but

this does not weigh against Drake, as actual confusion is not required to award preliminary injunctive relief. *SquirtCo.*, 628 F.2d at 1091; *see also Moon Seed*, 2021 WL at *7.

<u>Amendment:</u> On July 9, 2024 (the day after this brief's original filing), Des Moines news outlet KCCI Channel 8 posted a video segment on its website showing the reaction of people on the street to the allegations in Drake's Complaint (the "Video"). Exhibit 120. The coverage involved showing interviewees images of merchandise featuring the DMACC "D" and asking which school they belonged to. *Id.* The Video shows at least two people mistakenly identifying DMACC merchandise as Drake merchandise. *Id.*



*Excerpt of Exhibit 120*

This "[e]vidence of actual confusion is undoubtedly the best evidence of a likelihood of confusion." *Iowa Paint*, 296 F.Supp.2d at 997 (citations omitted).

### f) Degree of Care

"The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 285–86 (6th Cir. 1997). In other words, the more similar the marks, the less consumer sophistication matters. Here, the marks at issue are virtually identical, which severely diminishes the relevance of this factor, which nevertheless weighs in Drake's favor.

Confusion is evaluated from the perspective of the "ordinarily prudent purchaser." *Elec. Commc'ns, Inc. v. Elect. Components for Indus. Co.*, 443 F.2d 487, 492 (8th Cir. 1971). A

purchaser's expertise or the cost of the relevant services "does not necessarily preclude customers from mistaking one trademark for the other when the marks are [] similar" and cover services "in the same field." *Induct-o-Matic Corp v. Inductotherm Corp.*, 747 F.2d 358, 364–65 (6th Cir. 1984) (internal marks and citations omitted). "[C]onfusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about [an expensive] instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Daddy's Junky Music*, 109 F.3d at 285–86; *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1120–21 (6th Cir. 1996) (noting golfers spending $15,000 on club membership fees can be confused between two courses using the same mark). Moreover, the Eighth Circuit has established that infringement is not limited to confusion at the time of purchase. *See Insty*Bit*, 95 F.3d at 671–72 (noting Lanham Act eliminated reference to "purchasers").

The typical purchasers of educational services are prospective students. While that normally brings to mind those graduating high school (i.e., children on the cusp of adulthood), it also includes any person seeking a way to improve their socioeconomic situation or employment. This latter group may not consider that further education is a means to that end.

While college is certainly no small expense, even the "tremendous" cost of law school and relative sophistication of prospective law students, that sophistication applies *only* at the point of sale; it does not foreclose "initial interest" confusion. *See Bd. of Regents of the Univ. of Houston System v. Houston College of Law, Inc.*, 214 F.Supp.3d 573, 597–98 (S.D. Tex., 2016).

> Prospective law students are not endowed with an inbuilt knowledge of the legal education industry. It is only after their interest in legal education is first piqued that they begin the process of *becoming* sophisticated. In other words, there exists a period of time in every prospective law student's career where, not only is he unsophisticated, he knows practically nothing about the industry and is particularly susceptible to confusion.

*Id.* (emphasis in original).

If prospective law students lack the sophistication to avoid initial interest confusion when evaluating potential law schools, the same must be true for prospective undergraduate students when evaluating potential undergraduate programs, vocational training, or continuing education. Thus, even though this factor is largely irrelevant given the near identity of the parties' marks, it weighs strongly in Drake's favor.

> g)    *Summary of SquirtCo. Factors Shows Drake is Likely to Succeed on the Merits*

Considering the strength of the Drake Brand, the significant visual and auditory similarity between the parties' marks, the close degree of geographic and competitive proximity between Drake and DMACC, and DMACC's knowledge of and intent to trade off Drake's strong reputation, the *SquirtCo.* factors weigh decidedly in Drake's favor. Plaintiff has thus demonstrated a strong likelihood of success on its Lanham Act trademark infringement claim.

> **2.    Drake is Likely to Prevail on its Unfair Competition and Dilution Claims**

> a)    *Unfair Competition*

Even if Drake could be deemed unlikely to prevail on its trademark infringement claims, there is no doubt DMACC is engaging in unfair competition. In reporting the bill that became the federal Lanham Act (1946), the Senate Committee on Patents said:

> There is no essential difference between trademark infringement and what is loosely called unfair competition. Unfair competition is the genus of which trademark infringement is one of the species; . . . All trademark cases are cases of unfair competition and involve the same legal wrong.

