**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| DRAKE UNIVERSITY, | Case No. 4:24-CV-00227-SMR-SBJ |
| Plaintiff, | |
| vs. | |
| DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE, | |
| Defendants. | |
| DES MOINES AREA COMMUNITY COLLEGE, | |
| Counterclaim Plaintiff, | |
| vs. | |
| DRAKE UNIVERSITY, | |
| Counterclaim Defendant. | |

**DEFENDANTS'/COUNTERCLAIM PLAINTIFF'S RESISTANCE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................ iv

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND—THE FACTS DO NOT SUPPORT DRAKE'S REQUEST
        FOR RARE, EXTRAORDINARY RELIEF. ....................................................... 5

        A.      DMACC Has Long-Standing Trademark Rights in Its Federally
                Registered "DMACC" Trademark and a Standalone "D"—Both of Which
                Are Incorporated in the Logo DMACC Began Using in October 2023. ............... 5

        B.      Drake Does Not Own The Letter "D" or The Color Blue; Instead, Drake
                Owns Only Three Federal Trademark Registrations Arguably Relevant to
                this Dispute—Two of Which Were Adopted in Drake's 2005 Rebrand. ............... 9

                1.      Countless Universities, Colleges, and Schools Use the Letter
                        "D"—Including DMACC. ............................................................ 9

                2.      Countless Universities, Colleges, and Schools Use the Color Blue
                        in Their Branding—Including DMACC. ....................................... 10

                3.      Drake's Trademark Registrations Have Three Different "Ds"—
                        Two of Which Also Require a Bulldog. ........................................ 10

III.    DRAKE IGNORES THE SCOPE OF ITS TRADEMARK RIGHTS IN
        SEEKING A RARE, EXTRAORDINARY REMEDY—DRAKE'S MOTION
        FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED. ................................. 11

        A.      Drake Cannot Satisfy the Exacting Legal Standard for the Extraordinary
                Remedy of a Preliminary Injunction. ..................................................... 11

        B.      Drake Will Not Succeed on the Merits—This is Reason Enough to Deny
                Drake's Motion. .......................................................................... 12

                1.      Drake Will Not Succeed on Its Lanham Act Claims and Common
                        Law Trademark Infringement and Unfair Competition Claims. .............. 12

                        a.      With the Exception of Its Three Registered Trademarks,
                                Drake Failed to Establish the First Required Element of
                                Counts 1-4—Ownership of a Valid, Protectible Trademark
                                for the Six Other Alleged Elements of the So-Called
                                "Drake Brand." ............................................................ 13

(i)    Drake Does Not Own The Letter "D" in All Shapes, Sizes, Colors, and Configurations. .......... 14

(ii)    Drake Failed to Establish Any Valid, Protectible Common Law Trademark Rights in "the Jacket," "the Drake Seal," and Griff and His Apparel and DMACC is Not Using Any of These......................................................... 17

(iii)    Drake Has Not Established Any Valid, Protectible Common Law Trademark Rights in Two Shades of Blue.......................................... 20

(iv)    Drake Has Not Established Any Valid, Protectible Common Law Trademark Rights in the "Vintage Drake 'D.'".................................. 23

(v)    Drake's Only Valid and Enforceable Trademarks Are Its Three Federally Registered Trademarks. ......................................... 26

b.    There is No Likelihood of Confusion Between Drake's Valid, Protectible Trademarks and the DMACC Logo. .............. 27

(i)    Drake's Registered Trademarks Are Weak and Commonplace and Entitled to A Limited Scope of Protection. ................................ 28

(ii)    The Parties' Marks Are Dissimilar. ...................... 30

(iii)    The Parties' Respective College and University Services are Not Directly Competitive............................................................ 33

(iv)    DMACC Never Intended to "Pass Off" Its College Services as the University Services of Drake. .............................................................. 33

(v)    There Is No Evidence of Actual Confusion. .......... 35

(vi)    The Purchasers of the Parties' Respective College and University Services are Sophisticated and Exercise Great Care Before Paying the High Cost of Post-High School Education. .................................................. 37

2.    Drake Will Not Succeed on Its Dilution Claim Under Iowa Code § 548.113................................................................................................ 38

C.      Drake Does Not Face Certain, Great, Imminent Harm—This is Also
        Reason Enough to Deny Drake's Motion. ............................................................ 39

D.      The Other Two Factors—Balance of the Harms and Public Interest—
        Weigh Against Injunctive Relief. ........................................................................ 42

IV.    CONCLUSION ................................................................................................................ 43

CERTIFICATE OF SERVICE .................................................................................................. 44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amer. Dairy Queen Corp. v. W.B. Mason Co.*,
   No. 18-cv-693, 2022 WL 2760024 (D. Minn. July 14, 2022) ........................................ *passim*

*Carson v. Simon*,
   978 F.3d 1051 (8th Cir. 2020) .....................................................................................12

*Cellular Sales, Inc. v. Mackay*,
   942 F.2d 483 (8th Cir. 1991) .......................................................................................29

*Couser v. Shelby Cty., Iowa*,
   681 F. Supp. 3d 920 (S.D. Iowa 2023) .......................................................................42

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
   640 F.2d 109 (8th Cir. 1981) (en banc) ...............................................................11, 39, 42

*Flavor Corp of America v. Kemin Indus., Inc.*,
   493 F.2d 275 (8th Cir. 1974) .......................................................................................25

*Forney Indus., Inc. v. Daco of Missouri, Inc.*,
   No. 14-cv-01326-CMA-MEH, 2015 WL 3457807 (D. Colo. May 29, 2015).........................22

*Gen. Mills, Inc. v. Kellogg Co.*,
   824 F.2d 622 (8th Cir. 1987) .......................................................................... *passim*

*Gen. Motors Corp. v. Harry Brown's, LLC*,
   563 F.3d 312 (8th Cir. 2009) .......................................................................................39

*H&R Block, Inc. v. Block, Inc.*,
   58 F.4th 939 (8th Cir. 2023) .......................................................................... *passim*

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*,
   182 F.3d 598 (8th Cir. 1999) .......................................................................................40

*Insty\*Bit, Inc. v. Poly-Tech Industries, Inc.*,
   95 F.3d 663 (8th Cir. 1996) .......................................................................................34

*Iowa Utils. Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) .......................................................................................39

*Jacobs v. Fareportal, Inc.*,
   No. 8:17CV362, 2020 WL 6587245 (D. Neb. May 29, 2020) ...............................................36

*JDR Indus., Inc. v. McDowell*,
   121 F. Supp. 3d 872 (D. Neb. 2015)..............................................................................14

*Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*,
   745 F.3d 877 (8th Cir. 2014) ........................................................................28, 30

*Luigino's, Inc. v. Stouffer Corp.*,
   170 F.3d 827 ...............................................................................................31, 32

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
   2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ..........................................................37

*Masters v. UHS of Delaware, Inc.*,
   631 F.3d 464 (8th Cir 2011) ...............................................................................40

*McFarlin v. Newport Special Sch. Dist.*,
   980 F.2d 1208 (8th Cir. 1992) ............................................................................39

*Moon Seed LLC v. Weidner*,
   604 F. Supp. 3d 780 (S.D. Iowa 2022) ...................................................... *passim*

*MPAY Inc. v. Erie Custom Comput. Applications, Inc.*,
   970 F.3d 1010 (8th Cir. 2020) ............................................................................42

*Nat'l Presto Industries, Inc. v. U.S. Merchants Financial Grp. Inc.*,
   No. 18-cv-03321, 2021 WL 2515806 (D. Minn. June 18, 2021) ...........................34

*Natural Polymer Int'l Corp. v. S&M Nutec, LLC*,
   No. Civ.A.3:03CV0461-P, 2004 WL 912568 (N.D. Tex. Apr. 27, 2004)...............22

*Outcomes Pharm. Health Care, L.C. v. Nat'l Cmty. Pharmacists Ass'n*,
   No. 4:05-cv-00682-JEG, 2006 WL 3782905 (S.D. Iowa Dec. 22, 2006) .................28, 35, 42

*Phyllis Schlafly Revocable Trust v. Cori*,
   924 F.3d 1004 (8th Cir. 2019) ............................................................................41

*Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*,
   No. 14-cv-1831, 2014 WL 7183789 (D. Minn. Dec. 16, 2014) ............................29

*Powell v. Noble*,
   No. 4:14-cv-236, 2015 WL 11170162 (S.D. Iowa Dec. 23, 2015)........................13

*PSK, LLC v. Hicklin*,
   757 F. Supp. 2d 836 (N.D. Iowa 2010)....................................................21, 38, 39

*Rodriguez v. Molina*,
   608 F. Supp. 3d 791 (S.D. Iowa 2022) ...............................................................42

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*,
   613 F.3d 754 (8th Cir. 2010) ......................................................31, 33, 34, 37

*Sleep No. Corp. v. Young*,
    33 F.4th 1012 (8th Cir. 2022) ..................................................................................11

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*,
    293 F. Supp. 3d 1334 (M.D. Fla. Dec. 12, 2017) ....................................................25

*Tumey v. Mycroft AI, Inc.*,
    27 F.4th 657 (8th Cir. 2022) ....................................................................................11

*Viacom, Inc. v. Ingram Enters., Inc.*,
    141 F.3d 886 (8th Cir. 1998) ....................................................................................39

*Watkins, Inc. v. Lewis*,
    346 F.3d 841 (8th Cir. 2003) ....................................................................................40

