IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br>          Plaintiff,<br><br>     vs.<br><br>DES MOINES AREA COMMUNITY<br>COLLEGE FOUNDATION and DES<br>MOINES AREA COMMUNITY COLLEGE<br>          Defendants. | No. 4:24-cv-00227<br><br>**REPLY BRIEF IN SUPPORT OF<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION** |
| DES MOINES AREA COMMUNITY<br>COLLEGE,<br>          Counterclaim Plaintiff,<br><br>     vs.<br><br>DRAKE UNIVERSITY,<br>          Counterclaim Defendant. | |

John D. Gilbertson
Joshua J. Conley
ZARLEYCONLEY PLC
West Des Moines, Iowa
for DRAKE UNIVERSITY

## I.    INTRODUCTION

DMACC's Rebrand adopts every facet of Drake's identity except Griff.  Despite extensive briefing, Defendants fail to answer the question on everyone's mind: *why?*  Instead, DMACC obfuscates with misapplied precedent and inapplicable facts.  While Drake must reply to these disparate points, in the end this larger question remains unanswered: if Drake's trademarks can't extend a mile down the road that was named after it, what does trademark law actually protect?

## II.    ARGUMENT

### A.    DMACC's Proffered Legal Standards Do Not Apply

DMACC cites *H&R Block, Inc. v. Block, Inc.* for the premises that (1) Drake carries a "heavier burden" for preliminary injunctive relief; and (2) Drake must show a "substantial" likelihood of confusion to establish likelihood of success on the merits.  Dkt. 30 at 18, 35.[1]

Regarding the first, in the trademark context, virtually all preliminary injunction motions seek to enjoin the defendant from using a trademark.  This is, temporarily, the same relief a plaintiff hopes to obtain permanently at trial.  DMACC's implication is that trademark plaintiffs carry a heavier burden than usual for a preliminary injunction.  This is not the standard.

*H&R Block*'s "heavier burden" language derives from *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.* that cites 2 McCarthy on Trademarks & Unfair Competition § 482. 815 F.2d 500, 503 (8th Cir. 1987) (currently 4 McCarthy § 30:30 (5th ed.)).  The "heavier burden," as articulated by McCarthy, is relegated to special circumstances where a preliminary injunction effectively acts as a permanent injunction.  This is best illustrated by way of example.  In *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, the district court preliminarily enjoined the defendant from using the mark REAL WHEELS.  101 F.3d 259, 260–62 (2d Cir. 1996) (2d Cir.

---

[1] When citing to the docket, Drake will utilize the Court's numbering, i.e., at the top right of each page.

1996). At that time, the defendant had an intent-to-use ("ITU") application pending to federally register REAL WHEELS. On appeal, the Second Circuit vacated in part, because enjoining the defendant from all use of REAL WHEELS would prevent the requisite use to obtain registration; this would effectively—and *permanently*—terminate defendant's rights as the holder of its ITU application. *Id*. at 262. Here, no such concerns exist. Also unclear is how such an elevated standard would impact the application of the relevant balancing test(s). Drake's burden, while heavy, is no greater than a typical plaintiff seeking preliminary injunctive relief.

DMACC's implication that a "substantial" likelihood of confusion be shown is also misleading. Dkt. 30, at 34–35. "As in any ordinary civil action, the plaintiff bears the burden of proving by a preponderance of the evidence that a likelihood of confusion exists." McCarthy § 23:62. Thus, both heightened standards proffered by DMACC do not exist here.

## B. Drake Did Not Delay in Bringing Suit

The laches clock does not begin to run upon a defendant's first unpermitted use of a mark. A plaintiff is allowed to tolerate de minimis infringement and act promptly when a junior user suddenly expands or changes its mark. McCarthy § 31:21. Laches is measured from the date when the infringement *significantly* impacts plaintiff's goodwill and business reputation. McCarthy § 31:19. Hence, the doctrine "is not intended to encourage precipitous litigation" and "a plaintiff is not ordinarily chargeable with delay prior to an actual intrusion upon its rights*." Restatement (Third) Unfair Competition § 31 cmt. c. (1995).

