IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br>　　　Plaintiff,<br><br>　　vs.<br><br>DES MOINES AREA COMMUNITY<br>COLLEGE FOUNDATION and DES<br>MOINES AREA COMMUNITY COLLEGE<br>　　　Defendants. | No. 4:24-cv-00227<br><br>**BRIEF IN SUPPORT OF MOTION<br>TO DISQUALIFY COUNSEL** |
| DES MOINES AREA COMMUNITY<br>COLLEGE,<br>　　　Counterclaim Plaintiff,<br><br>　　vs.<br><br>DRAKE UNIVERSITY,<br>　　　Counterclaim Defendant. | |

Joshua J. Conley
John D. Gilbertson
ZARLEYCONLEY PLC
West Des Moines, Iowa
for DRAKE UNIVERSITY

## I.     INTRODUCTION

Drake University ("Drake") requests the disqualification of Fredrikson & Bryon P.A. ("Fredrikson") due to an imputed conflict of interest arising from the involvement of R. Scott Johnson, counsel at Fredrikson, and Tina Yin Sowatzke, former counsel at Fredrikson. Before joining Fredrikson, Mr. Johnson and Ms. Yin Sowatzke were attorneys at McKee, Voorhees & Sease, PLC ("MVS"). Prior to, throughout, and after both attorneys' tenures, MVS represented Drake University continuously with respect to Drake's intellectual property, including that at issue in this suit. Mr. Johnson or Ms. Yin Sowatzke represented, and arguably still represent in some regards, Drake with respect to every trademark registration at issue. Mr. Johnson's career, stature, and expertise suggest confidences were disclosed to him on matters in which his involvement is not expressly identified. Mr. Johnson and Fredrikson now represent DMACC to "challenge the strength and validity of Drake's asserted 'trademarks.'" Dkt. 27 at 1. The conflict of interests that exists is without waiver, consent, or remediation, and mandates disqualification.

## II.    LEGAL STANDARD

The decision on a motion to disqualify resides in the discretion of the Court. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir. 1999) (citations omitted). The moving party carries the burden to establish the need for disqualification. *Nustar Farms, LLC v. Zylstra*, 880 N.W.2d 478, 482 (8th Cir. 2016) (citing *Bottoms v. Stapleton*, 706 N.W.2d 411, 414 (Iowa 2005). The Court must evaluate this motion with "heightened scrutiny" to avoid "disqualification being wielded as a weapon." *Hoffman v. Internal Med., P.C.*, 533 N.W.2d 834, 836 (Iowa Ct. App. 1995). Doubts should be resolved in favor of disqualification. *Dr. John's, Inc. v. Sioux City, Iowa*, No. C03-4121-MWB, 2007 WL 5788, at *6 (N.D. Iowa Jan. 2, 2007) (citations omitted).

The Court "must look to both Iowa law and ethical rules announced by the national legal

profession."  *Id.*   The Iowa Rules of Professional Conduct are a "starting point" as they govern counsel before this Court and provide the "baseline" for ethical requirements.  *NuStar*, 880 N.W.2d at 482; *Urbandale Best, LLC v. R & R Real Est. Inv'rs, LLC*, No. 417CV00264JAJSBJ, 2018 WL 10345479, at *3 (S.D. Iowa June 12, 2018).   Comments do not add obligations but provide guidance for compliance.  Iowa R. Prof'l Conduct ("IRPC"), Preamble at [14].   While local rules and state standards are relevant, disqualification affects the rights of the parties and "are to be determined applying standards developed under federal law."  *Dr. John's*, 2007 WL 5788, at *6.

## III.   FACTS

### A.   R. Scott Johnson

Mr. Johnson began his legal career at MVS in 1999.  Ex. 1 at 1.  Mr. Johnson "is a trial attorney, certified licensing professional and registered patent attorney" who provides counsel on "the complexities of patent, trademark, copyright and trade secret litigation, and licensing issues." Ex. 2 at 1.  To "avoid intellectual property disputes," Mr. Johnson "frequently performs related opinion work involving an in-depth analysis of patent validity and infringement questions, trademark issues, and trade secret / right to use analysis."  *Id.*  If need be, Mr. Johnson "has the trial experience necessary to get a solution in state and federal courts" and before the United States Patent and Trademark Office's ("USPTO") tribunals.  *Id.*  Mr. Johnson "also prosecutes . . . patents, as well as trademark and copyright applications."  Ex. 3 at 1.

At MVS, Mr. Johnson was one of a "group of intellectual property specialists" dedicated to serving "as a faithful advocate."  Ex. 1 at 2.  This dedication went beyond assistance in technical areas and involved a "strive to build meaningful relationships with [MVS's] clients.  By truly appreciating a client's identity, their business, and their goals" attorneys at MVS were able to "truly be their intellectual property partner to better fulfill" their needs.  Ex. 1 at 3.  Such relationships were "extremely important to the long-term success of [MVS's] clients' intellectual

property assets." *Id*. Mr. Johnson and MVS were "prepared to build a relationship with" their clients to "satisfy [their] needs." *Id*.

