IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br><br>Plaintiff,<br>vs.<br>DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE,<br><br>Defendants.<br><br>DES MOINES AREA COMMUNITY COLLEGE,<br><br>Counterclaim Plaintiff,<br>vs.<br>DRAKE UNIVERSITY,<br><br>Counterclaim Defendant. | Case No. 4:24-CV-00227-SMR-SBJ<br><br>**DECLARATION OF R. SCOTT JOHNSON IN SUPPORT OF DEFENDANTS'/COUNTERCLAIM PLAINTIFF'S RESISTANCE TO PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL** |

I, R. Scott Johnson, declare as follows:

1. I am a shareholder at Fredrikson & Byron, P.A. and am one of the attorneys representing Defendants Des Moines Area Community College Foundation and Des Moines Area Community College (collectively, "DMACC") in this case. I make this declaration based on personal knowledge.

**My Time at McKee, Voorhees & Sease**

2. I started working at McKee, Voorhees & Sease ("MVS") as a law clerk in 1998 and continued my legal career there as an attorney until January 1, 2020. I am admitted to state and federal courts in Iowa. I am also a registered patent attorney licensed to practice in front of the United States Patent and Trademark Office.

3. During my time at MVS, I initially prepared and filed some mechanical related patent applications but focused primarily on intellectual property litigation. Over the course of my career at MVS, I spent perhaps 5-15% of my billable time prosecuting patents, approximately 10% of my billable time working on intellectual property licensing and related agreements, and perhaps 80% of my billable time working on litigation matters.

4. Trademark prosecution was an *extremely* small percentage of my work. When I had clients that needed trademark prosecution, it was my practice to refer that work internally to Christine Lebron-Dykeman. Attached as **Exhibit A** is Ms. Lebron-Dykeman's biography page, which I believe reflects her impressive career prosecuting and enforcing trademarks. While I was at MVS, she was my go-to for trademark prosecution, due in large part to her specialization in the field. I consider her to be an extremely competent trademark prosecutor, and I trusted her to do good work for my clients.

5. To the best of my knowledge, the only trademark prosecution clients I retained for myself were smaller clients (primarily startups) that had leaner legal budgets; I had no problem writing off some of my own time for these clients but did not feel it was appropriate to write off the time of someone of Ms. Lebron-Dykeman's expertise and experience.

6. While I was at MVS, MVS had a culture of consulting with each other on litigation matters, to work collaboratively to solve complex litigation problems.

7. There was no similar culture regarding trademark prosecution, which is a fairly straightforward practice. Regardless, I would not have been the attorney that the experienced trademark prosecutors at MVS would have consulted, given my primary focus on litigation.

8. Over the years at MVS, I was elected to the membership and eventually served on the Management Committee. The Management Committee focused broadly on running the firm,

managing its finances, and long and short term planning for firm success. I spent much of my time with the Management Committee addressing human resources and information technology implementation issues. Being on the Management Committee did not offer any special access to client matters or require review of any client matters unless client matters rose to a level of concern for the firm as a whole due to issues such as past due accounts. I do not recall ever discussing any Drake matter while on Management Committee. Nor would I have had time to independently rummage through files given how busy I was on the Management Committee. I also was trying to be a good father, a school board member, a mock trial coach, etc.—all while balancing my litigation focused practice.

**My Knowledge of and Interactions with Drake**

9. While I was at MVS, I knew that Drake was a firm client and that several of the attorneys in the office taught various intellectual property courses for Drake.

10. I do not recall ever consulting on any Drake matter.

11. I do not recall ever consulting on or participating in any Drake trademark prosecution.

12. Prior to this matter, I did not know my name was listed on any Drake trademark prosecution files as an "other appointed attorney."

13. To the best of my knowledge, I have never billed any time on any Drake matter while at MVS or Fredrikson, or worked for Drake as an attorney in any way.

14. To the best of my knowledge, I have never reviewed any Drake client files.

15. To the best of my knowledge, I have never signed anything on behalf of Drake.

16. While working at MVS, I did not believe I had the authority to sign any pleadings, filings, or applications on behalf of Drake, as Drake was not my client, and I was not working on any Drake matters.

17. I was not the client contact with Drake. To the best of my knowledge, I did not ever talk with anyone at Drake in my capacity as a legal representative.

18. My primary interaction with Drake while at MVS was as an occasional substitute adjunct professor of intellectual property law. I was never paid for any teaching by Drake.

19. To the best of my knowledge, I have never been Drake's attorney.

20. I have reviewed the Declaration of Earl F. Martin, attached to the motion to disqualify as Ex. 21. See ECF 41-22.

21. To the best of my knowledge, I have never met or spoken with Mr. Martin.

22. I have no idea what Mr. Martin looks like.

23. To the best of my knowledge, I have never learned or possessed any confidential or privileged information gained from representation of Drake University because, to the best of my knowledge, I have never personally represented Drake or been privy to any such information.

