IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - - - X
DRAKE UNIVERSITY,                :
                                 :
    Plaintiff,                   :
                                 :
vs.                              :      Case No. 4:24-cv-00227
                                 :
DES MOINES AREA COMMUNITY        :      HEARING TRANSCRIPT
COLLEGE FOUNDATION and           :
DES MOINES AREA COMMUNITY        :
COLLEGE,                         :
                                 :
    Defendants.                  :
- - - - - - - - - - - - - - - X
DES MOINES AREA COMMUNITY        :
COLLEGE FOUNDATION and           :
DES MOINES AREA COMMUNITY        :
COLLEGE,                         :
                                 :
    Counterclaim Plaintiffs,     :
                                 :
vs.                              :
                                 :
DRAKE UNIVERSITY,                :
                                 :
    Counterclaim Defendant.      :
- - - - - - - - - - - - - - - X


                      Courtroom, First Floor
                      U.S. Courthouse
                      123 East Walnut Street
                      Des Moines, Iowa
                      Tuesday, September 3, 2024
                      8:59 a.m.


BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Chief Judge.



            KELLI M. MULCAHY, CSR, RDR, CRR
               United States Courthouse
          123 East Walnut Street, Room 115
               Des Moines, Iowa 50309

APPEARANCES:

```
For the Plaintiff/          JOHN GILBERTSON, ESQ.
Counterclaim Defendant:     JOSHUA J. CONLEY, ESQ.
                            ZarleyConley PLC
                            580 Market Street, Suite 101
                            West Des Moines, Iowa  50266


For the Defendants/         R. SCOTT JOHNSON, ESQ.
Counterclaim Plaintiffs:    CARA S. DONELS, ESQ.
                            Fredrikson & Byron, P.A.
                            111 East Grand Avenue, Suite 301
                            Des Moines, Iowa  50309
```

1                    P R O C E E D I N G S

2        (In open court.)

3            THE COURT:  Thank you.  You can be seated.

4        We are here today for purposes of a disqualification

5   hearing in Case No. 4:24-cv-227.  Plaintiff Drake University is

6   suing Defendants Des Moines Area Community College and

7   Des Moines Area Community College Foundation for trademark

8   infringement.

9        Drake is represented by their attorneys -- let's see --

10  Joshua Conley and John Gilbertson.  DMACC is represented by

11  Attorneys Cara Donels and R. Scott Johnson, as well as DMACC's

12  president appears here today, Robert Denson.

13       Drake filed their complaint and a motion for preliminary

14  injunction on July 8th of 2024 seeking to enjoin DMACC's use of

15  a new logo.  An injunction hearing hasn't yet been scheduled,

16  and several motions are pending in that case because Drake has

17  also sought the disqualification of DMACC's counsel due to an

18  alleged conflict of interest.  On August 13th of 2024, Drake

19  filed a motion to disqualify counsel, and this hearing was

20  scheduled at this date and time.

21       What I would propose we do here is that each party present

22  any evidence that they may have on this matter, and then we'll

23  turn to argument by each attorney or each side.

24       Drake, this is your motion.  Any evidence you wish to

25  present?

1          MR. CONLEY:  Nothing beyond President Martin's

2     declaration that was submitted with the record.

3          THE COURT:  Okay.

4       DMACC, any evidence you wish to present?

5          MS. DONELS:  We previously presented evidence in the

6     form of two declarations, one from Mr. Johnson and one from

7     Ms. Yin Sowatzke.  Those are already in the record.

8          THE COURT:  Then argument on behalf of Plaintiff?

9          MR. CONLEY:  And I apologize, Your Honor.  We do have

10    additional exhibits from the Trademark Office that we would be

11    referring to today.  And to try to narrow that down, just to

12    make it simple, that would be Exhibit 11, which I believe in the

13    docket is 41-12.

14         THE COURT:  Okay.  Would you like to present any

15    argument?

16         MR. CONLEY:  Yes, Your Honor.

17       While I'm going to generally defer to our briefing,

18    including the reply brief that was filed this morning, I do want

19    to touch briefly on the three primary rules that we believe

20    require disqualification of opposing counsel.

21       The first rule is 32:1.7, and that governs concurrent

22    conflict of interest, and that arises when an attorney

23    represents two different clients at the same time and the

24    representation of one is adverse to the other.

25       In this instance, Drake University has relied upon McKee,

1   Voorhees & Sease for over 40 years for the representation of all

2   intellectual property matters.  Specifically, that includes

3   trademark registrations before the USPTO.  Amongst those are

4   applications and filings and maintenance documents in which

5   Drake appoints Mr. Johnson and Mrs. Yin Sowatzke as

6   representatives of Drake University.

7        That representation, to the knowledge of Drake University,

8   has never terminated.  They've never received notification of

9   any withdrawal of any sort of Mr. Johnson or Mrs. --

10  Ms. Yin Sowatzke; therefore, to Drake's understanding, they are

11  still actually represented by those two counsel.

12       Earlier this year, Mr. Johnson and Fredrikson & Byron law

13  firm began representation of DMACC.  At that point in time,

14  there was concurrent representation, and quite clearly the

15  representation of DMACC in this instance is adverse to Drake

16  University, and therefore disqualification is required

17  underneath that rule.

18       Under Rule 32:1.9(a), that addresses former representation.

19  Now, there's been arguments presented that Mr. Johnson,

20  Ms. Yin Sowatzke have terminated that representation at some

21  point in time and therefore Drake University would be a former

22  client.  The rules then apply to whether or not -- the test to

23  determine whether there's a conflict of interest is if the

24  representation of DMACC is a -- in a substantial relation to the

25  representation that they had of Drake University.

