IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br>　　Plaintiff,<br><br>vs.<br><br>DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE<br>　　Defendants. | No. 4:24-cv-00227<br><br>BRIEF IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIM PLAINTIFF DES MOINES AREA COMMUNITY COLLEGE FOUNDATION'S THIRD CLAIM FOR DEFAMATION<br><br>**ORAL ARGUMENT REQUESTED** |
| DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE,<br>　　Counterclaim Plaintiffs,<br><br>vs.<br><br>DRAKE UNIVERSITY,<br>　　Counterclaim Defendant. | |

Joshua J. Conley
John D. Gilbertson
ZARLEYCONLEY PLC
West Des Moines, Iowa
for DRAKE UNIVERSITY

Table of Contents

I. INTRODUCTION & PROCEDURAL HISTORY ............................................................................... 3

II. LEGAL STANDARD ................................................................................................................... 4

III. ARGUMENT ............................................................................................................................ 4

    A. Defamation Standard ........................................................................................................ 4

    B. Pleading Defamation Requires Specificity ...................................................................... 6

    C. Application to the Foundation's Defamation Claim ........................................................ 7

        1. The Complained of Statements Do Not "Concern" the Foundation ........................ 7

        2. The Complained-of Statements are a Public Concern ............................................. 8

        3. The Complained of Statements are Misrepresented by the Foundation ................. 9

            a) Paragraph 98 of the Foundation's Counterclaim ........................................ 9

            b) Paragraphs 99 and 100 of the Foundation's Counterclaim ....................... 10

            c) Paragraph 103 of the Foundation's Counterclaim ................................... 11

        4. The Iowa Capital Dispatch Image ........................................................................ 12

        5. The Foundation Failed to Properly Plead Special Damages ................................ 14

    D. Attorney Fee Request .................................................................................................... 15

IV. CONCLUSION ........................................................................................................................ 16

Drake University ("Drake"), by and through counsel hereby moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Counterclaim Plaintiff, Des Moines Area Community College Foundation (the "Foundation")'s third claim for defamation.

## I.   INTRODUCTION & PROCEDURAL HISTORY

This is the fourth attempt to accuse Drake of defamatory conduct for sending an email to its alumni regarding the present litigation (the "Alumni Email") (Dkt. 74-13). In its first attempt, Defendant Des Moines Area Community College (the "College") brought a claim for defamation but failed to do so with any degree of specificity. Dkt. 21, at 58 ¶¶ 78–83. Drake moved to dismiss it (the "First Motion"). Dkt. 46; 46-1. The First Motion is still pending.

Among the arguments Drake raised in the First Motion was the fundamental tenet of defamation claims that the *specific words* forming the basis of the claim must be pled. Dkt. 46-1, at 3. Drake also cited Iowa Supreme Court case law holding that damages must be pled with particularity. Dkt. 46-1, at 4 (citing *Shaw Cleaners & Dyers, Inc. v. Des Moines Dress Club*, 245 N.W. 234, 235 (Iowa 1932) ("A general allegation of loss of patronage in a gross amount and consequent loss of profits is not sufficient as an averment for special damages.")).

The College then filed an Amended Answer & Counterclaims. Dkt. 52. Despite now being on notice of the pleading requirements for a defamation claim, the College again failed to allege the actual words that supposedly gave rise to the claim. Dkt. 52, at 58 ¶¶ 85–93. It also added a paragraph alleging damages but failed to include any detail. Dkt. 52, at 58 ¶ 92 ("DMACC was defamed and damaged in name, reputation, and business."). The College also half-heartedly resisted the First Motion under the flawed belief that an amended counterclaim automatically rendered the First Motion moot. Dkt. 53 at 2–3 (dedicating a single, short paragraph to its position).

