```
                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF IOWA
                         CENTRAL DIVISION


- - - - - - - - - - - - - - - X
DRAKE UNIVERSITY,                :
                                 :
      Plaintiff,                 :
                                 :
vs.                              :
                                 :
DES MOINES AREA COMMUNITY        :
COLLEGE FOUNDATION and           :
DES MOINES AREA COMMUNITY        :
COLLEGE,                         :
                                 :
      Defendants.                :    Case No. 4:24-cv-00227
- - - - - - - - - - - - - - - X
DES MOINES AREA COMMUNITY        :        HEARING TRANSCRIPT
COLLEGE and DES MOINES AREA      :
COMMUNITY COLLEGE FOUNDATION, :
                                 :
      Counterclaimants,          :
                                 :
vs.                              :
                                 :
DRAKE UNIVERSITY,                :
                                 :
      Counterclaim Defendant. :
- - - - - - - - - - - - - - - X
```

```
                              Courtroom, First Floor
                              U.S. Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa
                              Tuesday, October 15, 2024
                              8:59 a.m.
```

BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Chief Judge.

```
              KELLI M. MULCAHY, CSR, RDR, CRR
                  United States Courthouse
              123 East Walnut Street, Room 115
                  Des Moines, Iowa 50309
```

APPEARANCES:

For the Plaintiff/          JOHN GILBERTSON, ESQ.
Counterclaim Defendant:     JOSHUA J. CONLEY, ESQ.
                            ZarleyConley PLC
                            580 Market Street, Suite 101
                            West Des Moines, Iowa  50266


For the Defendants/         R. SCOTT JOHNSON, ESQ.
Counterclaimants:           CARA S. DONELS, ESQ.
                            ERIN M. BOGGESS, ESQ.
                            Fredrikson & Byron, P.A.
                            111 East Grand Avenue, Suite 301
                            Des Moines, Iowa  50309

1                    P R O C E E D I N G S

2        (In open court.)

3            THE COURT:  Thank you.  You may be seated.

4        We are here today for purposes of an injunction hearing in

5    Case No. 4:24-cv-227.  Plaintiff Drake University is suing

6    Defendants Des Moines Area Community College and the Des Moines

7    Area Community College Foundation for trademark infringement.

8        Drake is represented by Attorneys John Gilbertson and

9    Joshua Conley.  They are also joined by Earl Martin.  Drake --

10   or DMACC is represented by attorneys R. Scott Johnson, Cara

11   Donels, Erin Boggess, and Robert Denson.

12       Drake filed their complaint and their motion for

13   preliminary injunction on July 8th of 2024 seeking to enjoin

14   DMACC's use of a new logo.  After addressing Drake's motion to

15   disqualify counsel, the injunction hearing was originally set

16   for September 24th of 2024.  I had an emergency come up, and I

17   apologize for that.  Due to that issue, we had to move the

18   hearing to today.  So we've had some correspondence with both

19   parties in preparation for this hearing to see what, if any,

20   evidence the parties might be offering and to help ensure that

21   we had set aside enough time.

22       I understand that Drake does not intend to present any

23   particular evidence in this case but has argument it would like

24   to present.  I understand DMACC has some limited historical

25   evidence of the prosecution of past trademarks that they would

1  like to present and then have arguments as well.

2      Who will be primarily speaking today on behalf of

3  Plaintiff?

4          MR. GILBERTSON:  John Gilbertson, Your Honor.

5          THE COURT:  All right.  Mr. Gilbertson, you are welcome

6  to stay at counsel table or use the podium.  Whichever is most

7  comfortable for you is fine with me.

8          MR. GILBERTSON:  Okay.

9      If our slides could be posted on the screen, please.

10          THE COURT:  You can -- I'm sorry.  Go ahead whenever

11  you're ready.

12          MR. GILBERTSON:  No problem.

13          THE COURT:  I'm used to criminal lawyers.  They just go

14  whenever they want to.

15          MR. GILBERTSON:  Oh, sure.  Fair enough.

16      On November 1st, 2023, DMACC embarked on an unfair and

17  unnecessary invasion of Drake University's 120-year-old brand.

18  Your Honor, I'd like to start by asking you to look around the

19  room at all of the block-style Ds that appear on people's

20  clothing, including at the defense table.

21          MR. JOHNSON:  Your Honor, do we need to object to new

22  evidence being brought in or --

23          THE COURT:  I think it's fine.

24          MR. JOHNSON:  Okay.  Thank you.

25          THE COURT:  Go ahead.

1          MR. GILBERTSON:  And the question I would ask the Court

2    is:  If you didn't know which side we were all on, would you be

3    able to confidently tell?  I submit that your average person

4    wouldn't, and that's a huge problem because through a century of

5    use, Drake University has earned the right to stand out in this

6    room, and they don't.

7          I want to take a moment to clear up a common misconception

8    that we have seen kind of percolating through the public

9    reaction to this litigation, which is that Drake is the big bad

10   university picking on the local community college.  That could

11   hardly be farther from the truth.

12         While this is a David and Goliath story, DMACC isn't David,

13   it's Goliath.  By its own metrics during the 2022-2023 school

14   year, DMACC served over 72,000 students, 72,000.  That is more

15   than the University of Iowa, Iowa State, and UNI combined.  And

16   that's not just undergrad, that's total enrollment.

17         Drake's enrollment during that period was just over 4500.

18   That's about a sixteenth of DMACC.  Now, why does that matter?

19   Well, brands and trademarks are intangible assets, and they

20   derive their value from public perception and their ability to

21   identify somebody at the source of the service.

22         Now, until last fall, Drake was the only college in Iowa

23   utilizing a block-style collegiate D in a dark blue/light blue

24   color scheme, so necessarily, Drake is the only entity that

25   could be identified by that mark.  But with numbers like this,

1   DMACC is exposing so many people to its new brand in such a

2   short period of time relative to Drake that DMACC has the

3   ability to fundamentally alter how the public perceives of --

4   how they perceive the source of services emanating from this

5   mark.

6        So there's infringement here, no question, and if Drake has

7   to wait until trial to resolve this and in the meantime it's got

8   a competitor 16 times its size flooding the market with

9   confusingly similar imagery, it won't matter if Drake prevails

10  in the end because any distinctiveness that it has built up in

11  those marks as the source of educational services will have been

12  eroded to the point where the public doesn't identify it as such

13  anymore.

14       So that's precisely what preliminary injunctions are

15  designed for, to stop the bleeding and preserve the status quo

16  while the merits of this case can be adjudicated.  And those

17  merits, for reasons I will explain today, overwhelmingly favor

18  Drake.

19       So we are here to discuss a preliminary injunction, and

20  that is evaluated under the *Dataphase* factors from the Eighth

21  Circuit, and those are the likelihood that Drake will succeed on

22  the merits, the threat of irreparable harm to Drake if the

23  motion is denied, how such harm compares to the hardship DMACC

24  would suffer if the Court grants the motion improperly, and the

25  public interest.  And so I'm going to address those four factors

1   in that order.

2       So this is primarily a trademark infringement case, and so

3   the question of whether Drake is likely to prevail is evaluated

4   using the *SquirtCo* factors, which are the strength of Drake's

5   marks, the similarity between Drake's marks and DMACC's marks,

6   the competitive proximity of the parties' goods and services,

7   DMACC's intent to mislead or confuse, incidents of actual

8   confusion, and the degree of care exercised by the relevant

9   purchaser.  We often refer to that as consumer sophistication.

10      So to make sure we know what we're talking about today,

11  this is Drake's family of protected marks.  These are DMACC's

12  marks that we are objecting to.  Now, we are not asking for the

13  moon here, Your Honor.  We are only asking for protection for

14  what we've already got, and we don't want our closest neighbor

15  using marks that are confusingly similar.

16      So we're going to talk about a lot of details today, but

17  before I jump into that, I want to pose three questions to the

18  Court that I would ask the Court keep top of mind during my talk

19  because they are the only questions that are truly dispositive

20  of this motion, and that is:  No. 1, did Drake begin using a

21  standalone block-style D to denote the source of its post-

22  secondary educational services before DMACC did; No. 2, did

23  Drake begin using its current school colors before DMACC did;

24  and, No. 3, do Drake and DMACC offer their educational services

25  in the same geographic region.  Now, as we'll find, the answer

1  to all of these are yes.

2      This fact pattern alone, where we have prior use of a mark,

3  regardless of whether it's registered or not, when that mark is

4  virtually identical to the defendant's mark, when both are used

5  in connection with the same services and both are used in

6  connection with the same -- or in the same geographic region,

7  that fact pattern was sufficient for this Court to grant

8  preliminary injunctive relief in the *Moon Seed vs. Weidner*

9  decision, which we referenced in our briefing, and we ask that

10 the Court reach the same conclusion today.

11     Now, I want to take a quick note.  I have a category at the

12 top of my list here for existence before the strength factor,

13 and that is because the Drake brand involves both registered and

14 unregistered marks.  Registered marks are entitled to certain

15 presumptions of validity so that the infringement analysis for

16 its registered marks can proceed straight to that first *SquirtCo*

17 factor.

18     Common law marks are equally enforceable to registered

19 marks, but they require a threshold showing that they exist, and

20 we do that by showing two things; that Drake is using the mark

21 in question and that the mark identifies Drake as the provider

22 of services thereunder.

23     Now, of particular importance to this motion are Drake's

24 standalone D, which is often in a block-style collegiate font,

25 and the Drake colors, so I'm going to start with the standalone

1    D.

2        Now, Drake actually has registered rights in three

3    different standalone Ds.  On the screen are the three registered

4    marks we have asserted in this case.  Two are for the more

5    modern Ds that were adopted in 2005, and the image on the far

6    right is the -- is an image of Marching Spike, which has been

7    registered since 1989 and features a prominent block-style

8    collegiate D on the chest of a bulldog wearing a varsity

9    sweater.

10        Now, the D on Marching Spike is not disclaimed, and that's

11    significant for our purposes here because it means that Drake

12    has registered rights in that D and we're not limited to

13    enforcing our rights only within the confines of Marching Spike.

14        And so the takeaway is that Drake has registered rights in

15    these three Ds, and since we have that, those are presumptively

16    valid, and we technically could skip the whole common law

17    analysis and jump straight to strength.  We don't need to rely

18    on that presumption, though, because we also have substantial

19    common law rights in a standalone D, particularly in a block-

20    style font.

21        So, again, our burden to show that is use and that that use

22    identifies Drake.

23            THE COURT:  And just to be clear here, are you arguing

24    that DMACC's logo infringes on the Academic and Athletic Drake

25    Ds as well?

1          MR. GILBERTSON:  Yes, we are.  We are primarily focused

2    on the block D because that's the closest, but their logo is the

3    standalone D, and we do have registered rights to the standalone

4    D.  So we are asserting infringement of all three, but

5    particularly the block-style one.

6          THE COURT:  And is your analysis regarding the color, I

7    guess, inherently paired with the D, or are they both separately

8    proceeding as well?  In other words, if they used this

9    standalone block D in red, would that be, in your view, an

10   infringement as well?

11         MR. GILBERTSON:  Well, they didn't do that --

12         THE COURT:  I would agree, but --

13         MR. GILBERTSON:  -- so it's hard for me to say that

14   right now because we don't know how it would have been

15   presented.  You know, we're not here asking the Court to make

16   DMACC do X, Y, or Z; we're asking the Court to make them stop A,

17   B, C, which is using a block-style D in the Drake colors or

18   anything confusingly similar to that.

19         THE COURT:  Even with "DMACC" below it?

20         MR. GILBERTSON:  Correct.

21         THE COURT:  Okay.

22         MR. GILBERTSON:  Because "DMACC" below it is used in a

23   similar font that Drake uses.  It's a five-letter word that

24   begins with D, and I can't tell from looking at DMACC's lapel

25   pins that it says "DMACC" under it, but I can see the D.

1          THE COURT:  Okay.  Go ahead.

2          MR. GILBERTSON:  So with respect to Drake's common law

3    rights in the standalone block-style D, the first thing we have

4    to show is use.  The record is replete with evidence of use.

5    And all of these examples on the screen in front of you predate

6    DMACC's adoption of the standalone D.  We use it on athletic

7    uniforms, university apparel, athletic facilities, and, notably,

8    as the main uniform of our live mascot.

9          So we can certainly satisfy use, the use factor.  Now,

10   whether that use identifies Drake depends on the D's

11   distinctiveness.  Distinctiveness can be inherent or it can be

12   acquired.

13         So here the D is inherently distinctive because it is

14   arbitrary, and it is arbitrary because it does nothing to

15   describe educational services.  It also doesn't describe Drake's

16   locations, which DMACC can't even say.  So arbitrary marks are

17   considered inherently distinctive, and therefore, based on that,

18   we can stop the common law analysis here and show use and

19   identity.

20         Even if we couldn't do that, we can show acquired

21   distinctiveness.  On the screen is an image of Exhibit 18 to the

22   complaint, which we referenced in our briefing.  It is an

23   excerpt from an article that ran in the *Des Moines Register* in

24   2020.  That article has a photograph of basketball shorts that

25   were worn as part of the uniform of Drake's basketball players

1  during its annual Des Moines hometown team weekend.

