IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| DRAKE UNIVERSITY,<br>    Plaintiff,<br><br>vs.<br><br>DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE,<br>    Defendants.<br><br>DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and DES MOINES AREA COMMUNITY COLLEGE,<br>    Counterclaim Plaintiffs,<br><br>vs.<br><br>DRAKE UNIVERSITY,<br>    Counterclaim Defendant. | No. 4:24-cv-00227<br><br>**RESISTANCE TO DEFENDANTS' MOTION TO INCREASE PRELIMINARY INJUNCTION BOND**<br><br>**ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................................ 2

II. Legal Standard.................................................................................................................... 2

III. Argument ............................................................................................................................ 3

   A.   The Bond Amount Has Sound Basis in the Preliminary Injunction Record................... 3

   B.   DMACC's Evidence is Unreliable................................................................................. 5

       1.   Basketball Team Equipment ................................................................................. 5

       2.   Boone Basketball Court........................................................................................ 8

       3.   Mittera Invoices .................................................................................................. 10

   C.   Drake's Bond is Not a Token Amount ........................................................................ 11

   D.   DMACC is Not Harmed by Replacing Enjoined Logos.............................................. 12

   E.   DMACC's Unsold Merchandise and Giveaways Are Not Losses .............................. 13

IV. Conclusion........................................................................................................................ 13

**I.    INTRODUCTION**

DMACC's request is grounded in alleged costs directed at *replacement*, not *removal*, of the enjoined marks. This is not an arbitrary distinction. DMACC is not harmed by its replacement costs because it can continue to use the replacement materials regardless of the outcome of this case. This is because DMACC is replacing enjoined marks with other, current DMACC trademarks. If DMACC ultimately prevails, it will simply have a wider range of marketing materials to choose from—that Drake will have paid for. Increasing the bond, therefore, would be a windfall for DMACC, not simply compensation, and would punish Drake for obtaining the injunction. Viewed objectively, this Motion functions as a means to burden a smaller institution in pursuit of protecting its rights, rather than as a security to protect DMACC.

The Court was also well within its discretion to set Drake's bond at $25,000 given Defendants' wholesale failure to present any substance to its allegation of the harm they would suffer by the imposition of a preliminary injunction. *See* ECF No. 30, at 42. DMACC also grossly mischaracterizes its alleged "harms," and instead has used these proceedings as cover to purchase hundreds of thousands of dollars of new goods it does not need, evidenced by unreliable, incorrect, and inconsistent invoices. Further still, Defendants' request is based on conjecture, which renders this request (that can be raised at any time in the future) premature. The Court should deny DMACC's motion in full.

**II.    LEGAL STANDARD**

A party seeking an increase in the amount of a bond bears the burden of justifying the increase. *In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007). "The amount of a bond rests within the sound discretion of the trial court." *Stockslager v. Carroll Elec. Coop. Corp.,* 528 F.2d 949, 951 (8th Cir. 1976) (further noting the amount of a bond "will not be disturbed on appeal absent an abuse of that discretion."). An abuse of discretion in the context of

a bond calculation is when the court "fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous." *In re President Casinos, Inc.*, 360 B.R. 262, 264 (B.A.P. 8th Cir. 2007). A court is not required to order a bond to protect a party from economic damages that are speculative. *Id.* at 266.

**III.   ARGUMENT**

    **A.   The Bond Amount Has Sound Basis in the Preliminary Injunction Record**

DMACC suggests the Court failed to make findings with respect to the bond amount. ECF No. 111-1, at 3. This is not true. The Court rendered its decision on a voluminous preliminary injunction record, comprising nearly 100 pages of briefing, over 100 exhibits, and a 2-plus hour hearing. DMACC has had ample opportunity to quantify its alleged harm. Yet in its Resistance to Drake's motion, DMACC devoted a single sentence and no evidence to the harm it would allegedly suffer if Drake's motion was granted:

> Drake is unlikely to succeed on the merits and will not suffer irreparable harm; therefore, the remaining two factors favor DMACC because the rebranding costs and reputational damage DMACC will incur due to a baseless injunction are detrimentally unfair and unreasonable and against the public interest.

ECF No. 30, at 49. DMACC had another opportunity to articulate the scope of its alleged harm at the preliminary injunction hearing. Again, however, it devoted only scant substantive argument (and **no evidence**) to the issue:

> "[DMACC] would have to abandon the federal trademark registration it has with the D and "Campus Recreation" that it's had since 2014.[1] [DMACC] would have to go back and take down signs, posters, banners, rebrand cars, rebrand entirely, hundreds of thousands of dollars of expenditure."