S. Rep. No. 1333, 79th Cong., 2d Sess., 1946 U.S.C.C.A.N. 1275. Hence, unfair competition covers misconduct beyond mere trademark or trade dress infringement.

Under Iowa law, the doctrine of unfair competition addresses the question of a defendant's methods and representations in *marketing* its goods or services—not its right to make or offer them. *Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 231 (Iowa 1977); *see also Books are Fun,*

*Ltd. V. Rosebrough*, 2007 WL 9711266 at *25 (S.D. Iowa Mar. 29, 2007) (noting *Basic Chemicals* is the most recent Iowa Supreme Court case informing the unfair competition analysis).  The doctrine is applied in cases where one has established its business using certain marks or symbols, such that they have become known generally as designating the services of that person.  *See Motor Accessories Mfg. Co. v. Marshalltown Motor Material Mfg. Co.*, 149 N.W. 184, 186 (Iowa 1914). The object of the law is to protect those marks from invasion by others who seek to, and do, take the custom, goodwill, and the business connected to such marks.  *Id.*  "There is no practical way. . . to prevent the filching of trade established by one in [a good or service] through a name, symbol, or mark, than by prohibiting the use of [it]."  *Id.*

Here, DMACC has altered every contour of its identity to emulate Drake.  DMACC has adopted a standalone "D" to denote the source of post-secondary educational services, which Drake has been doing with exclusivity in DMACC's market area for at least the last 100 years. DMACC has also adopted a new color scheme, which Drake has been using with exclusivity in DMACC's market area for almost a decade.  DMACC has further moved to adopt an institutional seal—for the first time since 1972—that is highly similar to the Drake Seal.  *Cf.* Dkt. 1.31, 1.80.

It is simply too large a coincidence for DMACC to claim this assumption of Drake's very identity was not by design.  "The essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another, and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances."  *Johnson Gas Appliance Co. v. Reliable Gas Prods. Co.*, 10 N.W.2d 23, 27 (Iowa 1943) (citations omitted).

There are only four colleges or universities in Des Moines: Drake, DMACC, DMU, and Grand View.  There is no logical explanation as to why DMACC would adopt the brand elements

of the most prestigious of the group. Exhibits 99, 100. It can be plainly inferred from the foregoing that DMACC intends to capture some of Drake's goodwill and reputation for itself. DMACC has publicly stated that the Rebrand is intended to represent three characteristics: (1) affordability; (2) accessibility; and (3) excellence. Exhibit 106. The first two are quantifiably demonstrated by DMACC's tuition, student size, and geographic footprint. Exhibit 103. DMACC's historical webpage highlights both cost and access. Exhibit 113. Excellence is not so simply demonstrated or achieved. Exhibits 99, 109. It takes decades, or even a century to establish in the minds of consumers; unless, of course, it is filched from the competition.

Drake is therefore likely to prevail on its unfair competition claims, for which the only "practical way" to remedy is through injunctive relief. *Motor Accessories*, 149 N.W. at 186. Drake requests this Court exercise its equitable power to prevent this "filching" of its goodwill by granting the present motion.

### b)    *Dilution*

The owner of a mark which is famous in Iowa is entitled to an injunction against another's use of the mark which causes dilution of the distinctive quality of the owner's mark, as well as additional remedies if the user intended its use to have this effect. Iowa Code §548.113. Dilution occurs when consumers associate a famous mark with a new and different source. *Luigino's*, 170 F.3d at 832. Section 548.113 sets forth seven nonexclusive factors for determining whether a mark is famous in Iowa, including (a) the degree of inherent distinctiveness of the mark; (b) the duration and extent of use of the mark in connection with the owner's goods and services; (c) the duration and extent of advertising and publicity of the mark; (d) the geographic scope of the owner's trading area; (e) the trade channels for the goods and services with which the mark is used; (f) the degree of recognition of the owner's mark in its and the other's trading areas; and (g) the nature and extent of use of the same or similar mark by third parties.

There is no doubt the Drake Brand is famous in Iowa.  As many of these factors overlap with the infringement analysis conducted above, Drake hereby incorporates them by reference and will not reproduce them exhaustively here.  However, each factor can be succinctly met:  the Drake Brand (a) is inherently distinctive as it comprises arbitrary symbols related to education and related goods and services; (b) has elements that have been in use for decades if not its 143-year history and that are (c) marketed extensively; (d) is present in the same geographic trade area and (e) in the same trade channel as DMACC; (f) is associated by the relevant public with Drake (*see, e.g.*, Dkt. 1.88–89); and (g) is, upon information and belief, prior to October of 2023, the only college or university brand in Iowa to use a standalone "D" to denote its name or the source of its goods and services.