*Weems Indus., Inc. v. Teknor Apex Co.*,
    540 F. Supp. 3d 839 (N.D. Iowa 2021)...............................................................13, 21

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................11

## Statutes

15 U.S.C. §§ 1051 *et seq.*, The Lanham Act ................................................................12, 27, 41

15 U.S.C. § 1057(b) .........................................................................................................27

15 U.S.C. § 1114 ..............................................................................................................12

15 U.S.C. § 1116(a) ..........................................................................................................41

15 U.S.C. § 1125(a) ..........................................................................................................12

15 U.S.C. § 1125(a)(1).......................................................................................................20

15 U.S.C. § 1127.........................................................................................14, 17, 23, 25

Iowa Code § 548.113 .................................................................................................12, 38

## Other Authorities

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 24:87 (4th ed. 1999)..............................................................................................39

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 23:48 (5th ed. 2022)..............................................................................................32

## I.    INTRODUCTION

Plaintiff Drake University ("Drake") may be one of the many universities, colleges, and schools that "wears the 'D,'" but it is certainly not alone and does not own the letter in all shapes, sizes, colors, and configurations.  Indeed, Drake does not even own a registered trademark for the so-called "Vintage Drake 'D'" upon which it relies so heavily in its motion.  Nor does Drake come close to establishing any enforceable common law trademark rights in the "Vintage Drake 'D'"— a "D" that Drake stopped using as a trademark no later than 2005 when it rebranded to the stylized "D" shown below.  Drake also does not own any type of trademark registration for any shade of blue—a fact that should surprise no one given the volume of universities, colleges, and schools that use blue in their branding.  After all, there are only so many letters and colors to choose from and Drake—a small private liberal arts school in Iowa—cannot lay claim to the letter "D" and the color blue to the exclusion of all others.

What Drake actually owns are federal registrations for the three design marks below—the images of which are noticeably absent in Drake's brief.

  

It is no secret why Drake shied away from its registered trademarks in its request for extraordinary relief—these marks look nothing like the trademark shown on the next page that Defendant/Counterclaim Plaintiff Des Moines Area Community College ("DMACC") is actually

1

using.[1]  A trademark that is not—as Drake falsely represents—a standalone "D," but instead prominently features the DMACC name.



Because no one would possibly think the logo above is associated with anyone other than DMACC, Drake employs a smoke and mirrors approach by pointing to isolated use of a standalone "D" while simultaneously claiming rights in a bundle of things Drake collectively refers to as a legally unrecognized and unenforceable "Drake Brand."  But this is not how the laws underlying Drake's asserted claims work.  An accurate legal analysis, which is set forth below, demonstrates Drake will not succeed on any of its claims because it simply does not own the letter "D" or the color blue and DMACC's actual logo has not and will not be confused with the only enforceable rights Drake has in the three registered trademarks on the previous page.

Indeed, in the **nine months** since DMACC adopted the trademark above, neither party has learned of actual confusion caused by DMACC's rebranding.  This is not surprising.  When people see a "D" on DMACC's campus or materials, they associate that "D" with DMACC and when people see a "D" on Drake's campus or materials, they associate that "D" with Drake.  For the same reason that someone visiting Dartmouth College or looking at its website would not believe

---

[1] Drake included Des Moines Area Community College Foundation (the "Foundation") as a defendant in this case, but did not assert any facts to support claims against the Foundation.  *See* First Amended Complaint (ECF No. 17).  Accordingly, DMACC is filing a motion to dismiss the Foundation contemporaneously with this response.  If that motion is denied, the Court should not enter a preliminary injunction against the Foundation for the reasons set forth herein.

that Dartmouth's "D" references Drake, no one would confuse DMACC's logo above with Drake.

Dartmouth's federally registered "D" trademark is shown below:



Moreover, Dowling Catholic High School—only a few miles down the street from

Drake—also uses a standalone "D" that looks strikingly similar to the "Vintage Drake 'D.'"

 

Dartmouth's and Dowling's "Ds" destroy any chance that Drake's "Vintage Drake 'D'" is distinctive and shows Drake's true intention was to abandon the unoriginal "Vintage Drake 'D'" in favor of Drake's 2005 rebranded and registered stylized "D."  At best, Drake was asleep at the wheel and failed to enforce its supposed rights against Dartmouth, Dowling, and countless others—including DMACC.  Drake cannot suddenly claim imminent irreparable harm after years of silence.

Despite Drake's incorrect assertions, DMACC has been using a standalone "D" in its marketing for years.  DMACC has owned a federal registration for the trademark below since 2014, which has been used by DMACC since at least 2000.



As shown in the example on the next page, DMACC often used the "D" in the registered mark above by itself, in blue and white, as a trademark—even marking it with the trademark symbol.



Drake never opposed DMACC's federal registration, never raised any issue with respect to DMACC's use of the "D" above, and has provided no evidence of any actual confusion despite DMACC's decade of use. This all calls into question Drake's current aggressive litigation tactics against DMACC and singlehandedly defeats Drake's motion for extraordinary relief.

The purchasers of the parties' respective college and university services are sophisticated and take great care in their selection of post-high school education—no one is going to mistakenly enroll in DMACC believing it to be Drake and vice versa. There has not been, and will not be, any actionable harm to Drake caused by DMACC's use of its current logo—let alone imminent and certain irreparable harm to support the rare, extraordinary relief of granting a preliminary injunction **after nine months** of successful co-existence under DMACC's current brand and **at least a decade after** DMACC began using a blue and white standalone "D."

For these reasons and those set forth more fully below, DMACC respectfully requests that the Court deny Drake's motion for a preliminary injunction.[2]

## II.    BACKGROUND—THE FACTS DO NOT SUPPORT DRAKE'S REQUEST FOR RARE, EXTRAORDINARY RELIEF.

### A.    DMACC Has Long-Standing Trademark Rights in Its Federally Registered "DMACC" Trademark and a Standalone "D"—Both of Which Are Incorporated in the Logo DMACC Began Using in October 2023.

DMACC began offering college education services in Iowa in 1966.  Declaration of Todd Jones dated July 30, 2024 ("Jones Decl."), at ¶ 2.  DMACC is now the largest college in Iowa with the lowest tuition and fees in the state.  *Id.*  Since at least 1972, DMACC has referred to itself and its offered goods and services under the abbreviation "DMACC"—a trademark that has been federally registered since 2013.  *Id.*, ¶ 3, Ex. A.  The "DMACC" trademark very clearly starts with the letter "D"—indeed, you cannot say "DMACC" without the "D."  The federally registered DMACC trademark is not limited to any particular font, style, size, or color.  *See id.*, Ex. A

Given the prominence of the letter "D" in its colloquial name, DMACC has historically used a standalone "D" to refer to DMACC.  *Id.*, ¶ 4.  For example, since at least 2000, DMACC has used the trademark below, which has been federally registered since 2014.



---

[2] The scope of Drake's requested relief is unclear.  Construed literally, Drake has only asserted claims with respect to and is only seeking an injunction preventing DMACC from using the "D" in its current logo by itself in the current shades of blue.  *See* First Amended Complaint (ECF No. 17), ¶¶ 145, 148, 215; Drake's Amended Brief (ECF No. 10-1), pp. 4, 12-13, 37.  But because Drake's First Amended Complaint defined "Infringing Marks" to include vague and undefined "variations thereon" and its requested injunction includes the color white (despite presenting no arguments or evidence regarding the color white), DMACC's opposition addresses its current logo that includes the "DMACC" name as well as use of the letter "D" alone.  *See id.*

*Id.*, Ex. B.  This trademark is not limited to any particular font, style, size, or color.  *See id.*, Ex.

B.  As shown in the examples below, the "D" in the registered trademark above clearly refers to

DMACC and has been used by DMACC for years, including in the colors blue and white.







*See* Jones Decl., Ex. C.

In addition to the registered mark above, DMACC also used the "D" alone as a trademark—

in blue and white—even marking it with the trademark symbol to indicate its use as a source

identifier.  *See id*.















*See id.*  Notably, Drake never complained about DMACC's use of the standalone "D" shown above despite its use in commerce since at least 2014.  Jones Decl., at ¶ 6.

In October 2023, DMACC began using the trademark below, which incorporates the "D" in DMACC's trademarks above along with the "DMACC" name (the "DMACC Logo").



*Id*. at ¶ 7.  The DMACC Logo was intended to formally update DMACC's brand to a sleeker, more modern style while maintaining the consistency of the shorthand "D" and "DMACC" that DMACC had been using for years.  *Id*.  It had absolutely nothing to do with Drake.  *Id*. at ¶ 8.  And because Drake's brand guide is publicly available, DMACC intentionally avoided Drake's modern, stylized "D" by using the block-style "D" DMACC had been using for years with added features Drake expressly prohibits in its own marks—including the use of multiple colors and shadowing (see excerpt below from Drake's brand guide ).  *Id*., Ex. D, p. 12.



On November 19, 2023, DMACC filed an application to federally register the DMACC Logo.  *Id.*, ¶ 9, Ex. E.  That application was recently published for opposition, indicating that the United States Patent and Trademark Office ("USPTO") found no conflict between the DMACC Logo and any other marks, including Drake's registered trademarks.  *See* Declaration of Laura L. Myers dated July 31, 2024 ("Myers Decl."), ¶ 2.