DMACC's Campus Recreation mark did not require Drake to act. The mark is used solely in connection with DMACC's intramural sports and recreational activities, which by definition involve only those at DMACC. Such activities do not involve Drake or the public in any way, thus Drake would have no reason to know about the logo DMACC uses. Save for a small smattering of usages emphasized by opposing counsel, the Campus Recreation mark is almost

always depicted with CAMPUS RECREATION to the right of the "D" with the bear claw—the way it is registered.  Bearing this in mind, Drake "should be afforded some latitude to assess both the impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362 (6th Cir. 1985).

Curiously, DMACC argues Drake's Double D Award is not sufficient to evidence use of the Vintage "D" as a mark because it is given to alumni.  Dkt. 30, at 32.  The Double D Award is awarded during the Drake Relays to prominent alumni such as Zach Johnson (PGA golfer), who live and work outside Drake's campus.  If the Double D Award does not constitute trademark use, DMACC's internal use of its Campus Recreation mark cannot have triggered an obligation to act.

### C.  Threat of Irreparable Harm is Presumed

DMACC alleges Drake is not entitled to a presumption of irreparable harm upon a showing of likelihood of success on the merits.  Dkt. 30-5, at 47–48.  DMACC's caselaw predates the codification (without qualification) of the presumption afforded under 15 U.S.C. § 1116(a).  Thus, Drake's contention on this point stands uncontradicted.

### D.  Tying "DMACC" to the DMACC "D" Does Not Alleviate Confusion

House marks do not alleviate confusion when the marks are otherwise similar.  *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) ("different colors and typefaces **and** "the prominent display of house marks conveys perceptible distinctions") (emphasis added).  The DMACC "D" uses the same font as the Vintage Drake "D" and the Drake Colors.  *See* Dkt. 1-81–89.  The use of a small five-letter "house mark" that begins with "D" (like "Drake") does not alleviate confusion.

### E.  DMACC Has Not "Locked" its "D" with "DMACC"

DMACC contends the array of merchandise in its college bookstore featuring a standalone "D" was the work of a rogue vendor.  Dkt. 30-1 ¶ 15.  This is dubious given the number of products,

4

and that the same standalone "D" somehow appeared on its basketball court. Dkts. 1-81–87.

DMACC states it has pulled all merchandise featuring a standalone "D" from shelves. Dkt. 30, at 42. DMACC also states in its Answer that it has "locked its logo such that the 'D' does not appear without the 'DMACC.'" Dkt. 21 at 40, ¶ 28. Yet, as of this filing, DMACC still has 16 items for sale in its online bookstore with a prominent standalone "D" not locked to "DMACC." Ex. 122. In fact, DMACC's own Exhibit C features instances of an unlocked "D." Dkt. 30-4, at 5, 6, 9, 10, 12; *see also* Ex. 123 (other non-merchandise usage). DMACC also continues to identify the "D" as a trademark with a ™ designation to the lower right of the letter, but above "DMACC." Ex. 124.

The rogue vendor theory is further undermined by the DMACC hat shown in Dkt. 5-16. The hat was purchased at DMACC's Ankeny Campus Bookstore and bears a price label dated December 8, 2023, suggesting it remained on the shelves for over seven months before being removed in response to Drake's complaint. Ex. 125. Lest it be forgotten, this product as well as others were available online and on DMACC's campus at the time it was repeatedly asserted that the "'D' is "always accompanied by the 'DMACC' name." Dkt. 21-11, at 2.

DMACC fails to show Drake's concerns have been alleviated. Instead, DMACC's characterization of its new branding's use has been shown to be false and without quality control.[2] The need for immediate judicial intervention is self-evident.

### F. Drake's Standalone "D" is Valid and Enforceable Against DMACC

DMACC thoroughly loses the thread in citing to a bevy of other trademark registrations. Third-party registrations are not evidence of the strength or weakness of Drake's marks. McCarthy § 11:89. Trademark registrations are also not effective against common law trademarks that are

---

[2] DMACC's inclusion of shirts knocking off the Kansas City Royals registered mark to support its position further demonstrates a lack of concern for other's intellectual property rights. Dkt. 30 at 14; Ex. 126.

in use before the registration date.  McCarthy § 26:53.