While at MVS, Mr. Johnson had numerous practice areas, including litigation, licensing, and trademarks. Ex. 1 at 1. The litigation practice group, to which Mr. Johnson was the chair for a time, involved "a cross-functional team of attorneys and technical advisors to provide you with high-quality, comprehensive litigation services." Ex. 1 at 4. The licensing practice group advised clients and prepared agreements "for all types of intellectual property" and work "closely with [MVS's] clients' general attorneys in reviewing or drafting intellectual property provisions for various types of agreements such as franchising statements or agreements, company purchases, sale of intellectual property, loans where intellectual property is given as collateral and joint ventures." Ex. 1 at 5. Within the trademark practice group, Mr. Johnson assisted with "all aspects of brand protection," including clearance and registration, litigation, due diligence, negotiation of licenses and agreements, and obtaining and maintaining trademark registrations. Ex. 1 at 6.

Mr. Johnson is a Certified Licensing Professional ("CLP") and, for at least a time, was one of only three such individuals to hold the designation in Iowa. Ex. 4. The CLP "credential is a professional designation intended to distinguish those who have demonstrated experience, proficiency, knowledge, and understanding of licensing and commercialization of intellectual property." Ex. 5 at 1. The designation "[e]stablishes credibility amongst colleagues and recognizes knowledge and qualifications in the field." *Id*.

As a fixture at MVS, Mr. Johnson served on the Executive Committee. Ex. 23 at ¶ 27. Mr. Johnson stature at MVS is depicted throughout its website captured from 2017 that includes Mr. Johnson's image (and name) on the majority of pages. *See generally* Ex. 1.

After more than 20 years, Mr. Johnson departed MVS and joined Fredrikson in 2020. Ex.

2 at 1; Dkt. 27-2 at 3.  At Fredrikson, Mr. Johnson sustains his practice in its Intellectual Property and Intellectual Property Litigation practice groups.  Ex. 2 at 1.  Within the Intellectual Property group, Mr. Johnson continues to provide "thoughtful attention … to clients and their changing needs" that leads to recognizing "better ways of serving them."  Ex. 6 at 1.  With respect to trademarks, this involves advice and counseling, clearance, registration, and maintenance, evaluation and licensing, and litigation.  Ex. 6 at 1–2.

The same year Mr. Johnson joined Fredrikson, he was recognized as one of the *Best Lawyers in America* within Trademark Law.  Ex. 2 at 3.  This recognition has continued through 2024.  *Id.*  The *Best Lawyers* designation is the result of a peer reviewed process designed "to capture, as accurately as possible, the consensus opinion of leading lawyers about the professional abilities of their colleagues within the same geographical area and legal practice area."  Ex. 7.  *Best Lawyers* describe the area of Trademark Law as "critical to the success of any company" as a trademark portfolio may "constitute the majority of the value of [a client's] business."  Ex. 8 at 2.

### B.   Tina Yin Sowatzke

Ms. Yin Sowatzke was also an attorney at MVS that transitioned her career to Fredrikson. Although less experienced than Mr. Johnson, Ms. Yin Sowatzke has nonetheless built a career working "collaboratively with clients to help protect their intellectual property assets and grow their IP portfolios through strategic planning of their current and future goals."  Ex. 9 at 1.  Her practice has involved universities and "advising clients on protecting their business branding and products through trademarks."  *Id.*  Ms. Yin Sowatzke departed Fredrikson in June of 2024 to take the role of intellectual property counsel for General Mills.

### C.   McKee, Voorhees & Sease's Representation of Drake University

For at least the last 40 years, MVS and its predecessors have been the exclusive legal

representation of Drake's intellectual property matters.[1]   Ex. 21 at ¶10.   Given the length of representation and the fact that MVS is a small boutique firm practicing only in intellectual property law, Drake's understanding is that it retained "MVS as a whole—not any one attorney—to handle all of Drake's intellectual property." Ex. 21 at ¶ 15.

MVS's representation has involved matters of due diligence, procurement, maintenance, commercialization (e.g., licensing), litigation assessments, coordinating prospective litigations, among a variety of other legal tasks. Ex. 21 at ¶ 14.   Part and parcel with this representation has been close work between MVS and Drake in the prosecution and maintenance of its brand, as well as general advice and counsel regarding "all of Drake's intellectual property" that involved Drake freely sharing confidential business information with MVS. Ex. 21 at ¶¶ 12–13.   "Drake trusted MVS with this information because of the duties of confidentiality and undivided loyalty it owed [Drake] as [its] lawyers." Ex. 21 at ¶ 17.