24. To the best of my knowledge, everything I know about Drake from before this litigation is public information.

25. To the best of my knowledge, everything I know about Drake's trademarks is either from public trademark filings reviewed after the start of this matter or is publicly available online from news sources or social media.

26. I have not had access to any MVS files since January 2020.

**Marching Spike Trademark**

27. To the best of my knowledge, I never worked on the trademark application or prosecution related to U.S. Registration No. 1,567,283 ("Marching Spike mark").

28. Prior to this matter, I did not know that my name was listed as "Other Appointed Attorney" on any Drake trademark filing, let alone the Marching Spike mark.

29. It is my belief that it must have been MVS's standard practice to include every MVS attorney's names on trademark filings--regardless of whether they actually conducted work on that matter.

30. I have formed this belief through my understanding that MVS's USPTO filings utilize client codes for patent matters; in the USPTO system, it is my understanding that the client codes list every MVS attorney who is able to practice before the USPTO, regardless of whether they ever prosecute patents or trademarks. I utilized client codes in prosecuting patents for my clients but entered an appearance before the USPTO by signing documents submitted to the USPTO.

31. My belief is confirmed by a review of the other appointed attorneys in the filings Drake has submitted in support of its motion to disqualify. My name is listed alongside every other attorney I recall working with at MVS at the various times of the trademark filings; including attorneys that it is my understanding do no trademark prosecution work.

32. Attorneys listed via client codes or listed as other appointed attorneys for a matter did not receive copies of filings done on such matters. Having every attorney at the firm receive filings submitted or received for every matter on which they were listed would be an absurd waste of client resources, and further, an absurd waste of attorney time.

33. Because, to the best of my knowledge, I have never worked for Drake, billed any time to any Drake University matter, and never signed any document related to the Marching Spike filing, I do not believe I ever entered an appearance at the USPTO on behalf of Drake. I was not aware of my listing on Drake's trademark application and was not aware of any need to withdraw from the Marching Spike prosecution. I never represented Drake to begin with.

34. It is further my understanding based on 37 C.F.R. 2.17(g) that, even if MVS's listing of me as "Other Appointed Attorney" on a trademark filing I had no knowledge of, for a client I did not work for, could be considered "representation," any such representation would have ended on December 21, 2019, the date that the renewal application filing my name appears on was accepted by the Trademark Office. Attached as **Exhibit B** is the December 21, 2019, acceptance of the Renewal Application.

**Academic D Trademark**

35. To the best of my knowledge, I never worked on the trademark application or prosecution related to U.S. Registration No. 3,498,202 ("Academic D mark").

36. Prior to this matter, I did not know that my name was listed as "Other Appointed Attorney" on any Drake trademark filing, let alone the Academic D mark.

37. Because, to the best of my knowledge, I have never worked for Drake, billed any time to any Drake University matter, and never signed any document related to the Marching Spike filing, I do not believe I ever entered an appearance at the USPTO on behalf of Drake. I was not aware of my listing on Drake's trademark filings and was not aware of any need to withdraw from the Academic D mark prosecution. I never represented Drake to begin with.

38. It is further my understanding based on 37 C.F.R. 2.17(g) that, even if MVS's listing of me as "Other Appointed Attorney" on a trademark filing I had no knowledge of, for a

client I did not work for, could be considered "representation," any such representation would have ended on September 7, 2018, the date that the Application for Renewal filing my name appears on was accepted by the Trademark Office. Attached as **Exhibit C** is the September 7, 2018 acceptance of the Renewal Application.

**Athletic D Trademark**

39. To the best of my knowledge, I never worked on the trademark application or prosecution related to U.S. Registration No. 4,625,043 ("Athletic D mark").

40. Prior to this matter, I did not know that my name was listed as "Other Appointed Attorney" on any Drake trademark filing, let alone the Athletic D mark.

41. Because, to the best of my knowledge, I have never worked for Drake, billed any time to any Drake University matter, and never signed any document related to the Marching Spike filing, I do not believe I ever entered an appearance at the USPTO on behalf of Drake. I was not aware of my listing on Drake's trademark filings and was not aware of any need to withdraw from the Athletic D mark prosecution. I never represented Drake to begin with.

42. It is further my understanding based on 37 C.F.R. 2.17(g) that, even if MVS's listing of me as "Other Appointed Attorney" on a trademark filing I had no knowledge of, for a client I did not work for, could be considered "representation," any such representation would have ended on October 21, 2014, the date that the Athletic D mark registered. Attached as **Exhibit D** is the October 21, 2014, registration.