1        In this instance, there is.  They're attacking the very

2   trademarks that they're identified as being a representative for

3   Drake on; therefore, disqualification is required.

4        Lastly, underneath Rule 32:1.9(b), disqualification can

5   occur or a conflict can arise even if an attorney didn't

6   represent a client directly but worked at a firm in which

7   representation did occur and thereafter they represent an

8   adverse party.

9        That is very -- that is not as simplistic of an approach.

10  You need to present facts and evidence that you can derive

11  circumstances and interferences that the attorney, in this

12  instance Mr. Johnson, acquired information about Drake

13  University.

14       While he has attested that he doesn't recall learning

15  anything, Mr. Johnson's a talented attorney.  He's been

16  practicing for over two decades.  He spent 22 years at McKee,

17  Voorhees & Sease, and he was a staple at that firm.  He was

18  also, at least for a certain amount of time, one of only three

19  CLPs, a Certified Licensing Professional, which is important

20  when you're talking about intellectual property, which is

21  commonly licensed.  He was also the head of their litigation

22  department for some time, and, as he attested to in his own

23  declaration, he also worked in -- that was a collaborative

24  environment.

25       If we refer to President Martin's declaration, he also

1  declares that Drake University relied upon McKee, Voorhees &

2  Sease for all matters intellectual property related, and that

3  included licensing and litigation or dispute resolution, which

4  would necessarily include Mr. Johnson.

5      Now, in addition to that, Mr. Johnson also has been

6  involved in trademarks.  He's even been recognized as one of the

7  Best Lawyers in America for trademarks.  So it's highly likely

8  that attorneys working in a small office such as McKee,

9  Vorhees & Sease -- that they're going to confer with someone as

10 talented as Mr. Johnson to obtain information when they're

11 trying to decide how to advise Drake University.

12     In addition, if we even look at the comments, specifically

13 Comment 6 to 32:1.9, you'll see that they say that you can

14 actually infer that actual knowledge was provided simply based

15 off something as minuscule as general access to client files and

16 being on a management committee.  Mr. Johnson had both of those

17 things at his disposal.  He was on a management committee, and

18 he also -- there was general access to Drake University's files.

19 All of those things infer and provide circumstances that actual

20 confidences were disclosed to Mr. Johnson.

21     In response, from what we see in the resistance is we have

22 two declarations from opposing counsel that we believe have

23 created this conflict of interest saying that they do not

24 recall, and that casts doubt whether or not they did learn

25 something and they just don't recall it.

1      At that point in time, if that's the best that they have,

2  there's enough inferences to demonstrate that they have obtained

3  actual knowledge, and therefore disqualification is necessary.

4  Even if there are doubts about it, doubts have to be given to

5  the moving party, and if there's a violation of any of these

6  rules, it would necessarily require that Mr. Johnson be

7  disqualified and then, via Rule 32:1.10, that would be imputed

8  to the rest of Fredrikson & Byron.

9          THE COURT:  All right.  Let's talk more specifically

10  about what did happen.

11      How many attorneys were at MVS during the relevant time

12  frame here of 2005 to the end of 2019?

13          MR. CONLEY:  That is a difficult question.  And

14  Mr. Johnson would probably know better than I, but I believe it

15  was in the ballpark of 12 to 20 would be my estimate.

16          THE COURT:  Was there ever any litigation surrounding

17  these trademarks before the time you filed your lawsuit here?

18          MR. CONLEY:  There was not litigation, no.

19          THE COURT:  Isn't the registration process for

20  trademarks fairly formulaic?  In other words, isn't the -- you

21  know, the strength of a trademark inherently public because it's

22  determined by the traits of the trademark itself?

23          MR. CONLEY:  Well, there's quite a bit that actually

24  goes into that, Your Honor.  Before you file, there's due

25  diligence, which even McKee's website that we've provided in our

1  exhibits shows that you need to evaluate a mark, and then you

2  also need to determine what classes and classifications you can

3  use in conjunction with.  So there is actually a lot of

4  discussion of what you're going to seek registration for and

5  what you won't.

6      On those same grounds, even with the trademarks, we do have

7  common law trademarks at issue here, such as the vintage style

8  D, which would be something that would possibly have been

9  discussed with McKee, Voorhees & Sease at some point in time.

10     So while the process is formulaic as in it follows a set

11  path, there's still a lot of guidance on what path you do take

12  throughout the Trademark Office.

13         THE COURT:  Okay.  Explain to me generically what kind

14  of confidential information you think would have been relayed to

15  MVS about these trademarks.

16         MR. CONLEY:  Possible usage, how it was going to be

17  used, how it won't be used, whether or not usage is dwindling,

18  whether or not it's worth the value, is it being licensed

19  substantially.

20         THE COURT:  Why not permit MVS to just affirm whether

21  or not they ever billed anything for Johnson?

22         MR. CONLEY:  That's a great question, Your Honor.

23  Billing is not dispositive, as we've submitted in our reply

24  brief.

25         THE COURT:  I agree.  But it's relevant.  Would you

1  agree with that?

2          MR. CONLEY:  It can be useful.  However, we would say

3  that, referring to Exhibit 11, where we have Drake University

4  expressly appointing Mr. Johnson and indicating that they are

5  selecting him to represent, Mr. Johnson, we think that that's

6  stronger evidence.

7          THE COURT:  Is it fair for me to assume that there is

8  no bill that's ever listed him that was sent to Drake?

9          MR. CONLEY:  Your Honor, we asked that -- we asked

10  Drake University to look into it.  They had very scant records.

11  It's kind of like a government administration; there is

12  turnover.  So there was a different group in there before, and

13  they have tried to obtain the billing, and they have not been

14  able to find a substantial amount of their billing in general

15  across the board.