In reply, Drake articulated how the First Motion also applied to the amended pleading and

how the half-cocked nature of the amended counterclaim suggested the College's defamation claim was brought for no reason other than to harass. Dkt. 62. The College requested leave to file a surreply. Dkt. 65-1. Surprisingly, the surreply did not argue for the defamation claim, but rather stated the claim would be withdrawn and reraised by the Foundation. Dkt. 67, at 3–4.

Now, the Foundation has brought a claim for defamation which, like the prior attempts, contains numerous incurable deficiencies, as well as objectively and recklessly false accusations. As set forth more fully herein, Drake requests the Foundations' defamation claim be dismissed with prejudice and that the Court award Drake its attorney fees under 28 U.S.C. § 1927 or its inherent power to sanction misconduct.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Reasonable inferences that may be drawn are drawn in favor of the non-moving party. *Id*. Legal conclusions and mere "recitation[s] of the elements of a cause of action" may be disregarded. *Twombly*, 550 U.S. at 555. As part of the evaluation, the court may draw on its judicial experience and common sense based on the complaint in full. *Iqbal*, 556 U.S. at 679.

## III.   ARGUMENT

### A.   Defamation Standard

To establish defamation, the complaining party must sufficiently allege the counterclaim defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). Defamation

is limited to factual assertions and omits opinions. *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021) ("speech that is considered 'rhetorical hyperbole' [or a] 'vigorous epithet'" is not actionable as defamation) (citation omitted). Statements that communicate the speaker's opinion are protected under the First Amendment. *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990).

There are two types of defamation: *per quod* and *per se*. *Johnson*, 542 N.W.2d at 510. Defamation *per quod* requires references to facts or circumstances beyond the actual words used to establish the defamation and requires proof of (1) malice, (2) falsity, and (3) special damages. *Foote v. Doe 1*, 679 F.Supp.3d 775, 808 (S.D. Iowa 2023) (citations omitted); *Lloyd v. Drake Univ.*, 2003 WL 25493343, at *8 (Iowa Dist. Ct., June 11, 2003). Malice requires "ill will, hatred, the desire to do another harm, or wrongful motive." *Id*. Reliance on "sources whose credibility has not been challenged" works against a statement being made with malice. *Id*. at 10. Moreover, "if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." *Hovey v. Iowa St. Daily Pub. Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985).

Defamation *per se* presumes these additional elements "based on the very nature of the words used." *Johnson*, 542 N.W.2d at 510 (citations omitted). When discussing businesses, such defamatory statements are those "which charge business incompetence or lack of skill in the trade, occupation, profession or office" or involve dishonesty, moral turpitude, or immorality. *Betz v. Fed. Home Loan Bank of Des Moines*, 549 F. Supp. 3d 951, 961–62 (S.D. Iowa 2021). Whether a statement can have a defamatory meaning is a question for the Court. *See Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989).

"[Defamation] *per se* is available only when a private figure plaintiff sues a nonmedia defendant for certain kinds of defamatory statements that do not concern a matter of public importance." *Galanakis v. City of Newton, Iowa*, 2024 WL 606235, at *18 (S.D. Iowa Feb. 8,

2024) (alteration in original) (citing *Bierman v. Weier*, 826 N.W.2d 436, 448 (Iowa 2013)). The "private plaintiff, private concern" requirement of defamation *per se* serves the constitutional goal of assuring "unfettered interchange of ideas for the bringing about of political and social changes desired by people." *Bierman*, 826 N.W.2d at 462 (citations omitted).

### B.  Pleading Defamation Requires Specificity

Defamation claims are not favored and "must always be specifically alleged" regardless of type. *Cimijotti v. Paulsen*, 219 F. Supp. 621, 622 (N.D. Iowa 1963). "[I]t is necessary to state in the petition the words that were spoken or written, upon which the action is based." *Nelson v. Melvin*, 19 N.W.2d 685, 688–89 (Iowa 1945). Federal courts favor such *in haec verba* pleadings because knowing the exact language used is necessary to respond and to evaluate the possibility of a privilege. *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 698–99 (8th Cir. 1979) (citations omitted); *Lloyd,* 2003 WL 25493343, at *8 ("[T]he burden to derive defamatory statements should certainly not be incurred upon the courts or defendants."). Requiring such specificity "should deter filings by those who have only a vague feeling that they have been wronged but cannot point to any specific factual error in the article." Susan M. Gilles, *Taking First Amendment Procedure Seriously: An Analysis of Process in Libel Litigation*, 58 Ohio St. L.J. 1753, 1799-1800 (1998). In short, a complaining party must "plead the *exact* words of their libel, or face dismissal." *Lloyd,* 2003 WL 25493343, at *8