2      The *Register*, without prompt, described the shorts as

3  featuring the, quote, traditional Drake block D.  So here we

4  have Iowa's leading newspaper seeing a block-style D and

5  thinking Drake.

6          THE COURT:  How can you identify that as use in

7  commerce?

8          MR. GILBERTSON:  Well, athletics -- a university's use

9  of a logo in connection with its athletics is commerce.  People

10  are paying money to come see these games, and they're also

11  paying tuition to come and play for these teams.

12      So the fact that we have that level of recognition by such

13  a prominent organization is evidence of how strong this market

14  is.  So we're talking about existence right now, and that is

15  prime evidence of strength.

16      We have additional evidence in Exhibits 88 and 89 to the

17  complaint, and that we reference in our briefing.  88, which is

18  on the screen in front of you, is a screenshot of a Facebook

19  post that the Des Moines Register posted back in 2023 before

20  this litigation kicked off, and it was immediately met with

21  skepticism from people online, who said things like, "Looks a

22  lot like Drake"; "Very similar to Drake"; "DMACC bulldogs," with

23  the Marching Spike and the standalone D; and, "What a waste of

24  time and effort and cost to make this change when it looks so

25  similar to Drake.  Why?"

1    Exhibit 89, we have something similar.  Exhibit 89 is a

2    screenshot of a Facebook post that DMACC posted announcing its

3    rebrand.  The very first comment was, "Isn't Drake University

4    gonna be pissed you stole their D?"

5    Now, if someone's immediate reaction to seeing DMACC's D is

6    that it reminds them of Drake, they obviously associate that D

7    with Drake.  That is evidence of distinctiveness.  And so

8    these -- these three exhibits alone establish that we have also

9    acquired distinctiveness.

10    So we have a presumption under our registrations of

11    validity, we have inherent distinctiveness because the D is

12    arbitrary, and we have acquired distinctiveness because of the

13    relevant public associating the D with Drake.

14    THE COURT:  But you can understand the skepticism of

15    relying on Facebook comments, right, in our society today?  You

16    haven't undertaken any kind of survey, right, any kind of

17    scientific work that would show this?  You're just relying on

18    whoever posts anonymously whatever they want on these commentary

19    pages, right?

20    MR. GILBERTSON:  Sure.  But a couple of things, though.

21    We're not using this for actually confusion; we're using it for

22    evidence that people associate this with Drake.  And while this

23    may be faceless people, it is still people, and they are

24    associating a D with Drake to such a degree that they feel

25    compelled to say something about it.

1    So we do not need the Facebook posts to establish

2    distinctiveness of the D and we don't need it to establish

3    actual confusion.  And as far as survey evidence goes, the legal

4    standard is not whether we can show survey evidence of

5    confusion, it's whether we can show actual confusion, and at the

6    preliminary injunction stage, that's enough.  We don't have time

7    to come out and get a survey before filing a preliminary

8    injunction motion.

9    So to recap, the standalone D, it's enforceable.  It's also

10   very strong for the same reason.  It's arbitrary, which entitles

11   us to the greatest degree of protection.  It's been in use since

12   1902, and people associate it with Drake.  So the D is both

13   enforceable and strong.

14   Now, the same goes for Drake's colors.  Drake's colors are

15   not registered so, again, we need to show use and

16   distinctiveness.

17   Use, there are five examples on the screen in front of you.

18   The top row is a copy of an admissions document that is sent to

19   admitted students.  It is rendered in Drake's dark blue/light

20   blue color scheme.

21   To the right of that in the top right corner is a

22   photograph of the Drake Double D Award, which is presented every

23   year at the Drake Relays to prominent Drake alumni.  It is

24   rendered in Drake's light blue/dark blue color scheme.  It also

25   has a pair of interlocking standalone-style Ds on it.

1      The image in the middle is Drake stadium, and that is

2   what's referred to as "the blue oval," which is the subject of a

3   trademark application.  The track, where the world-famous Drake

4   Relays are run and the world's attention is attracted every

5   year, is rendered in Drake's light blue secondary color, and the

6   end zones of the football field are rendered in its dark blue

7   color.

8      And then on the bottom row we have the screenshot of

9   Drake's website, which is rendered in its color scheme, and we

10  have an image of the Griffmobile, which is the official vehicle

11  of Drake's live mascot, Griff, and it's the vehicle that he is

12  transported to all Drake events in that is rendered in Drake's

13  color scheme.

14     So this by itself is enough to satisfy both use and

15  distinctiveness, and that's because school colors are unique in

16  the sense that they acquire distinctiveness when they are used

17  in conjunction with other identifying indicia like "Drake" or

18  "Bulldogs" or "Griff" in connection with educational services.

19  That is one of the holdings of the *Louisiana Board of*

20  *Supervisors vs. Smack Apparel* case, which we cited in our reply

21  brief.

22     So this is already sufficient to show existence of

23  trademark rights in colors.  Now, again, we don't have to rely

24  on that because there's evidence in the record that people in

25  Des Moines associate the colors with Drake.

1      The first of which, the day after this case was filed, KCCI

2  did a segment about this litigation.  I'm going to play a clip

3  of that in a little bit.  That's Exhibit 20 in the record.  But

4  for our purposes here, that segment involved asking people if

5  they could distinguish between Drake products and DMACC

6  products, and they were shown color images of the two schools'

7  products.  Both people in the video erroneously attribute the

8  DMACC examples to Drake.  That is evidence that consumers

9  associate the Drake colors with Drake.

10      Another example is in the Rotary Club video, which is in

11  the record as Exhibit 90.  In that video, there is a man talking

12  to DMACC's marketing director, Todd Jones, and that man

13  references that the colors specifically, DMACC's colors, look,

14  quote, a lot like Drake University's logo.

15      In fact, those colors are so associated with Drake that

16  RAYGUN sells a shirt that proclaims "Des Moines looks great in

17  blue," in a light blue color.  Now, RAYGUN is a world-famous

18  T-shirt company, and here we have them referring to Drake by its

19  colors.  That's how strong they are.

20      To recap, we can plainly show we use the colors, and we can

21  show the colors identify Drake as the source of educational

22  services.  So the conclusion is that Drake's colors, as well as

23  its standalone D, are both valid and strong.

24          THE COURT:  Do the colors need to take on a secondary

25  meaning to be protectable?

1          MR. GILBERTSON:  Yes, they do.

2      So this first factor of strength plus existence weighs in

3  Drake's favor.

4      The next factor we look at under *SquirtCo* is the similarity

5  of Drake's marks and DMACC's marks.  Now, on the screen is a

6  grid of -- consisting of a top row which has the Drake Vintage

7  D, which is the same one that appears on Griff's chest, and to

8  the right of that are the Drake colors.  On the bottom row,

9  that's the DMACC D that they adopted last fall and the new DMACC

10 colors.

11     So from -- and similarity is evaluated using what's called

12 the sight, sound, and meaning test.  So from a sight and sound

13 perspective, we have the same letter, so they look and sound the

14 same, and for all intents and purposes, we have the exact same

15 colors.

16     Now, DMACC argued not once or twice but four times in its

17 resistance that the use of that shadow is enough to distinguish

18 the two marks.  Let's see if that's true.

19     This is DMACC's Vintage D -- excuse me.  That is Drake's

20 Vintage D.  To the right of it is DMACC's D without the shadow.

21 Those look identical to me.

22     Does the shadow help?  Before you answer that, I'd like to

23 look at this principle in a different context.

24     Let's say that I want to open a burger joint called

25 Michael's.  Can I use this logo?  Obviously, not.  That's

 1  McDonald's.

 2       Would it make a difference if I put a shadow on it?

 3       What if I make it red?  Does that help?

 4       Of course not.  If anything, making that shadow red, which

 5  is McDonald's other color, heightens the similarity between the

 6  two marks, not mitigates it.

 7       So the same is true here.  The shadow not only fails to

 8  materially distinguish DMACC's D from Drake's D, but when it's

 9  rendered in Drake's secondary color, the marks are functionally

10  identical.  So for sight and sound purposes, we absolutely have

11  similarity.

12       Now, the meaning of the term is also relevant.  Now, rather

13  than try to explain that myself, Drake's president, Marty

14  Martin, articulated the meaning best in an email he wrote to

15  DMACC's president, Rob Denson, in an email back in February.

16  Mr. Martin said, "D for us is Drake and has been for the

17  totality of our existence.  D for you is Des, and thus does not

18  have the same essentiality for you as it does for us.  The D is

19  our identity."

20       He's right.  Here the respective Ds are the same letter in

21  the same font used in connection with the same color scheme.  It

22  does look and sound the same.  And since nobody in Des Moines

23  actually abbreviates "Des Moines" using a single D, which we

24  refer to in our briefing, the meaning of DMACC's D is

25  nonsensical, which, by definition, is confusing.  So this factor

1 strongly favors Drake.

2      The next factor you look at is the proximity, the

3 competitive proximity, between the two parties.  Services are in

4 competitive proximity when the sales outlets, trade channels, or

5 customers are similar or overlap.

6      Both DMACC and Drake provide post-secondary educational

7 services in central Iowa, and both draw prospective students

8 from that same area.  They both offer two- and four-year

9 degrees.  DMACC traditionally has offered two-year degrees, and

10 they also offer four-year degrees through its partnership with

11 UNI.  Drake has traditionally offered four-year degrees, but it

12 also offers two-year degrees through its John Dee Bright

13 College, which, rather coincidentally, opened around the time

14 that DMACC started work on their rebrand.

15      So the parties are also in close physical proximity.  On

16 the screen are three images that appear in the complaint and

17 that are referenced in our briefing.  The top two images are

18 screenshots from Google Maps.  The blue dot in the center

19 represents the location of Drake's campus in Des Moines, and the

20 blue circle represents a ten-mile radius around Drake.

21      In the image on the left, there are three red dots within

22 that circle.  Those are locations of DMACC's -- three of DMACC's

23 campuses.

24      And I want to note that even though the circle is ten

25 miles, the farthest campus from Drake, I believe, is the West

1    Des Moines campus, which is approximately eight miles.  So we've

2    got three DMACC locations, campus locations, within eight miles

3    of Drake.

4         The image on the right has maroon dots, and that represents

5    the location of DMACC Learning Centers.  I believe the farthest

6    one away is about six miles.

7         So what we've got here is seven DMACC locations within

8    approximately eight miles of Drake.  That is severe overlap.

9         And the absurdity of this is best illustrated by an image

10   on the bottom, which is a screenshot from Google Maps which

11   shows the distance from Drake's legal clinic, which is the

12   easternmost of campus, to DMACC's urban campus.  It's 1.2 miles

13   down the road that was named after Drake's -- or Drake

14   University.  You can practically see the urban campus from the

15   legal clinic.

16        Now, so the takeaway from this is both parties offer the

17   same services to the same consumer class in the same small

18   geographic area using the same letter in the same font with the

19   same colors.  Now, under *Community of Christ Copyright*

20   *Corporation vs. Devon Park Restoration Branch of Jesus Christ's*

21   *Church*, that's such a devastating set of facts that the Court

22   may presume a likelihood of confusion.  And that set of facts,

23   like I mentioned earlier, was sufficient for this court to grant

24   preliminary injunctive relief in the *Moon Seed* decision, and it

25   should do so again here.  This factor weighs so firmly in

1    Drake's favor that DMACC concedes the point in its resistance.

2        The next factor we look at is Defendant's intent.  Now, the

3    reason intent is relevant is because if a defendant intends to

4    cause confusion, it's more likely to succeed.

5        Now, we can actually infer an inference of intent under the

6    *Insty*Bit* decision from the Eighth Circuit.  That decision tells

7    us that the defendant's adoption of a similar mark where there

8    was a prior relationship between the parties substantially

9    increases the likelihood of an intent to deceive.

10        That concept is also articulated in the *Aveda Corporation*

11    decision from the District of Minnesota, which notes given the

12    sheer size of the universe of symbols and marks that are

13    available to choose from, courts look with, quote-unquote,

14    suspicion on those who select marks that closely approach those

15    of its successful competitor.

16        Here DMACC has undoubtedly been aware of Drake and has

17    partnered with Drake for many years.  They partner on academic

18    offerings to their students.  One example is the Drake admission

19    partnership program DMACC has, and that partnership began long

20    before DMACC adopted its new D.

21        DMACC's rebrand was also developed entirely in-house and

22    was presumably overseen by its director of marketing, Mr. Jones.

23    Mr. Jones holds a degree from Drake.  It is unquestionable that

24    the parties had a prior relationship such that DMACC was aware

25    of Drake's brand before launching its rebrand, so that

1  substantially increases the likelihood of intent to confuse

2  under *Insty*Bit*.

3      We can also infer intent by what DMACC reviewed before they

4  launched.  We know they reviewed our brand standards and style

5  guide prior to launching.  Now, the brand standards and style

6  guide is an internal document.  It's publicly available, but

7  it's an internal document that the Drake marketing department

8  has put together that provides guidance to other Drake

9  departments on how to use the various elements of the Drake

10  brand.

11      Now, we know that they reviewed this because we alleged it

12  in our amended complaint, where we said, "Upon information and

13  belief, individuals involved in conceiving, developing, and

14  implementing the rebrand, including President Denson, reviewed

15  Drake's brand guide prior to announcing the rebrand in October

16  2023."  DMACC admitted that allegation.