Exhibit 1 (Preliminary Injunction hearing transcript, at 70; ln 21–24). Additionally, nowhere does the record indicate that Drake would be unable to satisfy a judgment for damages that might be

---

[1] DMACC has not abandoned this mark nor does the Order as modified require it to do so. ECF No. 101.

obtained by DMACC should it be wrongfully enjoined. Both factors weigh against granting DMACC's motion. *See ISG Tech., Inc. v. Secure Data Techs., Inc.*, 2021 WL 5546463, at *6 (W.D. Mo., Feb. 2, 2021) (declining to grant in full a motion to increase bond amount when enjoined party failed to raise the issue at the preliminary injunction hearing, and nothing in record indicated movant's inability to pay).

DMACC cites *Rathmann Grp. v. Tanenbaum* to suggest that the Court abused its discretion in arriving at the bond amount in this case. ECF No. 111-1, at 4. The circumstances in that case, however, are easily distinguishable. For one thing, the district court required **no bond** in exchange for granting preliminary injunctive relief, electing instead to leave in place two small bonds that had been required in exchange for two prior temporary restraining orders. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 788–89 (8th Cir. 1989). While not expressly discussed in the case, this is an apparent violation of Fed. R. Civ. P. 65(c), which *requires* a bond in exchange for preliminary injunctive relief, an interpretation this Court endorsed in *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1105 (S.D. Iowa 2020) (noting the "mandatory language of Rule 65(c)").

Second, that case involved an employer suing a former employee over an alleged breach of a one-year noncompete clause. *Id.*, at 788. The court enjoined the employee from competing with the employer for a 12-month period after employer's resignation date. *Id.* at 788–89. Hence, the term of the court's injunction was coterminous with the noncompete the employee was accused of breaching, effectively granting the employer a permanent injunction for no additional bond. *Id.* It was *this part* of the order (i.e., failure to even consider the question of requiring a bond) which the Eighth Circuit found to be an abuse of discretion—not the amount. *Id.* at 789 (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (finding error because the lower

court failed to exercise discretion required by Rule 65(c) by expressly considering question of requiring bond—not setting bond at a particular amount)).

In any event, a bond is merely a security device, not a limit on damages DMACC may obtain against Drake if the facts warrant such an award. *See Minn. Mining & Mfg. Co. v. Ruah Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997).

### B. DMACC's Evidence is Unreliable

DMACC substantiates its request for a bond increase exclusively upon Vice President of Student Affairs Erica Spiller's declaration that refers to a variety of invoices. Review of this declaration and exhibits provides more questions than answers. For instance, little to no explanation or evidence is provided on the need to incur the costs to *cease* use of the enjoined marks, and frequently, the content of the declaration and the invoices are at odds.[2] The following addresses the more egregious examples, but otherwise, Drake objects to every exhibit DMACC relies on as unreliable, incorrect, redundant, unnecessary, and/or misleading.

#### 1. Basketball Team Equipment

DMACC grossly misrepresents what it deems "necessary" costs to comply with the injunctive Order. A prime example is its basketball team. DMACC spent over $16,000 to outfit its basketball team with new travel gear,[3] new branded locker-room stools,[4] new laser-engraved

---

[2] Drake propounded requests for production seeking such materials, including materials that demonstrate all usage of the New DMACC "D" and Colors, as well as communications related to compliance with the preliminary injunction order. Although those response were due on January 6, 2025, DMACC has produced a mere six pages and their objections. *See* Exhibit 2, at 7 (Request No. 4) and 8 (Request No. 6).

[3] Exhibit E (ECF No. 112-7)

[4] Exhibit G (ECF No. 112-9)

basketballs,[5] new coaches' gear,[6] and new home/away uniforms.[7] There are myriad problems with these purchases.

The first involves the scope of correction on its men's basketball uniforms. DMACC alleged on December 5, 2024 that it could not comply with the injunction order because DMACC's men's basketball uniforms "feature the rebrand block-style 'D.'" Spiller Declaration, ECF No. 97-2, ¶ 10. No detail is provided as to **how** the rebrand "D" was featured on the uniforms. *Id*. Ms. Spiller declared that she instructed a coach to order new uniforms. *Id.* at ¶ 11. She declared the uniforms would not ship until December 14, 2024, and that they would not arrive until mid-January 2025. *Id*. at ¶ 11. She further declared that compliance was impossible because the team "requires uniforms to play in now." *Id*. at ¶ 12.

On December 9, in resistance to DMACC's Motion to Extend and Clarify, Drake located and presented evidence that the enjoined "D" only appeared on the waistband of DMACC's basketball shorts. *See* ECF No. 99-1, at 2. It did not appear anywhere else, namely, the jerseys.