The foregoing is more than sufficient to find the Drake Brand and its constituent parts famous in Iowa.  For all the reasons set forth above, DMACC's Rebrand is causing consumers to associate the famous Drake Brand with a new and different source, i.e., DMACC.  Drake is thus likely to prevail on its state law dilution claim.

### B.    Drake is Incurring Irreparable Harm

#### 1.    Irreparable Harm May Be Presumed

A plaintiff **shall** be entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits.  15 U.S.C. § 1116(a).  Drake has demonstrated it is likely to prevail on its infringement claims, which entitles it to a presumption of irreparable harm.

#### 2.    Drake's Irreparable Harm is Demonstrable

DMACC began as a vocational and technical learning center in Des Moines. Exhibit 113. In the late 1980s, DMACC began offering a set of general education courses that virtually every bachelor's degree requires, which allowed students to reduce the costs to obtain credits with limited application to their eventual emphasis of study.  *Id*.  After completing these "gen eds" at

DMACC, students could then transfer to four-year institutions to complete the courses tailored to their desired area of expertise. *Id.*

The model proved successful, and DMACC has expanded aggressively. Exhibit 114. Between 2000 and 2009, DMACC built or renovated at least seven major additions to its campuses, including the sleek West Des Moines Campus, the Betts Building on DMACC's Urban Campus just down the road from Drake, the Hunziker Career Academy in Ames, the state-of-the-art Health Sciences facility and a new 60,000 square foot classroom, office, and conference center at DMACC's Ankeny Campus, the Jasper County Career Academy on DMACC's Newton Campus, and student housing at its Boone Campus. *Id.* This was all overseen by DMACC's newly-appointed (and current) president, Rob Denson. During this period, DMACC's enrollment soared; in one year alone (2009), fall enrollment increased 19.4%. *Id.*

DMACC's growth continues at a startling rate. DMACC serves an area that is home to 20% of Iowans and served over **72,000** individuals during the 2022–2023 academic year. Exhibit 113. That is more than the enrollment of the University of Iowa, Iowa State University, and the University of Northern Iowa **combined**. Exhibits 115–117. DMACC has a footprint of 2.3 million square feet spread among 62 buildings. Exhibit 103. Since 2015, DMACC has spent $100 million on new and renovated facilities and in 2023 received $14.5 million in grants. *Id.*

Undoubtedly DMACC has no intention of slowing its expansion in Iowa's post-secondary education market. Indeed, DMACC has formally aligned its services with at least nine Iowa colleges and universities. Through its UNI@DMACC partnership, for instance, DMACC students can earn a bachelor's degree from the University of Northern Iowa ("UNI") in a variety of disciplines. Exhibit 118. DMACC's website also highlights the Drake Admission Partnership Program ("DAPP"), which provides for guaranteed admission to Drake after successful

completion of DMACC coursework.  Exhibit 108.

This mix of competition and collaboration between DMACC and Drake means Drake is uniquely susceptible to brand erosion.  By partnering with four-year colleges, DMACC offers students a way to obtain a four-year degree and pay less for it.  This is consistent with DMACC's strategy of offering students a more financially accessible path to higher education.

This leaves only the issue of **legitimacy**.  Enter the Rebrand.  By adopting Drake's brand identity and offering four-year degrees (including from Drake), DMACC is effectively able to market itself an institution from which those in Iowa's most populated city can obtain a four-year degree without having to move, i.e. "Drake, but cheaper."  We thus arrive at the only logical explanation for DMACC's conduct: to get so close to Drake that the only perceived difference between the two is cost.

**To be perfectly clear**: Drake takes no issue with DMACC (or any other institution) competing to offer the best educational experience for the lowest cost—hence Drake's John Dee Bright College that competes fairly with DMACC by offering associate degrees under the Drake Brand.  The problem here is that *DMACC* is now also offering associate degrees under the Drake Brand, and is thus not competing fairly.  This harms the distinctiveness of the Drake Brand and its goodwill, portions of which have been used exclusively by Drake in Iowa since the 1900s.