Despite the name of both schools beginning with the letter "D" and DMACC's use of a blue and white standalone "D" for at least a decade, Drake and DMACC have—until Drake's

recent aggressions—peacefully co-existed and maintained a mutually beneficial relationship[3] for

the betterment of higher education in Iowa.  Jones Decl., ¶ 10.

    **B.**      **Drake Does Not Own The Letter "D" or The Color Blue; Instead, Drake Owns Only Three Federal Trademark Registrations Arguably Relevant to this Dispute—Two of Which Were Adopted in Drake's 2005 Rebrand.**

           **1.**      <u>**Countless Universities, Colleges, and Schools Use the Letter "D"— Including DMACC.**</u>

There are over 1,500 universities, colleges, and schools that start with the letter "D."  *See*

Myers Decl., Ex. 1.  Even a cursory review of the USPTO records easily locates 34 federally

registered or pending trademarks for the letter "D" owned by universities, colleges, and schools.

*See id.*, Ex. 2.  This includes the examples below, the last of which is a university in Sioux Center,

Iowa.

     

*Dartmouth College*     *Duke University*     *Davidson College*     *Denison University*     *Dickinson State Univ.*     *Dordt University*

And, as explained above, DMACC has used a standalone blue and white "D" for the past decade.



---

    [3] Drake makes much of the UNI@DMACC program but fails to mention that Drake was originally offered the program and turned it down.  Drake and DMACC were recently also involved in joint efforts to purchase additional nursing equipment.  DMACC has had a nursing program for years and Drake is just starting one.  *See* Jones Decl., ¶¶ 11-12.

*See* Jones Decl., Ex. C.  Drake simply does not own the letter "D" in all shapes, sizes, colors, and configurations.

   **2.**  <u>**Countless Universities, Colleges, and Schools Use the Color Blue in Their Branding—Including DMACC.**</u>

  As Drake is forced to acknowledge, DMACC has used the color blue (and white) in its branding for years.  Jones Decl., ¶ 13.  This includes the use of those colors in the standalone "D" shown above.  DMACC is hardly alone.  One of the more well-known schools that starts with the letter "D"—Duke University— also uses blue (and white) in its branding as shown in the example at right.  Myers Decl., Ex. 3.  Other notable schools that use blue (and white) include, but are not limited to, Brigham Young University (*see* www.byu.edu), University of North Carolina (*see* www.unc.edu), Pennsylvania State University (*see* www.psu.edu), University of Memphis (*see* www.memphis.edu), Yale University (www.yale.edu), University at Buffalo (www.buffalo.edu), University of Kentucky (*see* www.uky.edu), Georgia State University (www.gsu.edu), and the University of Kansas (*see* ku.edu).  Drake does not own the color blue (or white or the combination of the two).

   **3.**  <u>**Drake's Trademark Registrations Have Three Different "Ds"—Two of Which Also Require a Bulldog.**</u>

  Drake is asserting only three federally registered trademarks in this case, which are set forth below.  *See* First Amended Complaint (ECF No. 17).

  

*U.S. Reg. No. 3,498,202*  *U.S. Reg. No. 4,624,043*  *U.S. Reg. No. 1,567,283*

*"Academic 'D'"*                    *"Athletic 'D'"*                    *"Marching Spike"*

The first two were adopted by Drake during its 2005 rebrand, which was touted as "creating a new and distinctive 'D'" in a "sharp new typeface." *See* Myers Decl., Ex. 4 at p. 20, Ex. 5.

To be abundantly clear, Drake does not own any registered federal or state trademarks for the six other alleged elements of the so-called "Drake Brand." This includes the "Drake Seal"—Drake allowed the USPTO to cancel its registration for that mark in 2016. *See id*., Ex. 6. Drake tied its varying "D" marks to either a swooshy "D," a bulldog, or both. No other standalone "D" has been shown to have the distinctiveness and continuous use required for trademark protection. Drake's trademark rights are limited.

## III.   DRAKE IGNORES THE SCOPE OF ITS TRADEMARK RIGHTS IN SEEKING A RARE, EXTRAORDINARY REMEDY−DRAKE'S MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED.

### A.   Drake Cannot Satisfy the Exacting Legal Standard for the Extraordinary Remedy of a Preliminary Injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction bears the burden of showing that such extraordinary relief is warranted." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (citation omitted). And "a movant carries a 'heavier' burden when granting a preliminary injunction has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *Id.* (citation omitted).

The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).  "While no single factor is determinative, the probability of success factor is the most significant."  *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (citations omitted).

None of the required factors support the extraordinary and rare relief of a preliminary injunction under the circumstances in this case.

**B.    Drake Will Not Succeed on the Merits—This is Reason Enough to Deny Drake's Motion.**

Drake has asserted six claims against DMACC:  (1) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) federal unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (3) common law trademark infringement; (4) common law unfair competition; (5) injury to business reputation—dilution under Iowa Code § 548.113; and (6) unjust enrichment. *See* First Amended Complaint (ECF No. 17) at pp. 54-57.  Drake did not rely on Count 6 for unjust enrichment in its motion for a preliminary injunction; therefore, DMACC does not address it here. *See* Drake's Amended Brief (ECF No. 10-1).

For the reasons set forth below, Drake will not succeed on Counts 1-5 of its First Amended Complaint.

**1.    Drake Will Not Succeed on Its Lanham Act Claims and Common Law Trademark Infringement and Unfair Competition Claims.**

"To establish trademark infringement, [Drake] must show:  (1) it has a valid, protectible mark, and (2) there is a likelihood of confusion between its mark and the marks that [DMACC] is using."  *H&R Block*, 58 F.4th at 946 (citation omitted).  The same analysis applies to both registered and unregistered marks under the Lanham Act—in other words, to Counts 1 and 2 of the First Amended Complaint.  *See Moon Seed LLC v. Weidner*, 604 F. Supp. 3d 780, 789 (S.D. Iowa 2022).  Drake's common law claims for trademark infringement and unfair competition (Counts 3 and 4 of the First Amended Complaint) are based on the same allegations and are also

subject to the same analysis. *See, e.g., id.* at 789 n.1; *Weems Indus., Inc. v. Teknor Apex Co.*, 540 F. Supp. 3d 839, 848 (N.D. Iowa 2021).

        a.        <u>With the Exception of Its Three Registered Trademarks, Drake Failed to Establish the First Required Element of Counts 1-4— Ownership of a Valid, Protectible Trademark for the Six Other Alleged Elements of the So-Called "Drake Brand."</u>

      With respect to the first required element of Counts 1-4 of Drake's First Amended Complaint—ownership of a valid, protectible trademark—Drake improperly employs a kitchen sink approach when claiming enforceable rights in a nebulous "Drake Brand" that Drake vaguely defines as being "comprised of one or more of the devices, names, and symbols reflected in (1) the standalone 'D,' (2) the Vintage Drake 'D,' (3) the Academic 'D,' (4) the Athletic 'D,' (5) the Drake Colors, (6) Griff and his apparel, (7) the Jacket, (8) Marching Spike, and (9) the Drake Seal." *See* Drake's Amended Brief (ECF No. 10-1), p. 11. Putting aside Drake's erroneous litigation strategy, Drake has not established that it owns valid, protectible trademarks in anything other than the "Academic 'D,'" "Athletic 'D,'" and "Marching Spike" for which Drake owns federal trademark registrations.

      It is undisputed that Drake does not own federal or state trademark registrations for the other six alleged elements of the "Drake Brand" and, therefore, Drake must prove common law trademark rights in each of those elements separately. *See* Drake's Amended Brief (ECF No. 10-1), p. 16 (acknowledging that "some elements of the Drake Brand are not registered trademarks; thus, Drake's common law rights must be established"). Drake failed to do so in its moving papers and cannot do so for the first time on reply. *See, e.g., Powell v. Noble*, No. 4:14-cv-236, 2015 WL 11170162, at *3 (S.D. Iowa Dec. 23, 2015) ("It is well established that issues not argued in an opening brief cannot be raised for the first in a reply brief.") (quotations and citations omitted). DMACC addresses each of Drake's failures below.

### (i)     *Drake Does Not Own The Letter "D" in All Shapes, Sizes, Colors, and Configurations.*

To begin with, Drake simply does not own a "standalone 'D'"—in all shapes, sizes, colors, and configurations—for use with university and college goods and services. This is not how federal or common law trademark and unfair competition laws work. Rather, "a common law trademark arises from the adoption and actual use of a word, phrase, logo or other device to identify goods or services with a particular party." *Moon Seed*, 604 F. Supp. 3d at 789 (quotations and citation omitted). And in order for a common law trademark "to identify a plaintiff as the provider of certain goods or services in the minds of consumers, it must be sufficiently distinct." *Id.* (citation omitted).

Thus, Drake must prove ownership of a specific trademark that Drake has continuously used in commerce in connection with the offering for sale or sale of its goods and services, not some naïve notion that it owns the letter D to the exclusion of all others. *See, e.g., JDR Indus., Inc. v. McDowell*, 121 F. Supp. 3d 872, 883 (D. Neb. 2015) ("Trademark rights are acquired and maintained through the use of a particular mark. In other words, a party's ownership of a protectable mark is determined on the basis of priority of use in commerce.") (citation omitted). To support its egregiously overreaching claim that it owns the letter "D" in all forms, Drake points only to a single lyric of its fight song. *See* Drake's Amended Brief (ECF No. 10-1), p. 5; *see also* First Amended Complaint (ECF No. 17) at ¶¶ 16-18. This is not a legally recognized use in commerce to support valid, protectible trademark rights in the letter "D." *See, e.g.*, 15 U.S.C. § 1127 (defining the required "use in commerce" to establish trademark rights); *Moon Seed*, 604 F. Supp. 3d at 789 (requiring "adoption and actual use of a word, phrase, logo or other device **to identify goods or services** of a particular party" to establish common law trademark rights) (emphasis added).