For instance, the Dartmouth registration repeatedly cited by DMACC registered on October 12, 2004.  Dkt. 30-16.  Drake's use of its Vintage "D" began in Des Moines a century earlier, thus achieving priority.  Even if Dartmouth's registration predated Drake's use of its Vintage "D," Dartmouth's mark is only registered for clothing.  Dkt. 30-16 at 2.

Looking to DMACC's Exhibit 2, other than Dordt University, no school on the list is located within a 593-mile radius of Drake and none are in neighboring states.  Dkt. 30-9. Dartmouth is 1,093 miles from Drake—*nearly a thousand times farther* than DMACC.  Second, a review of Dordt's registration certificate (notably absent from DMACC's Resistance) shows that it did not register until 2012—more than a century after Drake began use of the Vintage D—and thus, like Dartmouth, is ineffective against Drake.  Ex. 127.  Third, the logo shown is not only visually distinct from the Vintage Drake "D," *but it is not even in use*; Dordt rebranded five years ago to a stylized "DU" featuring a cross.  Ex. 128.  Fourth, like Dartmouth's registration, Dordt's old logo is only registered for clothing—not education.  Ex. 127.  In fact, of the 34 marks cited, only seven are registered in connection with post-secondary education services.  For all of DMACC's commotion about Duke, *not a single Duke mark* falls within that list.

To the extent DMACC raises a *jus tertii* defense (asserting third party rights), the Federal courts[3] and the Trademark Office have foreclosed its use. "The fact that the third persons might possess some rights in their respective marks which they could possibly assert against [plaintiff] in a proper proceeding can avail [defendant] nothing herein. . . the conflict here is between [plaintiff] and [defendant], not [plaintiff] and the world."  *Krug Vins Fins de Champagne v.*

---

[3] *See, e.g., General Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647 (S.D. N.Y. 1997) (*jus tertii* cannot be a defense*); Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009) (same); *Innovation Ventures, LLC v. NVE, Inc.*, 2016 WL 266396 (E.D. Mich. 2016) (same); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, (W.D. Wis. 2003) (same).

*Rutman Wine Co.*, 197 U.S.P.Q. 572, 1977 WL 22662, at *3 (TTAB 1977).

DMACC's contention that a "crowded field" precludes enforcement is similarly untenable. Schools in geographic proximity have often been enjoined from the use of similar marks. *See, e.g., Pres. & Trs. Of Colby College v. Colby College-N.H.*, 508 F.2d 804, 812 (enjoining Colby College-New Hampshire from infringing Colby College in Maine, noting the particular importance of preserving individual identities for "educational institutions serving the public.").[4]

DMACC admits that if Drake does, in fact, have trademark rights in the Vintage Drake "D," such rights would only extend to the mark in a solid white or blue color. Dkt. 30, at 33 n 7. This is so narrowly construed as to collapse on itself; if trademark rights in white and blue vintage "Ds" are not strong enough to prevent your competitor down the street from putting one on top of the other and adding a drop shadow to it—in your secondary color—what would they protect?

### G.  DMACC Admits a "D" is Distinctive

DMACC alleges that the Vintage Drake "D" is unoriginal and not distinctive. Dkt. 30, at 10. Yet, DMACC cites 34 examples of registered marks comprised of standalone "Ds" distinctive enough to be registered.[5] Dkt. 30-9. Also, if the vintage, block-style "D" is unoriginal, why did DMACC (1) choose one to update to "a sleeker, more modern style," (2) expend resources into developing a mark deemed indistinct, and (3) file a trademark application when it already has a registration for DMACC? Dkts. 30-1 at 2; 30 at 49; 30-6 at 2.