"MVS either exclusively handled or assisted Drake in handling the drafting, prosecution, and maintenance of all of Drake's trademarks, including U.S. Registration Nos. 1,567,283 ("Marching Spike"), 3,498,202 (the "Academic 'D'"), and 4,625,043 (the "Athletic 'D'"). Ex. 21 at ¶ 11.   While Drake understands that trademark registrations and the prosecution histories are public record, "MVS was privy to confidential information regarding how Drake's trademarks were being used that would not appear in the public record; for example, whether marks should be abandoned or modified based on their use in commerce." Ex. 21 at ¶ 18.   "MVS also counseled Drake on what *not* to file; for example, if a mark was too weak to support federal registration or if some other limitation was present that could negatively affect Drake's ability to enforce its intellectual property rights." *Id.* (emphasis in original).   Counsel at MVS know "Drake's

---

[1] It is counsel's understanding that MVS declined representation of Drake with respect to the present lawsuit due to a conflict of interest arising from its concurrent representation of Defendants. Ex. 23 at ¶ 29.

intellectual property matters inside and out, including those trademarks" at issue in this suit.  Ex. 21 at ¶ 16.  Drake "must justifiably presume that Mr. Johnson, who was counsel at MVS for over 20 years and is identified as a representative on trademarks identified by the USPTO, was privy to Drake's confidences."  Ex. 21 at ¶ 29.

Drake has a unique relationship with MVS.  "For more than 30 years, attorneys at [MVS] have played a significant role in developing the intellectual property program at Drake University Law School."  Ex. 10.  MVS has made contributions to Drake over the years, including a dedication of $100,000 to a Drake-endowed scholarship.  *Id*.  "For the better part of three decades" attorneys at MVS have "spent hundreds of hours teaching would-be lawyers about the finer points of patent, trademark, and copyright law" *Id*.  Then name-partner, Edmund Sease stated, "[W]ith one-third of our attorneys having studied at Drake University, this is a way for us to give back to the university…."  *Id*.  The relationship with Drake has and remains a highlight on MVS's Trademark practice area page due to their assistance in "obtaining and maintaining" the DRAKE RELAYS trademark registration.  Ex. 1 at 6.

Mr. Johnson is or was an appointed attorney on nineteen (19) of the thirty (30) marks owned by Drake according to the USPTO including Marching Spike, the Academic "D," and the Athletic "D."  *See* Ex. 11 at 2, 11, 23, 37, 47, 54, 59, 63, 66, 70, 75, 82, 88, 93, 99, 107, 114, 119, 131; *see also infra* Section III(D) (discussion of appointed attorneys before the USPTO).  Ms. Yin Sowatzke is or was appointed on three (3) marks, including Marching Spike and the Athletic "D."  *See* Ex. 11 at 2, 28, 125.

Drake applied for the registration of the Academic "D" in 2007.  Ex. 11 at 9.  The application identifies the literal element as being "D" without any feature disclaimed.  *Id*.  The application, signed by Victoria Payseur, then Drake University Vice President of Business &

Finance, expressly "appoints… R. Scott Johnson… to submit this application on behalf of the applicant." Ex. 11, at 13, 20. The specimen demonstrating use includes the Academic "D" in a standalone fashion adjacent the large verbiage "THINK BLUE" followed by "DRAKE BLUE" on a subsequent page—each of these aspects are now challenged by Mr. Johnson. Ex. 11 at 17–19; *see, e.g.,* Dkt. 21 at 53–54, ¶¶ 75–77; Dkt. 30 at 28, fn. 5. Mr. Johnson is similarly identified as an appointed attorney in the 2014 maintenance filing signed by Debra Lukehart, Drake University Executive Director, Marketing and Communications (Ex. 12 at 1, 6) and the 2018 maintenance filing signed by David Remund, Drake University Executive Director, University Communications with each filed by MVS. Ex. 13 at 2, 6; *see also* 37 C.F.R. § 11.18 ("The presentation to the [USPTO] (whether by signing, filing, submitting, or later advocating) of any document by any person, whether a practitioner or non-practitioner, constitutes a certification…").

Mr. Johnson was first identified as counsel for DMACC on March 26, 2024. Dkt. 1-97 at 1. Drake does not have any record of receiving notice of the withdrawal of either of these attorneys from representing Drake. Ex. 21 at ¶ 26. Drake has never received communication from Fredrikson directly, including any request for Drake's consent to represent the Defendants. Ex. 21 at ¶ 30. Drake does not consent to Fredrikson's representation of DMACC. Ex. 21 at ¶ 31.

Drake University's President Marty Martin deems it "shocking that an attorney formerly in a leadership position with Drake's exclusive intellectual property law firm is publicly attacking and undermining the assets he was appointed to secure and protect, which include both registered and unregistered marks." Ex. 21 at ¶ 32. Mr. Martin is "extremely concerned" Mr. Johnson will use confidences learned while at MVS to the disadvantage of Drake University and finds the "inexplicable behavior [] a betrayal and injustice to a client which deserves better." Ex. 21 at ¶33.