**Move to Fredrikson & Byron**

43. On or around January 1, 2020, I moved to Fredrikson & Byron, P.A. I have worked there ever since.

44. As part of that move, I endeavored to follow the Iowa Rules of Professional Conduct to the letter.

45. It is my recollection that I worked to identify an active client list, a conflict of interest list, and a closed file list. I understand that between myself and MVS, we sent a joint letter announcing my departure and new firm to every client that I worked for while at MVS based on these lists. Clients were then asked to provide direction as to whether their files should stay at MVS or be sent to me at Fredrikson.

46. I further understand that clients that were not mine, and that I did not work for, were not contacted, and did not need to be contacted under the ethics rules. In essence, I did not work for every firm client, and not every firm client was considered my client. Thus, MVS and I agreed we did not need to contact every firm client to notify them of my departure--just those firm clients that needed to be notified under the ethics rules.

47. I do not believe Drake received a notice regarding my departure, because Drake was not my client, and I did not perform any work for Drake.

48. Since coming to Fredrikson, I understand that Fredrikson has had one employment matter representing Drake, which concluded three years ago. I am not an employment lawyer, and I did not bill time to or consult on that matter. I understand the work has concluded and Drake is a former client.

49. While at Fredrikson, I do not believe I have ever had the authority to file anything on Drake's behalf.

50. I further do not believe I have ever had the authority to represent Drake while at Fredrikson.

51. This is because I have had no relationship with Drake while at Fredrikson.

52. I do not believe Fredrikson has the authority to file any trademark prosecution filings on Drake's behalf.

**This Litigation**

53. On May 2, 2024, Drake's counsel sent me a letter requesting that DMACC cease and desist from any further use of the DMACC "D." Drake's counsel did not mention any concern about my representation of DMACC at that time. Drake demanded a response by May 23, 2024. I responded to Drake's counsel on behalf of DMACC on May 8, 2024 and affirmatively stated that "As you know, I represent Des Moines Area Community College, widely known as DMACC (you can't say DMACC without the "D")."

54. Drake's deadline passed and months went by. In early July, 2024, counsel for Drake accused me of a conflict arising out of my representation of DMACC opposite Drake in this matter. I was surprised by this allegation, as it was (and still is) my understanding that I had never represented Drake.

55. Attached hereto as **Exhibit E** is a true and correct copy of emails between myself and members of MVS dated between July 15, 2024, and July 16, 2024, wherein I initially asked MVS to look into whether I had ever billed any hours to any Drake matter. MVS declined to provide this information.

56. Attached as **Exhibit F** is a true and correct copy of a July 15, 2024, letter I sent to counsel for Drake, identifying the *Deere* case, and informing Drake's counsel that I do not possess any Drake confidential information.

57. Attached hereto as **Exhibit G** is a true and correct copy of emails between myself and counsel for Drake, dated between July 17, 2024, and July 19, 2024, wherein I requested that

Drake consent to MVS's provision of the number of hours I worked on any hours related to Drake. Drake's counsel did not respond to this request.

58. Attached as **Exhibit H** is a true and correct copy of related emails between myself and members of MVS dated between August 15 and August 16, 2024 wherein I again asked MVS to look into whether I had ever billed any hours to any Drake. As the emails indicate, MVS has again denied my request for fear of providing or being perceived to provide a competitive advantage to either party.

59. I am seeking reimbursement of fees spent on this opposition on behalf of DMACC because I believe this is but one example where Drake's counsel has advanced a position not on the merits, but to obtain a competitive advantage. Drake's counsel filed its conflict notice letter on the open court docket when it filed its initial Complaint, which I suspect was when Drake believed newspapers who watch court dockets would be paying attention. At least one newspaper has published an article on Drake's allegations I violated ethical standards. This article was published prior to Drake filing its motion to disqualify. I do not believe Drake filed its motion for any legitimate purpose. Attached as **Exhibit I** is a true and accurate copy of the referenced newspaper article. DMACC intends to use this motion practice as an example of the exceptional nature of the manner Drake has litigated this suit when DMACC seeks its fees.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __27th__ day of August, 2024.

 /s/ R. Scott Johnson  
 R. Scott Johnson

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2024, I electronically filed the **DECLARATION OF R. SCOTT JOHNSON IN SUPPORT OF DEFENDANTS'/COUNTERCLAIM PLAINTIFF'S RESISTANCE TO PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL** with the Clerk of the Court using the ECF, who in turn sent notice to the following:

Joshua J. Conley, Esq.
 jconley@zarleyconley.com
John D. Gilbertson, Esq.
 jgilbertson@zarleyconley.com
ZARLEYCONLEY PLC
580 Market Street, Suite 101
West Des Moines, IA  50266

*Attorneys for Plaintiff*

　　　　　　　　　　　　　　　　　　　　　/s/ Erica Palmer
　　　　　　　　　　　　　　　　　　　　　Erica Palmer

#83236223v1