16      Communications were also had with McKee, Voorhees & Sease,

17  who said a very similar thing they said to Fredrikson & Byron,

18  which is, "We're going to stay out of this," and they weren't

19  going to provide us with anything.

20          THE COURT:  But MVS did say if Drake consented and I

21  ordered it, they would answer that question, correct?

22          MR. CONLEY:  Yes.

23          THE COURT:  Okay.  Any objection to getting that

24  question answered?

25          MR. CONLEY:  The only objection I would have to that,

1  Your Honor, is I don't think that it's dispositive to this

2  issue.

3         THE COURT:  Again, I don't disagree with that, but it

4  would be helpful, would it not?

5         MR. CONLEY:  If Your Honor finds it to be helpful,

6  absolutely, then there's no objection to it.

7         THE COURT:  Okay.  If Attorney Johnson's participation

8  in the case was so harmful, why did you wait so long to file

9  your motion?  I mean, really, we had to force you to do it.

10 Why?

11        MR. CONLEY:  Your Honor -- and I appreciated you

12 expediting this.  Our law firm is just John and I,

13 Mr. Gilbertson and I, and our primary focus was on dealing with

14 the dispute with DMACC to get that remedied as quickly as

15 possible.

16     At the same time, as hopefully my remarks have shown, I

17 have a great deal of respect for Mr. Johnson, and asking for

18 disqualification and asserting there's been a conflict of

19 interest is not something we take lightly.

20     There was also quite a bit of investigation.  There was a

21 considerable amount of manpower that was put into this, hoping

22 to present our compelling case.

23     In addition to that, there was also the fact that we

24 would -- we were trying to work this out without judicial

25 involvement by requesting that Mr. Johnson recuse himself and

1   withdraw, bow out gracefully from this matter.  And we continued

2   that, actually, pretty much up and until we had to file our

3   motion to disqualify.

4        So while it was definitely an expedient matter that we

5   wanted to have addressed by the Court, our plates were quite

6   full at the time.

7        THE COURT:  With respect to the concurrent conflict

8   argument that you've made, do you consider that every attorney

9   that is on the filings done by MVS is still representing Drake?

10       MR. CONLEY:  As long as there was not a notification to

11  whoever they're representing, in this case Drake University,

12  then, yes, by the rule, that would have -- there would be an

13  understanding it was an attorney-client relationship, and, as

14  the rules of ethics require, you would have to provide some

15  degree of notice to that client.

16       And so while I understand this might have -- may or may not

17  have been a standard practice, it's a standard practice that you

18  can't fault the client for the firm electing to impose.

19       THE COURT:  Okay.  Any additional thoughts before I

20  turn to your colleagues here?

21       MR. CONLEY:  If you would like me to touch on anything

22  from the resistance or prefer that I wait to reply to address

23  that, I'd be happy to.

24       THE COURT:  Okay.

25       Ms. Donels or Mr. Johnson.

1          MS. DONELS:  Yes, Your Honor.  I have provided a

2    PowerPoint presentation if that's fine with Your Honor.

3          THE COURT:  Yes.  Do you have a copy for us and the

4    court reporter?

5          MS. DONELS:  Yes.

6          THE COURT:  Go ahead.

7          MS. DONELS:  Thank you, Your Honor.

8      I'll be handling the legal arguments on behalf of DMACC

9    today; however, if Your Honor has any questions for Mr. Johnson,

10   please feel free to ask him, as he's happy to answer.

11     Ms. Yin Sowatzke is not present today, as she has not been

12   employed with Fredrikson & Byron since June and has actually not

13   lived in Iowa since last June, I believe.

14        Your Honor, this shouldn't be so hard.  It was Drake's

15   burden today to establish that there is a conflict that is

16   sufficient for a claim for disqualification.  Drake has failed

17   to meet its burden.

18        Drake alleges that there is a concurrent representation

19   conflict under Rule 32:1.7(a), a conflict based on former

20   representation under Rule 32:1.9(a), and a conflict based on the

21   Fredrikson attorneys' previous employment under McKee,

22   Voorhees & Sease under Rule 32:1.9(b).  Drake has failed to meet

23   its burden because Drake has failed to establish that the

24   Fredrikson attorneys ever represented Drake and has also failed

25   to establish that the Fredrikson attorneys have ever gained any

1    confidential information regarding Drake.

2         Now, Drake had all of the cards.  It could have found this

3    information.  Today Drake submitted an additional exhibit

4    stating that it knew that McKee, Voorhees & Sease would not

5    provide the billing records absent a court order as of July

6    12th.  It is September 3rd, and Drake still has not moved the

7    Court for an order.  Those billing records would definitively

8    answer the question of whether Mr. Johnson or Ms. Yin Sowatzke

9    ever worked for Drake.

10        Instead, because Drake has not met its burden to prove that

11   disqualification is proper, today we will talk about trademark

12   filings.

13        Now I'd like to direct Your Honor's attention to Docket

14   41-12 at pages 1 through 2.  Drake is relying on two camps of

15   facts today to establish that disqualification is proper.  The

16   first is trademark filings like the ones shown.  The second

17   relates to the Fredrikson attorneys' former employment at McKee,

18   Voorhees & Sease.

19        If you look at Docket 41-12, the page shown here, page 1,

20   is a piece of the Marching Spike mark.  This is one of the three

21   marks asserted in this litigation.  This particular document is

22   a November 2019 Combined Declaration of Use and/or Excusable

23   Nonuse and an Application for Renewal of Registration of a Mark

24   under Sections 8 and 9.

25        As you can see, under the "Attorney Section," Ms. Christine

1   Lebron-Dykeman is listed.  Similarly, under the "Correspondence

2   Section," Ms. Christine Lebron-Dykeman is listed.  This is

3   because Christine Lebron-Dykeman is or was Drake's attorney for

4   the filing of this -- for this declaration.