When pleading defamation *per quod*, special damages must be alleged with particularity, certainty, and precision. *Lloyd*, 2003 WL 25493343, at *10 (citing 50 Am. Jur. 2d *Libel & Slander* ¶ 451 (1993)); *Erick Bowman Remedy Co. v. Jensen Salsbery Labs.*, 17 F.2d 255, 259 (8th Cir. 1926). "A general allegation of loss of patronage in a gross amount and consequent loss of profits is not sufficient as an averment for special damages." *Lloyd*, 2003 WL 25493343, at *10 (quoting *Shaw Cleaners & Dyers v. Des Moines Dress Club*, 245 N.W. 231, 235 (Iowa 1933). Rather, the

6

names of the customers must be set forth in the pleading or the lost profits must be stated by showing figures showing the loss suffered. *Erick Bowman*, 17 F.2d at 259.

### C. Application to the Foundation's Defamation Claim

Despite Defendants' third bite at the apple, the Foundation fails on all fronts to plead a claim for defamation. When the foregoing standards are applied to each of the statements that could potentially serve as the "statement" on which the Foundation's claim is based, the outcome is the same—dismissal is required.

#### 1. The Complained of Statements Do Not "Concern" the Foundation

Defamation requires that the statement be "of and concerning" the complaining party, which requires that the statement be (1) intended to and (2) be understood as pertaining to the complaining party. *Brummer v. Taylor*, 569 F.3d 890, 891–93 (8th Cir. 2009). The Foundation's own filings demonstrate that is not the case here.

The Foundation's defamation claim is based solely on the Alumni Email. Dkt. 74-12. Paragraph 98 of the counterclaim describes the email as "concerning DMACC and, *by extension*, DMACCF…" Dkt. 74 (emphasis added). Defamation, however, does not operate by extension and there is no allegation that the email was intended or understood as concerning the Foundation.

The Foundation's Exhibit M (Dkt. 74-13) further demonstrates this deficiency. The emails contained therein were sent to Tara Connolly, Executive Director of the Foundation, with instruction to *pass along* the authors' dismay to the College. Dkt. 74-13. One states, "the DMACC marketing leadership responsible for the rebranding didn't do enough due diligence…." *Id*. at 2. That same email continues with the discussion of "both institutions" (i.e., Drake and DMACC) and that "[m]ost folks. . . give more credence to Drake's position." *Id*. The other email discusses that the writer is a "passionate believer in DMACC" who finds the trademark issues "at best tone deaf on part of DMACC" and asks the sentiment of the email "be shared with leadership at

DMACC." *Id.* at 3. While the email is addressed to the Foundation's director, it is abundantly clear the remarks are directed at the College, i.e., what the reader *understood* the Alumni Email to concern—not the Foundation.

Taken at face value and in light of the materials supplied by the Foundation, the Alumni Email does not contain statements "of and concerning" the Foundation as required to allege a claim of defamation. For this reason, the Foundation's claim of defamation must be dismissed.

### 2. The Complained-of Statements are a Public Concern

Defamation *per se* requires that the communication at issue regards a private plaintiff, and a private concern. *Bierman*, 826 N.W.2d at 462 (citations omitted). *"[P]urely private* disputes such as a lawsuit in which the impact is *limited primarily to the parties*" are insufficient to be considered a public concern. *Id*. (emphasis added). Inherently, those lawsuits that are not "purely" private or with an impact not "limited primarily" to the parties constitute a public concern.