17      Now I want to highlight a handful of excerpts from the

18  brand guide, which is included in the record at Docket 30-5.

19      The first page talks about Drake's colors.  In the top

20  right is a graph that consists of Drake's primary and secondary

21  palette, and the height of those bars corresponds to the

22  frequency with which those colors should be used in Drake

23  materials.

24      The dark blue/light blue is the primary palette, and the

25  description for the primary palette, which is blown up to the

1   right, states that, "The primary...palette is made up of...Drake

2   Blue and Light Blue," and the text makes clear that, "These hues

3   are central to the Drake brand and should be prevalent in

4   everything created for Drake.  Leading the way is Drake Blue,

5   which is distinguished and collegiate and speaks to the

6   tradition of Drake, while Light Blue is bright, youthful, and

7   friendly."  So DMACC saw this before it announced its new color

8   scheme.

9        The next slide shows the Drake seal.  Now, we are not

10  asserting the seal as part of our infringement claim, but DMACC

11  hasn't had an institutional seal in over 50 years, and the first

12  one back looks suspiciously like Drake's.  This will come up

13  again later, but for our purposes here, DMACC saw this page

14  before they launched its rebrand and its new seal.

15       Next slide is the page about Griff.  The largest image on

16  this page is a photograph of Griff I, who is the predecessor to

17  Drake's current live mascot.  He is wearing his trademark

18  leather jacket.  It's the same jacket that Griff II is wearing

19  in the top left of the screen, and it prominently features the

20  Drake Vintage D.

21       And varsity letters like that, as -- varsity letters

22  commonly are pretty thick, so that D is extruded a little bit

23  from the jacket, and if it sticks out from the jacket, it is

24  naturally going to have shadow when light hits it.

25       And so, again, DMACC reviewed this before it announced its

1  new block-style standalone D with the shadow in Drake's

2  secondary color.

3      Now, DMACC argues in its resistance that the brand guide --

4  that they used the brand guide actually as an example of what

5  not to do, but they appear to have used it as a blueprint.

6  Because if you zoom out and you look at the scope and the

7  quantity of the Drake elements that were incorporated into

8  DMACC's rebrand -- the D, the font, the colors, the seal -- in

9  view of the parties' prior partnerships and mutual awareness and

10  their marketing director's degree from Drake, that's a lot of

11  smoke, and where there's smoke, there's usually fire.  And

12  there's simply no plausible argument, in view of all this, that

13  DMACC was trying to avoid comparisons to Drake, so this factor

14  also weighs in Drake's favor.

15      The next factor we look at under *SquirtCo* is actual

16  confusion.  Actual confusion matters because it is the best

17  evidence of a likelihood of confusion, and a likelihood of

18  confusion is what results in Drake succeeding on the merits.

19      So as I referenced earlier, the day after this case was

20  filed, KCCI aired a news segment about this litigation, and they

21  asked people if they could distinguish between the Drake brand

22  and the DMACC rebrand.  Here is a clip from that segment.

23      (Video played in open court.)

24      MR. GILBERTSON:  Your Honor, people don't confuse weak

25  marks, and that's video evidence of people confusing DMACC and

1   Drake.  That's the best evidence that a likelihood of confusion

2   is occurring.  And even if this didn't exist, actual confusion

3   is not required to grant preliminary injunctive relief.  So this

4   factor also weighs firmly in Drake's favor.

5       The last factor we look at under *SquirtCo* is the degree of

6   care, and this looks at the relative sophistication of the

7   relevant consumer.  Here the relevant consumer base is

8   prospective students, many of whom have not yet reached the age

9   of majority.

10      These aren't professional purchasers because most people

11  don't do higher education more than once, and the

12  unsophisticated nature of these kinds of consumers has been

13  recognized in other federal courts, including the Southern

14  District of Texas, which stated, "There exists a period of time

15  in every prospective student's career where not only are they

16  unsophisticated, they know practically nothing about the

17  industry, and are particularly susceptible to confusion."

18      Now, the court here is actually referring to prospective

19  law students who are older, pay higher tuition, and have already

20  been through undergrad, and thus have some experience and

21  knowledge about how it works.  So if prospective law students

22  are particularly susceptible to confusion, so are prospective

23  undergrad students.

24      And so even if the parties' prospective customers were

25  considered sophisticated, the Eighth Circuit says that this

1   factor is less relevant when the marks are substantially

2   similar, used in the same category of services, and used in the

3   same geographic location.  That's also from the *Community of*

4   *Christ* decision from the Eighth Circuit.  We have all of those

5   here.

6        So the relevant consumer here is not sophisticated, and

7   even if they were, the exceptionally high degree of similarity

8   and proximity severely outweigh that, so this factor, finally,

9   also favors Drake.

10       So if we look back to our chart, we can see that all

11  factors weigh staunchly in Drake's favor.  Drake's standalone D

12  and colors are both enforceable and strong.  DMACC's new D and

13  its colors are essentially the same as Drake's.  The parties

14  offer the same services in the same area.  All signs point to

15  DMACC's intention to mimic or emulate Drake.  We have video

16  evidence of actual confusion.  And prospective college students

17  are not sophisticated professional purchasers, and even if they

18  were, the Eighth Circuit puts far more weight on similarity and

19  proximity, the latter of which DMACC conceded.

20       So we don't need all of these factors to weigh in our

21  favor.  The *SquirtCo* test is a -- it's not rigid or mechanical;

22  it's a balancing test to be applied using common sense and

23  discretion.  And so given that all of these factors weigh in

24  Drake's favor, the Court should, thus, find that we are likely,

25  exceptionally likely, to prevail on our claim for trademark

1  infringement.

2      Now, this factor is the most significant of the four

3  *Dataphase* factors.  The stronger the likelihood of success, the

4  less weight need be given to the remaining factors, but they

5  favor Drake also.

6      So if we move now to the second factor under *Dataphase*, it

7  looks at the threat of irreparable harm to Drake.  Drake doesn't

8  actually need to demonstrate this for the factor to weigh in its

9  favor.  The rules for trademark cases are different than most

10  other cases when we're talking about irreparable harm, and

11  that's because the Lanham Act, which is at 15 U.S.C. Section

12  1116(a), provides that a plaintiff shall be entitled to a

13  rebuttable presumption of irreparable harm upon a finding of a

14  likelihood of success on the merits.  We have that in spades.

15      And even if Drake -- excuse me -- DMACC could successfully

16  rebut that presumption, the threat of harm to Drake is severe

17  and demonstrable.  As I noted earlier, DMACC is huge.  Going by

18  its own metrics, DMACC occupies 2.3 million square feet of real

19  estate spread across six campuses and seven learning centers

20  across central Iowa.  In the last nine years, they've spent over

21  a hundred million dollars on new facilities, and, like I

22  mentioned earlier, Drake [sic] served more students in 2022-2023

23  than all three state universities combined.

24      Now, Drake's enrollment is about a sixteenth of that, which

25  means that if you assume Drake replaces its entire student body

1 every year, which, of course, it doesn't, it would take Drake 16

2 years to expose the same number of students to its brand that

3 DMACC has so far.

4     Now, this case probably won't go to trial for two years,

5 and so that means that we now go up to 32 years that Drake will

6 have lost to DMACC in terms of public exposure to its brand and

7 the source recognition that goes with that.  And, really, the

8 number is probably a lot higher because for every student who

9 goes to DMACC, there's probably three or four who thought about

10 it and are therefore exposed to DMACC's branding in some way.

11     So if Drake is forced to endure the harm that will

12 accompany a drawn-out litigation, which it is exceedingly likely

13 to win, it won't matter if Drake prevails in the end because its

14 brand won't be its own anymore.  That's not just harmful to the

15 Drake brand, that's existential.  And when something that took

16 122 years to build is destroyed basically overnight, you can't

17 calculate money damages for something like that.  So this

18 factor, while we have a presumption, even if it didn't, it most

19 certainly weighs in Drake's favor.

20     Now, the third factor we look at under *Dataphase* is the

21 balance of the hardships, and that takes the harm that Drake

22 will suffer and compares it to the hardship that DMACC would

23 suffer if the motion is granted improperly.  It's not even

24 close.

25     Where the moving party has made a substantial investment

1  developing its trademark relative to the nonmoving party, courts

2  generally find that the moving party's hardship outweighs that

3  of the nonmoving party.  That's from the *Iowa Paint* decision

4  here in the Southern District.

5      It is indisputable that Drake's investment in a

6  122-year-old brand is substantial compared to DMACC, whose new

7  brand has been out for less than a year and it was developed

8  entirely in-house without use of outside firms.

9      Moreover, DMACC has had tremendous success under its prior

10  branding, as I noted just a few minutes ago, and they don't

11  dispute that.  Its continued success does not depend on them

12  using a standalone D in the Drake colors.

13      And this lack of hardship is also illustrated by the

14  actions that DMACC has already taken.  Within a matter of weeks,

15  DMACC was able to pull a sizeable amount of merchandise from its

16  store shelves that featured its new standalone D.  Now, they

17  didn't get all of it, and we had to bring it up again in our

18  reply brief, but it was also able to remove the D on its

19  basketball court sometime between when the complaint was filed

20  and now.  And so that demonstrates how easy it is for DMACC to

21  comply if this Court were to issue an order directing it to

22  cease use of the standalone D in the Drake colors.

23      So on the one hand, we have a clear and imminent erosion of

24  Drake's brand that monetary damage can't compensate for, and on

25  the other hand, Drake -- excuse me -- DMACC will need to update

1   its website and some of its promotional materials to change its

2   colors and maybe go back to its old logo.  That's not actionable

3   harm when they've had such success under it, and that's probably

4   why DMACC didn't even argue this factor in its resistance.  So

5   this factor also weighs firmly in Drake's favor.

6       The last factor we look at under *Dataphase* is the public

7   interest.  In the context of trademark infringement, this factor

8   involves balancing the interest in protecting the public from

9   confusion with the interest in a competitive market.

10       The public is not harmed by requiring DMACC to return to

11   its prior successful branding.  The public is harmed when you

12   have two colleges a mile from each other offering the same

13   services under the same letter under the same color.

14       The interest in fostering a competitive market cannot

15   outweigh this because, like I've said a couple times, DMACC has

16   had tremendous success under its prior branding, and they don't

17   need the Drake brand to effectively compete.

18       Courts have consistently found there was a strong public

19   interest in preventing confusion and that DMACC failed to rebut

20   any of Drake's authorities on this point in its resistance would

21   suggest that it agrees.  So this factor also weighs in Drake's

22   favor.

23       So if we look back at everything we've just talked about,

24   Drake is exceptionally likely to prevail on the merits of its

25   claim.  Because of that, we are entitled to a rebuttable

1  presumption of irreparable harm.  And even if we weren't, we can

2  show it.  DMACC's hardship, by contrast, is negligible at best,

3  and the public interest in avoiding confusion is undisputed.  So

4  all *Dataphase* factors weigh in favor of granting this motion.

5  Now, before I close up, Your Honor, I want to briefly touch

6  on Drake's unfair competition claim.  Unfair competition is

7  applied in cases where one has established its business using

8  certain marks or symbols such that they become generally known

9  as designating that entity.

10  The object of the doctrine is to protect such marks from

11  invasion by others who seek to take the goodwill associated with

12  those marks, and injunctive relief is available under this cause

13  of action because there's no practical way to prevent the

14  filching of an established mark's goodwill than by prohibiting

15  the other party's use of it.

16  Here, Drake has established an institution using marks and

17  symbols, some of them for over 100 years; in particular, the

18  Vintage D and the seal.

19  These were DMACC's symbols that until recently it had used

20  to establish its institution.

21  This is what DMACC has decided its symbols are now, and

22  this is where the seal comes into play, so I want to take a look

23  at them.

24  They're the same shape.  They have similar concentric

25  circles, they both have a lamp.  They both have a book.  They're

1  both black and white.  They both have the year of the

2  institution's founding.  There's an overall visual similarity

3  here.

4      Now, DMACC makes a big deal in its resistance that Drake is

5  attempting to lay claim to this unreasonably broad swath of

6  elements that you would commonly find in an institution's seal.

7  That's not what's happening here.  We don't object to DMACC's

8  seal because it has a lamp and a book.  We object because it

9  looks so similar in light of all of the other things that

10 they've already taken.  They've taken everything but Griff,

11 quite frankly.

12     And seals don't have to look like this.  In its answer,

13 DMACC provided a great smattering of what institutional seals

14 look like.  They all look different, and none of them look like

15 Drake's.  DMACC's own seals look nothing like Drake's seals.

16     So we don't have a problem with DMACC adopting an

17 institutional seal, but when you've adopted our letter when it

18 doesn't really stand for your name, when you've adopted our font

19 when you knew that we used it because you looked at the brand

20 guide, when you've adopted our color scheme which makes the

21 least sense out of any of this, and now you've adopted an

22 institutional seal for the first time in 50 years that looks

23 like ours when it didn't have to, these are too many

24 conclusion -- or, excuse me, coincidences to be an accident.

25     And the only real conclusion you can draw from this is

1   DMACC is trying to emulate Drake.  Now, the reason you emulate

2   someone usually is because you want something that they have,

3   and by doing what they do, you might get it too.  When we're

4   talking about brands and trademarks, that thing that they have

5   is goodwill, reputation, legitimacy.