In her December 13 declaration, Ms. Spiller acknowledged this for the first time, specifically that the uniform tops contained no enjoined Ds. ECF No. 102, at 2, ¶ 3(d)(a); *see also generally* ECF No. 99-1. Yet, DMACC did not just purchase new shorts—it purchased entire new uniforms, tops and bottoms for home and away games. This was unnecessary, not only because the shorts were the only portion of the uniform affected, but more importantly, DMACC could comply, for example, by simply having the players roll the waistband of the shorts or untuck their shirts to cover it—which they did. ECF No. 108, at 6 ¶ 3(c)(iv). Compliance did not require new uniforms, and even if it did, only the shorts needed replacement. As new uniforms were not a

---

[5] Exhibit H (ECF No. 112-10)

[6] Exhibit J (ECF No. 112-12)

[7] Exhibits K–L (ECF Nos. 112-13, 112-14)

6

necessary compliance expense, it cannot be a basis to increase Drake's bond. The Court should deduct this from any modified bond. *See* Exhibits K–L (ECF Nos. 112-13, 112-14).

The second problem involves Ms. Spiller's inconsistent timeline for when the new uniforms would arrive. In her declarations dated December 13, December 23, December 30, and January 6 explaining DMACC's compliance efforts, Ms. Spiller declared that "DMACC staff placed a new order for the basketball uniforms on December 2, 2024" and that they "are custom made overseas and are scheduled to arrive mid-January 2025." ECF. Nos. 102, at 2; 108, at 6; 113, at 4; 115, at 5. Yet, on December 27, Ms. Spiller declared that Exhibits K and L are true and correct copies of order summaries for basketball uniforms dated December **16**, 2024. ECF 112-1, at 3, ¶¶ 5(k)–(l). A review of Exhibits K and L confirm that the "Order Date" for both uniforms was December 16, 2024, with the "Delivery Date" listed as **two days later**, on December 18, 2024—despite Ms. Spiller declaring on other occasions that the uniforms are scheduled to arrive mid-January. *Cf.* Exhibits K–L (ECF Nos. 112-13, 112-14); *e.g.* ECF No. 113, at 4. No explanation has been offered to explain these inconsistencies. As Ms. Spiller's credibility is the only evidentiary basis for DMACC's bond increase request, the Court should require more than contradictory, self-serving statements.

The third problem with the basketball gear is that, other than the uniforms, the record is devoid of any evidence, or even argument, that DMACC was using travel gear, stools, basketballs, or coaches gear featuring the enjoined logo.[8] Even if DMACC was using the enjoined mark on those items, compliance requires *ceasing* use, which could be accomplished by any number of inexpensive means, e.g., covering the marks with tape or swapping out its branded locker-room stools for standard folding chairs. Instead, DMACC has exploited the injunction as an opportunity

---

[8] DMACC has provided no photos of either pre- or post-preliminary injunction usage of its marks.

to outfit its team, including its coaches, with entirely new equipment and clothing that feature current DMACC marks that it can continue to use regardless of the outcome of this case.

The fourth problem involves the availability of non-infringing substitutes. Based on photos of DMACC's basketball players that Drake submitted in connection with its Motion for Show Cause Order, DMACC already has non-infringing travel gear. *See* ECF 99-1, at 7 (player second from left wearing pants with enjoined logo, but player on far left wearing pants with non-enjoined logo). DMACC also presumably has non-infringing stools, basketballs, and coaches gear in its facilities prior to the rebrand—or access to less expensive non-custom versions of these things. There is nothing in the record to indicate what happened to those items or whether they can be utilized to comply; it is thus impossible to ascertain whether the expense of purchasing brand-new gear was necessary. Even if DMACC could show actionable harm, it has some duty to mitigate it. By all measures, it has done the opposite. This cannot be sufficient for DMACC to meet its burden to justify a bond increase. *In re President Casinos*, 360 B.R., at 266.

Without some basis in the record to suggest the basketball team could not keep functioning without new uniforms, branded travel gear, branded locker-room stools, branded basketballs, and branded coaches gear, these are plainly unnecessary expenses. The Court should, at least, deduct these costs from any modified bond. *See* Exhibits E, G, H, J.

### 2. Boone Basketball Court

Another problematic example is the Boone Basketball Court. DMACC declared previously that it is impossible to remove the enjoined "D" from center court because it would require refinishing the entire court due to its age and type, and that this would pose a safety risk to students. ECF No. 109-1, at 5, ¶ 3(b). DMACC also contends that this work will cost $18,208.00. *See* Exhibit F (ECF No. 112-8). Each proposition is highly suspect.