Despite its long and storied history, Drake is small compared to DMACC.  During the 2022–2023 academic year, Drake's undergraduate enrollment was just over 2,700 students, and total enrollment at just over 4,500—$^1/_{16}$ of DMACC's consumers.  Exhibit 119. To illustrate the immense harm that is presently being inflicted on Drake because of DMACC's Rebrand, consider this striking figure: generously assuming an average annual enrollment at Drake of 3,500 students

since its founding in 1881, DMACC will expose more people to the DMACC "D" in **seven years** than Drake will have in its entire history.[3]   If that isn't irreparable harm, nothing is.

### C.  The Balance of Hardships Favors Drake

The Court must "balance[] the harm [the Plaintiff] will face if the injunction is not granted with the harm [Defendants] will face if the injunction is improperly granted." *Kuper Indus., LLC*, 89 F.Supp.3d 1005, 1013 (D. Neb. 2015).  The balance of hardships is not affected by the fact that the defendant can no longer run its business using a mark it was not entitled to use initially.  *See, e.g.*, *E.A. Sween Co. v. Deli Express of Tenafly, LLC*, 19 F.Supp.3d 560, 577 (D. N.J. 2014) ("The only 'hardship' imposed upon Defendant is that it refrain from engaging in unlawful conduct.").  A defendant's continued infringement after being notified of a plaintiff's protected marks supports a finding of this factor in the plaintiff's favor.  *Id.*  This factor also favors a plaintiff when, as here, defendant's harm is self-inflicted, which courts find to be "far outweighed by the immeasurable damage done [to plaintiff] by the infringement of its trademark[s]."  *See, e.g., Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004).

DMACC was resoundingly informed of its infringement immediately after the Rebrand—from Drake, through public comment, and from Santa Claus himself.  If this Court grants the present motion for injunctive relief, the only "harm" to DMACC would be that it must revert to using "DMACC" and its prior colors.  No name change is required.  *Cf. Moon Seed*, 2021 WL at *7 (granting preliminary injunction requiring defendant to cease use of its business name immediately even though the disputed mark was in use for approximately nine months).

DMACC has had exceptional success under its prior brand.  Exhibit 103.  Granting the

---

[3]

| | | |
|---|---|---:|
| Drake students per year | | 3,500 |
| Years Since 1881 | x | 143 |
| "Drake Enrollment since 1881" | | 500,500 |
| Individuals served by DMACC annually | ÷ | 72,000 |
| | | 6.95  years |

present motion will not affect DMACC's core business in any way; it would merely require DMACC to stop using the DMACC "D" and the New DMACC Colors. It cannot seriously be argued that the harm to Drake—which has spent a century and great sums building its brand—is outweighed by the harm to DMACC, which only just began using the marks at issue, has achieved great success under its prior marks, and is intent on continuing its growth on the back of Drake's hard-won reputation.

### D.   The Public Interest Justifies Preliminary Injunctive Relief

Courts have consistently found that there is a strong public interest in preventing confusion in the marketplace.  *See Aveda*, 706 F.Supp. 1419 at 1431–32; *see also E.A. Sween Co.*, 19 F.Supp.3d at 577; *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F.Supp.2d 781, 797 (W.D. Tex. 2009).  A trademark's purpose is to protect the public from confusion about the identity of the enterprise from which goods and services are purchased.  *See Iowa Paint*, 296 F.Supp.2d at 1003.  Where a moving party demonstrates "not only that the nonmoving party's products are confusingly similar, but that misrepresentations of origin are being made in the marketplace, the public interest favors injunctive relief."  *Aveda*, 706 F.Supp. 1419 at 1432.

The public is not harmed by requiring DMACC to revert to its prior, successful branding. It does not serve the public by having two post-secondary educational institutions using the same symbolism to promote the same services to the same prospective student base in the same small geographic area.  It is self-evident that this factor weighs in Drake's favor.

## V.   CONCLUSION

For at least the foregoing reasons, Drake respectfully requests the Court grant the present motion and enter a preliminary injunction requiring DMACC to immediately cease use of (1) a standalone "D" and (2) a color scheme comprised only of blues and whites to denote the source of its educational services, athletics, and ancillary goods and services.

Respectfully submitted,

Dated: July 10, 2024                 **ZARLEYCONLEY PLC**

By:     /s/Joshua J. Conley
        /s/John D. Gilbertson
        Joshua J. Conley, AT0011828
        John D. Gilbertson, AT0014515
        580 Market Street, Suite 101
        West Des Moines, IA 50266
        Telephone:  (515) 558-0200
        Facsimile:   (515) 558-7790
        jconley@zarleyconley.com
        jgilbertson@zarleyconley.com
        **ATTORNEYS FOR PLAINTIFF**