14

There are well over 1,000 schools that start with the letter "D" and at least 34 federally registered or pending trademarks for the letter "D" owned by third-party universities, colleges, and schools, including the examples below for basic "D" design marks.



See Myers Decl., Exs. 1, 2; *see also*, *e.g.*, *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626-27 (8th Cir. 1987) (explaining that "evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection"). Contrary to Drake's unsupported allegations, at least one other university in Iowa—Dordt University—owns the federally registered "D" trademark below.



See Myers Decl., Ex. 2. And, as explained above, DMACC has used the blue and white standalone "D" below since at least 2014.



See Jones Decl., Ex. C. Finally, as the examples on the next page from Dowling Catholic High School show, there are other schools in Des Moines that use a standalone "D" to identify themselves.

 

Declaration of R. Scott Johnson, dated July 31, 2024 ("Johnson Decl."), ¶¶ 1-4, Exs. A, B, C. Notably, Dowling, which offers many classes that provide potential college credit, has cheers such as the "GO BIG D" cheer which frequently refers to the school by its first letter—"D." *Id.*, ¶¶ 5-6 ("If you're yelling for Dowling say Go (Go); If you're yelling for Dowling say Big D (Big D); If you're yelling for Dowling say Go Big D (Go Big D) Go Big D!").

Moreover, Drake has not shown continuous and consistent use of any particular "D" other than its registered trademarks since 2005. Drake's many references to its historical files are seemingly singular examples of old uses of old-style letters. Drake failed to provide dates for most of the photographs, failed to include any references to marketing campaigns or events, or merchandise sales volumes. Indeed, a review of Drake's online bookstore shows none of the standalone "Vintage Drake 'D'" merchandise on which Drake relies. *See* Myers Decl., Ex. 7. The only merchandise with the so-called "Vintage Drake 'D'" also includes Drake's "Marching Spike" and/or the Drake name, which is likely key to any source identification value. *See id.* Drake has simply failed to show any level of consistent, continuous use of "D" other than those in its federally registered marks.

Thus, Drake has not and cannot show that it has valid, protectible trademark rights in the letter "D" in all shapes, sizes, colors, and configurations. Drake certainly has not previously

attempted to enforce any such broad rights against Duke, Dowling, Dartmouth, Dordt, etc.—or even DMACC before now.  Accordingly, the Court should disregard the first identified element of the alleged "Drake Brand" in its analysis of Drake's request for a preliminary injunction.

>    ### *(ii)    Drake Failed to Establish Any Valid, Protectible Common Law Trademark Rights in "the Jacket," "the Drake Seal," and Griff and His Apparel and DMACC is Not Using Any of These.*

Likewise, Drake failed to establish that it uses "the Jacket" and "the Drake Seal" in commerce to identify its goods and services as required to establish valid, protectible common law trademark rights in these elements.  *See* 15 U.S.C. § 1127; *Moon Seed*, 604 F. Supp. 3d at 789. Putting aside Griff's use of "the Jacket," the only other alleged uses are by the recording artist, Aubrey Drake Graham—who has no connection to Drake—and Paul F. Morrison—who passed away almost seven years ago in November 2017.  *See* Drake's Amended Brief (ECF No. 10-1), pp. 8-9; First Amended Complaint (ECF No. 17) at ¶¶ 85, 86, 97; https://alumni.drake.edu/paulmorrison (identifying November 30, 2017, as the date of Mr. Morrison's passing).  These two individuals wearing "the Jacket" at a single concert and at an unknown number of "public appearances" does not constitute use of "the Jacket" in commerce by Drake to identify its goods and services.  In addition, Drake failed to provide any evidence of actual use of "the Drake Seal"—a previously registered trademark that Drake allowed the USPTO to cancel over eight years ago in 2016.  *See* Drake's Amended Brief (ECF No. 10-1), pp. 10, 16; First Amended Complaint (ECF No. 17) at ¶¶ 50-53; Myers Decl., Ex. 6.  Without any evidence of Drake's use of "the Jacket" (separate and apart from Griff) and "the Drake Seal" to identify its goods and services, the Court should disregard the seventh and ninth identified elements of the alleged "Drake Brand" in its analysis of Drake's request for a preliminary injunction.

Drake also failed to show that those two elements as well as Griff and his apparel satisfy the second requirement necessary to prove ownership of a common law trademark—that the alleged trademark serves as a source identifier in the minds of consumers. *See* Drake's Amended Brief (ECF No. 10-1), pp. 16-17 (Drake's acknowledgement of the two requirements to establish ownership of a valid, protectible trademark). Indeed, in its discussion of distinctiveness, Drake fails to mention or provide actual evidence that "the Jacket" or "the Drake Seal" are distinct—let alone establish that consumers identify these elements as source identifiers for Drake. *See id*. Without any attempt to do so, Drake has not carried its burden to establish that these elements constitute valid, protectible trademarks to support Counts 1-4 of the Amended Complaint.

Even Drake's beloved Griff reflects a common theme amongst the many schools who have bulldog mascots. As the examples on the next page illustrate, schools commonly adorn their bulldog mascots with the first letter of the school's name and the school colors—including the letter "D" and the color blue.



*Butler University*
*U.S. Reg. No. 5,874,791*



*Dean College*
*U.S. Reg. No. 5,807,359*



*University of Georgia*
*U.S. Reg. 3,105,938*

*See* Myers Decl., Ex. 8. Without any actual evidence of consumer recognition in this crowded field, the Court cannot simply assume that Griff and his apparel constitute a valid, protectible common law trademark and relieve Drake of its burden to prove likely success on that assertion. Moreover, any common law trademark rights Drake could show in Griff would be limited given the number of similar bulldog marks for universities and colleges and Drake's failure to enforce

its purported rights against any of them. For at least these reasons, the Court should disregard the sixth, seventh, and ninth identified elements of the alleged "Drake Brand" when deciding Drake's motion.

Even if Drake had shown that Griff and his apparel, "the Jacket," and "the Drake Seal" are valid, protectible common law trademarks—which Drake has not—Drake cannot succeed on Counts 1-4 with respect to these elements because DMACC is not using any of them. There is no allegation, nor could there be, that DMACC is using a live bulldog (with or without clothes) or any imagery of a bulldog to promote its educational services and related services and merchandise. *See* Drake's Amended Brief (ECF No. 10-1); First Amended Complaint (ECF No. 17). Indeed, DMACC's mascot is a bear—not a bulldog. Jones Decl., ¶ 14. The same is true for "the Jacket"— there is no allegation, nor could there be, that DMACC is using the same or a similar jacket as a trademark in commerce. *See* Drake's Amended Brief (ECF No. 10-1); First Amended Complaint (ECF No. 17). Plus, as shown below, "the Jacket" clearly displays the "Drake University" name, thereby eliminating any potential for confusion even if DMACC was using a letterman jacket of some kind. *See* Drake's Amended Brief (ECF No. 10-1), pp. 7-8; First Amended Complaint (ECF No. 17) at ¶ 74.



*Exhibit 37*



*Exhibit 38*

Finally, Drake provided no proof that DMACC is using its seal in commerce. *See id*. Drake only alleged that DMACC filed an intent-to-use—as opposed to a use-based—application to

federally register its seal. *See* First Amended Complaint (ECF No. 17) at ¶ 162. And as shown below, the incorporation of the parties' names in their respective seals eliminates any possibility of confusion if and when those seals are used by the parties. *See, e.g.*, *H&R Block*, 58 F.4th at 948 ("Otherwise similar marks are not likely to be confused when used in conjunction with the clearly displayed name of the manufacturer.") (quotations and citation omitted).[4]

 

Without any proof of use by DMACC, there can be no claims for federal or common law trademark infringement or unfair competition with respect to Griff and his apparel, "the Jacket," or "the Drake Seal." *See, e.g.*, 15 U.S.C. § 1125(a)(1) (requiring "use[ ] in commerce" by the accused offender). This is another reason why the Court should ignore the sixth, seventh, and ninth identified elements of the alleged "Drake Brand" in its analysis of Drake's request for a preliminary injunction.

> ### (iii)     *Drake Has Not Established Any Valid, Protectible Common Law Trademark Rights in Two Shades of Blue.*

With respect to the second admittedly required element to establish ownership of a valid, protectible, common law trademark—sufficient distinctiveness to serve as a source identifier—

---

[4] Drake implies that it has exclusive rights to use a lamp and book in a school seal. As noted in DMACC's Counterclaims, these elements are extremely common amongst school seals. Drake failed to establish its seal has acquired any level of consumer recognition based on these elements, which is not the proper analysis anyway. *See, e.g.*, *Gen. Mills*, 824 F.2d at 627 ("[I]n analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features.").