### H.  Drake's Colors Have Secondary Meaning

To determine secondary meaning, courts consider, *inter alia*, length and manner of use, volume of sales, amount and manner of advertising, and defendant's intent to copy it. *See Bd. Of*

---

[4] *See, e.g., Cal. W. Sch. Law v. Cal. W. Univ.*, 125 Cal. App. 3d 1002 (Ct. App. 1981) (California Western University enjoined due to California Western School of Law); *Bd. Regents Univ. of Houston Sys. V. Houston Coll. Law, Inc.*, 215 F.Supp.35 573 (S.D. Tex., 2016) (Houston College of Law enjoined due to University of Houston Law Center).

[5] Trademarks cannot be registered if not distinctive. *See* 15 U.S.C. § 1052 et seq.

*Supervisors for La. St. Univ. Agric. & Mech. Coll. V. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008). The record is full of the Drake Colors being used in a source-identifying manner, both alone and in combination with Drake's standalone "D." *See, e.g.,* Dkts. 1-14–18, 1-21, 1-47, 1-52, 1-59 1-61–69, 1-71. This is sufficient to establish secondary meaning. *Id.*

Drake's Brand Guide further highlights the source-identifying nature of Drake's colors. "The primary color palette is made up of two shades of blue—Drake Blue and Light Blue. *These hues are central to the Drake Brand and should be prevalent in everything created for Drake*." Dkt. 30-5, at 13 (emphasis added). DMACC admits it knew this because it reviewed the Brand Guide, but never contacted Drake about the Rebrand prior to launching it. Dkt. 1-97, at 1. Further, the publicly available specimen to secure the Academic "D" (to which DMACC's current counsel was an appointed attorney) is a brochure advertising Drake's educational services with the phrase "Think Blue… Drake Blue." Ex. 129, at 2–6.

## I.    DMACC's Intent to Trade Off Drake's Goodwill Should Be Inferred

DMACC's assertion that Drake misrepresented *Insty*Bit, Inc.* is false. The decisions states a prior *relationship* between the parties heightens the inference of intent and, hence, a likelihood of confusion increases.  95 F.3d 663, 671 (8th Cir. 1996). Here, a prior relationship exists.

## J.    Initial Interest Confusion is Not Foreclosed in this Case

DMACC asserts that initial interest confusion cannot apply here because college is expensive, citing *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 2022 WL 2760024 (D. Minn. July 14, 2022). The *Dairy Queen* court found that initial interest confusion is inapplicable "where the relevant average consumers are sophisticated at the level of careful **professional** purchasers." *Id.* at *73 (emphasis added). Professional purchasers are those who routinely make purchases and are experienced in the subject matter. Higher education, particularly undergraduate education, is often a decision made by those who have never engaged them before, i.e., not professionals. Indeed,

among the 34 examples of professional buyers listed in the leading trademark treatise, no mention is made of educational services of any kind. *See* McCarthy § 23:102. Even if some but not all purchasers are professionals, the matter must be evaluated through the eyes of the less knowledgeable consumer. *Country Floors, Inc. v. P'ship of Gepner & Ford*, 930 F.2d 1056, 1066 (3d Cir. 1991) ("[E]ven if most of the customers are professionals, the trademark law protects the entire gamut of purchasers.").

The assertion that no one is going to mistakenly enroll in DMACC is nothing more than attorney argument and is irrelevant anyway. Initial interest confusion "recognizes that a senior user's goodwill holds value at all times, not merely at the moment of purchase, and protects against the threat of a competitor receiving a free ride on the goodwill of an established mark." *Dairy Queen*, 2022 WL at *73 (citations omitted); *see also* Dkt. 18-1 at 29–30 (discussing initial interest confusion in the context of law school students).

## III.    CONCLUSION

Drake respectfully requests the Court grant its Motion for Preliminary Injunction in full.

Respectfully submitted,

Dated: August 9, 2024                 **ZARLEYCONLEY PLC**

By:    /s/John D. Gilbertson
John D. Gilbertson, AT0014515
Joshua J. Conley, AT0011828
580 Market Street, Suite 101
West Des Moines, IA 50266
Telephone: (515) 558-0200
Facsimile: (515) 558-7790
jgilbertson@zarleyconley.com
jconley@zarleyconley.com
**ATTORNEYS FOR PLAINTIFF &
COUNTERCLAIM DEFENDANT**