**D. Appointed Attorneys**

A practitioner's authority to act on behalf of a trademark applicant can arise from the filing

of a power of attorney signed by someone with legal authority to bind the applicant, registrant, or party.  37 C.F.R. § 2.17(b), (c)(1)–(2).  Additional attorneys can be appointed with an associate power of attorney submitted by that practitioner.  37 C.F.R. § 2.17(c)(2).  The appearance of associate attorneys constitutes "a representation to the [USPTO] that [they are] authorized to represent the person or entity on whose behalf [they act]."

Mr. Johnson has declared that he "never knew" he was listed on any trademark for Drake filed at the USPTO as an appointed attorney. Dkt. 27-1, at ¶ 6.  Mr. Johnson declared further that he "subsequently determined" his appointment was "a standard practice."  *Id.*

As seen in Exhibit 14, Mr. Johnson signed or submitted an application identifying himself as the primary attorney of record along with all other attorneys at MVS as associate attorneys in 2001, 2003–15, and 2018.  Exhibit 15 includes a hand-signed response by Mr. Johnson while at MVS in which his signature block indicates he is submitting on behalf of the "Attorneys of Record" (plural). Ex. 15 at 9.  Exhibit 16 is a submission by Mr. Johnson revoking a third-party attorney and appointing himself and all MVS attorneys as representatives.  Exhibit 17 includes submissions by other appointed attorneys on applications to which Mr. Johnson is the primary attorney.  Exhibit 18 shows Mr. Johnson continues to file applications identifying multiple appointed attorneys at Fredrikson.  *See also* Ex. 19 (other appointed attorney at Fredrikson filing on applications Mr. Johnson is identified as the primary attorney).  Upon information, Mr. Johnson was aware he was an appointed representative on one or more trademark applications or registrations owned by Drake before the present dispute arose.  *See supra*.  Mr. Johnson's recollection of representing Drake is not a prerequisite for disqualification under the applicable rules.  *Infra* Section IV.

**E.   Rule 7(k) Certification**

Prior to the filing of the present motion, counsel for Drake requested Mr. Johnson and Fredrikson withdraw from representing Defendants. Ex. 20 at 1, 41.  These requests were directed

at Mr. Johnson, Ms. Laura Myers, and Fredrikson President, Melodie R. Rose.  *Id*.  These requests were denied.  Ex. 20 at 37, 43.  During a meet and confer regarding this present motion on July 15, 2024, Mr. Johnson did not consent to his disqualification and stated, "I will seek sanctions against you for doing it" and that Drake's counsel was going down a "dark path." Ex. 23 at ¶ 25.; *see also* Ex. 22 (noting a threat of a disciplinary action without basis is improper under the Model Rules and if a basis exists, the subject conduct must be reported).

After suit was commenced, additional attempts were made to seek opposing counsel's withdrawal, including submitting a notice to the Court that should Fredrikson take action in this suit, Drake would seek to have those submissions sealed and would move for disqualification. Dkt. 3.  These efforts continued up through defense counsel's responsive filings.  To avoid delay in seeking to strike opposing counsel's submissions, Drake moved for the filings to be sealed.  Dkt. 24.  This was proffered to Mr. Johnson before moving the Court, as was the possibility of an arrangement where Mr. Johnson would withdraw leaving Fredrikson as counsel for Defendants. Ex. 23 at ¶ 26.  All entreaties were rebuffed.  "As a result, in the short time between the documents being filed and subsequently sealed, multiple publications and/or news outlets reached out to Drake based on [Mr. Johnson's] representations."  Ex. 21 at ¶ 28.

## IV.   ARGUMENT

### A.   Iowa Rule of Professional Conduct 32:1.7

Rule 32:1.7 states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest."  A concurrent conflict is present if the representation of one client will be directly adverse to another client.  *Id*. at 32:1.7(a)(1).  Comment [3] to Rule 32:1.7 discusses that a lawyer should have a conflict check in place as "[i]gnorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this rule."  *See Autoscribe Corp. v. Wells Fargo Bank, N.A.*, 2010 WL 11564962, at *5 (S.D. Iowa Nov. 4, 2010) (finding the failure to

10

identify a conflict as a "serious issue"). Some concurrent conflicts may be waived by obtaining informed consent, confirmed in writing by each affected client. IRPC 32:1.7(b)(4).

To determine whether a violation of Rule 32:1.7 has occurred, consideration is given to (1) whether the attorney simultaneously represented one party at a time they represented the other party; and (2) whether the representation involved a concurrent conflict of interest. *See NuStar*, 880 N.W.2d at 482–84. Simultaneous representation involves establishing (1) when the attorney-client representation began with one client; and (2) when the attorney-client relationship ended with the other client. *Id.* at 483. The beginning of an attorney-client relationship can be established expressly or implied by the conduct of the parties. *Id.* at 478. An attorney-client relationship also exists for a client who regularly relies on counsel for legal services on an occasional and ongoing basis—"thus, an attorney-client relationship cannot be turned off and on." *Iowa S. Ct. Bd. of Prof. Ethics and Conduct v. Fay*, 619 N.W.2d 321, 325 (Iowa 2000). "[B]eing clear about the beginning and the ending of the attorney-client relationship" benefits both the attorney and the client. ABA Center for Professional Responsibility, *Podcasting the Model Rules of Professional Conduct–Rule 1.7*. The concurrent conflict of interest arises "where directly adverse representation *will* take place." *NuStar*, 880 N.W.2d at 484.

"Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent." *Id.* at cmt. [6]. Representation is prohibited "even when matters are wholly unrelated" as the client is "likely to feel betrayed." *Id.* Neither Rule 32:1.7 or its commentary require a requisite level of knowledge held by the attorney or prejudice imparted on a client for a violation to occur.

Mr. Johnson and Ms. Yin Sowatzke are both appointed by Drake to represent it with respect to its intellectual property including various trademark registrations. *See e.g.,* Ex. 11. Mr.

Johnson and Ms. Yin Sowatzke are appointed attorneys on the Marching Spike and Athletic "D." Ex. 11 at 2, 23, 28. Mr. Johnson is also an appointed attorney on the Academic "D." Ex. 11 at 11. Drake has not received notice of either attorneys' withdrawal as of filing. Ex. 21 ¶ 26. Each was also counsel at MVS during a span of 40-plus years the firm has represented Drake. On a regular and ongoing basis, Drake relied upon MVS as a whole for legal services related to Drake's intellectual property. Dec. at ¶.

Mr. Johnson, and, by extension,[2] Ms. Yin Sowatzke began their representation of DMACC on or before March 26, 2024, "to challenge the strength and validity of Drake's asserted 'trademarks.'" Dkts. 1-97 at 1; 27 at 1. DMACC, through counsel, have stated that "[a]n actual controversy exists between DMACC and Drake regarding the infringement and validity of Drake's trademarks." Dkt. 21 at 34.

DMACC, through counsel, have "[d]enied" that the "Drake Brand is distinctive to both the consuming public and Drake's trade." Dkt. 17 at ¶ 120; Dkt. 21 at ¶ 120. DMACC, through counsel, has "[d]enied" the unlawful activities alleged by Drake. Dkt. 17 at ¶¶ 215–19; Dkt. 21 at ¶¶ 215–19; *see also* Dkt. 21 at ¶¶ 240–45, 247–53, 255–59, 261–65, 267–69, 271–76. DMACC, through counsel, has alleged that "DMACC has not infringed any valid trademark rights of Drake" and that Drake "has failed to attain requisite distinctiveness in its alleged trademarks or the entirety of the Drake Brand." Dkt. 21 at 32–33. DMACC, through counsel, alleges that "Drake has abandoned one or more of the trademarks Drake now asserts as part of the Drake Brand" and "Drake has unclean hands in its efforts to try and enforce trademarks, including cancelled trademark registrations, as part of the Drake Brand." *Id.* at 33.

Opposing counsel's representation of DMACC is directly adverse to Drake. A concurrent

---

[2] For conflicts, when one lawyer is involved, the entire firm is involved. *Hoffmann*, 533 N.W.2d at 834 (citations omitted).

conflict is present.  Drake has not and will not consent to permit opposing counsel to continue representing DMACC.  Ex. 21 at ¶ 31.

### B.  Iowa Rule of Professional Conduct 32:1.9(a)

Rule 32:1.9(a) states, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."  This "rule is violated when three conditions are met:  (1) there are consecutive representations of two or more clients, (2) the representations involve 'the same or a substantially related matter,' and (3) the new client's interests are 'materially adverse' to those of the former client."  *Iowa S. Ct. Atty. Disc. Bd. v. Leitner*, 998 N.W.2d 627, 640–41 (Iowa 2023) (citations omitted).

Comment [3] to Rule 32:1.9 states that matters "are 'substantially related' for purposes of this rule if they involve the same transaction or legal dispute."  To determine whether matters are substantially related, the courts look to three factors: (1) the nature and scope of the prior representation; (2) the nature of the present representation; and (3) whether the client might have disclosed a confidence to their attorney in the prior representation which could be relevant to the present action.  *NuStar*, 880 N.W.2d at 485.

Under this rule, the burden remains with the moving party but "the Court is also cognizant of the presumption in favor of disqualification when a former client seeks to prevent a lawyer who previously represented it from acting on behalf of an opposing party."  *Autoscribe Corp.*, 2010 WL 11564962, at *5.  "The party seeking disqualification is not required to show that confidential information will be used in the subsequent litigation, or even that it was disclosed in the prior representation."  *In re Guardianship of J.W.*, 991 N.W.2d 143, 155 (Iowa 2023).  This rule also "does not wait for an actual breach of confidences before disqualification is warranted; the *risk* of such a breach is the proper focus of the disqualification inquiry."  *Id*. at 157.  The "evidence must

only establish the scope of legal representation" and "[o]nce the substantial relationship is established, it is assumed the attorney obtained information in the first representation relevant to the subsequent litigation." *Hoffman*, 533 N.W.2d at 836–37 (citations omitted).