5       THE COURT:  What is the purpose, then, of the "Other

6   Appointed Attorney" section?

7       MS. DONELS:  Yes, Your Honor.  I think Mr. Johnson may

8   be able to say why McKee did that, but it's my understanding

9   that it's kind of a clerical thing, where in case

10  Ms. Lebron-Dykeman was not present, any of the other attorneys

11  could have stepped in but didn't necessarily step in.

12      THE COURT:  How is that not representation, then, if

13  they don't have to do anything more to be deemed to be attorneys

14  of record, they can file, they can appear?

15      MS. DONELS:  They do have to do something more, Your

16  Honor.  They have to sign something, they have to file something

17  in the matter.  They're not just representation -- representing

18  and filing on behalf of Drake as of this listing.

19      THE COURT:  Did they receive notice of anything that

20  was going on in the case?  In other words, like we do through

21  CM/ECF, every attorney of record gets notified, anything like

22  that similar?

23      MS. DONELS:  No, Your Honor.  It's my understanding

24  that in order to receive any notice, you would have to be in

25  that "Correspondence Section" or you would have to have your

1   contact information submitted as part of the file online as part

2   of the account.

3          THE COURT:  Okay.

4          MS. DONELS:  Now, Mr. Johnson and Ms. Yin Sowatzke's

5   names are listed among 19 other names in the "Other Appointed

6   Attorney" section.  DMACC has submitted declarations from both

7   Mr. Johnson and Ms. Yin Sowatzke stating that they were unaware

8   that their names appeared on Drake's trademark filings in this

9   "Other Appointed Attorney" section.

10      Your Honor, I have never filed a Declaration of Use, a

11  Declaration of Nonuse -- or Excusable Nonuse or an Application

12  for Renewal of Registration of a Mark, but I do know that any of

13  my clients that have trademarks, if they saw that 19 attorneys

14  touched a three-page form, they would be very upset with me.

15      That's essentially what Drake's argument is here today,

16  Your Honor.  Drake is arguing that because another attorney

17  listed Mr. Johnson and Ms. Yin Sowatzke among every other

18  attorney in the firm's names in this "Other Appointed Attorney"

19  section, that means that we have a concurrent conflict of

20  interest and a conflict based on former representation.  That's

21  simply not the law.

22      Representation is not something that you stumble into

23  unknowingly.  Here Drake relies on those trademark filings to

24  establish that there was representation.  As of the reply brief

25  submitted this morning, it appears that Drake also relies on

1  McKee -- or the Fredrikson attorneys' employment at McKee,

2  Voorhees & Sease to establish representation.

3      But representation only happens if -- I'm missing a slide.

4  Representation only happens if an attorney -- if an entity or a

5  person seeks advice or assistance from an attorney, that advice

6  or assistance pertains to the attorney's professional

7  competence, and the attorney agrees or -- either expressly or

8  impliedly, to actually give that advice.

9      Drake has not established any of those.  It could have done

10  so.  Drake could have moved the Court for access to those

11  billing records at any point between when it first argued that

12  there was a conflict of interest and today.  It did not do so.

13      DMACC, on the other hand, has submitted evidence, and has

14  submitted evidence from Mr. Johnson and Ms. Yin Sowatzke,

15  stating that neither ever recalls that their names were on these

16  documents.  They don't recall ever giving advice to Drake or

17  meeting with Drake or billing any time to any Drake matter, let

18  alone a Drake trademark matter.

19      DMACC is unaware of any case law that would establish an

20  attorney-client relationship between a lawyer whose name is

21  listed among the entire firm's names on a trademark filing they

22  did not even work on and the trademark client.  Drake has

23  certainly not identified any such case law.  Instead, Drake

24  tries to impute representation to Mr. Johnson and

25  Ms. Yin Sowatzke based on their prior employment at McKee,

1  Voorhees & Sease.

2      Now, I'll touch more on this later, but we know from the

3  *Deere* case that you can't just impute a conflict.  Imputation of

4  a conflict only works when there is actual knowledge, which has

5  not been established here.

6      Even if these filings could establish that there was a

7  relationship, that wouldn't establish concurrent representation;

8  namely, there's been no overlap between the alleged

9  representation of Drake and the representation of DMACC.

10     Now, representation in front of the Trademark Office is not

11  forever.  To understand when the Trademark Office determines

12  that representation is concluded, we look to the trademark rules

13  housed in the CFR.

14     Under the trademark rules, when your representation

15  pertains to the filing of an application for a trademark, your

16  representation is deemed concluded when the mark registers, when

17  ownership changes, or when the application is abandoned.

18     As relevant here, if representation is recognized as to the

19  filing of an affidavit under Section 8 or a renewal application

20  under Section 9, your recognition is deemed to end upon the

21  acceptance or rejection of the filing by the Trademark Office.

22  The latest this could possibly be for Mr. Johnson is December

23  2019.  For Ms. Yin Sowatzke, it's February 2021.  Now, as Drake

24  alleges in its complaint, the present dispute didn't begin until

25  March 2024; thus, there is no concurrent representation.

1       There is also no conflict based on former representation.

2   A lawyer who has formerly represented a client in a matter shall

3   not thereafter represent another person in the same or

4   substantially related matter in which that person's interests

5   are materially adverse to the interests of the former client.

6       I won't beat a dead horse here.  We do not believe that

7   there has been any former representation.  However, Drake has

8   also failed to establish that the alleged prior representation

9   is substantially related to the current litigation.