Courts have consistently found that there is a strong public interest in preventing confusion in the marketplace. *See Aveda Corp. v. Evita Mfg., Inc.*, 706 F.Supp. 1419, 1431–32 (D. Minn. 1989); *see also E.A. Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*, 19 F.Supp.3d 560, 577 (D. N.J. 2014); *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F.Supp.2d 781, 797 (W.D. Tex. 2009). A trademark's purpose is to protect the public from confusion about the identity of the enterprise from which goods and services are purchased. *See Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg., Inc.*, 296 F.Supp.2d 983, 1003 (S.D. Iowa 2003).

Here, the lawsuit discussed in the Alumni Email involves trademarks. The brands underlying the action impact hundreds of thousands of individuals who are (or were) students, who benefit from the goodwill and prestige associated with their respective institutions. *See also Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 552 (Iowa 1972) (finding a qualified privilege attaches to communications made in good faith concerning subject matter in which the speaker has

an interest, right, duty, or obligation, and the listener has a corresponding interest). The Alumni Email referenced the public institution DMACC—not the Foundation—and a lawsuit that extends well beyond the parties to this litigation. *See* Dkt. 67, at 3 (acknowledging DMACC is almost certainly foreclosed from bringing a defamation claim based on its status as a municipal corporation).

Accordingly, the Foundation cannot rely on the presumptions afforded by a claim of defamation *per se* because the Alumni Email is directed at a public concern involving a public entity. Thus, the Foundation must sufficiently allege malice, falsity, and special damages in order to survive the present motion. These will be discussed further *infra*.

### 3. The Complained of Statements are Misrepresented by the Foundation

The Foundation's counterclaims span many pages, but only a handful of allegations even come close to sufficiently identifying *in haec verba* the statement(s) at issue. These include the allegations at (1) paragraph 98 discussing the Alumni Email in broad, misleading terms; (2) paragraph 99 and 100 reciting Drake's report of this litigation's claims and interpreting the same; and (3) paragraph 103 that dissects one of the statements in the Alumni Email to misleadingly place it out of context.[1]

#### a) Paragraph 98 of the Foundation's Counterclaim

At **paragraph 98**, the Foundation alleges,

> On July 11, 2024, Drake falsely wrote of and concerning DMACC, and by extension, DMACCF, stating to Drake's alumni (Ex. L) and the press that DMACC and DMACCF's logo was a stand alone 'D' and that Drake owned trademark rights in a block style 'D' separate from any use on a bulldog."

Dkt. 74, at 62 ¶ 98. The Alumni Email's contents do not comport with the Foundation's allegations. Drake sent the email to alumni, not press. Dkt. 74-12. The phrase "DMACC's logo

---

[1] Each of the discussed allegations also fail to "concern" the Foundation as already discussed in Section III(C)(1).

was a standalone 'D'" is not present in the email. *Id*. Instead, the Alumni Email reports the existence of, and Drake's basis for, this litigation, i.e., to remedy "what we *believe* to be clear violations of trademark law and unfair competition." *Id.* (emphasis added). Also absent is any statement that "Drake owned trademark rights in a block style 'D' separate from any use on a bulldog" as the Foundation alleges. *Id*. Beyond being misleading, the absence of this language from the Alumni Email necessarily renders paragraph 98 incapable of meeting the *in haec verba* standard required to plead defamation. *Lloyd,* 2003 WL 25493343, at *8.

### b) *Paragraphs 99 and 100 of the Foundation's Counterclaim*

At **paragraph 99**, the Foundation quotes the Alumni Email as follows:

[1] The complaint centers on new branding that was unveiled by DMACC in October 2023, [2] which incorporates several elements that closely resemble our established brand identity, [3] including our standalone "D" in block-style collegiate font, [4] which has been used by Drake for well over a century, and reflects the legacy, excellence, and identity of our institution.