6        Now, I don't profess to know how you go about obtaining

7   legitimacy as an academic institution, but I do know that a

8   great place to start is by looking the part.  And who better to

9   look like than the most prestigious university in town?  And

10  that is what unfair competition is about.

11       So even if DMACC could be deemed not to be infringing the

12  Drake brand, there is something viscerally unfair and

13  unnecessary about what DMACC has done.  Where the infringement

14  analysis is more about depth of each of the individual factors,

15  here it's more about breadth, and by that I mean the quantity of

16  decisions that were -- had to have been made to bring Drake --

17  DMACC's new brand exceptionally close to Drake.  This doctrine

18  allows the Court to act even if infringement somehow is not

19  found.

20       So, for example, if the Court finds that adopting the

21  single-letter logo of your closest neighbor isn't infringement,

22  it's got to be unfair competition.  If the Court finds that

23  adding a drop shadow to your competitor's logo in your

24  competitor's secondary color isn't infringement, it's got to be

25  unfair competition.  And if the Court finds that adopting the

1  same color scheme with a tiny twist is enough to avoid

2  infringement, it's still unfair competition.

3       Unfair and unnecessary, that's what this case is.  It's

4  about DMACC taking something that isn't theirs and that they

5  don't need.

6       Now I would invite you one more time to look around at all

7  of the block-style Ds that appear on people's outfits in this

8  room.  One group has earned the right to wear this brand, and

9  they will lose it if DMACC is permitted to continue this

10  transparent and inexplicable quest to assume Drake's identity.

11       Now, I've talked a lot about details today, but I want to

12  return to the three questions I posed at the beginning of my

13  talk, which are:  Did Drake begin using a standalone D in a

14  block-style font to denote the source of its educational

15  services before DMACC did?  Yes.  Did Drake begin using its

16  school colors before DMACC did?  Yes.  And do Drake and DMACC

17  offer their educational services in the same geographic region?

18  Unquestionably.

19       That fact pattern was enough to grant preliminary

20  injunctive relief against the defendant in the *Moon Seed* case

21  that I've referenced, and the Court in that decision was so

22  confident it was the right decision that it only required the

23  plaintiff to post a $3,000 bond.  We urge the Court to reach the

24  same conclusion here.

25            THE COURT:  Thank you.

1    And who will be arguing on behalf of DMACC?

2    MR. JOHNSON:  Good morning, Your Honor.  Unfortunately,

3  you're stuck with me.

4    THE COURT:  Okay.  You are also welcome to argue at the

5  podium or counsel table, whichever you would prefer.

6    MR. JOHNSON:  Thank you, Your Honor.  If you wouldn't

7  mind giving me a second to plug in my computer.

8    THE COURT:  Yes.

9    MR. JOHNSON:  Good morning, Your Honor.  May it please

10  the Court.

11    THE COURT:  Yes.

12    MR. JOHNSON:  My name is Scott Johnson.  I represent

13  the defendant in this matter, Des Moines Area Community College,

14  more affectionately known as DMACC.  Can't say DMACC without the

15  D.

16    Your Honor, we're here today because Drake has filed a

17  motion for preliminary injunctive relief claiming that it owns

18  the D in all shapes, sizes, and colors.  We believe today D

19  should stand for denied.

20    In order to understand a bit about how we got here, I'd

21  like to start with just an overview, and a quick one, of DMACC's

22  history -- of DMACC's history.

23    DMACC was originally founded in 1966 as the Area 11

24  Community College, and six years later, it became known as

25  DMACC.  The Des Moines Area Community College first used DMACC

1   as a brand with two different shades of blue and white as its

2   colors in 1972.  And you know who didn't say a word?  Drake.

3        After 1972, we launched a block-style D in 2000 that we

4   used with our campus recreational services for our students.

5   That included both internal and external events.  We played

6   other schools.  We went to other campuses.  We hosted other

7   college kids.  I can say kids, I think.  I'm in my fifties now.

8   That began in 2000.  Again, it's a block-style D in blue and

9   white.

10        THE COURT:  Did it ever appear without the bear paw?

11        MR. JOHNSON:  Not without the bear paw, Your Honor, but

12  it did appear without the "Campus Recreation" beside it.  And we

13  did register this mark.  We applied for that registration in

14  2014.  That registration was published, or allowed, in trademark

15  parlance, without opposition.  Drake never said a word about it.

16        We used it publicly on Facebook pages without "Campus

17  Recreation" by it.  We used it to announce different events

18  during the day.  And we even, you know, put a little TM by it to

19  denote to the public that we were claiming trademark rights in

20  that block-style D.

21        Now, in October of last year, nearly a year ago next week,

22  we launched what we call the block-style D and DMACC mark.  Now,

23  this is the mark that is supposedly at issue in this case, but

24  much of Drake's, if we call it, evidence removes the "DMACC" and

25  just focuses on the block-style D.  They did that in the

1   briefing.  You note KCCI, which conducted its survey on Drake's

2   campus, also removed the "DMACC."  So they removed the house

3   brand that we've had since 1972.

4           THE COURT:  But you were marketing it without "DMACC"

5   on it.

6           MR. JOHNSON:  We weren't, actually.  That was a

7   third-party vendor of ours that used that brand on some of our

8   goods, and when we found out about it, we did change that.

9           THE COURT:  What goods did the vendor control?

10          MR. JOHNSON:  The vendor generally controls

11   merchandise, so they control things like hats and T-shirts and

12   stuffed animals, things like that.

13          THE COURT:  So they didn't paint it on your basketball

14   court, then?

15          MR. JOHNSON:  Well, that's true, Your Honor.  That was

16   painted on the basketball court without "DMACC" on it, and that

17   was done, I believe, before we agreed to put "DMACC" under

18   everything with Drake.

19          THE COURT:  Okay.  But it's not fair to say Drake

20   complained about all the DMACCs when you're, in fact, marketing

21   it without "DMACC."

22          MR. JOHNSON:  Well, again, that was a third-party

23   vendor that we did have limited instances of that we did take

24   control over.

25          THE COURT:  And a different third-party vendor that

1   painted it on your basketball court?

2            MR. JOHNSON:  I'm not sure about that, Your Honor.

3            THE COURT:  You see the problem, right?

4            MR. JOHNSON:  It's a fair point, yes.  I understand,

5   yes.

6            THE COURT:  All right.

7            MR. JOHNSON:  We're here.  Drake must show -- in order

8   to obtain the extraordinary remedy of preliminary injunctive

9   relief, they must show irreparable harm, likelihood of success,

10  that the balance of those harms favors Drake, and that the

11  public interest favors Drake.

12       Courts have held in the Eighth Circuit that the likelihood

13  of success factor is the most important.  Now, likelihood of

14  success depends on the claims at issue.  These are the claims

15  that are at issue in Drake's complaint.  There are six of them.

16  Only the first five are actually at issue in this motion for

17  preliminary injunctive relief.  The first four of those are all

18  based on trademark infringement claims.  The last one is

19  dilution, which Drake's counsel didn't really discuss in their

20  argument, but it is mentioned in their briefing.

21       Now, to establish trademark infringement, the underlying

22  basis for those first four causes of action, Drake must show two

23  things:  First, that it has a valid protectable mark; and,

24  second, that there is infringement of that mark because there is

25  a likelihood of confusion between that mark and the DMACC

1  activity.

2      Now, Drake's lawyers sort of conflate whatever the marks

3  are that they have under this theory that it's all a Drake

4  brand, but they really break down into two categories.  Drake

5  has three federal trademarks and then it has several other

6  elements that it calls its alleged common law trademarks.

7      These are the elements that it's calling the Drake brand:

8  the standalone D, the Vintage D, the Academic D, the Athletic D,

9  the Drake colors, Griff and its apparel, the jacket, the

10  Marching Spike, and the Drake seal.

11      The ones in red have no federal registration behind them.

12  Despite what Drake's lawyers say about the Vintage D, that is an

13  utter misrepresentation to the Court.  There is no registration

14  of a Vintage D.  That is not a thing.

15          THE COURT:  It's on the Marching Spike, isn't it?

16          MR. JOHNSON:  It's on the Marching Spike, but as we'll

17  see, that federal registration requires the entirety of that

18  illustration.  It is limited to that.  It requires the bulldog,

19  Your Honor.

20          THE COURT:  In the same way that DMACC requires the

21  bear claw?

22          MR. JOHNSON:  We don't require the bear claw.

23          THE COURT:  That's not how your mark was registered

24  that you're talking about?

25          MR. JOHNSON:  That mark was registered with a lot of

1   words in it, but our mark that is the DMACC and D, we did apply

2   for a federal registration.  The federal trademark examiner

3   reviewed that and published it, saying it was allowable,

4   published it for opposition.  That mark is currently pending

5   because Drake has submitted a request for extension of time to

6   oppose.

7          THE COURT:  Okay.

8          MR. JOHNSON:  But let's talk about Drake's -- I kicked

9   myself out of my presentation.  I apologize.

10      Let's talk about Drake's common law marks in this block-

11  style D and, in fact, the D that they claim they own, which is

12  every D under the sun.  To establish it, they have to look at

13  the actual marks themselves.  They can't look at this holistic

14  Drake brand.  It's not the proper test to establish validity of

15  a trademark.

16      To establish validity, they have to show first that there

17  is a valid and protectable mark.  And if we look at the

18  standalone D, the standalone D -- in order to show that they

19  have rights in that standalone D, they have to show use in

20  commerce to act as a source identifier.  That use has to be

21  consistent and continuous, and it also has to be distinct.

22      Drake's lawyers conveniently skip over that first part,

23  consistent and continuous use.  And as we'll see, they have the

24  data -- or they could have the data and, like at the

25  disqualification hearing, they chose not to present it even if

1    they had access to it.

2        So if we look at the evidence that Drake is relying on for

3    its notion that it owns any D of any size, shape, or color, they

4    submit one thing, and it's this.  It's a banner that we believe

5    hangs in the Knapp Center on Drake's campus.  It uses the word

6    "Drake" and "bulldog" in there in conjunction with this notion

7    about the D.

8        Drake's lawyers selectively presented the Court one line

9    from this banner, "Here's to the one who wears the D."  That D

10   has to appear on a bulldog or it has to be associated with

11   Drake.  Drake admits that in its own brand guides, as we'll see

12   later.

13       This banner in and of itself is not trademark use, which

14   requires use in commerce as a source identifier.  Drake never

15   presents any evidence that it uses a D as a source identifier

16   based on this banner.  It fails to meet the showing of any

17   evidence of secondary meaning.

18       Again, it's been nearly a year since DMACC launched its D

19   and DMACC brand, and Drake has had plenty of time before today's

20   hearing, and certainly plenty of time before it filed its motion

21   for preliminary injunctive relief, to come up with evidence of

22   secondary meaning, and the Court is left with an empty record.

23       Typical evidence of secondary meaning, there's two types.

24   There's direct evidence, which typically comes in through

25   consumer surveys or testimony.  Drake had nine months to present

1    that and did nothing.  It also can be presented in the form of

2    circumstantial evidence through length and manner of

3    exclusivity.  Drake could have presented that and didn't.

4        Advertising expenditures and scope, there's not a dollar of

5    advertising expenditure mentioned in any of Drake's pleadings or

6    exhibits.  Sales or numbers of customers, we don't have any

7    sales data for any Drake T-shirt, any Drake hat, certainly none

8    for the banner.  Again, Drake has this data, should have this

9    data and chose not to present it to the Court.  There's a

10   reason.

11       They could have conducted market surveys.  They had nine

12   months to do so and chose not to.  They could have provided

13   proof of intentional copying, and instead they rely on Santa and

14   an elf.

15       Drake has no rights in a standalone D.  They haven't shown

16   use in commerce, and they haven't shown that it's been used as a

17   source identifier for Drake.  They failed that first part of

18   this test.

19       The second part of the test requires that the standalone D

20   be distinct.  Again, Drake fails this requirement, and it fails

21   it because there is widespread third-party use that shows there

22   are no valid or protectable rights in a university using a D --

23   excuse me -- a D by itself as its brand.

24       There are over a thousand universities, colleges, and

25   schools that start with the letter D.  All of them can use D,

1    according to Drake's lawyers, with this academic naming

2    convention thing where they can all use a collegiate style,

3    i.e., what Drake calls its block-style D, as a brand.

4        There are 34 of these schools that have pursued federally

5    registered D-related trademarks.  Why are there 24 registered

6    trademarks out there?  Because the D by itself is not distinct.

7    The little differences matter.

8        If we look at some of those, Dartmouth College has what

9    Drake is now asserting to be its block-style D, began using it

10   before Drake, and has a federal registration for that block-

11   style D.  Drake did not oppose this federal registration, has

12   never sued Dartmouth for violation of its trademark rights.

13       Denison University, Dickinson State University, Duke

14   University all use Ds to identify their schools.  Schools even

15   use the bulldog with a D on it.  Drake understands this.  Drake

16   makes light of the fact that there are so many similar marks,

17   and, in fact, last weekend just had the battle of the bulldogs,

18   where Drake won its football game against another school in its

19   conference that uses a bulldog as its mascot.