### a) *The Quote Includes Removal of Obsolete Features*

The quote for this work includes sanding off two "obsolete" 3-point lines, and cover with beige to match the floor color. ECF No. 112-8, at 2. Regulation basketball courts have 3-point lines, and given that the quote refers to complete removal of some lines, it can be assumed that the floor includes other, proper, three-point lines that will remain. The record fails to explain why Drake should be liable for removing these "obsolete" features of DMACC's basketball court, or any lines for that matter. Exhibit F is also not broken down by line item, leaving the Court to speculate about how much each task contributes to the total, which is not a proper basis to increase Drake's bond.

### b) *"…the entire court must be redone…"*

The quote in Exhibit F contains two figures: the first is to refinish the entire court, the second is to address only the center-court logo and 3-point lines. The description of the second figure includes application of two coats of water-based sealer, and another two coats of water-based finish. Upon information and belief, this is the same water-based finish contemplated in the first figure. It is thus unclear why DMACC must refinish the entire court when the center-court quote includes said finish. Moreover, the quote in Exhibit F contains no indications about why the age and type of court requires refinishing the entire court. *Cf.* Spiller Declaration, ECF No. 109-1, at 5, ¶ 3(b). The record also fails to explain why Drake should be liable for refinishing DMACC's entire basketball court, again leaving the Court to speculate, which is not a proper basis for a bond increase.

### c) *"Refinishing a basketball court . . . poses a safety risk to the students who use the court"*

DMACC argues that refinishing the basketball court poses a safety risk to students because the new layer of finish causes the court to be slippery, and thus DMACC cannot refinish the court

9

until the season winds down in May 2025. ECF No. 109, at 6; *see also* ECF NO. 109-1, at 5, ¶ 3(b); *see also* ECF No. 102-2 (noting importance of "allowing the finish to dry and cure properly without compromising safety"). Yet, the portion of Exhibit F devoted to refinishing the entire court notes a "24-hour cure time before back to normal use." ECF No. 112-8 (emphasis added). No explanation is provided for this stark inconsistency. DMACC's statements are plainly self-serving, and contradictory to those provided by the vendor. This is not a proper basis for a bond increase.

### 3. Mittera Invoices

DMACC's Exhibit AA is an invoice from Mittera Group, Inc. for 5,000 "viewbooks."[9] ECF No. 112-29. The date of Exhibit AA is December 19, 2024. The invoice number is 0192397. DMACC's Exhibit AB is also an invoice from Mittera, dated December 31, **2023**. ECF No. 112-30. Ms. Spiller explains in her sworn declaration that the invoice is dated incorrectly, and that "this invoice is for the new brochures without the enjoined logo." ECF No. 112-1, at 5, ¶ 5(bb). Drake presumes Ms. Spiller means that the *year* of Exhibit AB is incorrect, and should read December 31, **2024**. Yet, the invoice number for Exhibit AB is 0185497, a lower number than Exhibit AA—*6,900* invoices lower. The same relationship is present in the invoices' "Job Number" fields. Exhibit AA lists the Job Number as 100122. ECF No. 112-29. Exhibit AB, supposedly dated 12 days later, lists the Job Number as 95203—nearly 5,000 jobs earlier. ECF No. 112-30. DMACC offers no explanation for these irregularities.

In the absence of any reasonable explanation, the inference is that Exhibit AB is, in fact, from 2023 or some time pre-injunction, which places it firmly outside the scope of any actions DMACC has taken to comply with the injunction order. Given the magnitude of

---

[9] The record is devoid of any evidence of what a "viewbook" is or why the purchase is *necessary* due to the injunction.

misrepresentations that have occurred thus far, it is difficult for Drake to attribute this to a harmless mistake.

A third Mittera invoice contains yet another substantial cause of concern. DMACC's Exhibit W is an invoice dated December 16, 2024. ECF No. 112-25. The invoice is purportedly for the printing of 167,000 continuing education postcards, and for the recycling of 167,000 postcards "due to customer error." *Id.* It is unclear whether this "error" is due to the injunction, or as expressly stated, an error on DMACC's part in printing the original postcards, leaving the Court to speculate. Moreover, recycling the postcards is purported to cost $6,001.00. *Id.* The record is devoid of any evidence as to why it is necessary to incur **over $6,000** to dispose of postcards. The Metro Park East Landfill just east of Des Moines accepts mixed recyclables for **no charge.** Exhibit 3. It is plainly unnecessary that DMACC incur such a substantial charge, which means it is even more unnecessary that Drake be responsible for it.