Drake alleges that its purported two shades of blue "are arbitrary and inherently distinctive." *See* Drake's Amended Brief (ECF No. 10-1), p. 16.  This is legally improper "because color on its own, like a descriptive mark, cannot be inherently distinctive, the color must acquire secondary meaning to receive legal protection." *Weems*, 540 F. Supp. 3d at 850 (citations omitted).  In other words, Drake must establish that the two shades of blue collectively "identify and distinguish a particular brand so strongly that, over time, customers come to treat a particular color on a product or its packaging as signifying that brand as its source." *Id.* (internal quotations and citation omitted).  Drake has not and cannot do so.

"Direct evidence of secondary meaning most often comes in the form of consumer testimony and surveys." *PSK, LLC v. Hicklin*, 757 F. Supp. 2d 836, 863 (N.D. Iowa 2010) (citation omitted).  Drake provided neither.  "Circumstantial evidence typically includes:  (1) exclusivity, length and manner of use; (2) the amount and manner of advertising; (3) the amount of sales and number of customers; (4) an established place in the market; and (5) proof of intentional copying." *Id.* (citation omitted).  Drake provided no evidence of exclusivity, sales associated with the use of the two shades of blue, advertising expenditures focused on the two shades of blue, an established place in the market, or proof of intentional copying of the two shades of blue.  Instead, Drake alleged only that it has used the two shades of blue since 2016 and provided three undated images of its website, student recruitment and admissions materials, and the "Griffmobile." *See* Drake's Amended Brief (ECF No. 10-1), p. 10; First Amended Complaint (ECF No. 17) at ¶¶ 107-09.[5]

---

[5] Drake's use of blue on its track, fire hydrants, and one particular T-shirt are limited to a single shade of blue (the darker shade) and do not support its alleged trademark rights in the two shades comprising the purported "Drake Colors." *See* First Amended Complaint (ECF No. 17) at ¶¶ 111-13.

This is insufficient to establish secondary meaning in two shades of blue, particularly given the number of universities and colleges that use blue in their branding—including DMACC and Duke University, two schools that start with the letter "D." *See* Section II(B)(2) *supra*; *see also, e.g., Forney Indus., Inc. v. Daco of Missouri, Inc.*, No. 14-cv-01326-CMA-MEH, 2015 WL 3457807, at *5 (D. Colo. May 29, 2015) ("That Forney's Color Mark has not been uniform over time, and that use of the colors in its Color Mark is not unique, means that consumers will not, by definition, associate the Color Mark with Forney.") (citations omitted); *Natural Polymer Int'l Corp. v. S&M Nutec, LLC*, No. Civ.A.3:03CV0461-P, 2004 WL 912568, at *5 (N.D. Tex. Apr. 27, 2004) (finding "no trademark rights in the color green because it is a color mark that has not acquired distinctiveness" and explaining that "[e]vidence of long-term use is insufficient to prove secondary meaning without empirical proof that the design has come through use to be uniquely associated with a specific source") (internal quotations and citations omitted).

Further, Drake does not allege—nor could it—that it uses the two shades of blue in its identifying trademarks. As explained in its brand guide (excerpted on the next page), Drake's logo[6] always appear in solid dark blue, white, or black and is specifically prohibited from being used in other colors (including light blue) or shaded:

---

[6] Drake's brand guide also explains that its registered standalone "D" trademark is "[t]he 'D' of the primary logo" that is only "sometimes used alone in situations where space or size limitations make the full logo cumbersome" and that when it is used alone, "the 'D' should be the primary mark"—subject to the same limitations as the Drake logo. *See* Jones Decl., Ex. D, p. 13.



See Jones Decl., Ex. D, p. 12.

Drake's conclusory allegations without any supporting evidence do not support a finding that it has acquired secondary meaning in two shades of blue that is required to obtain ownership of a valid, protectible common law trademark in that color combination to the exclusion of others. Accordingly, the Court should disregard the fifth identified element of the alleged "Drake Brand" in its analysis of Drake's request for a preliminary injunction.

> **(iv)    Drake Has Not Established Any Valid, Protectible Common Law Trademark Rights in the "Vintage Drake 'D.'"**

Drake relies heavily on the aptly named "Vintage Drake 'D'" in its motion, but fails to establish a current, valid, protectible common law trademark in the "vintage," *i.e.*, old and past, "D." To begin with, most of Drake's alleged use of the "Vintage Drake 'D'" is ancient—dating back to the early 1900s—followed by alleged isolated use decades ago in 1960, 1970, and 1980. *See* Drake's Amended Brief (ECF No. 10-1), p. 5; First Amended Complaint (ECF No. 17) at ¶¶ 20-23. The Court can disregard this evidence—if this is all Drake had, there would be no question that the "Vintage Drake 'D,'" standing alone, was abandoned by Drake long ago. *See, e.g.,* 15 U.S.C. § 1127 (explaining that "[n]onuse for 3 consecutive years shall be prima facie

evidence of abandonment"). And this would not be surprising because Drake rebranded almost 20 years ago in 2005 to its current "Academic 'D'" and "Athletic 'D.'"



SPIKE GETS A FACE LIFT: Drake unveiled a new logo for both academic and athletic programs in July. The new look features an updated, more realistic Bulldog mascot and a sharp new typeface.

*See* Myers Decl., Ex. 4, p. 20.

Drake's remaining attempts to show use of the "Vintage Drake 'D'" alone (as opposed to in combination with a bulldog that DMACC does not use) are limited to the following:

1.  Undated photos of a single sweatshirt and a single T-shirt featuring a white "Vintage Drake 'D.'" *See* Drake's Amended Brief (ECF No. 10-1), p. 5; First Amended Complaint (ECF No. 17) at ¶ 24. Notably, Drake's online bookstore does not show either clothing item as currently available. *See* Myers Decl., Ex. 7.

2.  A small, blue "Vintage Drake 'D'" on athletic shorts worn by Drake basketball players in a single game over four years ago in January 2020. *See* Drake's Amended Brief (ECF No. 10-1), p. 5; First Amended Complaint at ¶¶ 26-27.

3.  A white "Vintage Drake 'D'" on the floor of a basketball court that Drake fails to mention is normally hidden from the public. *See* Drake's Amended Brief (ECF No. 10-1), p 5; First Amended Complaint (ECF No. 17), ¶ 28; DMACC's Counterclaims, ¶¶ 34-35.

4. An alumni group's logo—featuring a blue "Vintage Drake 'D'" along with the "Drake University" name and "Drake Bulldogs" and an award provided by this group to past Drake athletes. *See* Drake's Amended Brief (ECF No. 10-1), pp. 5-6; First Amended Complaint (ECF No. 17), ¶¶ 29-35.

5. Drake does not reference it in its brief, but its Amended Complaint includes undated photos of sweaters worn by Michael Admire featuring a white or blue "Vintage 'D.'" *See* First Amended Complaint, ¶ 103.

First of all, other than the undated photos of a single T-shirt and single sweatshirt, these are not trademark uses, *i.e.*, Drake using the "Vintage Drake 'D'" in commerce to identify its goods and services to consumers. *See* 15 U.S.C. § 1127; *Moon Seed*, 604 F. Supp. 3d at 789. This is reason enough for the Court to disregard the "Vintage Drake 'D'" when deciding Drake's motion.

Nevertheless, such meager evidence is insufficient to establish a valid, protectible common law trademark for a standalone "D" in a "block-style collegiate font"—let alone every possible color and design of such a "D." *See, e.g.*, *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1367 (M.D. Fla. Dec. 12, 2017) (explaining that "*de minimis* use of a trademark is insufficient to establish trademark ownership rights" (emphasis in original)); *Flavor Corp of America v. Kemin Indus., Inc.*, 493 F.2d 275, 284-85 (8th Cir. 1974) (explaining that "this court adopted a de minimus rule in determining whether a common law trademark was entitled to injunctive protection" and "held that a significant penetration into a market must be shown before injunctive relief will be granted, and nominal or de minimus sales are not sufficient to justify that protection"). And the trademark rights Drake is trying to create out of thin air would run afoul of other's current and established trademark rights, including Dartmouth's federally registered "D" (shown at right) that has a prior first use

date from 1900.  *See* Myers Decl., Ex. 9.  In light of Dartmouth's identical federally registered "D," Dowling's strikingly similar "D" (*see* Johnson Decl., Exs. A-C), and the many other federally registered "D" trademarks for universities, colleges, and schools (*see* Myers Decl., Ex. 2), Drake has utterly failed to establish that the "Vintage Drake 'D'" is sufficiently distinctive to consumers to be deserving of common law trademark protection.

Drake has not established current ownership of a valid, protectible common law trademark for a standalone "Vintage Drake 'D;'" therefore, the Court should disregard the second identified element of the alleged "Drake Brand" in its analysis of Drake's request for a preliminary injunction.[7]

>    **(v)**    ***Drake's Only Valid and Enforceable Trademarks Are Its Three Federally Registered Trademarks.***

After weeding through Drake's attorney argument and conclusory, unsubstantiated allegations, Drake is left with its three registered trademarks (shown below) to support Counts 1-4 of the First Amended Complaint—the third, fourth, and eighth elements of the so-called "Drake Brand."







*U.S. Reg. No. 3,498,202*            *U.S. Reg. No. 4,624,043*            *U.S. Reg. No. 1,567,283*
*"Academic 'D'"*                *"Athletic 'D'"*                *"Marching Spike"*

---

[7] Even if Drake had established that the "Vintage Drake 'D'" is a valid, protectible common law trademark—which it did not—any rights would be limited to how the "Vintage Drake 'D'" has actually been used by Drake, *i.e.*, in a solid white or blue color.  Given the limited scope of protection for "D" marks in the crowded university, college, and school field and all of the other likelihood of confusion factors discussed below, there would be no likelihood of confusion between a solid white or blue "Vintage Drake 'D'" and the DMACC Logo, which features a blue and white "D" shadowed in a different shade of blue with the words "DMACC."