"Confidential disclosures, actual or presumed, necessitate disqualification of the attorney when the attorney represents an adverse interest in a related matter." *Autoscribe Corp.*, 2010 WL 11564962, at *5. Accordingly, if a court "determine[s] a substantial relationship exists, then unequivocally, the law firm must be disqualified." *Indus. Steel Constr., Inc. v. Lunda Constr. Co.*, No. 3:20-cv-70, 2021 WL 6618710, at *10 (S.D. Iowa Mar. 1, 2021) (quotations omitted).

"Rule 32:1.9(a) has been described as 'a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him.'" *J.W.*, 991 N.W.2d at 152 (citations omitted). The "idea of a lawyer changing sides is at the heart of" the rule. *Id*. By "changing sides, the attorney has breached a duty of fidelity and loyalty." *Id*. For this reason, "the 'appearance of impropriety doctrine' was adopted to protect the public, our profession, and those it serves." *Id*. at 152 (citations omitted). Because "clients are guaranteed confidentiality, they are willing to share their most private thoughts and relate the most sensitive and embarrassing information, secure in the knowledge that what has been shared will be safeguarded and will never be used against them by a lawyer." Gregory C. Sisk, Change and Continuity in Attorney–Client Confidentiality: The New Iowa Rules of Professional Conduct, 55 Drake L. Rev. 347, 356 (2007). In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients. *In re J.W.*, 991 N.W.2d at 152 (citations omitted).

Charles W. Wolfram in Former-Client Conflicts discusses the real-world implications of Rule 32:1.9(a) within the realm of intellectual property:

> Consider the consequences. If no conflict precludes the later representation, then Lawyer is free in the later representation to attack the [trademark] that Lawyer was

14

earlier retained and paid by Client One to obtain. Such a representation would raise two problems - affecting both Client One and Client Two. First, consider the interests of Client One, the former client. Presumably, Client One sought to obtain a [trademark], by means of Lawyer's work, that was immune from such later attack that could be avoided through diligent representation. If it were permissible for Lawyer now to shoot at the same target that Lawyer earlier had set up, we well might also be concerned that Lawyer had done less than Lawyer might have done during the course of the earlier representation to protect Client One's interests against just such an attack. . . .

We don't want the builders of legal edifices to be in a position later to lay effective siege to their own work by exploiting weak spots planted within it, whether intentionally or artlessly. The reason, again, is simple concern with the vagaries of human nature - the instinct to disloyalty – in context in which the threat may be not inconsiderable that the unfortunate consequences of those vagaries will be visited on the former client. An allied consideration is that Lawyer's attack on her own work would deprive Client One of significant value (the [trademark]) for which Client One paid Lawyer substantial fees. At the simple level of fair exchanges, it would seem perverse and wasteful to permit Lawyer to destroy the very value that Lawyer was paid to create.

10 Geo. J. Ethics 677, 697–98 (1997).[3]

Opposing counsel was[4] appointed as counsel on 19 of Drake's trademarks before the USPTO, including Marching Spike, the Academic "D," and the Athletic "D." *See* page 7, *supra*; *see also* Ex. 11 at 1–2, 9–11, 21–23.  With regard to at least the Academic "D," Mr. Johnson was appointed throughout the application for registration and the subsequent maintenance of the registration.  Ex. 11 at 9–20; Exs. 12–13.  The application identifies the literal element as being "D" without any feature disclaimed.  Ex. 11 at 9.  A specimen submitted during Mr. Johnson's representation included the Academic "D" in a standalone fashion adjacent the large verbiage "THINK BLUE" followed by "DRAKE BLUE."  Ex. 11 at 17–19. Mr. Johnson was also an attorney for 22 of MVS's 40-plus years of representing Drake with respect to its intellectual

---

[3] *See also* IRPC 32:1.9, cmt. [3] ("a lawyer who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations")

[4] For purposes of discussion under rule 32:1.9(a), it is presumed that opposing counsel obviated the required disqualification under rule 32:1.7.

property. Dkt. 27-2 at 3; Ex. 21 at ¶ 10. Mr. Johnson represents DMACC consecutively in the current litigation. *See, e.g.,* Dkt. 21 at 60.

Mr. Johnson's representation is the same or substantially related to the matter for which Mr. Johnson represented Drake. Drake's complaint raises allegations based on the "Drake Brand," which includes registrations for which Mr. Johnson was and is appointed counsel. *See, e.g.,* Dkt. 17 at 31; *see also* Ex. 11 at 1–2, 9–11, 21–23. Mr. Johnson is counsel for DMACC to "challenge the strength and validity of Drake's asserted 'trademarks.'" Dkt. 27 at 1. This includes contentions that "Drake's registered trademarks are weak and entitled to a limited scope of protection" and that Drake lacks protectible common law trademark rights in elements of the Drake Brand. Dkts. 30 at 30, 46 n. 12. DMACC's interests are therefore "materially adverse" to those of Drake.