10       When we are evaluating whether the former representation

11   and the current litigation are substantially related, we look to

12   the nature and scope of the prior representation, the nature of

13   the present lawsuit, and whether the client might have disclosed

14   a confidence to its attorney in the prior representation which

15   could be relevant to the present action.

16       As to the nature and the scope, Drake is primarily alleging

17   that these trademark filings are the nature and scope as well as

18   the Fredrikson attorneys' former employment at McKee, Voorhees &

19   Sease; however, the *NuStar* case is very instructive here.

20       In the *NuStar Farms* case, the Court found that an attorney

21   who met with a client, had telephone conversations with a

22   client, appeared as their attorney, and signed pleadings on the

23   client's behalf was highly involved in the former

24   representation.

25       Here DMACC has submitted declarations that neither

1   Fredrikson attorney recall ever even working for Drake.  They

2   never met with Drake, never had phone calls or conversations,

3   and never appeared intentionally on Drake's behalf.  They never

4   even knew their names were on these Drake trademark filings, and

5   they never signed any filings on Drake's behalf.

6       There is simply no scope to a prior representation when the

7   entire representation consists of someone else listing your name

8   on the document that you didn't know about.

9       As to the second factor, the nature of the present lawsuit,

10  Drake has not identified any specific information suggesting

11  that the Fredrikson attorneys' past representation contemplated

12  an overlap with the present lawsuit.

13      It is true that three of the trademarks in which the

14  Fredrikson attorneys appear as other appointed attorneys are

15  asserted here; however, as Your Honor discussed, those are

16  public filings.  Moreover, there's been no evidence that the

17  Fredrikson attorneys actually represented Drake in relation to

18  those filings, ever met with Drake, or discussed any of the

19  information that Mr. Conley discussed.

20      As to the third factor, whether any confidential material

21  has been disclosed, here there has been no allegation of any

22  specific material.  In fact, Drake has stated, quote, Drake is

23  not required to show that confidential information will be used

24  in this litigation or that any such information was disclosed to

25  Mr. Johnson.

1    At this point, it would have been helpful for Drake to
2    review the *Deere* case that Mr. Johnson sent them.  In the *Deere*
3    case, this court criticized Kinze for not demonstrating that
4    Attorney Harty gained knowledge of relevant specific facts from
5    the prior representation that was material to the *Deere* dispute.
6    As in *Deere*, Drake's failure to identify the disclosure of
7    any confidential material is fatal to its disqualification
8    motion.
9    Again, Drake could have moved the Court for the billing
10   records.  It simply chose not to.  Drake has shown -- has not
11   shown that the alleged prior representation is substantially
12   related to this dispute, and thus there is no conflict of
13   interest under Rule 32:1.9(a).
14   There is also no conflict of interest based on the
15   Fredrikson attorneys' former employment at McKee, Voorhees &
16   Sease.  Rule 32:1.9(b) also requires the attorney acquire actual
17   knowledge of protected information that is material to the
18   matter.
19   Again, had Drake reviewed the *Deere* case, that would have
20   solved this debate.  In *Deere*, this court held that former
21   employment at McKee, Voorhees & Sease is not enough to
22   disqualify an attorney from appearing opposite a McKee,
23   Voorhees & Sease client.
24   If we take Drake's position to its conclusion, there would
25   be no former McKee, Voorhees & Sease attorney that could ever

1  appear opposite a McKee, Voorhees & Sease client, and the rules

2  make clear that imputation of a former firm's conflicts should

3  be narrowly applied or else lawyer mobility would be severely

4  impacted.  This is why actual knowledge is required.  Only those

5  that should be disqualified are.  Because Drake hasn't even

6  attempted to argue actual knowledge, its motion fails as to Rule

7  32:1.9(b).

8      Here, Fredrikson should not be disqualified.  Drake has not

9  established that there was any former representation at all;

10  thus, there is no concurrent representation or former

11  representation under Rules 32:1.7(a) or 32:1.9(a).  Drake has

12  not established that either attorney ever received any Drake

13  confidential information; thus, there is no conflict of interest

14  under Rule 32:1.9(a) or 32:1.9(b).

15      DMACC respectfully asks the Court to deny Drake's motion in

16  its entirety.

17      Thank you.

18          THE COURT:  You had indicated that the filings done in

19  this case on the relevant trademarks listed every other attorney

20  at MVS.  Is that the case, every single attorney that was

21  working there at the time is listed?

22          MS. DONELS:  From our understanding, yes, Your Honor.

23          THE COURT:  Okay.  Presuming that Drake has met its

24  burden here of at least initially showing there's a problem, how

25  does Mr. Johnson saying he doesn't recollect having confidential

1   information establish what you're arguing, which is there is no

2   knowledge, he has no actual knowledge?

3            MS. DONELS:  Yes, Your Honor.  Well, first, it's

4   Drake's burden to prove that there has been some conflict.  So

5   at this point we have no affirmative evidence from Drake as to

6   actual representation and only evidence saying the absence of --

7            THE COURT:  Okay.  But isn't them saying, "Hey, he's on

8   the filings" enough to trigger at least a burden for Mr. Johnson

9   to show, "I didn't have information"?

10           MS. DONELS:  And he did.

11           THE COURT:  Okay.  But how is saying, "I don't

12   recollect," the same as saying, "I have no knowledge"?

13           MS. DONELS:  I think we're getting tripped up in the

14   wording because Mr. Johnson is an attorney and tried to write it

15   in a way that attorneys write declarations.  He doesn't remember

16   ever working for Drake.  He can't affirmatively say that absent

17   a review of the billing records, which we've asked for.

18           THE COURT:  Okay.  When you're talking about concurrent

19   conflict information, does the client need to take any

20   additional action for the other appointed attorney to represent

21   them when you're looking at those forms?  In other words, could

22   they -- could he have sat down at a hearing, could he have

23   phoned in for a hearing without having to do anything more?