Dkt. 74 (quoting Dkt. 74-12) (annotated). This statement, alone or in combination with other allegations, fails to identify a defamatory statement.

Line [1] accurately reports that this lawsuit arises out of DMACC's rebrand in 2023. Line [2], which is Drake's opinion, is nonetheless accurate as no serious argument can be asserted that the Rebrand does not, at a minimum, closely resemble parts of Drake's brand, e.g., colors. Line [3] accurately draws a comparison between Drake's Vintage "D" and an *element* of the Rebrand (*see, e.g.* Dkt. 1–78). Line [4] is self-referential and cannot be a basis for defamation as it does not concern the Foundation.

The alleged falsity of these allegations is further undermined by the Foundation's own allegations. Referring back to paragraph 98, the Alumni Email does not state the Foundation is using a standalone "D"—the statement refers to "**our** standalone 'D,'" meaning Drake's. Nor does

10

the above statement mention Drake owning "trademark rights" in a block style "D" separate from any use of a bulldog as alleged by the Foundation.

Looking to **paragraph 100** ("DMACC and DMACCF do not use the alleged Drake 'D.'"), nowhere in the Alumni Email does Drake state that the Foundation is using the alleged Drake "D." Rather, it states that the rebrand incorporates "several elements" that "closely resemble" Drake's brand identity, which include Drake's Vintage "D."

At worst, the quote in paragraph 99 is a mix of self-apparent truth with a dash of Drake's opinion. A defamation claim cannot be substantiated on such a statement. *See Hovey*, 372 N.W.2d at 256 ("if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation."); *see also Milkovich*, 497 U.S. at 20 (opinions are protected under the First Amendment).

### c) Paragraph 103 of the Foundation's Counterclaim

At **paragraph 103**, the Foundation alleges "Drake stated DMACC and DMACCF's use of the logo 'causes confusion in the marketplace' which is untrue." Drake did not say that in the Alumni Email. The quoted language is pulled from the last line of a sentence discussing a hypothetical situation. The full sentence reads:

> When institutions in our same region such as DMACC—with more than 70,000 students (in 2022-2023) and a sizeable footprint in the Des Moines metro—use a visual identity similar to ours, it causes confusion in the marketplace.

Dkt. 74-12 at 3. Hence, the actual language of the email discusses a generic "institution" with a "similar" "visual identity." At no point is the Foundation referenced or identified. Nor is there an express discussion of a logo of any kind. Even if those words were present, the fact remains that

actual confusion has occurred as evidenced by the KCCI segment discussing this lawsuit.  *See* Dkt. 12-2.[2]

With respect to each of the foregoing statements, the Foundation fail to go beyond mere recitation of the elements of falsity and malice required for defamation *per quod*.  Common sense and the relevant case law compel the conclusion that Drake's statements are truthful, not malicious, and thus not defamatory, requiring grant of this Motion.  *Iqbal*, 556 U.S. at 663–64 ("the tenet that a court must accept a complainant's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").

In sum, none of these alleged statements can be relied on to state a claim for defamation.

### 4. The Iowa Capital Dispatch Image

At **paragraph 57**, the Foundation introduced the below image and alleged at paragraphs 58 and 59 that Drake "intentionally misrepresented the DMACC and DMACCF logos in its message to alumni and others" and "intentionally cropped the image of the DMACC and DMACCF logos in its communications with its alumni to alter the DMACC and DMACCF logos to appear more similar to Drake's."  These allegations are blatant fabrications.



The imagery related to DMACC is accurate.  A standalone "D" was, at the time the email was sent, in use by the Foundation as a trademark and still is today.  For example, the Foundation publishes DMACC Magazine for outreach to donors, and the current issue includes the use of the

---

[2] *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008) (citation omitted) (permitting consideration of materials necessarily embraced by the pleadings).

new DMACC "D" logo inside a QR code for donors to scan to register for one of its events. Dkt. 44-8 at 14. The logo includes a ™ symbol in the lower right corner of the standalone, block-style "D," which, by the Foundation's own allegations, indicates to the public that the Foundation considers the "D"—by itself—a trademark. *See* Dkt. 74, at 38 ¶ 31 (noting the DMACC intramural program's use of block-style "D" that has been identified with a ™ designation). It is also unclear how the mere presence of the Foundation's mark is somehow defamatory, let alone false or presented with malice.