20       Drake suggests it owns the letter D in all shapes, sizes,

21   colors, and configurations, and that's what it told DMACC when

22   DMACC was trying to resolve this suit so schools wouldn't be

23   spending money on lawyers.  And when they went ahead with this

24   lawsuit, they failed to come forth with any evidence of a

25   standalone D being used in commerce, any evidence of secondary

1   meaning, and they failed to show that their standalone D is

2   distinct because they can't.  It's not.

3       Drake simply does not own the letter D.  That's one of the

4   elements that they claim trademark rights in.  They failed.

5       The next one is this so-called Vintage D.  The Vintage D

6   must meet the same test.  It must be shown to have been used in

7   commerce as a source identifier and been used consistently and

8   continuously, and it must be shown to be distinct.

9       What is the Vintage D?  I still don't know the answer to

10  this question as we sit here today at a hearing after piles of

11  paper, and that's because Drake is relying on this federally

12  registered mark for its Vintage D, apparently.  The problem is

13  the mark is not just a D.  Nobody looks at the D and says Drake.

14  They look at the D on the chest of a Marching Spike bulldog.

15  That's what was registered with the Trademark Office.  That's

16  what provides the distinctness of this mark.  It's on a

17  bulldog's chest.

18      What is Drake trying to do in this lawsuit?  Well, they're

19  trying to abandon the bulldog and leave us all just looking at a

20  D.  That is not what their mark is, that's not what their

21  marketing is, and it's not their brand.  They don't own it.

22  They failed to meet their burden of showing continuous and

23  consistent use and distinctiveness.

24      And if we look at that evidence, what we see is ancient

25  photos from the 1900s where they present a D with a white fill,

1   if you will, rounded corners, a light blue background.

2       Then they present another yearbook where the D is actually

3   white in a different font and surrounded by red.

4       And then we have a black-and-white photo with another style

5   D, again apparently in white.  It could be yellow for all I

6   know.  But, again, it's from the early 1900s.

7       Another early 1900s photo with two different Ds on them,

8   two different color schemes.  They're black and white again.

9   And, again, another athletic uniform with yet another style of a

10  D.

11      They have isolated uses from other eras, other decades,

12  from the '60s, '70s, and '80s.  There's a sad picture of Griff

13  with a different style of D.  There's a hat on someone.  We

14  don't know what color it is, and it looks like the Dowling hat

15  that's sitting at counsel table.

16      Then we have undated photos of D sweatshirts and D

17  T-shirts.  Drake did not provide any sales data.  They didn't

18  provide any marketing data.  They didn't tell us how many of

19  these shirts were sold.  There's no volume data.

20      They didn't tell us where these shirts really were stored.

21  We went to the Drake bookstore.  We couldn't find it.  We can't

22  find it online.  It's not part of their bookstore online, their

23  digital bookstore.  Neither of these are available.

24      Now, they also point and counsel pointed you to shorts,

25  athletic shorts, that were a one-off athletic short worn during

1  a game in 2020.  This was for the hometown team game, and it was

2  done more than four years ago.  Unfortunately for Drake, the

3  statutory presumption is that if you don't use a mark within

4  three years, it's considered abandoned.  There's no evidence

5  within the last three years that Drake has used a standalone D

6  as a trademark.

7       They point to their basketball court, and they show a

8  Vintage D, or whatever they call it, in the back of the court.

9  What they didn't tell the Court or the public in their filings

10 is that when the public shows up for basketball games, this is

11 covered up by the bleachers.  The public sits on top of it.

12      So the Vintage D, we're left with an alumni group's logo,

13 an award given to Drake athletes, some undated photos of a

14 sweater that apparently was custom-made or worn by a Michael

15 Admire.  Again, no data.  We're left with no data.  Drake's

16 lawyers could have provided it, probably had access to it, and

17 chose not to.  Why?

18      At best, this random, scattered evidence, most of which is

19 ancient, shows de minimis use of a traditional collegiate-style

20 D.  It's not enough evidence of continuous and consistent use to

21 justify injunctive protection.

22          THE COURT:  How does the use of the Vintage D on Griff

23 not constitute use in commerce?

24          MR. JOHNSON:  Because you have to look at -- well, that

25 does constitute use in commerce as Griff plus a D, but not the D

1   alone.  DMACC, if it were to come out and put that on a bulldog,

2   because the bulldog is a mascot -- they're relying on that brand

3   strength of Griff to associate with that D.  It's those two

4   things together that form that association in the consumer's

5   mind, not the D alone.  Drake has presented no evidence of any

6   consumer recognition of a block-style D by itself.  That's the

7   fundamental problem here.

8      And they're trying to play games with this trademark

9   registration.  The trademark registration is for Marching Spike.

10   It's not for the letter D.  The Marching Spike requires the

11   bulldog.  It's not enough to have a D alone.  And there's a

12   reason it's not enough to have a D alone.  Drake hasn't even

13   used it consistently.  There are different colors, different

14   shapes, different sizes of the D that Drake uses internally,

15   externally, on shorts, with its athletic clubs.  It's just not

16   enough.

17      If we look at the Vintage D, the problem with that

18   inconsistent use -- Drake understood that that was an issue, and

19   so they developed what's called the *Brand Standards & Style*

20   *Guide* that's used internally to establish consistency, to

21   establish continuous use of a mark.  And here it is.  It's the

22   subject of a lot of declarations and pages of argument.

23      This is what the *Brand Standards & Style Guide* talks about

24   with regard to the logo.  What's missing from the logo?  Well,

25   what's present is it says, hey, this is how you have to use

1    Drake University; single color, blue, black, or white.  That's

2    what's required.  What's missing?  There's no Vintage D in

3    there.  It's not mentioned in the brand standards guide.

4        If we look at what Drake refers to in the brand standards

5    guide as the Drake D, again, it's not the Vintage D.  Drake is

6    talking about something completely different.  They're talking

7    about what they rebranded in 2005 to adopt, and it's shown here;

8    the D that is the swooshy-style D, this rounded D.  That shape

9    is what gives that D its distinctiveness.  It's not the fact

10   that it's a D.  And it's certainly not a block-style D.

11       And Drake recognizes the weakness of just using a D by

12   itself.  That's why they don't have a registration for a D by

13   itself without Griff.  They have a registration for this D, this

14   swooshy D, and they say special circumstances sometimes allow

15   for the use of the Drake D on its own, but only when "Drake

16   University" is written nearby.  That's an internal marketing

17   recognition of a standalone D being a weak, weak mark, entitled

18   to very narrow protection, if any at all.

19       They do talk about other Drake marks.  They talk about the

20   seal.  They talk about Griff.  Again, this is the only image in

21   here of anything that could ever be considered a block-style D,

22   and where is it?  It's on the chest of a bulldog.  It's the

23   bulldog that's the brand, not the D.  No mention of a Vintage D

24   anywhere in Drake's own style guides.

25       Again, this vintage style D, if it's the block style --

1  whichever style Drake tries to present, it lacks that other

2  element to establish common law trademark rights;

3  distinctiveness.  We saw earlier all of the different colleges

4  and universities and the schools that use a block-style D, and

5  Drake's reply brief tries to say, "Oh, these are distant

6  schools.  We don't compete against them."  You know, they try to

7  make other arguments.

8      Well, there is a school in town -- full disclosure, both my

9  kids go there -- called Dowling.  Dowling's a well-known private

10 high school.  Kids pay tuition to go there.  They're able to

11 take college courses there, college courses that are supported

12 by DMACC.  And Dowling uses the same block-style D at issue in

13 this case without a peep from Drake.  Drake has never complained

14 to Dowling, a school that is closer than DMACC, in Drake's own

15 backyard.

16     Drake's DMACC -- or Drake's D elements are just too common

17 to have trademark rights, and, again, DMACC has been using this

18 block-style D since 2000 without any word or complaint from

19 Drake.

20         THE COURT:  But it's always had the bear paw in it.

21         MR. JOHNSON:  It has, Your Honor.  But again --

22         THE COURT:  Doesn't that make a very significant

23 difference?

24         MR. JOHNSON:  It would if Drake had rights.  Drake

25 doesn't have rights, which is the first question we have to ask.

1  Drake abandoned those rights, and it did so in 2005 very, very

2  publicly.  It adopted a new D because it knew the weakness of

3  that old vintage-style D.

4      The Vintage D was abandoned by Drake in 2005, and there's

5  no evidence in the record of significant sales or any sales, any

6  marketing spend.  There's a lot of pictures and attorney

7  argument.  That's all we're left with, and we cannot base

8  trademark rights off of attorney argument.

9      Now, recently, and after this hearing was rescheduled,

10  Drake had an event just a couple blocks away, down at the

11  Brenton Skating Plaza, where they announced their basketball

12  team -- well, I guess this is a football game.  It doesn't use

13  the block-style D at its stadium.  It doesn't use it on anyone

14  in the crowd.

15      MR. GILBERTSON:  Objection, Your Honor.  This evidence

16  was not presented.

17      MR. JOHNSON:  It's very recent, Your Honor.  It's come

18  about since the hearing, and the citation for it is public.  It

19  shows how Drake is using the mark today.

20      And, again, on its helmets, it's not using that mark

21  anywhere.

22      At the Brenton Skating Plaza, Drake put on its basketball

23  thing just last week.  This evidence is what Drake is doing

24  today, the mark it's using today.  It uses this mark, the

25  swooshy-style D that it has a federal registration for.  It uses

1   the bulldog with the D.

2       And it has T-shirts, lots of T-shirts.  And, in fact, that

3   T-shirt on the right says "Drake:  Same colors as Duke but

4   better at basketball."  Drake knows it doesn't own colors too.

5       Again, no evidence T-shirts or Drake is using the D, the

6   Vintage D, anywhere as a brand anymore.  It's been abandoned.

7       Looking at the colors themselves, colors are not inherently

8   distinctive.  There must be evidence of secondary meaning

9   produced with colors, and colors must meet that same test of

10  distinctiveness to qualify as trademark rights.

11      Colors have to acquire secondary meaning, and, again, that

12  evidence usually comes in the form of consumer testimony and

13  surveys.  Drake offers none of it; no consumer testimony, no

14  survey evidence.

15      What they offer is a brand guide that limits its logo to

16  one color only, and it can be any of the three; blue, black, or

17  white.  And we see that.  The Drake brand guide even requires

18  that it only appear in blue, black, or white.  It says never

19  drop a shadow to the Drake logo, do not add any elements to the

20  logo not mentioned in the guide, the logo should never be

21  outlined in contrasting color or given a stroke with transparent

22  fill.

23      You know who violated those Drake branding guide principles

24  because it wasn't trying to copy Drake is DMACC.  DMACC has

25  multiple colors in its logo.  It does apply drop shadows, and it

1  does add additional elements, specifically the house brand

2  "DMACC."  It wasn't shown in that KCCI article, but anyone

3  looking at that will say, "Oh, that's DMACC."

4      And, again, the blue and white colors lack distinctiveness.

5  DMACC's been using them from 1972.  Others schools that start

6  with D have also been using those same blue and white colors.

7      Duke.  Duke uses a D in blue and white.  Drake's never said

8  a peep.

9      Other schools use blue and white colors as their school

10  colors, including BYU, Penn State, University of North Carolina,

11  Memphis, Yale, Buffalo, Kentucky, Georgia State, and Kansas.

12  Drake's never complained to them about their use of the colors.

13  At least there's no evidence of it in the record.

14      And, again, to establish trademark rights, the first

15  requirement of any trademark infringement test, Drake has to

16  show that it's acquired secondary meaning in those colors.  It

17  doesn't submit any evidence of it.  No consumer testimony, no

18  sales data, no advertising data, no survey evidence.

19      Unfortunately for Drake, it's claiming rights, arguing for

20  rights, and in the nine months it had to look and prepare and

21  file its motion, never bothered to gather the evidence to

22  support those rights.

23      Griff and his apparel.  This is another of those trademarks

24  that we think Drake has claimed.  Griff and his apparel, again,

25  they have to show that this acts as a source identifier and that

1  it's distinct.  Again, Drake fails to submit evidence.

2      They want you to say, "Oh, yeah, everybody knows Griff."

3  Unfortunately, that's not enough in a court of law.  We require

4  evidence.  Evidence must be presented through consumer

5  testimony, sales data, advertising data, survey evidence.

6  There's no evidence that Griff and his apparel, whatever that

7  may be, have established secondary meaning in the minds of

8  consumers.

9      They submit a bunch of photos, no data.  And why?  Because

10  a lot of schools use bulldogs as their mark, as their brand, as

11  their mascot, and they know it.  They just had a battle of

12  bulldogs.  Butler University has a registration for its bulldog.

13  Dean College has a registration for its bulldog with a D.

14  University of Georgia, which also just had its battle of the

15  bulldogs against Mississippi State, also has its registration

16  for its bulldog.

17      DMACC doesn't use a bulldog.  None of the bulldog stuff

18  matters, including the two federal registrations that rely on

19  Griff for the registration, because DMACC is a bear, not a

20  bulldog.  DMACC sought to protect its bear mark, filed a federal

21  trademark application for it.  To my knowledge, Drake has not

22  yet opposed that, probably has no basis to do so.

23      The jacket.  Drake is actually claiming rights in a letter

24  jacket.  Again, it suffers the same fatal flaws.  They have to

25  show that they have these rights in the letter jacket; that it

1  acts as a source identifier, has secondary meaning, and is

2  distinct.  Again, the record is silent on any evidence of

3  consumer testimony, sales data, advertising data, survey

4  evidence.  There's no evidence the jacket has secondary meaning.