**C.  Drake's Bond is Not a Token Amount**

DMACC cites *Northern States Power Co. v. Fed. Transit Admin.* to support the notion that this Court only required a "token" bond, but the circumstances here are far different. 270 F.3d 586 (8th Cir. 2001). For one thing, the enjoined party in *Northern States*, a utility company, was not required to merely change out some marketing materials; the injunction required it to **relocate** underground power lines and related facilities, which at the time were located beneath the heart of downtown Minneapolis. *Id.* at 587. That is infinitely more costly and specialized work than DMACC has been obliged to do.

Second, that case involved a convoluted cast of parties that included the State of Minnesota, the Federal Transit Administration, the U.S. Department of Transportation, and others. The Court of Appeals noted "substantial uncertainties" about where the money would come from if the movants ultimately had to pay costs and damages to the enjoined party, and the court felt that that

11

issue should be addressed proactively to remove doubt. *Id.* at 588 ("We think that issue should be faced now"). No such concern is present here. DMACC is also free to move for a bond increase at any time; in fact, given the admittedly speculative nature of many of its alleged costs, DMACC should wait until it can ascertain its compliance costs with more precision. *See In re President Casinos,* 360 B.R., at 266 (speculative damages not proper basis for bond).

Third, the bond in *Northern States* ($50,000) really was a token amount under the circumstances. After reviewing the evidence presented by the enjoined parties of the costs involved to comply with relocating underground infrastructure, the Court of Appeals increased the movant's bond to $8,000,000—**160 times** the original bond amount. *Northern States*, 270 F.3d, at 588. For reasons discussed *supra*, DMACC grossly misrepresents its alleged costs, but even if we take them at their word, a "token" bond in this case under the *Northern States* framework would be $1,562.50.[10] This Court required a bond sixteen times that amount.[11]

### D. DMACC is Not Harmed by Replacing Enjoined Logos

DMACC insists it has been harmed by incurring costs to replace enjoined logos with new ones, but this assumes DMACC otherwise has no use for these new materials. This is simply not true. DMACC has been replacing enjoined logos with the following marks and variations thereon.



---

[10] $1,562.50 x 160 = $250,000

[11] $1,562.50 x 16 = $25,000

*See* Exhibits 4–7.

DMACC has pending applications to register all three of these marks with the United States Patent and Trademark Office. Exhibits 8–10. If DMACC ultimately prevails in its interlocutory appeal and the injunction is lifted, DMACC can simply keep the replacment materials and continue to use them along with the previously enjoined materials, because they feature other, current, trademarks of DMACC. It is not as if uniforms, patches, billboards, etc. are perishable or time-sensititve, and DMACC has presented no evidence that the enjoined or replacement materials would be rendered immaterial or otherwise unusable upon a reversal of the injunciton. This is not sufficient to justify a bond increase.

### E. DMACC's Unsold Merchandise and Giveaways Are Not Losses

DMACC argues that its unsold bookstore merchandise featuring enjoined marks should be deemed a compensatory loss. ECF No. 111-1, at 6–7; *see also* ECF No. 112-37. It alleges the same (without evidence) as to $2,000.00 worth of alleged "giveaways" with the enjoined logo that can "no longer be distributed." ECF No. 112-1, at 7 ¶ 10. Neither are losses for purposes of a preliminary injnction bond. If the injunction is reversed, DMACC can simply put the items back on sale and/or give them away.

### IV.     CONCLUSION

DMACC fails to show that **any** of its alleged expenses are truly losses for which security is needed. Nor does DMACC establish that the Court abused its discretion by making clearly erroneous factual findings. Instead, DMACC appears to have gone on a spending spree to outfit its departments with new materials and equipment that feature DMACC's current trademarks, which will have value and utility to DMACC regardless of the outcome of this case. Forcing Drake to compensate DMACC for this feigned harm effectively punishes Drake for obtaining a

preliminary injunction, which is contrary to the purpose of the bond requirement.  Drake urges the Court to deny this motion in full as premature, profligate, and insincere.

                                    Respectfully submitted,

Dated: January 10, 2025                **ZARLEYCONLEY PLC**

                          By:    /s/John D. Gilbertson
                                    John D. Gilbertson, AT0014515
                                    Joshua J. Conley, AT0011828
                                    580 Market Street, Suite 101
                                    West Des Moines, IA 50266
                                    Telephone:  (515) 558-0200
                                    Facsimile:   (515) 558-7790
                                    jgilbertson@zarleyconley.com
                                    jconley@zarleyconley.com
                                    **ATTORNEYS FOR PLAINTIFF &**
                                    **COUNTERCLAIM DEFENDANT**