Under the Lanham Act, these registrations are "prima facie evidence" that the registered marks are valid, owned by Drake, and that Drake has the exclusive right to use the registered marks in commerce with the identified goods. *See* 15 U.S.C. § 1057(b). DMACC is not challenging that here, but Drake still will not succeed on Counts 1-4 because there is no likelihood of confusion between Drake's registered trademarks and the DMACC Logo. *See, e.g., Gen. Mills*, 824 F.2d at 626 ("[A] mark's registered status is only an evidentiary tool, and the fact of registration does not affect the plaintiff's ultimate burden of proof in an infringement case.") (citations omitted).

> b. <u>There is No Likelihood of Confusion Between Drake's Valid, Protectible Trademarks and the DMACC Logo.</u>

"The 'core inquiry' when assessing the likelihood of confusion is 'whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on defendant's use.'" *H&R Block*, 58 F.4th at 947 (citation omitted). The Eighth Circuit "has set forth a list of nonexclusive, nonexhaustive factors to assess likelihood of confusion, which includes: "(1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its cost and conditions of purchase." *Id.* (quotations and citation omitted). "No one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." *Id.* (quotations and citation omitted).

"Before the grant of a preliminary injunction is warranted, [Eighth Circuit] precedent requires [Drake] to show a **<u>probability</u>** of confusion, not merely a possibility." *Id.* at 950 (internal quotations and citation omitted) (emphasis added); *see also id.* at 949-50 ("To succeed on the merits of its trademark infringement claim, [Drake] must show that [DMACC's] use of a protected

27

mark creates a likelihood of confusion, deception, or mistake on the part of an **appreciable number** of ordinary consumers.") (internal quotations and citation omitted) (emphasis added). "To satisfy the requisite probability standard, there must be a **substantial likelihood** that the public will be confused." *Id*. at 950 (internal quotations and citation omitted) (emphasis added); *see also id.* at 950-51 (finding "it was clear error for the district court to find a likelihood of confusion" because "[w]hile the record supports possible confusion by some consumers, there is a paucity of evidence to rise to the level of substantial confusion by an appreciable number of ordinary consumers").

Because the aforementioned factors do not weigh in Drake's favor, Drake is unlikely to succeed on the merits on Counts 1-4 of its First Amended Complaint.

> ### (i)    Drake's Registered Trademarks Are Weak and Commonplace and Entitled to A Limited Scope of Protection.

"When examining the likelihood of confusion, a strong and distinctive mark is entitled to greater protection than a weak or commonplace one."  *H&R Block*, 58 F.4th at 947 (internal quotations and citation omitted).  "Even if a mark is valid and protectible, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods and services." *Outcomes Pharm. Health Care, L.C. v. Nat'l Cmty. Pharmacists Ass'n*, No. 4:05-cv-00682-JEG, 2006 WL 3782905, at *20 (S.D. Iowa Dec. 22, 2006) (quotations and citation omitted). "Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related."  *Id*. (quoting *Gen. Mills,* 824 F.2d at 626).  That is precisely the case here.

"Two relevant measurements of a mark's strength are its conceptual strength and its commercial strength." *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th

Cir. 2014).   Conceptual strength exists on a continuum in which marks are evaluated in the following categories:   (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 485 (8th Cir. 1991).   At best, Drake's registered trademarks are suggestive because they consist of Drake's bulldog mascot and the letter "D"—the first letter of Drake's name.   These are not arbitrary or fanciful marks that have no discernible connection to Drake's goods and services.

More importantly, regardless of where Drake's registered marks fall on the spectrum above, widespread third-party use of the letter "D" and bulldogs with university, college, and school goods and services severely weakens the conceptual strength of Drake's registered marks. *See, e.g., Amer. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-cv-693 (SRN/ECW), 2022 WL 2760024, at *61 (D. Minn. July 14, 2022) (finding that "third-party use of BLIZZARD weakens the conceptual strength of Dairy Queen's BLIZZARD® mark"); *Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*, No. 14-cv-1831 (JRT/SER), 2014 WL 7183789, at *4 (D. Minn. Dec. 16, 2014) ("The fact that 'dip' is used throughout the car customization industry tends to weigh against Plasti Dip. It suggests the mark is not fanciful or arbitrary.").

There are well over 1,000 universities, colleges, and schools that start with the letter "D" and at least 34 federally registered "D" trademarks for university, college, and school services and related goods.   *See* Myers Decl., Exs. 1, 2.   These include Dartmouth College and Duke University—two schools older, and arguably more well known, than Drake—that use a standalone "D" trademark as a source identifier (as shown in the examples below).

   

*Id.*, Exs. 3, 10. There are also a lot of universities, colleges, and high schools that use a bulldog mascot and at least 15 federally registered or pending trademarks for those bulldogs adorned with the first letter of their school name. *See id.*, Exs. 8, 11. Drake's registered trademarks cannot be considered anything other than conceptually weak under these circumstances.

The second measurement—commercial strength—"depends on, among other things, consumer surveys and testimony, advertising expenditures, sales, and media attention." *Amer. Dairy Queen*, 2022 WL 2760024, at *61 (citing *Lovely Skin*, 745 F.3d at 888). Drake did not submit any such evidence; indeed, Drake failed to even discuss its registered trademarks in its discussion of commercial strength. *See* Drake's Amended Brief (ECF No. 10-1), p. 19. Drake cites no authority for its invitation to the Court to assume commercial strength without any supporting evidence and there is no basis for the Court to do so. Accordingly, the Court cannot conclude that Drake's registered trademarks are commercially strong on the record before it.

Drake's registered trademarks are weak and entitled to a limited scope of protection; therefore, the first likelihood of confusion factor weighs strongly against Drake.

### *(ii)    The Parties' Marks Are Dissimilar.*

The second factor is related to the first because "[s]tronger marks require a lower degree of similarity to support a finding of infringement, whereas weaker marks require a higher degree of similarity." *Amer. Dairy Queen*, 2022 WL 2760024, at *62 (citation omitted). Here, because Drake's registered trademarks are weak for the reasons set forth above, a higher degree of similarity is required.

"When analyzing the similarity of the marks at issue, courts are to examine the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *H&R Block*, 58 F.4th 947-48 (internal quotations and citation omitted); *see also Gen. Mills*, 824 F.2d at 627 ("[I]n analyzing the similarities of sight, sound, and

meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features."). "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010) (quotations and citation omitted).

The parties' respective trademarks are set forth below, both as registered and applied for and as used by the parties, *i.e.*, in color.



To begin with, as can clearly be seen, the parties' marks are not identical. Therefore, Drake's suggestion that the Court can simply presume that confusion is likely is baseless.[8] Likewise, Drake's instruction to "focus on common dominant elements" is improper and directly contradicts the controlling Eighth Circuit case law cited above. *See, e.g., Gen. Mills*, 824 F.2d at 627 (explaining that "a court must look to the overall impression created by the marks and **not merely compare individual features**") (emphasis added); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827 ("The **use of identical dominant words does not automatically mean that two marks**

---

[8] Drake cites an Eighth Circuit case for this idea, but that case did not determine that any such presumption exists. Instead, the "presumption" is referenced in a non-controlling Eastern District of Missouri case cited by the Eighth Circuit. *See* Drake's Amended Brief (ECF No. 10-1), p. 20.

**are similar**, however.") (citation omitted) (emphasis added).  Drake cannot remove the "D" from

Griff's chest and assert it alone as it attempts to do.

When the marks are considered in their entireties—as they must be—the only commonality

is the letter "D" and the color blue, neither of which are owned by Drake.  The other features of

the marks—distinct fonts, Drake's bulldog mascot, DMACC's house mark, and the outlined "D"

shadowed by a second, lighter "D" in DMACC's logo—easily distinguish the marks from each

other.  *See, e.g., Luigino's*, 170 F.3d at 831 ("The use of different colors and typefaces, as well as

the prominent display of the house marks conveys perceptible distinctions between the products.")

(citations omitted).  These differences cannot be ignored and the mutual use of the letter "D" and

the color blue cannot be sufficient to find similarity given the crowded field of "D" marks and blue

branding for universities, colleges, and schools.  *See, e.g.*, 4 J. Thomas McCarthy, *McCarthy on*

*Trademarks and Unfair Competition* § 23:48 (5th ed. 2022) ("If the common element of

conflicting marks is a word that is 'weak' then this reduces the likelihood of confusion.  A portion

of a mark may be 'weak' in the sense that such portion is descriptive, highly suggestive, or is in

common use by many other sellers in the market.") (citations omitted).[9]

Further, DMACC is using its name in the DMACC Logo, which eliminates any

possibility of confusion even if Drake could convince the Court that the parties' marks are similar

under the applicable legal standards.  *See, e.g.*, *H&R Block*, 58 F.4th at 948 ("Otherwise similar

marks are not likely to be confused when used in conjunction with the clearly displayed name of

---

[9] Drake relies heavily on isolated use of the "D" in the DMACC Logo by itself (*see* Drake's Amended Brief (ECF No. 10-1), p. 14; First Amended Complaint (ECF No. 17), ¶¶ 171-73) that was not approved by DMACC and/or is no longer in use.  *See* Jones Decl., ¶ 15.  Nevertheless, the "D" in the DMACC logo is noticeably distinct from the three different "Ds" in Drake's registered marks.  It is also noticeably distinct from the "Vintage Drake 'D,'" for which Drake has only shown de minimis use in solid white or solid blue without any shadowing.

the manufacturer.") (quotations and citation omitted); *Amer. Dairy Queen*, 2022 WL 2760024, at *63 ("A defendant's house mark, especially a prominent one, can significantly decrease the degree of similarity.") (citation omitted).