Drake is not required to show that confidential information will be used in this litigation, or that any such information was disclosed to Mr. Johnson. *In re J.W.*, 991 N.W.2d at 155. With the substantial relationships established, it is assumed Mr. Johnson obtained information during his representation of Drake relevant to this litigation." *Hoffman*, 533 N.W.2d at 836–37. "[U]nequivocally, the law firm must be disqualified." *Indus. Steel*, 2021 WL 6618710, at *10.

### C. Iowa Rule of Professional Conduct 32:1.9(b)

Rule 32:1.9(b) states, "A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client (1) whose interests are materially adverse to that person, and (2) about whom the lawyer had acquired information protected by rules 32:1.6 [governing confidential information relating to client representation] and 32:1.9(c) [prohibiting a lawyer from using information gained from a former representation of a client to that client's disadvantage] that is material to the matter, unless the former client gives informed consent, confirmed in writing." Comment [5] states that this rules "operates to disqualify the lawyer only when the lawyer involved

has actual knowledge of information protected by rules 32:1.6 and 32:1.9(c)." The burden of proof should rest upon the firm whose disqualification is sought. *Id.*

"[I]f a lawyer while with one firm acquired ***no knowledge or information*** relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict." IRPC 32:1.9, cmt. [5] (emphasis added). Comment [6] elaborates that "Application of paragraph (b) depends on a situation's particular facts, aided by inferences, deductions, or working presumptions that reasonably may be made about the way in which lawyers work together." *See also* IRPC 32:1.0(f) (actual knowledge "may be inferred from circumstances"). For instance, a lawyer may have "general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients." IRPC 32:1.9, cmt. [6]. This reflects the "everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 383–84 (Cal. 1999); *see also* ABA Model Rules of Prof's Conduct 1.6, cmt. [5] ("Lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client [] instructed [it] be confined to specified lawyers.").

Rule 32:5.1(a) states partners and supervisory lawyers "shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Iowa Rules of Professional Conudct." Comment [2] to the rule elaborates that such "polices and procedures include those designed to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property,

and ensure that inexperienced lawyers are properly supervised."  The latter requirement is set forth in rule 32:5.1(b) that supervising lawyers shall make efforts to ensure other lawyer conform.

Mr. Johnson was[5] employed at MVS for 22 years.  Dkt. 27-2 at 3.  During that time, Drake exclusively entrusted MVS with its intellectual property assets.  Ex. 21 at ¶ 10.  "MVS was privy to confidential information regarding how Drake's trademarks were being used that would not appear in the public record; for example, whether marks should be abandoned or modified based on their use in commerce."  Ex. 21 at ¶ 18.  "MVS also counseled Drake on what *not* to file; for example, if a mark was too weak to support federal registration or if some other limitation was present that could negatively affect Drake's ability to enforce its intellectual property rights."  *Id.* MVS's representation involved matters of due diligence, procurement, maintenance, commercialization (e.g., licensing), litigation assessments, coordinating prospective litigations, among a variety of other legal tasks.  Ex. 21 at ¶ 14.  Counsel at MVS know "Drake's intellectual property matters inside and out, including those trademarks" at issue in this suit.  Ex. 21 at ¶ 16.

Beyond Mr. Johnson's express appointment to Drake's matters, the circumstances, inferences, deductions, and working presumptions imply Mr. Johnson had actual knowledge of Drake's confidences.  *See* IRPC 32:1.9, cmt. 5 (indicating that disqualification can be avoided if the lawyer has *no* knowledge, i.e., some knowledge would require disqualification).  These include Mr. Johnson's roles, qualifications, and working presumptions.

While at MVS, Mr. Johnson was part of multiple practice areas.  Ex. 1 at 3.  Within the licensing group, MVS worked "closely with [] clients' general attorneys in reviewing or drafting intellectual property provisions for various types of agreements such as franchising statements or agreements, company purchases, sale of intellectual property, loans where intellectual property is

---

[5] For purposes of discussion under rule 32:1.9(b), it is presumed that opposing counsel obviated the required disqualification under rule 32:1.7 and 32:1.9(a).

given as collateral and joint ventures." Ex. 1 at 5.  As one of very few CLPs in the state of Iowa, Mr. Johnson had "demonstrated experience, proficiency, knowledge, and understanding of licensing and commercialization of intellectual property," which would have established "credibility amongst colleagues." Ex. 5 at 1.  These circumstances give rise to the inference that Mr. Johnson would be an attorney within MVS to discuss client licensing issues with, including those MVS handled for Drake.

Mr. Johnson was also the chair of the litigation practice group. Ex. 1 at 1, 4.  The litigation group at MVS was "a cross-functional team of attorneys and technical advisors to provide [] high-quality, comprehensive litigation services." Ex. 1 at 4.  As a member and chair of this collaborative group, the natural deduction is Mr. Johnson was privy to all disputes and the related client confidences encountered by MVS's clients—including Drake's.