24           MS. DONELS:  I don't believe there would have been

25   hearings.

1          THE COURT:  That's not the question.

2          MS. DONELS:  Yes.  But for filing a document, I believe

3   he would have to file a document first that establishes him as

4   an appointed attorney -- or like the attorney in the "Attorney

5   Section."

6          THE COURT:  You think there would be an additional

7   filing of an appearance that would be necessary?

8          MS. DONELS:  I might need to let Mr. Johnson take this

9   question.

10          THE COURT:  Okay.

11          MR. JOHNSON:  Your Honor, before you would ever file

12   anything with the Trademark Office, you, of course, would have

13   conversations with the client about what was going to be filed.

14   In this case, my name appears as other appointed counsel on two

15   maintenance documents, which are declarations of continued use,

16   essentially, and those are things that an attorney can attest to

17   if they've talked to the client and verified those facts with

18   the client.

19      So I would have to have those conversations with the

20   client.  The client would know that I was then going to

21   essentially enter the appearance by filing that declaration on

22   their behalf.

23      Is there a separate power of attorney that you have to

24   enter beforehand?  No.  Could you file a declaration without a

25   client's knowledge or consent?  I don't believe so because

1  you're actually attesting to facts that the client has provided

2  to you.

3       Those are the maintenance types of documents on which my

4  name appears.  Any trademark filings, of course, you don't get

5  to do those without client consent either.  We certainly don't

6  pursue trademark protection willy-nilly or, you know, without

7  client knowledge.  Those are conversations, again, that you have

8  to have with the client beforehand.

9       I have no knowledge of ever talking to Drake, ever sitting

10  down with Drake, ever talking about any of these maintenance

11  documents or filing documents.  I believe it was just former

12  firm practice to list every attorney at the firm just in case

13  somebody else had to make that call to Drake because Christine

14  was out on extended leave or some other reason.  Then the

15  Trademark Office would be presented with a name that at least

16  was listed on the file.  But the client would have to authorize

17  me to file that next paper and enter that representation by

18  signing that document.

19            THE COURT:  I know you've said in your declaration that

20  there was not a culture of collaborating and sharing information

21  on trademark proceedings at MVS the same way there would have

22  been, you know, on complex litigation types of matters.

23            MR. JOHNSON:  Correct.

24            THE COURT:  Would you have nonetheless have had access

25  to those files?  I mean, are they stored in an electronic system

1  where you would have had access to them?  Are there hard copies

2  floating around?  Tell me about that.

3         MR. JOHNSON:  Yeah.  Theoretically, I guess -- look, at

4  McKee, it was a small office.  There were 20 lawyers.  There

5  were probably 25 support folks, paralegals and assistants.  If I

6  had really been nosy and wanted to get into those files, I guess

7  I theoretically could have.  That's the answer to that.

8      They were stored generally in paper form for a long time.

9  We had a lot of trouble going over to electronic records, but

10  eventually we did go paperless.

11     They were sent to a separate trademark filing department.

12  Those were the paralegals in charge of trademark files.

13  Christine Lebron-Dykeman oversaw that department.  If I ever

14  needed anything from my clients, I would ask my assistant to get

15  those trademark files.  She would get those trademark files from

16  that trademark department, and then I would proceed to work on

17  those trademark files for a client like mine.

18     But like Drake's lawyers submitted just this morning, when

19  I represented a client at the Trademark Office, my name appeared

20  as the attorney that was listed attorney of record in that

21  trademark filing.  I wasn't merely listed as another appointed

22  attorney.  That was essentially like the firm providing its

23  letterhead to the Patent Office.

24         THE COURT:  All right.

25     Any additional thoughts from DMACC on those issues?

1          MS. DONELS:  Yes, Your Honor.

2          Just back to the *Deere* case, all of those factors were

3     considered in *Deere* when determining whether to disqualify

4     Mr. Harty based on his former representation of Kinze and his

5     association with McKee, Voorhees & Sease.  They considered that

6     it was a small firm; that he was a managing member of that firm,

7     therefore -- I think him for him at least, it was 14 years and

8     had access to files.  And this court found that that was not

9     enough to disqualify Mr. Harty absent some showing of actual

10    knowledge of confidential information.

11         THE COURT:  All right.

12         Back to you.  Any response you'd like to make?

13         MR. CONLEY:  Yes, Your Honor.

14         I'm going to try to take these in order, and I do want to

15    note that our reply does address most everything that was just

16    said, but just for the sake of if Your Honor has any questions,

17    I'm going to go over that.

18         First I'd like to start with whether there was an

19    attorney-client relationship, maybe just discuss more generally

20    the resistance that we're seeing to this motion.  And it doesn't

21    seem to care what Drake thought or what their position was.

22    Instead, it's, well, it was a standard procedure that we had at

23    McKee, Voorhees & Sease, and it's whether or not the Trademark

24    Office recognized things, and that's not where we typically look

25    to see if there's an attorney-client relationship.  We care

1  about the client.  That's why we have our ethical rules.

2       So when we actually apply those standards that they set

3  forth, those three-factor tests, Drake reached out to McKee,

4  Voorhees & Sease as their firm for intellectual property

5  matters.  They are experts in that field -- Mr. Johnson is an

6  expert in that field -- and they represented them for 40 years.

7       And was there a -- was there information to show that that

8  relationship existed?  Most certainly and in abundance.  McKee,

9  Voorhees & Sease's website had numerous references to their

10  relationship with Drake University.  We have filings showing

11  that.