The Foundation, like the College, blatantly doctors the image within its counterclaim facts. Below is the image as it appears in the Alumni Email, which includes a credit for the image that states, "Image credit Iowa Capital Dispatch using elements from U.S. District Court exhibits." *See also* Dkt. 46-3 (original Iowa Capital Dispatch Article featuring the image).



Drake raised this in its First Motion. Dkt. 46-1, at 5 ("DMACCs complaint conveniently omits the image's caption, which credits the image to "Iowa Capital Dispatch using elements from U.S. District Court exhibits."). Despite this, the Foundation knowingly and falsely states in paragraphs 58 and 59 that *Drake* misrepresented the logo in the image and that *Drake* cropped the image. Dkt. 74, at 49. In reality, and well-known by the Foundation and its counsel, the image is an exact copy of an image arranged by a third party whose credibility is not challenged. *See Lloyd*, 2003 WL 25493343, at *10. In fact, the Foundation cites an Iowa Capital Dispatch article for its own purposes at paragraph 86. Dkt. 74, at 55.

The Foundation doubles down on its mendacious conduct at paragraph 106 alleging "Drake's *knowing alteration* of the DMACC and DMACCF's logo leads to the only conclusion: that Drake has acted with ill will, hatred, the desire to do another harm, and/or wrongful motive." (emphasis added). The irony of course is that the *Foundation* is making knowing alterations in a transparent attempt to sustain a frivolous claim.

### 5. The Foundation Failed to Properly Plead Special Damages

Because the Alumni Email involves a public concern, the Foundation's defamation claim necessarily falls within defamation *per quod*, for which special damages must be plead with specificity, e.g., including the names of the customers affected and including actual figures showing the loss suffered. *Erick Bowman*, 17 F.2d at 259. Neither are present here.

At paragraphs 62, 63, 112, and 113, the Foundation alludes to two different individuals on the same email thread who allegedly raised concerns about the present lawsuit. Dkt. 74, at 49–50, 63. Although the emails are included in Exhibit M (Dkt. 73-9), the names of the individuals are redacted. Likewise, no allegation or evidence is provided to show any amount of donation being lost. Instead, the emails in Exhibit M plainly show that the only donation referenced was actually made. *See* Dkt. 74-13, at 3 ("Had I not made a previous commitment to my good friend [REDACTED] I would not be making this donation…"). On this basis alone, the Foundation's claim for defamation must fail as special damages must be plead with particularity, certainty, and precision. *Lloyd*, 2003 WL 25493343, at *10 (citations omitted).

The lack of specificity, and lack of such special damages, did not stop the Foundation from making further misrepresentations to the Court. At paragraph 111 and 116, the Foundation alleges it has lost donors and "suffered actual damages through loss of donations." Notably, these allegations are not made upon information and belief, but rather set forth without qualification.

### D. Attorney Fee Request

For similar reasons set forth in Drake's First Motion to Dismiss the College's claim for defamation, Drake requests the Court require opposing counsel to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred" in bringing the present motion. 28 U.S.C. § 1927. Sanctions may be imposed where the attorney's conduct "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Boyd Jones Constr. Co. v. XTL, Inc.*, 2018 WL 6380777, at *2 (S.D. Iowa Nov. 9, 2018) (citing *Tenkku v. Normandy Bank*, 348 F.3d 737, 743 (8th Cir. 2003).