5      The only evidence that they present is either in

6  conjunction with a bulldog, Griff, or on a rapper whose name

7  happens to be Drake.  And the declaration from the person at

8  Drake actually talks about Drake and Drake's name giving rise to

9  publicity for Drake University.  It doesn't mention the effect

10  of a standard collegiate D on a letter jacket.  That's not

11  called out.  No surveys were conducted to determine the effect

12  of just a jacket.

13      And Paul Morrison, who I understand is a longtime Drake

14  employee, who is rightly honored with a letterman's jacket,

15  these are not uses in commerce of the jacket as a trademark.

16      Drake's declaration just points to the name Drake, and,

17  again, there's no evidence of distinctiveness.  The jacket

18  itself knows that the D is weak and includes "Drake University"

19  on the back.

20      Regardless, this shows the extent to which Drake will go to

21  try and establish rights through argument instead of evidence

22  because this doesn't matter.  Do you know what DMACC's letter

23  jackets look like?  I don't either because we don't have them.

24  That mark shouldn't be in the case.

25      And last we go to the Drake seal, the last of these common

1  law rights that Drake is trying to assert.  Drake again has to

2  meet the common law test, has to show for the seal that it acts

3  as a source identifier with secondary meaning and that it's

4  distinct.

5      I think I heard Drake's lawyers admit today during this

6  hearing that the seal is actually not a mark that they're trying

7  to enforce.  That wasn't apparent in their briefing, and we

8  spent argument time and room responding to it.

9      But apparently they knew all along that they didn't have

10  those trademark rights because they don't have those trademark

11  rights.  They haven't submitted that evidence that's required to

12  establish those trademark rights.  There's no evidence of

13  secondary meaning, no consumer testimony, no sales data, no

14  advertising data, no survey evidence.  There's no evidence that

15  the seal has secondary meaning.

16      And it's okay that they don't have secondary meaning in

17  that.  It's just the seal of the university.  I don't think they

18  use it in commerce as a trademark.  Instead, they try to focus

19  on this notion that they own a book and a lamp and that somehow

20  by incorporating that into DMACC's seal, that shows some

21  nefarious intent by DMACC.

22      That's not the case at all.  Everybody uses lamps and books

23  in their seals.  The answer is replete with examples of those,

24  one of which is the University of Michigan that's included here

25  just because it predates both DMACC and Drake.

1    But the important things about seals, they include the

2    university name.  "Drake University" is prominently displayed

3    there.  "DMACC" is prominently displayed there.  No one is going

4    to be confused by these seals that both use, in different ways,

5    lamps and books, very, very common elements.  Drake has failed

6    to establish not just secondary meaning in a seal, but any

7    amount of distinctiveness in its seal.

8    That's it for Drake's common law marks or their allegations

9    of common law marks, and what we're left with is an empty

10   record.  They don't have rights in those things because they

11   haven't presented evidence of those rights.

12   What they do have are three federal trademarks.  Those are

13   shown in green here.  Drake's federal trademarks overcome the

14   first part of the trademark infringement test because they're

15   presumed to have valid and protectable rights in those

16   registered trademarks.  So let's look at what those

17   registrations actually are for; the Academic D, Athletic D, and

18   the Marching Spike.

19   This is the Academic D that Drake adopted in 2005 as part

20   of its rebrand when it abandoned its old Ds.  It's a weak mark

21   limited to the design shown, and that's clarified by the Patent

22   and Trademark Office that shows an illustration drawing with the

23   words, letters, numbers in stylized form.  It is not for any D,

24   it's for that D with that style, those curves.  DMACC doesn't

25   use any of those.

1      The Athletic D suffers the same faults.  Again, it was

2  adopted in the 2005 rebrand when Drake abandoned the old D.

3  It's a weak mark.  It's limited to the design shown, and, again,

4  that's clear by looking at the Trademark Office, which notes the

5  mark consists of the capital letter D with the picture of a

6  bulldog leaning over the left side of the D.  The two are not

7  separable for purposes of trademark rights.  That is the mark.

8      Drake adopted this in 2005 and touted it publicly as

9  creating a new and distinctive D.  Drake abandoned its old D and

10  went with its new stylized D.  They kept it on one mark, this

11  one that was registered before the 2005 rebrand, and it's the

12  Marching Spike.  And, again, for counsel to stand up here and

13  suggest to the Court that this provides any type of federal

14  protection for a block-style D alone is a gross

15  misrepresentation.

16      The Patent Office describes this as an illustration drawing

17  which includes words, letters, numbers.  The illustration

18  drawing is the bulldog.  You cannot separate the two for

19  purposes of federal trademark protection.

20      Now, Drake has overcome the first element of trademark

21  infringement by showing that it does have valid protectable

22  rights in its federally registered trademarks, so we move on to

23  the second question; is there a likelihood of confusion between

24  those marks and what DMACC is doing.

25      Again, we look at the *SquirtCo* factors:  The strength of

1  the marks; the similarity of the marks; the degree of

2  competition; the intent to pass off instances of actual

3  confusion; and the type of product, cost, and conditions of

4  purchase.

5      There's no confusion here based on the strength of the

6  marks alone.  These marks are not inherently distinctive.

7  They're not -- I think counsel actually described them as

8  arbitrary, saying a D in and of itself is arbitrary, which is

9  utterly ridiculous.  D stands for the name of the school.

10  DMACC.  Can't say the DMACC without the D.

11      But Drake's federal trademarks are weak and narrow in

12  scope, and they actually show three different Ds that just sort

13  of emphasize that Drake doesn't have rights in any type of D.

14  The registered D on the left requires its stylized form.  The

15  other two registrations require a bulldog.

16      These marks are weak and narrow, and the conceptual

17  strength -- the strength of these marks can be measured in two

18  different ways, conceptually and commercially.  Conceptual

19  strength is where we see cases talk about it's generic,

20  descriptive, suggestive, or arbitrary or fanciful.  Commercial

21  strength is where we have significant evidence of things like

22  sales volume, sales dollars, advertising spends, and consistent,

23  continuous use, those things that you would normally see in a

24  trademark infringement case that are just utterly absent here.

25      But D does not stand for distinct.  Because of the

1    widespread third-party use of a variety of Ds, we know that

2    Drake's D mark must be limited to its stylized form.  It cannot

3    be in the block-style D -- uh-oh.  I don't know why it went --

4    oh, there we go.  Thanks.

5        It can't be limited to its block form -- or it has to be

6    limited to its stylized form because there are so many other Ds

7    out there have been registered.

8        This was also registered in 2005 in the rebrand -- I seem

9    to be losing the connection here, Your Honor.  I don't know.

10       But the conceptual strength of these three federal

11   trademarks is weak, and, unfortunately, the commercial strength,

12   again, we're again left asking for data.  It's typically shown

13   through consumer testimonies -- consumer testimony or surveys,

14   advertising expenditures, or sales, and Drake provided zero

15   evidence of any of that.  Weak marks are limited to their scope

16   of -- in their scope of protection.

17       If we look at the similarity of the marks, the similarity

18   of the marks, it's easy to tell the difference.  The swoosh D on

19   the left is not similar to DMACC's block-style D.  The Griff in

20   the second and third marks, DMACC doesn't use a bulldog.  And

21   DMACC puts "DMACC" under its D and does so consistently now.

22       The degree of competition between the marks.  Here again,

23   the degree of competition is that these parties actually used to

24   cooperate together.  They used to work together.  They used to

25   help each other out on projects.  DMACC used to refer students

1  to Drake.

2         THE COURT:  Doesn't that make it even more likely there

3  will be confusion?  I mean, even putting the "DMACC" house mark

4  below the D, how is it still unlikely that there's going to be

5  some confusion, given the color schemes, given the fonts that

6  are used, given the geographic location, given the overlap of

7  what they do?

8         MR. JOHNSON:  All of those factors should suggest that

9  some confusion is actually happening, and it isn't.  That's the

10 fundamental thing here is there is no confusion that's

11 happening.  And those differences, those slight differences --

12 the consuming public has come to be able to recognize those

13 slight differences.

14     College is not an off-the-shelf purchase.  It is a careful

15 consideration.  It's an expensive consideration.  The degree of

16 competition, DMACC traditionally provides community college

17 services.  Drake typically did not.

18         THE COURT:  But here it's more than just who's choosing

19 to go to those schools, right?  It's who's buying these items of

20 apparel, it's who might be associated with these two schools

21 when some video goes viral and someone's wearing an item that

22 can be confused doing something wretched, right?  Those are all

23 part of the problem too, not just who is picking which school.

24         MR. JOHNSON:  Well, it could be, but there's no

25 evidence of any of that.  That's all speculation.  The fact that

1   there hasn't been any of that that has occurred in the nearly

2   year since DMACC adopted its D in DMACC --

3          THE COURT:  They have presented evidence.  I've got

4   some concerns about the Facebook, but they did present evidence.

5   They did present news articles, they did present --

6          MR. JOHNSON:  The news articles were about the case.

7   They weren't in response to the rebrand launch so much except

8   the KCCI story that was conducted on Drake's campus without the

9   proper marks.  It relied on a Vintage D from Drake that Drake

10  doesn't own, it abandoned.  It doesn't have those rights.  It

11  cannot assert those rights here today.  It hasn't provided the

12  evidence of those.

13      So all of these concerns aren't properly looking at any

14  evidence that compared the right marks.  It didn't compare the

15  D, the swooshy-style registered D, or the bulldog with the

16  swoosh D, with the DMACC and D.  It didn't compare those things.

17  That's not the evidence at issue.

18      Unfortunately for Drake, it wasn't diligent.  D doesn't

19  stand for diligent because Drake wasn't.  They didn't maintain

20  consistency and continuous use of what they now want to claim as

21  their Vintage D mark.

22      And the consuming public is able to distinguish these

23  features because they're smart people.  These are people who are

24  going to college.  They're paying a lot of money in tuition.

25  And the fact that Drake is now offering a community college

1  under a different brand, the John Dee Bright program, doesn't

2  change the fact of who Drake is.

3      It's a school that's hard to get into, it's expensive to

4  get into, that has basketball games and is nationally televised

5  where it plays Duke, it plays other schools that use bulldogs.

6          THE COURT:  Again, that's one aspect of it, but it's

7  not all of it, right?

8          MR. JOHNSON:  I understand, Your Honor.  But if there

9  were other aspects of it, it's Drake's burden to produce that

10  evidence, and it didn't do so.

11     We can all sit here and say, look, okay, that block style

12  looks like that block style.  Drake's lawyers have said that's

13  the conventional style for universities to use, a collegiate

14  letter.  That doesn't give Drake the right to shut down DMACC's

15  branding because Drake is personally affronted.

16          THE COURT:  Okay.  What if it's combined with the color

17  scheme?  What if those are paired?

18          MR. JOHNSON:  Well, again, the colors on that Vintage D

19  varied.  That's the only evidence before the Court.  Drake

20  doesn't have evidence of secondary meaning in the color scheme.

21  They didn't present any survey testimony, any consumer

22  affidavit.

23     They didn't bother to go out and ask the general public if

24  blue and white represents Drake.  They didn't bother to go out

25  and ask anyone if blue and white plus a block-style D represents

1    Drake.  Why?  They had a year to do it, and they chose not to.

2    We're left with an empty record, and we can't grant an

3    extraordinary remedy like preliminary injunctive relief based on

4    an empty record.

5         These schools do work together, and the students never show

6    up at the wrong campus.  There's no evidence of that.  They

7    never call the wrong campus.  There's no evidence of that.  They

8    don't submit the applications to the wrong entity.  There's no

9    evidence of that.  They don't buy a Drake hat and assume it's a

10   DMACC hat.  There's no evidence of that.

11        It's that dearth of evidence that is Drake's problem.  They

12   don't have it.  They haven't submitted it.  They merely want you

13   to rely on presumption and attorney argument, which is improper.

14        Instead, they're really focused on this intent to pass off

15   element, and they claim that it's based off of the fact that

16   DMACC had knowledge of Drake.  Of course DMACC had knowledge of

17   Drake.  Knowledge of another's product is not evidence of

18   intent.

19        This university naming convention, that's pure attorney

20   argument and would entitle every school that starts with a D to

21   use a collegiate-style D.  DMACC did the right thing.  It sought

22   to establish its own rights.  It filed for a federal trademark

23   protection in November of last year, and it did so on the D and

24   DMACC mark.  The examiner found no marks in conflict.

25        We've been using a block-style D since 2000 in blue and

1   white without a word from Drake.

2           THE COURT:  Always with a bear paw in it?

3           MR. JOHNSON:  Again, yes, Your Honor.

4           THE COURT:  Okay.  Abandon that argument.  You're not

5   going to win that one with me, okay, clearly.

6           MR. JOHNSON:  I appreciate that.

7       But, again, there's no evidence of intent here.  The Santa

8   and the elf thing, we believe the evidence will show that Drake

9   actually staged that, and it's something that we look forward to

10  taking depositions on.  But that is not evidence of actual

11  confusion.  It's not evidence of intent to pass off.

12      When it comes to instances of actual confusion, incidents

13  of actual confusion, again, we're left with none.  They don't

14  provide surveys or testimony.  There's no evidence of actual

15  confusion, despite the mark being used in commerce for nearly a

16  year next week.