Finally, the "similarity of the marks must also take into account the conditions in which buying decisions are made." *Amer. Dairy Queen*, 2022 WL 2760024, at *65 (finding "the marks are even more dissimilar when the purchasing processes for these products are considered") (citations omitted). Decisions about which university or college to attend are not made on a whim; rather, the decision to invest many thousands of dollars in post-high school education is one that is heavily researched and contemplated before purchase. Thus, the applicable purchasing process nullifies any possible similarity between the parties' marks.

The second likelihood of confusion factor weighs strongly against Drake.

> ### (iii)    *The Parties' Respective College and University Services are Not Directly Competitive.*

DMACC and Drake are not direct competitors—they offer distinct post-high school education programs that would not be confused with one another, one a reasonably priced community college and the other an expensive four-year university. But DMACC recognizes that direct competition is not required under Eighth Circuit law, and therefore concedes this factor weighs at least somewhat in Drake's favor. *See, e.g., Moon Seed*, 604 F. Supp. 3d at 792. This factor alone, however, does not support a finding that confusion is likely.

> ### (iv)    *DMACC Never Intended to "Pass Off" Its College Services as the University Services of Drake.*

"While proof of bad intent is not required for success in an infringement or unfair competition claim, the absence of such intent is a factor to be considered." *Sensient Techs.*, 613 F.3d at 766 (internal quotations and citation omitted). Here, there is absolutely no credible evidence that DMACC intended to pass itself off as Drake.

To begin with, Drake incorrectly represents to the Court that DMACC's mere knowledge of Drake "alone supports an inference of intent."  *See* Drake's Amended Brief (ECF No. 10-1), p. 22.  Once again, Drake's instruction to the Court flatly contradicts well-established and controlling Eighth Circuit law.  *See, e.g., Sensient Techs.*, 613 F.3d at 766 ("Knowledge of another's product and intent to compete with that product is not equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion.") (quotations and citation omitted).  The case Drake misrepresents—*Insty\*Bit, Inc. v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 671 (8th Cir. 1996)— involved an accused infringer who began selling the same products it had previously sold for the trademark owner.  That is not the case here.

Likewise, Drake's naming conventions argument is made out of whole cloth.  There are no established naming conventions in Iowa or among colleges and universities that bind DMACC's conduct or somehow implicate it acted improperly.  And, as previously explained, DMACC has used a standalone blue and white "D" since at least 2014 and Drake never said a word about it. Drake's naming conventions argument is nothing more than baseless attorney argument that the Court should ignore.

Drake's misleading account of the parties' pre-suit discussions is also irrelevant.  The relevant "intent" for this factor is DMACC's intent when selecting its new logo—not months after the logo was admittedly already in use.  *See, e.g., Nat'l Presto Industries, Inc. v. U.S. Merchants Financial Grp. Inc.*, No. 18-cv-03321, 2021 WL 2515806, at *21-22 (D. Minn. June 18, 2021). DMACC adopted and sought to federally register the DMACC Logo that prominently displays the "DMACC" name.  This alone should defeat any assertion that DMACC intended to pass off its goods and services of those of Drake.  *See, e.g., Amer. Dairy Queen*, 2022 WL 2760024, at *70 (explaining that "a defendant's use of its house mark may demonstrate the absence of intent to

trade on a plaintiff's trademark") (citation omitted). Drake's reliance on isolated use of the "D" in the DMACC Logo does not change DMACC's intent. Even though DMACC had been using a nearly identical blue and white standalone "D" since 2014, it pulled the limited use by a third-party vendor of the new "D" in the DMACC Logo when Drake raised it as an issue for the first time in its Complaint. *See* Jones Decl., ¶ 15. This further demonstrates that DMACC has no intention to pass itself off as Drake.

Finally, Drake's reference to the accidental use of a "D" that looks like Denison University's "D" on DMACC's Campus Recreation Facebook page has no bearing on DMACC's intent with respect to Drake and is therefore irrelevant to the Court's analysis. This mistake occurred shortly after the DMACC Logo was adopted and if anything, demonstrates the widespread use of a block-lettered standalone "D" by colleges and universities.

There is simply no evidence that DMACC intended to pass off its goods and services as those of Drake. DMACC adopted and sought to register a trademark that incorporates a "D" that is essentially identical to the standalone "D" DMACC has used since at least 2014 and prominently displays the "DMACC" name. This factor weighs against a likelihood of confusion.

### (v)      There Is No Evidence of Actual Confusion.

"While actual confusion is not required, it is often considered the best evidence of likelihood of confusion." *H&R Block*, 58 F.4th at 950 (internal quotations and citation omitted). "Moreover, even evidence of several isolated incidents of actual confusion occurring initially upon the creation of a potentially confusing mark is insufficient to demonstrate a likelihood of confusion." *Id.* (citation omitted). Importantly, "[t]he absence of actual confusion has been considered an important factor." *Outcomes Pharm.*, 2006 WL 3782905, at *22 (citations omitted).

Drake has not asserted, nor could it, that a single student has mistakenly enrolled at DMACC believing it to be Drake—thus, there is not and cannot be any actual confusion in this

case. *See, e.g., H&R Block*, 58 F.4th at 949-950 (finding that "[t]he district court clearly erred in finding evidence of actual confusion" in light of plaintiff's admission that it had "not identified for us a single customer who used Cash App, thinking it was an H&R Block product"). Moreover, the initial Facebook posts cited by Drake do not support entry of a preliminary injunction under controlling Eighth Circuit law. *See id*. at 951 (finding that "several incidents of potential confusion occurring shortly after Block, Inc.'s name change" consisting of social media posts and news articles was "dubious evidence" "insufficient for H&R Block to satisfy its burden of showing a substantial likelihood of confusion about whether Cash App Taxes is affiliated with H&R Block by an appreciable number of ordinary consumers").

To be clear, Drake's reliance on a declaration submitted by one of its attorneys does not establish actual consumer confusion. Nor does a local news outlet's informal—and legally improper—attempt at a "survey." *See, e.g., Jacobs v. Fareportal, Inc.*, No. 8:17CV362, 2020 WL 6587245, at 6 (D. Neb. May 29, 2020) (explaining the two recognized types of confusion surveys, neither of which was used by the news outlet). Not surprisingly, Drake cites no authority for the idea that its own attorneys can establish actual confusion and allowing such "evidence" would set a bad example for future litigants. And even if this manufactured "evidence" were legitimate examples of actual confusion, they are insufficient to support a preliminary injunction. *See H&R Block*, 58 F.4th at 950-951 (finding "it was clear error for the district court to find a likelihood of confusion" because "[w]hile the record supports possible confusion by some consumers, there is a paucity of evidence to rise to the level of substantial confusion by an appreciable number of ordinary consumers").

Despite nine months of co-existence under the DMACC Logo and at least ten years of DMACC using a standalone blue and white "D," this is the best Drake could come up with to claim

there has been actual confusion—that is telling.    There is no credible evidence of actual confusion.[10]    Accordingly, this factor weighs in favor of DMACC.

>                    ***(vi)    The Purchasers of the Parties' Respective College and University Services are Sophisticated and Exercise Great Care Before Paying the High Cost of Post-High School Education.***

"When examining consumer sophistication for purposes of trademark infringement, a court is to stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *H&R Block*, 58 F.4th at 949 (internal quotations and citation omitted).    "This factor is more important in confusion-of-source cases where the degree of care that the purchaser exercises in purchasing a product can eliminate the confusion that might otherwise exist." *Sensient Techs.*, 613 F.3d at 769 (internal quotations and citation omitted).    And "[a]s a general matter, the greater the cost of the product or service, the more time and effort consumers are expected to expend when making decisions, and therefore the likelihood of confusion decreases." *Amer. Dairy Queen*, 2022 WL 2760024, at *72 (internal quotations and citation omitted).

The cost of post-high school education is one of largest expenses the average individual will incur in his or her lifetime.    Indeed, undergraduate full-time tuition for students entering Drake this fall is $25,722 per semester for a grand total of $205,776 over four years.    *See* https://www.drake.edu/finaid/tuition/.    The lower cost to attend DMACC is still a 5-figure investment.    Further, post-high school education is not a decision that purchasers make on

---

[10] Drake had previously alleged that the "rotary club incident" was evidence of actual confusion, but evidently dropped that argument after DMACC explained it was meritless. *See, e.g., MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 2004 WL 434404, at *3 (S.D.N.Y. Mar. 8, 2004) (finding that a senator's joke on CNN's *Late Edition* that he "thought the Nader Advertisement was a credit card ad" constituted "little or no evidence of actual confusion").

impulse—potential students diligently research universities and colleges to find the right fit for their needs and typically visit university and college campuses to that end. This is precisely the situation where the degree of care exercised by the ordinary purchaser of the parties' university and college services can eliminate any possibility of confusion that may otherwise exist.