As a member of the trademark practice group, Mr. Johnson provided counsel on "the complexities … of trademark litigation[,]" including how to "avoid intellectual property disputes" by performing "related opinion work involving an in-depth analysis of … trademark issues." Ex. 2 at 1.  Mr. Johnson also took part in the prosecution of trademark applications. Ex. 3 at 1.  His work was so recognized by his peers that the year he departed from MVS, Mr. Johnson was recognized as one of the *Best Lawyers in America* within Trademark Law—a peer reviewed designation based on a consensus opinion of leading lawyers in the same geographical area and legal practice area. Ex. 2 at 3; Ex. 7 at 1.  The inferences to be drawn from these particular facts is that Mr. Johnson obtained confidences about Drake's trademark assets during his time at MVS due to his prestige amongst his colleagues.  [Cite to Dec].

Mr. Johnson was also a member of the executive committee and a partner at MVS.  Ex. 23 at ¶ 27.  Within this role and as required by the rules, Mr. Johnson was involved in establishing

policies and procedures governing how matters and client funds were managed, and providing supervision to ensure compliance with the rules.  These facts give rise to the inference that Mr. Johnson was privy to the ongoings of all of MVS's clients.

MVS's pursuit of building "meaningful relationships with [MVS's] clients" involved "appreciating a client's identity, their business, and their goals" to "truly be their intellectual property partner to better fulfill" their needs.  Ex. 1 at 3.  Deductively, relationships with clients, including Drake, cannot be characterized as superficial or transactional, but rather infers an exchange of confidences to fully understand the aspirations of each client.  This is supported by Mr. Johnson's current profile at Fredrikson that indicates his "thoughtful attention … to clients and their changing needs" that leads to recognizing "better ways of serving them."  Ex. 6 at 1.

Upon information, MVS permits all attorneys general access to client files absent special circumstances.  Ex. 23 at ¶ 28.  Mr. Johnson was in a position to be privy to all information about MVS's clients, i.e., litigation chair and executive committee member.  IRPC 32:1.9, cmt. [6].

The "everyday reality" of attorneys sharing confidential information suggests a wealth of confidences related to Drake were exchanged with Mr. Johnson.  *SpeeDee Oil*, 980 P.2d 383–84. The inference is that Mr. Johnson was privy to one or more confidence, including those related to Drake's use and non-use of marks, the scope and duration of marks' use, identification and selection of goods or services, election to pursue federal registration or maintain common law trademark rights, permitting federal registrations to abandon, methodology for dispute resolution, and willingness to invest in litigation.  The foregoing demonstrates that Mr. Johnson could have become privy to this information in a variety of way, including billing review, docket meetings, cooler talk, meetings, office colloquy, and internal consultations with peers or subordinates.

In a letter to counsel, Mr. Johnson has only stated an inability to recall receipt of Drake's

confidences.  Dkt. 27-2.  This does not alleviate the concerns the rules are intended to address nor does a lack of recollection indicate that Mr. Johnson received "no knowledge," which is required to avoid disqualification under rule 32:1.9(b).  *Dr. John's,* 2007 WL 5788, at \*6 (citations omitted) (finding doubts should be resolved in favor of disqualification).

### D.   Iowa Rule of Professional Conduct 32:1.10

Rule 32:1.10 states, "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by rule 32:1.7 or 32:1.9…."  The rule provides exclusions to the imputation of conflicts, including waiver and screening that are not present for the purposes of this Motion.  Comment [2] states, "The rule of imputed disqualification stated in paragraph (a) gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."

IRPC Preamble at paragraph [14] states that some of the rules are drafted as imperatives, using the terms "shall" and "shall not," while others are drafted as being permissive and use the term "may."  Rules 32:1.7, 32:1.9(a), 32:1.9(b), and 32:1.10 are drafted as imperatives.  A lawyer shall not represent a client in violation of the rules and must withdraw.  IRPC 32:1.16.

The foregoing outlines omnifarious violations of imperatives imposed by the rules. Disqualification of Mr. Johnson and vicarious disqualification of Fredrikson is required.

## V.   CONCLUSION

Drake University requests the Court grant the present motion and award Drake its fees incurred in this Motion. *See, e.g.*, *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1270 (7th Cir. 1983) (affirming $25,000 in fees for the disqualification).

Respectfully submitted,

Dated: August 13, 2024                    **ZARLEYCONLEY PLC**

                          By:    /s/Joshua J. Conley
                                 Joshua J. Conley, AT0011828
                                 John D. Gilbertson, AT0014515
                                 580 Market Street, Suite 101
                                 West Des Moines, IA 50266
                                 Telephone:  (515) 558-0200
                                 Facsimile:   (515) 558-7790
                                 jconley@zarleyconley.com
                                 jgilbertson@zarleyconley.com
                                 **ATTORNEYS FOR PLAINTIFF &**
                                 **COUNTERCLAIM DEFENDANT**