12       And speaking of the filings, I want to first go to the --

13  I'd like to revisit Exhibit 11, which they showed the front page

14  and they showed a form where it just populated other appointed

15  attorneys.  But if we go a couple more pages into that actual

16  Exhibit 11, you'll see where Victoria Payseur, the VP of

17  business and finance, was actually the signator on the

18  application, and the language above her essentially says, "The

19  applicant hereby appoints," it lists numerous attorneys, and it

20  identifies R. Scott Johnson, of McKee, Voorhees & Sease.

21       This is not just some random form.  This is a submission

22  for an application that was signed by Drake University attesting

23  to the fact that they understood that Mr. Johnson was their

24  attorney.  This is not some random person filed it.  This is

25  Victoria Payseur.

1    And you'll notice that with all the other filings we

2   have -- or not -- I'm sorry, I shouldn't say "all" of them

3   because -- attest to that because there's quite a few filings

4   that we provided.  But they are signed by the applicant.  The

5   applicant understood that these people were their attorneys, and

6   President Martin's declaration attests to the same thing, that

7   that was their understanding that there was an attorney-client

8   relationship.

9    So all three factors definitively reside in finding a

10   relationship with every single attorney regardless of it being a

11   standard practice.  That's something McKee, Voorhees & Sease

12   elected to engage in, and therefore they are responsible for

13   those decisions.

14    On the second point that a signed document is required for

15   representation to take place, there's a reference to 37 CFR

16   2.17(b).  Unfortunately, the part relied upon in the resistance

17   is not complete.  If it is read in full, you can either sign a

18   document or appear, and appearance can occur through

19   appointment, including by an applicant or another attorney.  And

20   that is 33. -- sorry -- 37-2.17(c) discusses the ways that you

21   can appear.

22    So when that whole rule, all the subparts, are reviewed in

23   part, you do not need to sign anything.  And, in fact, I believe

24   it reads when a practitioner signs a document or appears

25   pursuant to this section, his or her signature or appearance

1  shall constitute a representation of the office that he or she

2  is authorized to represent the person or entity on whose behalf

3  he or she acts.

4       That is a clear indication that an "Other Appointed

5  Attorney" has no distinction.  That's why we have no case law,

6  we have no rules that treat an "Other Appointed Attorney" as

7  anything different.  It's just simply a different label.

8       And, in fact, we know that it's just a different label

9  because we've identified applications filed by Mr. Johnson with

10 him being the signatory that were then -- faced refusal that

11 were then responded to by another attorney as an attorney of

12 record.

13      So this isn't an odd practice that Mr. Johnson and McKee,

14 Voorhees & Sease are not familiar with.  They knew what they

15 were doing, and they identified these people so they could take

16 actions on it.  And not all firms do that.  We don't do that at

17 our firm.  Mr. Gilbertson is not on the applications unless I

18 need him to act on it.  So simply because there is this

19 different standard of practice doesn't negate the fact that an

20 attorney-client relationship existed.

21          THE COURT:  Even if you assume that Johnson was

22 representing Drake because of those filings, wouldn't that

23 representation have terminated in 2019?

24          MR. CONLEY:  That is a great question, Your Honor.  And

25 when you look at the actual language of that code section, it

1    uses the term "recognition."  If you dig a little bit deeper and

2    you go through the Federal Register, we'd note again -- this

3    kind of goes back to what I was talking to at the outset -- the

4    USPTO does not govern whether or not representation terminates.

5    And, in fact, the Federal Register talking about that rule

6    discusses -- and I'm going to find the language here for you, if

7    I can find it.

8        The Federal Register discussing it says the fact that the

9    USPTO does not control representation -- sorry.  I'm just going

10   to read from our brief, if you don't mind here.  I apologize.

11       The term "recognition" is used to reflect, quote, the fact

12   that the USPTO does not control representation agreements

13   between practitioners --

14           THE COURT:  Whoa.  You've got to slow down.

15           MR. CONLEY:  Sorry.

16       -- does not control representation agreements between

17   practitioners and clients but merely recognizes an attorney for

18   purposes of representation before the USPTO.

19       So, again, the USPTO itself indicates we use the term

20   "recognition" because we don't control how Drake understands its

21   relationship with its attorney, and that makes sense, because

22   you don't want a third party telling you your attorney doesn't

23   represent you anymore because you may not get wind of that

24   because they don't communicate with you directly.

25       So that's kind of a red herring, this recognition thing.

1   It has quite literally no bearing on whether or not

2   representation was still ongoing.

3        Let's see here.

4        Again, they reference the billing records being

5   dispositive.  And while, again, we defer to the -- Your Honor's

6   discretion on whether or not you think that's dispositive, it

7   would just cause further delay.  We're talking about 22 years of

8   going through materials.  And when we have all this other

9   evidence, we still don't see how that's relevant.

10       And, in fact, the case law said that you can represent

11  somebody without ever charging them a nickel.  Billing is not

12  dispositive and in this case is not even entirely -- is

13  completely unnecessary to rendering decision on this motion.

14       Again, on the standard practice, this has been brought up a

15  few different times.  It is both the standard practice but

16  somehow something that Mr. Johnson, who was there for 22 years,

17  was not aware of; a standard of practice that Mr. Johnson

18  himself engaged in, including -- I believe it's Exhibit 16 shows

19  that revocation filed by Mr. Johnson in which he removed a

20  third-party attorney and appointed all the other attorneys.

21       It's a practice that I believe Mr. Johnson still uses to

22  some extent over at Fredrikson & Byron because he appoints other

23  attorneys to assist him, and those other appointed attorneys

24  presumably are identified because they can act in a

25  representative capacity because that's why you would list them

1  as an "Other Appointed Attorney."