It is objectively unreasonable for counsel to repeatedly bring defamation claims that have progressively relied upon an ever more distorted reality and fail to allege the claim with the requisite degree of specificity despite having at least four opportunities to get it right. *See Stewart v. City of Chicago,* 622 F.Supp. 35, 35–38 (N.D. Ill. 1985) (awarding attorney fees under Section 1927 when counsel persisted in repeatedly filing deficient allegations up and to a second amended complaint). Defendants have been on notice of the special requirements for pleading defamation since at least August 20, 2024.[3] Despite this, it has since filed not one, but **three** pleadings which objectively fail to comport with them. Dkts. 52, 72, 74. The inference is that opposing counsel knows defamation is a dead end, yet they are tripling down to force Drake to expend resources again and again to vindicate itself on an issue that has already been picked up by the press. *See, e.g.* Dkt. 46-2 (Des Moines Register article with headline reading "DMACC files Defamation Claim in Response to Drake Copyright Infringement Lawsuit"). In light of the foregoing, the true purpose of this claim appears to be its dilatory effect and disproportionate cost to rebuff rather than obtaining legitimate relief, thus suggesting bad faith and an intention to harass Drake. *See, e.g.,*

---

[3] Drake's First Motion to Dismiss the College's defamation claim was filed August 20, 2014. Dkt. 46.

Dkt. 67, at 2–3 (admitting that the College's unfair competition and defamation claim were tenuous, the latter to such a degree that "multiple appeals" would be needed to give it even a glimmer of hope to advance). A scintilla of merit does not absolve counsel of culpability when the conduct undertaken is otherwise unreasonable and vexatious. *See Oliver v. In-N-Out Burgers*, 945 F. Supp.2d 1126, 1129 (S.D. Cal. 2013) ("Bad faith is present when an attorney … argues a meritorious claim for the purpose of harassing an opponent.").

Defendants' counsel cannot chalk this up to zealous advocacy. They know Drake did not create the image which appeared in the Alumni Email. They know this because the image was copied verbatim from the Iowa Capital Dispatch article, which appears in the record at Dkt. 46-3 and is composed exclusively of images from Drake's complaint. They also know the Alumni Email *credited* the image to the Iowa Capital Dispatch. Despite this, they brazenly allege that "Drake intentionally cropped the image of the DMACC and DMACCF logos in [the Alumni Email]." Dkt. 74, at 49 ¶ 59. They also intentionally omit the caption crediting the image to the Iowa Capital Dispatch in its pleadings. *Cf.* Dkt. 74, at 49 ¶ 57 (without caption); Dkt. 74-12 (with caption). Counsel has done this in *each of its four attempts* to bring a defamation claim. *See* Dkt. 21, at 45 ¶ 43; Dkt. 52, at 47 ¶ 50; Dkt. 72, at 49 ¶ 57; Dkt. 74, at 49 ¶ 57. Such repeated, knowing misrepresentations cannot be justified. *See Boyd Jones Construction*, 2018 WL 6380777 (granting motion for sanctions based on the Court's inherent authority due to factual misrepresentations).

Opposing counsel's conduct has multiplied the costs of these proceedings unreasonably and vexatiously, and without regard to its duty of candor.

## IV. CONCLUSION

For the reasons herein, Drake requests that the Court dismiss the Foundation's Third Claim for defamation with prejudice and without the opportunity for the Foundation to amend. Additionally, Drake requests reimbursement for the considerable resources expended repeatedly

defending itself from these frivolous allegations of defamation.

                                                Respectfully submitted,

Dated: October 18, 2024                **ZARLEYCONLEY PLC**

                            By:    /s/Joshua J. Conley
                                  /s/John D. Gilbertson
                                  Joshua J. Conley, AT0011828
                                  John D. Gilbertson, AT0014515
                                  580 Market Street, Suite 101
                                  West Des Moines, IA 50266
                                  Telephone:  (515) 558-0200
                                  Facsimile:   (515) 558-7790
                                  jconley@zarleyconley.com
                                  jgilbertson@zarleyconley.com
                                  **ATTORNEYS FOR PLAINTIFF &**
                                  **COUNTERCLAIM DEFENDANT**