17      Social media posts and news articles are classified by

18  courts as dubious at best.  And Drake's attorney declarations --

19  almost every declaration they have is from an attorney.  Those

20  are insufficient and problematic, and Santa and his elf just

21  don't count.

22      Again, the type of product, the cost and conditions of

23  purchase, these are sophisticated purchasers.  These are people

24  who are spending a lot of money.  They aren't impulse decisions.

25  The product here is educational services.  It's expensive.

1  Drake costs over $25,000 a year to attend and a grand total of

2  over $200,000 to attend for over four years.  That is not a

3  decision that any parent or student takes lightly.

4      And there's no evidence that anyone has applied to the

5  wrong school or listed the wrong school in an aid funding

6  request.  Great care is applied before applying to college.

7  Initial interest confusion does not apply here because these are

8  sophisticated purchasers.  They're not off-the-shelf purchases.

9      Again, there is no likelihood of confusion here.  There's

10  no likelihood of success on the first four claims at issue

11  because there's no likelihood of confusion or no trademark

12  rights to begin with.

13      Dilution is the only cause of action that's left, and

14  dilution does not apply when the goods and services are

15  sufficiently similar to defeat any claim for dilution.  Dilution

16  typically applies when you have one party trying to take

17  advantage of another party's famous brand, and Drake didn't

18  submit any evidence that its brand is famous.  Again, no

19  consumer testimony, no surveys, no sales data, no advertising

20  data, no comments from anyone that Drake's brand is somehow

21  famous and it would qualify for --

22          THE COURT:  A national rapper wearing their jacket?

23          MR. JOHNSON:  Whose name is Drake.

24          THE COURT:  Yeah.

25          MR. JOHNSON:  That was the basis for the brand, but not

1    the block-style D.

2            THE COURT:  Which he's wearing.

3            MR. JOHNSON:  But the mark "Drake" is not at issue in

4    the case.  The block-style D is what Drake is trying to say it

5    owns, and that is a bridge too far.  Drake has submitted no

6    evidence that it owns the block-style D, especially without the

7    word "Drake," without a rapper named Drake, or without a bulldog

8    associated with it.  And that's Drake's fundamental problem; no

9    likelihood of success.  DMACC should win on that factor.

10           The other factors that we look at are irreparable harm to

11   Drake.  Irreparable harm, again, there's no showing.  Drake

12   instead relies exclusively on a presumption of irreparable harm,

13   and they do so based on the statute, the Lanham Act statute,

14   that says they're entitled to a presumption if there's a

15   likelihood of confusion that's shown.  But they haven't

16   presented evidence of a likelihood of confusion, and DMACC has

17   responded with evidence to rebut that.

18           Drake's rebuttable presumption is gone.  Drake is now

19   required to provide evidence of irreparable harm, and all we

20   heard from the podium from Drake's lawyer today was of course

21   there should be irreparable harm because look at the size of the

22   schools and maybe this is going to happen.  Woulda, coulda,

23   shoulda.  Where is the evidence of irreparable harm?  There is

24   none.

25           The burden of persuasion always remains with Drake, and it

1   does not meet it.  That is reason enough to deny this motion for

2   preliminary injunction, no irreparable harm.

3       And Drake has not been diligent.  D certainly doesn't stand

4   for diligent.  Again, Drake waited ten years to even comment on

5   our bold D with the bear claw, and they waited nearly nine

6   months before complaining and filing this suit after we launched

7   the D and DMACC brand.

8           THE COURT:  Well, let's talk about that.

9           MR. JOHNSON:  Yeah.  You bet.

10          THE COURT:  When did they first reach out through the

11  lawyers and attempt to resolve this issue before the lawsuit was

12  filed?

13          MR. JOHNSON:  Through the lawyers, I believe that would

14  have been sometime early in 2023, Your Honor.  I don't recall

15  the exact date.

16          THE COURT:  So within a matter of weeks of the public

17  rebrand?

18          MR. JOHNSON:  No, no, no.  Not 2023, 2024.

19          THE COURT:  Right.  A matter of weeks within.  The

20  rebrand launched November 1st, correct?

21          MR. JOHNSON:  No.  The rebrand happened October 23rd of

22  2023.

23          THE COURT:  Okay.

24          MR. JOHNSON:  So they waited at least until -- I

25  believe it was -- I don't know the month.  It was in the early

1  spring, I believe, of 2024 when I first heard about this.  I

2  believe that's right.

3          THE COURT:  So you believe the first email you received

4  or anyone on the DMACC team received about the concerns they

5  were raising was spring of 2024?

6          MR. JOHNSON:  I don't know the answer to that, Your

7  Honor, and I don't want to give you the improper date.  I

8  apologize.

9          THE COURT:  Okay.

10          MR. JOHNSON:  It's not a base of data that I have.

11          THE COURT:  Because they referenced in their

12  presentation a February 1st email.

13          MR. JOHNSON:  That may be correct.  I just don't know.

14  I don't recall it, Your Honor.

15          THE COURT:  All right.

16          MR. JOHNSON:  But regardless, they chose not to file

17  suit until July.  And we responded promptly to their cease and

18  desist letter, and then the deadline went by, and months went

19  by.

20          THE COURT:  So you pulled all your -- what you're

21  claiming to be erroneous vendor merchandise immediately?

22          MR. JOHNSON:  Absolutely, Your Honor.

23          THE COURT:  When did you fix your basketball court?

24          MR. JOHNSON:  I believe that was done after it was

25  noticed, Your Honor, but I don't have a date for that.  I don't

1    know.  But, again, we are consistently using a D with DMACC.

2            THE COURT:  Okay.

3            MR. JOHNSON:  That's the mark that we've applied for

4    federal registration for.  And if the Court wants to limit us to

5    a D with DMACC around it, that's fine.  We're proud to be DMACC.

6    That's who we are.  We can't say DMACC without the D, and we do

7    put DMACC underneath it.

8        And, again, there's zero instances of actual confusion in

9    the past year, 358 days, I guess, to be exact from today's date.

10   There's zero evidence of any impact on Drake.  No showing of

11   lost students, no showing of lost sales.  There's no sales data

12   to begin with.

13       And DMACC's [sic] lawyers in their reply, again, go a

14   bridge too far and try to say that DMACC is not sticking to its

15   promise to use the D with DMACC, and they point to these

16   examples; a sweater where the D is shown there, and around that

17   D it says "Des Moines Area Community College."

18       Again, this one is something they say is a violation of

19   their rights.  Again, they're presuming that they have rights in

20   the block-style D, but it's also surrounded by "DMACC Bears."

21       Again, here it's one where it's a "DMACC Mom," and the D is

22   shown underneath it, and the thing across the "Mom" is "Des

23   Moines Area Community College."

24       Same with "Bear Nation."  There's a D there, and there is

25   DMACC.

1    Alumni for Des Moines Area Community College, Drake

2    complains about this, which shows the extent of Drake's

3    misunderstanding of the scope of their rights.  They think that

4    they have the right to stop DMACC from using a D where they're

5    clearly saying DMACC.

6    Same with -- I guess they submitted this hat, but they

7    failed to acknowledge or even point out where the hat was

8    purchased; on the DMACC athletic store in the Ankeny bookstore.

9    THE COURT:  And how would somebody who saw that out on

10   the street know that it came from the DMACC Ankeny bookstore?

11   MR. JOHNSON:  I don't know the answer to that question,

12   and Drake's lawyers never bothered to ask or present any

13   evidence of that.  It's their burden to show that a use like

14   that would cause Drake problems or that Drake even has the right

15   to stop, which they don't.  The only evidence shows Drake

16   abandoned its block-style D in 2005.

17   The balance of harms favors DMACC.  It doesn't favor Drake.

18   If this preliminary injunction were entered, DMACC would have to

19   abandon a pending federal trademark registration.  It would have

20   to abandon the federal trademark registration it has with the D

21   and "Campus Recreation" that it's had since 2014.  It would have

22   to go back and take down signs, posters, banners, rebrand cars,

23   rebrand entirely, hundreds of thousands of dollars of

24   expenditure.  That's the harm that DMACC would face with the

25   preliminary injunction based off of no evidence in a block-style

1    D.

2        And, finally, the public interest favors DMACC.  Public

3    interest here is that DMACC is a public institution that should

4    not suffer reputational harm through baseless litigation.  Drake

5    could have provided the Court with evidence that it owned a

6    block-style D, and it did not.  It had plenty of time.  It was

7    the only party that had access to the data, and it could have

8    conducted surveys.  Instead, it chose to rely on an improper

9    survey or questions being asked by a news reporter on its own

10   campus.  But DMACC is a public institution, and taxpayers should

11   not have to pay just because Drake wants to get rid of the

12   bulldog and turn the bulldog into a bully.

13       Thank you, Your Honor.

14           THE COURT:  Thank you.

15       Mr. Gilbertson, any final thoughts?

16           MR. GILBERTSON:  Yes.  I might stay at counsel table

17   just because I'm going to reference a few things here.

18           THE COURT:  Sure.

19           MR. JOHNSON:  Do you mind if I tear down while you're

20   answering?  Is that okay?

21           MR. GILBERTSON:  No.  Not at all.

22           MR. JOHNSON:  Thanks.

23           MR. GILBERTSON:  I've got to say Mr. Johnson has a

24   really nice tone, but his arguments are very strained.

25       I want to start by quick pointing out the location of the

1  KCCI interview.  DMACC's counsel alleges that that was done at

2  Drake, but it was not.

3       If we could pull up the screen, please.

4       It's not apparent in the clip that we played earlier,

5  but -- and I apologize this is turned.  I don't know how to turn

6  it.  But this is one of the clips of the KCCI interview, and

7  that's clearly Gray's Lake behind it.  Drake doesn't have that

8  on its campus.

9       With regard to the argument about -- I'm sorry -- the

10 argument regarding the -- oh, my gosh.  I'm sorry.

11      Regarding the argument that we do not have rights in a

12 standalone D, DMACC's counsel alleged that that was a

13 misrepresentation.  That's not true.  So the D on Marching

14 Spike's chest is not disclaimed, and that's relevant when we're

15 talking about the scope or existence of trademark rights.

16      Now, an example of what a disclaimer looks like is in the

17 registration to the right.  This registration is not at issue

18 here, but it is one of Drake's registration, and it has a

19 disclaimer on it, which says, "No claim is made to the exclusive

20 right to use 'real coaching' apart from the mark as shown."

21      So what that means in practicing is that Drake's rights are

22 in that mark as a whole, and if somebody else was using "real

23 coaching," without any other elements of this, this registration

24 wouldn't be sufficient to shut down that use because the use is

25 only of the disclaimed term.

1      DMACC wants you to think that the D on Marching Spike is

2   disclaimed, which means we are limited only to Marching Spike.

3   That's just not true.  And also, the test for trademark

4   infringement is not identity; it's likelihood of confusion.  So

5   another mark can be different from Marching Spike, and that does

6   not mean that Marching Spike is ineffective against it.  That is

7   my first point on that.

8      In no particular order, there's a lot of argument about the

9   lack of evidence and the lack of survey evidence and consumer

10  testimony and sales data and DMACC's harm.  This is a

11  preliminary injunction.  This is not summary judgment, and we

12  have not had the benefit of discovery, and there is no time to

13  put together a comprehensive survey, and we are not required to

14  present that for purposes of this motion.  The record is always

15  less developed at preliminary injunction stage.

16     And we're not trying to establish now that Drake will

17  prevail or that Drake is entitled to a permanent injunction.  We

18  are only required to show that Drake is likely to prevail.

19     With regard to -- oh, and counsel talked about the lack of

20  sales data.  He correctly noted that tuition is Drake is about

21  $24,000 a year.  Well, we can -- and I might be a little bit off

22  on those numbers, but we can estimate that if you take 20,000,

23  say, times 4500 students, which is in the record, times 122

24  years, and adjust for inflation, we have some idea of the

25  tuition dollars that have been paid to Drake while it has been

1    using its standalone D.

2        Regarding this issue of abandonment, we don't actually need

3    to show that we've continuously used the D from 1902 to the

4    present.  We only need to show there was consistent use before

5    DMACC started using it.

6        So if we just go back to when Griff I first became the live

7    mascot, Griff I, his main uniform is the letter jacket with the

8    block-style D.  Griff was the mascot until 2020, and Griff II

9    took over and became the live mascot.

10       In the record, we have images of Griff I and Griff II on

11   the bottom of the screen.  There's one in 2020 when the handoff

12   occurred.  Griff II has the brown on his face.  And so the

13   picture next to it, which is the picture of Griff at the Drake

14   Relays, and that's Griff II, the current mascot, he's wearing a

15   Vintage D on something that's not a letter jacket.  So there's

16   really no argument that we abandoned the standalone Vintage D.

17       Now, it doesn't appear in our brand guide as its own guide,

18   but there is a prominent photo of Griff in the letter jacket

19   with the standalone D, so the argument that it doesn't appear in

20   the style guide is just not true.

21       We also have --

22           THE COURT:  Can you explain how that constitutes

23   consistent use in commerce?

24           MR. GILBERTSON:  With Griff?  Well, Griff appears at

25   every official Drake function.  That is in the record.  And he

1   frequently wears clothing like this.