Recognizing that this factor weighs against it, Drake desperately clings to non-controlling case law from other circuits. But the Eighth Circuit has explained that, in this Circuit, initial interest confusion does not apply when dealing with sophisticated purchasers like the ordinary purchasers of the parties' university and college services. *See id.*, at \*73 (citation omitted). Drake cannot escape the undeniable fact that the last likelihood of confusion factor weighs strongly in DMACC's favor.

A proper evaluation of the relevant factors does not support a finding that confusion is likely, let alone that it is substantially probable that an appreciable number of consumers will be confused—what Drake is required to show to obtain a preliminary injunction. Accordingly, Drake has not carried its burden to prove it is likely to succeed on Counts 1-4 of the Amended Complaint.

### 2.    Drake Will Not Succeed on Its Dilution Claim Under Iowa Code § 548.113.

Iowa Code § 548.113 allows the owner of a "famous" mark to obtain injunctive relief against another's use of the mark if that use "causes dilution of the distinctive quality of the owner's mark…." *See also PSK, LLC*, 757 F. Supp. 2d at 871 (noting that "[t]he parties cite no case applying Section 548.113, and the court has found none," but explaining that "the statute— and Plaintiff's claim thereunder—is clearly directed at trademark dilution").[11]    "Normally, [dilution] applies in cases where similar marks are used on dissimilar goods." *Id.* (quotations and

---

[11] Counsel for DMACC was also unable to find any cases substantively discussing Iowa Code § 548.113 other than the *PSK* case cited above.

citation omitted).  "Therefore, courts typically hold that a dilution claim fails where the parties are competitors who sell similar goods or services." *Id*. at 871-72 (citations omitted).  While DMACC disputes that the parties are direct competitors, they do offer sufficiently similar goods and services to defeat Drake's dilution claim as a matter of law.

Likewise, for the reasons set forth above, Drake has not and cannot establish that its registered marks are sufficiently famous to support a dilution claim under Iowa law.[12]  *See id*. at 872 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:87 (4th ed. 1999), with approval for "when a mark is found to be too weak to be infringed by the traditional likely confusion test, then it is necessarily too weak to be diluted"); *see also Viacom, Inc. v. Ingram Enters., Inc.*, 141 F.3d 886, 890 n.6 (8th Cir. 1998) ("By definition, all trademarks are distinctive—very few are famous.") (quotations and citation omitted).

Because Drake has not shown that it is likely to succeed on the merits of any of its asserted claims, the Court should deny Drake's motion for a preliminary injunction for that reason alone.

### C.    Drake Does Not Face Certain, Great, Imminent Harm—This is Also Reason Enough to Deny Drake's Motion.

The irreparable harm factor requires a moving party to show they will suffer an irreparable harm if the preliminary injunction is not granted.  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318-19 (8th Cir. 2009) (citing *Dataphase*, 640 F.2d at 113).  "A party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).  In other words, a "theoretical possibility" of future harm is not sufficient to warrant a preliminary injunction. *McFarlin v. Newport Special Sch. Dist*., 980 F.2d 1208, 1211 (8th Cir. 1992).  "Failure to show

---

[12] As explained above, Drake has not established valid, protectible common law trademark rights in the other alleged elements of the so-called "Drake Brand."

irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted). Thus, even if Drake could prove likely success on the merits on any one of its claims—which it cannot— the Court should still deny Drake's motion because it does not imminently face certain and great irreparable harm.

To begin with, Drake waited roughly nine months after DMACC's rebrand to file suit against DMACC and seek injunctive relief—this delay alone is sufficient to defeat Drake's request for extraordinary relief. Even worse, however, Drake said nothing about DMACC's use of the blue and white standalone "D" below since at least 2014—Drake cannot suddenly cry foul and claim imminent, certain, and great irreparable harm after a decade of silence.



*See* Jones Decl., Ex. C.[13]

Drake's unexplained and unreasonable delay in moving for preliminary injunctive relief negates any presumption of irreparable harm based on consumer confusion and may, standing alone, justify denial of preliminary injunctive relief. *Hubbard Feeds, Inc. v. Animal Feed*

---

[13] Drake's silence and failure to act for a least ten years with respect to DMACC's use of a blue and white standalone "D" also supports several affirmative defenses to Drake's asserted claims, including laches and estoppel. *See, e.g.*, *Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 469 (8th Cir 2011) (explaining that "[l]aches applies in a trademark action when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted" and "estoppel bars a claim when an innocent defendant relies in good faith upon the claimant's misleading conduct or representations and changes its position to its detriment on the basis of that reliance") (internal quotations and citations omitted).

*Supplement, Inc.*, 182 F.3d 598, 603 (8th Cir. 1999) (citation omitted) (cited with approval by *Phyllis Schlafly Revocable Trust v. Cori*, 924 F.3d 1004, 1010 (8th Cir. 2019) (explaining that due to a five-month delay in seeking a preliminary injunction, "the trusts would not be entitled to such a presumption because they did not promptly seek preliminary relief concerning the alleged trademark infringement")).[14]

Further, the record shows that Drake is not at risk of any certain, great, and imminent irreparable harm. Despite DMACC's use of a blue and white standalone "D" since at least 2014 and use of the DMACC Logo since October 2023, Drake cannot identify a single lost student, any actual harm to its reputation or goodwill, or a single legitimately confused individual. Instead, Drake incorrectly asserts that DMACC is "now also offering associate degrees under the Drake brand, and is thus not competing fairly." Drake's Amended Brief (ECF No. 10-1), p. 35. This is untrue for the reasons set forth above—including without limitation the limited scope of Drake's legally recognized trademarks and the differences between the parties' trademarks. And the fact remains that Drake cannot identify any actual impact that DMACC has had on Drake or its "brand" despite DMACC's use of a blue and white standalone "D" since at least 2014. *See, e.g., H&R Block*, 58 F.4th at 952 ("Given the paucity of evidence concerning consumer confusion, H&R Block's worry about potential negative publicity and loss of intangible assets, such as reputation and goodwill, is speculative and inadequate to demonstrate a clear and present need for equitable relief.") (internal quotations and citations omitted).

---

[14] Even if the presumption applies, which it does not, the Lanham Act only provides Drake with a "**rebuttable** presumption of irreparable harm…upon a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a) (emphasis added). To the extent the Court believes that Drake has shown it is likely to succeed on the merits of its Lanham Act claims, any presumption of irreparable harm is rebutted for the reasons set forth in this section.

There is no threat of imminent, certain, and great irreparable harm to Drake and therefore, no basis for the extraordinary relief of a preliminary injunction.

D.    **The Other Two Factors—Balance of the Harms and Public Interest—Weigh Against Injunctive Relief.**

The balancing factor requires the Court to "weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase*, 640 F.2d at 113). "This factor requires the examination of the harm granting or denying the injunction poses to both parties to the dispute, as well as other interested parties." *Couser v. Shelby Cty., Iowa*, 681 F. Supp. 3d 920, 947 (S.D. Iowa 2023) (quotations and citation omitted). This "encompasses the determination of whether the harm to the moving party outweighs the financial loss and damage to the reputation of the nonmoving party." *Outcomes Pharm.*, 2006 WL 3782905, at *14 (internal quotations and citation omitted).

The public interest factor requires the Court to balance "the specific public interests that might be harmed and what public interests might be served." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 801 (S.D. Iowa 2022). Preliminary relief will only be granted when the benefits of granting the injunction outweigh the specific harms. *Id.* "More specifically, in the context of trademark infringement, this factor involves the balancing of the interest in protecting the public from confusion or deception with the interest in a competitive market." *Outcome Pharm.*, 2006 WL 3782905, at 25 (internal quotations and citations omitted).

Drake is unlikely to succeed on the merits and will not suffer irreparable harm; therefore, the remaining two factors favor DMACC because the rebranding costs and reputational damage DMACC will incur due to a baseless injunction are detrimentally unfair and unreasonable and against the public interest.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Drake University's Motion for Preliminary Injunction in its entirety.

Respectfully submitted,

Date: July 31, 2024

*/s/ R. Scott Johnson*

R. Scott Johnson (#AT0004007)
FREDRIKSON & BYRON, P.A.
111 East Grand Avenue, Suite 301
Des Moines, IA  50309-1977
Telephone:  (515) 242-8900
E-mail:  RSJohnson@fredlaw.com

Laura L. Myers (Minn. #0387116)
(*Pro Hac Vice* forthcoming)
FREDRIKSON & BYRON, P.A.
60 South 6th Street, Suite 1500
Minneapolis, MN  55402-4400
Telephone:  (612) 492-7000
E-mail:  LMyers@fredlaw.com

***Attorneys for Defendants and
Counterclaim Defendant***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2024, I electronically filed the

**DEFENDANTS'/COUNTERCLAIM PLAINTIFF'S RESISTANCE TO PLAINTIFF'S**

**MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the ECF,

who in turn sent notice to the following:

> Joshua J. Conley, Esq.
>   jconley@zarleyconley.com
> John D. Gilbertson, Esq.
>   jgilbertson@zarleyconley.com
> ZARLEYCONLEY PLC
> 580 Market Street, Suite 101
> West Des Moines, IA  50266
>
> *Attorneys for Plaintiff*

                                                              */s/ Erica Palmer*
                                                              Erica Palmer

#83197830

44