2      The next thing I want to talk about is the actual

3  knowledge.  There is quite a bit made about us failing to

4  identify confidences.  That is not the standard.  The rules make

5  that abundantly clear.

6      The terminology found at 32:1.0 expressly identifies

7  knowledge as something that can be derived from circumstances.

8  The commentary to 32:1.9 also addresses that actual knowledge

9  can be inferred from the circumstances, that we don't need to

10  disclose actual information.

11      In fact, the Iowa Supreme Court last year said, quote, the

12  party seeking disqualification is not required to show that

13  confidential information will be used in the subsequent

14  litigation or even that it was disclosed in the prior

15  representation.

16      Moreover, when we look at Rule 32:1.7, those matters don't

17  even have to be related to one another.  They can be wholly

18  unrelated.

19      When we look at 32:1.9(a), which is for a former client,

20  we, again, don't require any actual confidences being disclosed.

21  It more has to do with the duty of loyalty and flipping sides.

22  Once you've showed there's a substantial relationship between

23  the matters, those confidences are presumed irrefutably and

24  require disqualification.

25      And, in fact, if we look at the comments, it's Comment 3,

1   they give the example.  It says a lawyer who has previously

2   represented a client in securing environmental permits to do a

3   shopping center would be precluded from representing neighbors

4   seeking to impose rezoning of the property on the basis of

5   environmental considerations.

6       That's the same thing that we have here.  We have

7   Mr. Johnson being identified, selected by Drake University to

8   represent it with respect to trademarks, securing a trademark,

9   and now, before this Court, challenging its validity and its

10  strength.  That breaches a duty of loyalty.  That not only harms

11  Drake University but also harms the public.

12      And moreover, I want to just point out that while we've

13  been talking quite a bit about trademark registrations, McKee,

14  Voorhees & Sease was handling all intellectual property matters.

15  That means licensing, that means disputes, that means common law

16  trademarks that are never filed, the discussions of whether or

17  not to pursue those, the strength and veracity of those marks,

18  whether or not there was infringement with another entity, what

19  goods and services should be selected.  Those are all things

20  that happened behind closed doors in the confidence of

21  discussing those things with your attorneys.

22      As we know from President Martin, he entrusted all the

23  attorneys at McKee, Voorhees & Sease with that, and he entrusted

24  Mr. Johnson with those confidences as well.

25          THE COURT:  If the USPTO filings do not control whether

1   somebody represents them or not, which is what you're arguing --

2   right?

3          MR. CONLEY:  Yes.

4          THE COURT:  -- is there any other reason Drake has to

5   believe that Johnson represented them ever?

6          MR. CONLEY:  We have the express signatures on the

7   applications and the maintenance filings where we have the

8   actual head of a department, it changed over time, appointing

9   Mr. Johnson expressly.

10         THE COURT:  Okay.  Any other thoughts?

11         MR. CONLEY:  Very quickly, Your Honor, I just want to

12  quick touch on the *Deere* case and why that was not cited by

13  counsel.  It was reviewed at length, and the reason we did not

14  include it is the case law cited by this court was included in

15  our briefing.

16     Additionally, there's only so much space in a brief unless

17  you want to go overlength, and we elected not to do that.  We

18  also have that as an unpublished decision.

19     On top of that, it was also a decision that was rendered on

20  a record that was largely sealed off, so we don't know what

21  facts were all discussed.  We have generalities, but we don't

22  know exactly what was set forth before the court.

23     Here we have the Court's discretion to look at the facts

24  that we're presenting in determining, in their discretion,

25  whether or not disqualification should occur.

1          THE COURT:  And just for the clarity of the record, the

2   *Deere* decision was not my decision.  That's Judge Ebinger, not

3   me, but anyway.

4          Okay.  All right.  Any final thoughts?

5          MS. DONELS:  Quickly, Your Honor.

6          First, Drake's expectation that every McKee, Voorhees &

7   Sease attorney is now apparently barred from ever appearing

8   opposite of them if those attorneys leave McKee, Voorhees &

9   Sease is simply unrealistic and ignores the rule.

10         McKee didn't even think that every McKee, Voorhees & Sease

11  attorney was Drake's attorney.  We know that because when

12  Mr. Johnson left McKee, Voorhees & Sease, McKee didn't even send

13  Drake a letter notifying them.  McKee did not believe that

14  Mr. Johnson was Drake's attorney.

15         Second, as to these trademark filings, Drake has made a lot

16  of fuss about the difference between, you know, the

17  representation and recognition.  We cited those rules because

18  Drake has pinged Mr. Johnson for failing to withdraw.  That's

19  simply not something that he needed to do.  His recognition was

20  not still -- or his representation was not still recognized, so

21  why would he need to withdraw?  In fact, I don't think he even

22  was able to withdraw as an Other Appointed Attorney.  I think

23  you have to affirmatively file something and then withdraw.

24         Finally, as to whether Mr. Johnson was aware of these

25  filings, he was aware of the general process that McKee had to

1  list everybody in the "Other Appointed Attorney" section.  We

2  have admitted that.  However, he was not aware of these specific

3  filings.  He had no knowledge that the Marching Spike mark had a

4  November 2019 filing that Ms. Lebron-Dykeman submitted.  He had

5  no knowledge of the 2004 filings.  That is our point.  He did

6  not know of these specific documents because he was not involved

7  in Drake's representation while at McKee.

8       Thank you.

9          THE COURT:  Thank you.

10      I will take it under advisement.  I'll get a decision out

11 just as quickly as I can.

12      Thank you.

13      (Proceedings concluded at 9:49 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3    State of Iowa and Federal Official Realtime Court Reporter in

4    and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 7th day of October,

12   2024.

13

14                              _____
                                Kelli M. Mulcahy, CSR, RDR, CRR
15                              Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25