2       Now, we're not obligated to provide an example of every

3   single time he's ever appeared at an event, but we do have

4   instances of him appearing on the -- on the weather.

5       THE COURT:  Sure.  But do you have instances of what

6   we'll call the Vintage D in the absence of Griff?

7       MR. GILBERTSON:  The D Club, which is Drake's alumni

8   association, that presents the Double D Award that has the D on

9   it to prominent Drake alumni every year at Drake Relays.

10      THE COURT:  And still going on?

11      MR. GILBERTSON:  Yeah, that's still ongoing.  That was

12  awarded -- the name escapes me.  Louis Carr was the recipient

13  this year at the 2024 Drake Relays.  He's the director of

14  marketing, I believe, at BET.

15      There's also -- and the Vintage D appears on the basketball

16  floor.  Yes, it's covered during the basketball games, but

17  there's a lot that goes on at the Knapp Center besides

18  basketball games.  I just saw a kid the other day with a Drake

19  basketball camp shirt.  Events happen at the Knapp Center other

20  than official Drake basketball games, and the Double D Award is

21  there.

22      And Michael Admire, who is presently the director of Drake

23  athletics and the face of Drake athletics, wears sweaters with

24  the Vintage D at Drake basketball games as the play-by-play

25  broadcaster.

1          THE COURT:  Is there any evidence of when those

2    T-shirts that were photographed were photographed?

3          MR. GILBERTSON:  I do not believe we have the years in

4    there, but he is currently -- --

5          THE COURT:  I mean the ones hanging for sale on the

6    hangers that are from the undated photos that have -- each one

7    of them use a D?

8          MR. GILBERTSON:  We can get that information.  I do not

9    believe it is in the record as it stands right now.

10          THE COURT:  Okay.

11          MR. GILBERTSON:  There's a question of -- or there's

12    been accusations that Drake is overreaching, that we're asking

13    for the letter D in all aspects nationwide.  We aren't asking

14    the Court to give us nationwide exclusive rights in the letter

15    D.  We are asking the Court to recognize that until last fall,

16    Drake was the only college in Iowa utilizing the standalone D in

17    a block-style font since 1902.

18      I believe there's one other example, which is Dordt

19    College, but their D looks nothing like ours.  It was a design

20    mark, and they don't even use that mark anymore because they

21    rebranded to a design that features a cross because they are

22    religiously affiliated.

23      We've also been the only college in Iowa using the dark

24    blue/light blue color scheme since we adopted the colors in

25    1916.  Now, I don't think anyone in this room would think that

1    if a community college in Iowa City started up using a

2    standalone I in a black and yellow color scheme -- I don't think

3    anybody would bat an eye if the University of Iowa said we own

4    that I here.  That's what we are asking.

5        Drake -- Drake owns this D here.  That is targeted, direct,

6    narrow relief that we are asking for.  And those third-party

7    rights that DMACC brings up are irrelevant.  We're not suing

8    Dordt, we're not suing Duke.  They're a thousand miles away from

9    us.

10        The question that has to be answered is not do we own the D

11    to the exclusion of everybody else; the question is are our

12    rights in a block-style standalone D in these colors superior to

13    DMACC's.  That's -- that is the entire basis of our preliminary

14    injunction motion, and the answer is, quite simply, yes.

15        And piggybacking on that, this crowded field argument,

16    there's always other entities out there.  DMACC cited those 34

17    registrations of a D.  Only seven of those were registered in

18    connection with education.  The rest are apparel and mugs and

19    other goods.

20        And I would like to provide the Court an example of when a

21    crowded field argument would work.  I don't believe this case

22    was cited in our briefing, but we have found it in the -- we

23    have found it since then.  But there's a case out of the

24    Eleventh Circuit in Florida.  Basically what happened was the

25    plaintiff was a college called Florida International Board of

1  Trustees -- or Florida International University, and it sued

2  Florida National University for trademark infringement.  The

3  Court found that the plaintiff's mark was weak because it

4  operates in a crowded -- so plaintiff operates, key language, in

5  a crowded field with three-word university names that involve

6  the words Florida and University, and those are very descriptive

7  words.

8       So the location of the crowded field is a vital question.

9  Here Drake was the only entity using a block-style D in these

10  colors, and so there is no crowded field here, and so the -- I

11  mean, DMACC is the first one.  So there is no crowded field that

12  would impact that.  And even if it could be determined that

13  there was a crowded field, that only affects the scope, doesn't

14  affect the validity, and they're a mile down the street from us.

15       THE COURT:  Could you give me the citation for the

16  Florida Board of Trustees case.

17       MR. GILBERTSON:  Yes.  It is 830 Federal 3d 1242, and

18  the pin cite is 1258.  It's from the Eleventh Circuit.

19       THE COURT:  Thank you.

20       MR. GILBERTSON:  DMACC also argued that the house mark

21  makes a difference.  Well, not everything uses the house mark.

22  And even though they claim to have gotten rid of everything that

23  doesn't have DMACC -- well, first of all, that's not true.  Even

24  the examples that DMACC's counsel showed, like, for example, the

25  DMACC Mom shirt or the mug for the alumni association, it

1  doesn't have "DMACC" on it, it has "Des Moines Area Community

2  College," and the lettering is very small.  You could not read

3  it across the room.

4      And in any event, house marks don't actually alleviate

5  confusion when the marks are otherwise similar.  In our

6  briefing, we cited to the Eighth Circuit case *Luigino's vs.*

7  *Stouffer,* where the Court noted that house marks -- well, the

8  distinctions in the parties' marks in that case came from both

9  house marks and different colors and typefaces.

10     Here we don't have different colors and typefaces; we have

11  the exact same colors and typefaces.  And we also have a

12  five-letter acronym, it's the same number of letters as Drake,

13  presented in a font that is similar to the Drake font.  So

14  that's not enough of a distinction of a house mark to make a

15  difference.

16     On that point, I wanted to look up a couple of slides

17  related to this promise that DMACC is no longer using a

18  standalone D without DMACC.  Respectfully, we've heard this

19  before.

20     On the screen are three quotes.  The top two are from

21  emails from DMACC's president, Rod Denson, to Marty Martin in

22  March of this year where Mr. Denson says, quote, yes, we will

23  only use the D with the DMACC under it.

24     A week later he said, "As further assurance the actual mark

25  we filed has the DMACC under it so we will never use it without

1    DMACC."

2        And then DMACC's counsel, in its letter, stated that

3    DMACC's logo consists of a distinct D always accompanied by the

4    DMACC name.

5        Now, we've already talked about it in the record here, but

6    all of this was for sale and out in the world when those

7    statements were made, so they were plainly false.

8        And while they claim to have fixed it, and they did so

9    twice in filings -- the two quotes on the screen are from

10   DMACC's answer where they say, "DMACC has locked its logo such

11   that the D does not appear without the DMACC."  And then again

12   in the same document, they say, as of the date of this answer,

13   which is certified by counsel, DMACC is not aware of any goods

14   or services being offered with just a D and without DMACC

15   nearby.

16       Well, the only one of these shirts -- or the only one of

17   these items that has DMACC on it is the top right.  Every other

18   one says "Des Moines Area Community College."  And the bottom

19   three are very, very small, such that your average person is not

20   going to be able to read that unless they're right up close to

21   it.

22       So we can't trust that they are going to do what they say

23   they do, and that is part of why we're asking for the relief

24   that we are.

25       I also want to address this argument that people aren't

1    going to mistakenly enroll in DMACC thinking it's Drake.  That's

2    not the concern.  Now, initial interest confusion is a

3    recognized doctrine and a recognized way to find infringement,

4    and it's only disclaimed in the Eighth Circuit as it pertains to

5    professional purchasers, and, as I talked about earlier,

6    students are not professionals.  And the sophistication of your

7    average consumer -- or your average prospective student, even if

8    their parents are involved, is not particularly high.  I'd have

9    a lot less student debt if I was as sophisticated as DMACC

10   implies these kids are.

11       And regarding, you know, the, quote-unquote, speculation

12   that harm is occurring, again, we're in the preliminary

13   injunction phase.  The question is are we likely to prevail

14   given what is already here.

15       The other problem that we have, and the reason initial

16   confusion -- initial interest confusion is relevant, is because

17   what's happening here is that by looking exactly like Drake,

18   DMACC is able to attract some eyeballs that it wouldn't

19   otherwise be able to attract because the Drake brand is well

20   known in Des Moines.  And by attracting those eyeballs, DMACC

21   has now bought itself a window of time to differentiate itself

22   from Drake and to be able to show why it's better.

23       And so if that is -- that is an improper use of Drake's

24   even goodwill to now be able to insert themselves into the

25   decision and say, "Well, hey, look, we're basically the same,

1   we're just cheaper."  That is actionable confusion because it's

2   actually harmful to Drake.  And while we don't have numbers to

3   show what that looks like, we don't need to at this point

4   because we haven't had time to conduct that research.

5       When it comes to the -- DMACC also argued that if this

6   motion is granted they'll have to abandon the trademarks.

7   That's not true.  With regard to their pending application, we

8   have filed a motion to extend the time to oppose it.  And if the

9   time comes and we have to oppose it, we're going to oppose it.

10  So any delay to their registration -- or their application is

11  not going to be from this decision, it's going to be from our

12  actions.

13      With regard to their campus recreation mark, the D with the

14  bear claw, if they want to go and renew -- like if this Court

15  grants this motion and then they have to go and renew the mark,

16  there is something called excusable nonuse that even if Drake

17  had to -- excuse me -- DMACC had to stop using the mark for a

18  period of time due to a court order, that's excusable nonuse, so

19  they are not prohibited from maintaining that registration with

20  the USPTO.

21      I'll check my notes here.

22      And this is in our briefing, so I won't take too much time

23  here, but the campus recreation mark, that didn't start Drake's

24  clock to act because we didn't know about it because it was only

25  used with their intramural activities.  We would have no way to

1   know that.  And laches does not begin to run until the

2   infringement significantly impacts us.  That didn't

3   significantly impact us when we didn't know about it so that

4   didn't start our time to do anything.

5       And Drake -- there's a substantial number of instances

6   where Drake was -- excuse me -- trying to resolve this without

7   the involvement of attorneys.  In the record, there are a bunch

8   of emails between the respective presidents.  There was a

9   meeting between the marketing departments.

10          THE COURT:  When did that begin?

11          MR. GILBERTSON:  So the rebrand launched in late

12   October or early November of 2023.  At the Rotary Club meeting,

13   there was a John Smith from Drake University.  He did raise

14   concerns informally with Mr. Jones at that meeting.  Mr. Martin

15   reached out to Mr. Denson sometime between that event and the

16   meeting at Mr. Denson's office which took place on February 9th.

17       Now, my understanding is the reason the meeting took place

18   on February 9th is that was the first availability that

19   Mr. Denson had.  So I don't know exactly when the first

20   communication from Mr. Martin went out, but it was -- my

21   understanding is it was in January.

22          THE COURT:  When was the Rotary Club meeting?

23          MR. GILBERTSON:  We don't have the precise date for

24   that.  It was a holiday party, so it was December.

25          THE COURT:  And is the meeting between Mr. Denson and

1    Mr. Martin in the record somewhere?

2             MR. GILBERTSON:  Well, the meeting between them on

3    February 9th is in the record, yes.  And actually -- yeah.  It

4    would be in Mr. Martin's declaration.  And then there were some

5    additional meetings -- an additional meeting between the

6    marketing departments in February.  The record also contains

7    email correspondence between the presidents in March.

8         It was very end of March when DMACC said talk to our

9    attorney, and then April was when our firm was engaged.  We sent

10   the cease and desist a couple weeks later, and here we are.  So

11   we filed suit, I believe, two months to the day after DMACC

12   formally denied our demands in the cease and desist letter.

13            THE COURT:  Okay.  All right.

14            MR. GILBERTSON:  I want to make sure I don't have

15   anything else.

16        To the extent Dowling could be considered a relevant use,

17   that's a high school, and they --

18            THE COURT:  Maroon colors.  Yep.  I understand.

19            MR. GILBERTSON:  And there's also an argument that

20   Drake's use of a D is only used in connection with a bulldog,

21   it's actually the bulldog that is the symbol of Drake

22   University.  Well, Your Honor, I have a bulldog, and when I walk

23   down the street, nobody says, "Oh, you must be with Drake."

24   It's the D on Griff which is the symbol that points to Drake.

25        Also, there was an abundance of argument about lack of

1  secondary meaning of the D.  We don't have to show secondary

2  meaning as it pertains to the D because it's arbitrary.  Counsel

3  said that arbitrary means D stands for Drake -- excuse me --

4  it's not arbitrary because D stands for Drake.  That's not --

5  that's not the calculus.  It's whether D is descriptive of the

6  services.  D means Drake for sure, but it otherwise describes no

7  characteristic or location of the educational services that

8  Drake offers.

9      Nothing further.  Thank you.

10     THE COURT:  All right.  I will take it under

11 advisement.  I'll get a decision out as soon as I can.

12     Thank you.

13     (Proceedings concluded at 11:19 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2        I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3    State of Iowa and Federal Official Realtime Court Reporter in

4    and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11       Dated at Des Moines, Iowa, this 23rd day of December,

12   2024.

13

14                          _____
                            Kelli M. Mulcahy, CSR, RDR, CRR
15                          Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25