IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DRAKE UNIVERSITY, | ) | Case No. 4:24-cv-00227-SMR-SBJ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER ON MOTIONS TO DISMISS |
| DES MOINES AREA COMMUNITY | ) | AND MOTION TO STRIKE |
| COLLEGE FOUNDATION and DES | ) | |
| MOINES AREA COMMUNITY | ) | |
| COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| DES MOINES AREA COMMUNITY | ) | |
| COLLEGE, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DRAKE UNIVERSITY, | ) | |
| | ) | |
| Counterdefendant. | ) | |

Before the Court are three motions filed by Plaintiff Drake University ("Drake"). Drake brings two Motions to Dismiss as well as a Motion to Strike content contained in the answer, affirmative defenses, and counterclaims filed by Defendants Des Moines Area Community College ("DMACC") and Des Moines Area Community College Foundation ("DMACCF"). Although requested by Drake, oral arguments are not necessary for the disposition of these motions.

## I.     BACKGROUND

Drake initiated this action against DMACCF alleging trademark infringement of Drake's vintage block-style D and blue and white color scheme.  [ECF No. 1].  After amending its complaint to add DMACC as a party, both Defendants filed answers and counterclaims.  [ECF Nos. 17, 20, 21].   DMACC's counterclaims included claims of Defamation and Unfair Competition.  [ECF No. 21].  Drake then filed a Motion to Dismiss both claims, asserting that the defamation claim failed to meet the pleading standard due to a lack of specificity and that the unfair competition claim was inadequately pled under Iowa law and barred as a matter of law against a party claiming trademark infringement.  *Id.*  Drake separately moved to strike portions of DMACC's answer, including exhibits and factual allegations it deemed irrelevant and disparaging.  [ECF No. 48].

DMACC then amended its answer and counterclaims, removing the unfair competition claim and adding specification to its defamation claim.  [ECF No. 52].  However, it retained the contested exhibits and information addressed in Drake's Motion to Strike.  In a sur-reply to Drake's Motion to Dismiss, DMACC indicated it would abandon both the defamation and unfair competition claims, but noted that DMACCF would reassert the defamation claim as a private entity in its amended pleadings.  [ECF No. 67].  Subsequently, DMACCF filed its amended answer, affirmative defenses, and counterclaims, which included the previously abandoned counterclaim for defamation.  [ECF No. 74].  Drake responded with another Motion to Dismiss, arguing that the statements were not defamatory and DMACCF failed to plead special damages.  [ECF No. 82].  Drake seeks attorney's fees under 28 U.S.C. § 1927 in connection with both of its Motions to Dismiss.

II.    ANALYSIS

*A.    Legal Standard*

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A court must accept as true all facts pled and grant all reasonable inferences drawn from the pleadings in favor of the nonmovant.   *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 721 (8th Cir. 2014) (citation omitted).   When considering a motion to dismiss, the court is limited to the allegations in the complaint and materials embraced by the pleadings.   *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014).   A complaint is not adequately pled to state a claim for relief if it only contains "'naked assertions devoid of further factual enhancement.'" *Christopher v. Bushner*, 33 F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678).

Under the Rule 8 standard, a plaintiff is required only to set forth a "short and plain statement of the claim" with sufficient facts to "show that the pleader is entitled to relief."   Fed. R. Civ. P. 8(a).   To survive a motion to dismiss, the alleged facts "must be enough to raise a right to relief above the speculative level" by presenting claims that are facially plausible.   *Iqbal*, 556 U.S. at 678 (citation omitted).   The plausibility standard is not a probability requirement, but requires that the pleading contain sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" to support a violation.   *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015) (quoting *Twombly*, 550 U.S. at 570).   A plaintiff cannot base an entitlement to relief on mere "labels and conclusions."   *Twombly*, 550 U.S. at 555.   Thus, where a complaint pleads facts that are "consistent with" liability, but does not cross the line between possibility and plausibility,

it fails to state a claim under Rule 12(b)(6). *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 953 (8th Cir. 2023) (quoting *Twombly*, 550 U.S. at 557).

### B. Drake's First Motion to Dismiss

In its first Motion to Dismiss, Drake sought dismissal of DMACC's unfair competition and defamation claims. DMACC responded by voluntarily withdrawing the unfair competition claims and amended its pleadings accordingly. In its reply brief, Drake argued that DMACC's *per se* defamation was foreclosed due to its status as a public counter-plaintiff. Drake further sought an award of attorney's fees pursuant to 28 U.S.C. § 1927, alleging that DMACC acted objectively unreasonable and in bad faith by asserting those claims. DMACC was permitted to file a sur-reply to respond, wherein DMACC notified the Court that it would withdraw its defamation counterclaim citing the First Amendment protection for criticism of municipal corporations such as DMACC. However, it argued that awarding attorney's fees would be inappropriate because it had grounds for initially asserting both of its withdrawn claims. Additionally, DMACC pointed out that Drake did not raise its argument regarding the *per se* defamation claim until its reply brief, and that DMACC was withdrawing that counterclaim on different grounds altogether.

DMACC's voluntarily abandonment of the counterclaims contested by Drake in its first Motion to Dismiss renders those issues moot. The only issue which remains is whether Drake should be awarded attorney's fees under § 1927. That provision states that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The United States Court of Appeals for the Eighth Circuit has held that this provision requires "both a finding of objectively unreasonable behavior and a finding of bad faith." *NAACP Special Contribution Fund v. Atkins*, 908 F.2d 336, 340 (8th

Cir. 1990) (citation omitted).  A court may also sanction an attorney under § 1927 where his or her conduct "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."  *Tenkku v. Normandy Bank*, 348 F.3d 737, 743 (8th Cir. 2003) (citation omitted).  "The imposition of sanctions is a serious matter and should be approached with circumspection."  *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir. 1987).

Although the Court agrees that DMACC's defamation and unfair competition counterclaims were improperly pled, primarily due to a lack of specificity required for such claims under Iowa law, Drake has not established that these claims were brought in bad faith or with a reckless disregard for counsel's duties to the Court.  DMACC's filing of these counterclaims in its initial answer prompted Drake's Motion to Dismiss, but the Court cannot conclude that they were vexatious, or unreasonably multiplied the proceedings.  District courts are given great deference in imposing sanctions because they are in the best position to "evaluate the circumstance surrounding an alleged violation and render an informed judgment."  *Duranseau v. Portfolio Recovery Assocs.*, 644 Fed. App'x 702, 707 (8th Cir. 2016) (citation omitted).  While "both sides could have acted to make this litigation more efficient and civil" the Court finds that neither party's conduct warrants sanctions.  *See id*.  For these reasons, Drake's first Motion to Dismiss is moot and its request for attorneys' fees under § 1927 is denied.

### C.  Drake's Motion to Strike

Federal Rule of Civil Procedure 12(f)(1) permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f)(1).  "Motions to strike under Fed. R. Civ. P. 12(f) are viewed with disfavor and are infrequently granted."  *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977) (citation

omitted). This is because despite a district court's broad discretion on the issue, "striking a party's pleadings is an extreme measure." *Stanbury L. Firm v. I.R.S.,* 221 F.3d 1059, 1063 (8th Cir. 2000).

Drake moves to strike three specific provisions in DMACC's amended answer.[1] First, Drake seeks to strike Exhibit T, a public commentary published in the *Iowa Capital Dispatch.* [ECF No. 52-20]. This article was written by Daniel Finney who, now an English teacher, used to work as Drake's Public Relation Specialist and a journalist. [ECF No. 56 at 4]. Second, Drake challenges Exhibit I, a Yahoo News article written by Brett Michael Dykes discussing Drake's D+ marketing campaign. [ECF No. 52-9]. Third, Drake objects to Exhibit U, a thread of Facebook comments posted by users on a KCCI news post covering this lawsuit. [ECF No. 52-21]. Each of these exhibits are referenced in DMACC's amended answer when addressing Drake's branding and public reaction to the current trademark suit.

Drake argues that these exhibits lack relevance and were included in the pleading simply to disparage the university. Regarding Exhibits T and U, which reflect public commentary on the merits of the lawsuit and the similarities between the two marks, the Court finds that this content is relevant to the case. In fact, Drake argued as much when it included similar Facebook commentary reflecting public opinion in its amended complaint and motion for a preliminary injunction. As the Court noted in its injunction order, social media comments are an unreliable indicator of actual confusion and merit little weight in the *Squirt Co.* analysis. However, they are not "redundant, immaterial, impertinent, or scandalous" such that they must be stricken from the record. Drake placed public reaction to the lawsuit at issue through its own filings; to now assert that similar evidence submitted by DMACC must be stricken is inconsistent with its prior position.

---

[1] Although Drake initially filed its Motion to Strike in response to DMACC's first answer and counterclaims, the Court will apply it to DMACC's amended answer and counterclaim which retains all the contested content.

Neither of the exhibits rises to the level of "redundant, immaterial, impertinent, or scandalous matter" that would warrant the extraordinary remedy of striking under Rule 12(f).

As for Exhibit I, Drake's primary complaint seems to be the way that DMACC cropped a screenshot of the exhibit which was included in its statement of facts, even though the entire article was attached as an exhibit. Drake contradicts itself, stating that it "does not contest that the image from the article is relevant to show the extent to which Drake is known for using a standalone 'D' to signify the source of its post-secondary educational services and related goods and services," yet maintaining that "Mr. Dykes' personal opinion of a marketing campaign that ended more than a decade ago is not probative of any issue before the Court."

Although an article from 2010 commenting on a Drake marketing campaign may be less relevant than the other contested exhibits, DMACC contends that it reflects non-use of Drake's Vintage D and supports its abandonment defense. Drake's response that other evidence demonstrates that it did not abandon its Vintage D as of 2024, thereby rendering this article irrelevant, is unpersuasive. Further, Drake states that the article is redundant because DMACC's fifth affirmative defense alleges abandonment. The submission of multiple evidentiary items to support a single legal theory does not render the evidence redundant or subject to striking. The fact that the parties are actively disputing whether the article supports Drake's continued use of a standalone "D" or an abandonment of the Vintage D underscores that it should not be stricken. For the reasons discussed above, Drake's Motion to Strike is denied.

### D. Drake's Second Motion to Dismiss

In its Second Motion to Dismiss, Drake seeks dismissal of DMACCF's defamation counterclaim. Drake asserts that the alleged defamatory statements do not "concern" DMACCF, address matters of public concern, and have been misrepresented by DMACCF in its pleadings.

Additionally, it argues DMACCF failed to properly plead special damages as required for such claims. As with its first motion, Drake again requests attorney's fees under § 1927. DMACCF contests each of these allegations.

1.     Legal Standard

Defamation under Iowa law encompasses the "twin torts of libel and slander." *Hoffmann v. Clark*, 975 N.W.2d 656, 664 (Iowa 2022); *see also Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996) (explaining that defamation is "an invasion of the interest in reputation and good name") (citation omitted). Slander involves defamatory statements expressed orally, while libel pertains to defamatory content in writing or another fixed medium. *Hoffman*, 975 N.W.2d at 664 (citing *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021)). Each version of defamation requires the same essential elements. *Bauer*, 958 N.W.2d at 198. To establish a *prima facie* case for defamation, "a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013) (citation omitted).

a.   Publication

An essential element of defamation is the publication of the statement to one or more third parties. *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). The third party must both hear and understand the statement as defamatory. *Id*. This understanding must be assessed "in the context of the surrounding circumstances and within the entire communication." *Id*. Therefore, "[i]f a statement is not heard and understood by a third person to be defamatory, the defamatory statement is not published and is therefore not actionable." *Newell v. JDS Holdings, L.L.C.*, 834 N.W.2d 463, 470 (Iowa Ct. App. 2013) (citing *Huegerich*, 547 N.W.2d at 221).

-8-

A defamatory statement does not have to be widely disseminated to be actionable, "it is enough that the statement is communicated to a single individual other than the one defamed." *Doe v. Hagar*, 765 F.3d 855, 861 (8th Cir. 2014) (cleaned up) (quoting Restatement (Second) of Torts § 577 cmt. b (Am. L. Inst. 1977) ("Restatement (Second) of Torts").

### b.   Defamatory

Defamation reaches factual assertions, rather than opinions. *Bauer*, 958 N.W.2d at 198 (observing that "speech that is considered 'rhetorical hyperbole' and 'vigorous epithet' are nonactionable as defamation") (citation omitted). Statements which reflect the speaker's opinion are protected under the First Amendment. *See Milkovich v. Lorain J. Co.,* 497 U.S. 1, 20 (1990) (holding "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."). Whether a statement is capable of having a defamatory meaning presents a question of law for the court. *See Jones v. Palmer Commc'ns*, *Inc*., 440 N.W.2d 884, 891 (Iowa 1989).

Iowa courts use a four-factor test to assess whether a statement alleges facts or the speaker's opinion. *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018). Courts examine: (1) whether the statement has a precise, widely understood meaning or is instead "indefinite and ambiguous"; (2) the extent to which the challenged statement is "objectively capable of proof or disproof"; (3) "the context in which the alleged defamatory statement occurs"; and (4) "the broader social context" surrounding the statement's publication. *Id*. Importantly, a plaintiff need not prove false "the literal wording of the statement but what a reasonable reader or listener would have understood the author to have said." *Yates*, 721 N.W.2d at 771 (citing *Milkovich*, 497 U.S. at 16–17).

c.   Of and Concerning the Plaintiff

Iowa law does not require that the subject of a defamatory statement be expressly identified by name, it is sufficient that a third-party can understand to whom the statement refers.  *Bierman*, 826 N.W.2d at 464; *see also* Iowa Code § 659.1 (providing "[i]n an action for slander or libel, it shall not be necessary to state any extrinsic facts for the purpose of showing the application to the plaintiff of any defamatory matter out of which the cause of action arose.").  It is enough that the allegedly defamed person referred to is recognizable "by inference or innuendo."  *Boardman & Cartwright v. Gazette Co*., 281 N.W. 118, 120 (Iowa 1938); *see also Ruzicka v. Conde Nast Publ'ns, Inc*., 999 F.2d 1319, 1322 n.6 (8th Cir. 1993) ("The plaintiff need not be cited by name for the defamation to be 'of and concerning the plaintiff.'") (applying Minnesota law) (citations omitted).

d.   *Per se* versus *Per quod*

Statements can be defamatory in two ways.  The first is defamation *per se* which involves a statement that "has a 'natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.'"  *Bandstra*, 913 N.W.2d at 46 (quoting *Nickerson*, 542 N.W.2d at 510).  To put it more succinctly, a *per se* defamatory statement has "an obvious defamatory character."  *Hoffmann*, 975 N.W.2d at 664 (providing "Doe is an embezzler" as an example of libel *per se*).  A *per se* defamatory statement does not require the audience to have any additional context or information about the speaker, the subject of the statement, or subject matter of the statement.

The other type of libelous statement is defamation *per quod*.  By contrast, when a statement is defamatory *per quod*, it is not immediately apparent why a statement is defamatory—the listener or the audience needs more information to understand its tortious nature.  *Nickerson*, 542 N.W.2d

-10-

at 510 (explaining that "[a] statement is libelous *per quod* if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation.") (citing 50 Am. Jur. 2d, *Libel and Slander* § 146 (1995)). The distinction is critical because it determines what a plaintiff must prove to establish liability.

### e. General Damages versus Special Damages

When statements that are defamatory *per se* are published, a plaintiff is not required to prove damages—the publication of such statements are presumed to cause damage. *Rees v. O'Malley*, 461 N.W.2d 833, 839 (Iowa 1990). Courts have noted that presumption of damages makes defamation per se "an oddity of tort law" because it "allows recovery of purportedly compensatory damages without evidence of actual loss." *Hoffmann*, 975 N.W.2d at 664 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349 (1974)). Importantly, the presumption of damages extends only to "general damages, which are 'imposed for the purpose of compensating the plaintiff for the harm that the publication has caused to his reputation,' including emotional damages." *Id*. at 665 (emphasis in original) (quoting Restatement (Second) of Torts § 621 cmt. *a* (Am. L. Inst. 1977)). General damages differ from "special damages, which result from 'the loss of something having economic or pecuniary value.'" *Id*. (emphasis in original) (quoting Restatement (Second) of Torts § 621 cmt. *a* (Am. L. Inst. 1977)).

By contrast, when bringing a claim for defamation *per quod*, a plaintiff must prove reputational harm caused by the defamatory statement. *Bierman*, 826 N.W.2d at 447 ("Hurt feelings alone cannot serve as the basis of a defamation action.") (cleaned up) (citation omitted). Essentially, defamation *per quod* recognizes that actual harm is required if the words alone did not harm the plaintiff absent more context. *Id*. The distinction serves to ensure that liability attaches only where the plaintiff has suffered real injury.

2.    Analysis

DMACCF asserts that it has adequately pled both defamation *per se* and defamation *per quod* based on statements in an email Drake sent to its alumni regarding this litigation.  However, DMACCF's claim suffers from multiple deficiencies that preclude recovery under either theory.  Regardless of the type of defamation, DMACCF must adequately allege that Drake "(1) published a statement that was (2) defamatory (3) of and concerning [DMACCF]."  *Bierman*, 826 N.W.2d at 464 (citation omitted).  Neither party contests that DMACCF has satisfied the first element—in that the email was sent to third parties.  However, they sharply dispute the defamatory nature of the statements.  DMACCF alleges three purportedly defamatory statements: that DMACC's logo was a standalone "D"; that Drake owned trademark rights in a standalone block style "D" separate from a bulldog; and that DMACC's use of their new logo was causing confusion in the marketplace.   The Court will take each of these statements in turn.

a.    DMACC's Logo as a Standalone "D"

The purportedly defamatory representation regarding DMACC's logo fails on multiple grounds.  First, DMACCF alleges Drake made false statements by asserting that DMACC's "logo was a stand alone 'D'" and that "Drake owned trademark rights in a block style 'D' separate from any use on a bulldog."  [ECF No. 74 ¶ 98].  However, a review of the email reveals no such explicit statements.  [ECF No. 74-12].  The representation that DMACC's logo was a standalone "D" appears to be DMACCF's interpretation of an image included in the email, depicted at Figure 1. *Id*.  The accompanying text states only that Drake's complaint focuses on new DMACC branding "which incorporates several elements that closely resemble [Drake's] established brand identity, including our standalone "D" in block-style collegiate font, which has been used by Drake for well

over a century, and reflects the legacy, excellence, and identity of [Drake's] institution." *Id*. The

email does not directly characterizes DMACC's logo as a standalone "D."



Image credit Iowa Capital Dispatch using elements from U.S. District Court exhibits

Figure 1

Whether a statement is capable of having a defamatory meaning is a question for the Court

to determine. *See Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989). Iowa law

recognizes that defamation can apply to altered images. *Bertrand v. Mullin*, 846 N.W.2d 884, 891

(Iowa 2014). Even so, "if an allegedly defamatory statement is substantially true, it provides an

absolute defense to an action for defamation." *Hovey v. Iowa State Daily Publ'n Bd., Inc.*, 372

N.W.2d 253, 256 (Iowa 1985). Here, there is nothing about the image or the corresponding text

that reveals the statement's "obvious defamatory character."[2]  *Hoffmann*, 975 N.W.2d at 664.

Even the embedded statement that the mark closely resembles that of Drake is clearly an opinion

that cannot have a defamatory meaning.[3]  Therefore, DMACCF can only proceed under a

_____

[2] The Court assumes without deciding that DMACCF is a private figure plaintiff and the subject of the statements not an issue of public importance.

[3] While such a statement does have a widely understood meaning and in the context of the publication is clearly comparing the similarities between the two trademarks, how closely the

defamation *per quod* theory, which requires pleading sufficient factual allegations that the statement was false, malicious, and caused injury. *Bierman*, 826 N.W.2d at 444.

Notably, there is nothing about the text of the article or the contested image itself which indicates that DMACCF's new trademark is the stand-alone "D" featured in the image. Rather, the email characterizes this "D" as an element of DMACC's new branding that closely resembles Drake's own standalone "D." DMACCF does not contend, nor could it, that DMACC never used the stand-alone "D" portrayed in the image by itself in its marketing materials. *See* [ECF No. 1-81]. Considering the complaint and Exhibit L—which is necessarily embraced by the pleadings— DMACCF fails to state a claim even accepting its allegations as true. It has not adequately pled facts establishing that the statements are false or malicious.[4] DMACCF's conclusory assertion that "Drake's communications included false and defamatory statements" is not entitled to the presumption of truth. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Even if this statement could be considered defamatory, DMACCF fails to satisfy the third element for its defamation claim—that the statement is of and concerning DMACCF. It is not necessary that DMACCF be specifically identified in the allegedly defamatory statement, but it must be implicated sufficiently, such that a third-party would understand that the statement refers to it. *See Bierman*, 825 N.W.2d at 464–65. Here, the email explicitly names DMACC when discussing the lawsuit and the new logo. DMACCF argues in its resistance that because it was the

---

marks resemble one another is not at all objectively capable of proof or disproof. *See Bandstra*,913 N.W.2d at 47.

[4] DMACCF submitted evidence in the form of emails and communications from donors regarding the lawsuit and their impressions of the trademark issues damaging DMACC's reputation. At the pleadings stage, this is likely sufficient under Iowa law to establish damages for defamation *per quod* because it clearly demonstrates an injury to its reputation. *Bierman*, 826 N.W.2d at 444. Even so, given the other shortcomings of the claims, a determination on this issue is unnecessary.

only named defendant when the email was distributed, Drake was actually referring to DMACCF. This argument is unavailing. A third-party recipient of the statement would not have understood DMACCF to be the intended subject. *See id*. Only by looking beyond the email—to external media coverage or court filings—would a recipient discern DMACCF's involvement in the litigation. The statements were clearly of and concerning DMACC, which explains why it initially filed the defamation counterclaim.

As DMACC has admitted, such a claim is fundamentally improper because "[a] government entity cannot bring a libel or defamation action." *281 Care Comm. v. Arneson*, 638 F.3d 621, 634 (8th Cir. 2011) (citing *New York Times v. Sullivan,* 376 U.S. 254, 291 (1964). This concept is rooted in the core principles of the First Amendment and free expression. *See New York Times*, 376 U.S. at 292 (noting that allowing government pursuit of such actions raises the "possibility that a good-faith critic of government will be penalized for his criticism, [such a proposition] strikes at the very center of the constitutionally protected area of free expression."). As such, DMACCF may not circumvent this foundational rule by alleging defamation based on statements directed at DMACC.

> b.    Drake's Trademark Rights Separate from Use on a Bulldog

Similar deficiencies plague DMACCF's allegation that Drake made a defamatory statement when it represented that it has been using its own "standalone 'D' in block-style collegiate font" "for well over a century" and that the mark "reflects the legacy, excellence, and identity" of Drake. First, contrary to DMACCF's characterization, the email contains no assertion that "Drake owned trademark rights in a block style 'D' separate from any use on a bulldog." Second, statements about the duration of Drake's use of its "D" logo and what it represents is a matter of opinion rather than verifiable fact. Such statements are not objectively capable of being

proven true or false. *Bandstra*, 913 N.W.2d at 47. Third, DMACCF has not pled sufficient facts to establish that this statement would be false. While DMACCF alleges Drake abandoned its stand-alone "D" in a 2005 rebrand, that is a legal conclusion presented as a fact. Most fundamentally, these statements concern Drake's own history and branding—they are not "of and concerning" DMACC, much less DMACCF.

c.    Confusion in the Marketplace

Finally, DMACCF alleges that Drake made a defamatory statement in the email when it stated that "DMACC and DMACCF's use of the logo causes confusion in the marketplace." This provision included in the email in its entirety states:

> Our identity is important for our market recognition among students, faculty and staff, alumni, supporters, and the general public. When institutions in our same region such as DMACC—with more than 70,000 students (in 2022-2023) and a sizeable footprint in the Des Moines metro—use a visual identity similar to ours, it causes confusion in the marketplace. That confusion has already been evident in the media coverage, such as this recent segment from KCCI, in which individuals repeatedly mistook DMACC's new logo for Drake University.

DMACCF's allegations pertaining to this statement face the same deficiencies discussed above.

"Confusion in the marketplace" is not merely an opinion but a legal term of art in trademark law. The Eighth Circuit has explained that "[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1179 (8th Cir. 2020) (quoting *John Allan Co. v. Craig Allen Co. L.L.C.*, 540 F.3d 1133, 1140 (10th Cir. 2008)). Actual confusion constitutes one factor in the *SquirtCo.* analysis for trademark infringement claims. When analyzing this factor, courts examine "the number and extent of instances of actual confusion" as well as the information gathering

techniques utilized. *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010) (quoting *Duluth News-Tribune v. Mesabi Publ'n Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996). In the specialized context of trademark law, "confusion in the marketplace" lacks the precise, widely understood meaning required to sustain a defamation claim. Moreover, as a component of a multi-factor legal analysis, the concept is not objectively capable of proof or disproof. Courts may weigh evidence of confusion differently depending on the circumstances of the case. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005). The email's reference to confusion is best understood as a legal conclusion or opinion, particularly given the context—Drake prefaced the email by noting that it had filed a complaint against DMACC "*for what we believe* to be clear violations of trademark law." [ECF No. 74-12] (emphasis added). The statement about marketplace confusion, being fundamentally a conclusion drawn from evidence in a specialized legal context, is not the type of statement that defamation law was designed to address.

Finally, even if the statement could be deemed factual rather than an opinion or legal conclusion, it explicitly addresses DMACC's use of a visual identity similar to Drake's. It does not reference DMACCF at all. As with the other statements, this statement is "not of and concerning" DMACCF.

### 3.    Attorney's Fees

Drake once more requests that attorneys' fees be awarded because "[o]pposing counsel's conduct has multiplied the costs of these proceedings unreasonably and vexatiously, and without regard to its duty of candor." [ECF No. 82-1 at 16]. The Court may, in its discretion, award attorney's fees for the vexatious multiplication of proceedings if an attorney has acted objectively unreasonable and in bad faith. *See* 28 U.S.C. § 1927; *see also NAACP Special Contribution Fund,*

908 F.2d at 340. The purpose of the statute is not "to chill an attorney's enthusiasm, creativity or zealous advocacy." *Cruz v. Savage*, 896 F.2d 626, 634 (1st Cir. 1990). Rather, it is designed "to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006).

The Court has serious concerns about the reasonableness of DMACCF's defamation claims. These claims were deficient for the reasons discussed at length above. It should have been evident that the statements in the email were predominantly statements of opinion, which are not a proper basis for a claim of defamation. More troubling are certain misrepresentations in the pleading. Specifically, DMACCF alleged that Drake stated to its alumni "that DMACC and DMACCF's logo was a standalone 'D' and that Drake owned trademark rights in a block style 'D' separate from any use on a bulldog." [ECF No. 74 ¶ 98]. As the Court has explained, a fair reading of the email reveals no such statements. At best, DMACCF could have alleged that Drake "misrepresented" or "indicated" that DMACCF's logo was a stand alone "D" via the inclusion of the photo.

DMACCF further asserted that "Drake cropped the DMACC and DMACCF logo to eliminate the word 'DMACC' or 'DMACC Foundation' underneath the standalone 'D.'" Yet, the email attributes the image to "Iowa Capital Dispatch using elements from U.S. District Court exhibits." [ECF No. 74-12]. This attribution should have alerted counsel that Drake neither created nor altered the image. Similarly, while Drake described that its standalone "D" in block-style collegiate font is a part of its "established brand identity", it made no assertion about trademark rights in that symbol alone, separate from any bulldog imagery. To be sure, even if it

did, that is an opinion on the strength of their position in the lawsuit drawn from legal conclusions. It would not be grounds for defamation.

Overall, DMACCF's defamation claims are untenable. DMACCF takes giant interpretive leaps from the contents of the email to the allegations lodged in its counterclaim. The Court will not make those leaps. While the claims and the corresponding allegations are objectively unreasonable, the record is insufficient to support a finding that counsel's actions were taken in bad faith. DMACCF's contradictory allegations are as close to the line on this issue as the Court can envision, but it will exercise discretion and restraint in declining to impose sanctions. While zealous advocacy is expected, counsel must ground their pleadings in reasonable factual and legal interpretations. The parties are reminded that litigation positions, whether advanced in court or to the public, must reflect the same commitment to accuracy and candor.

### III.    CONCLUSION

For the reasons discussed above, Drake's First Motion to Dismiss is MOOT. [ECF No. 46]. Drake's Motion to Strike is DENIED. [ECF No. 48]. Drake's Second Motion to Dismiss is GRANTED. [ECF No. 82]. Drake's requests for attorney's fees are DENIED. [ECF Nos. 46, 82].

IT IS SO ORDERED.

Dated this 14th day of March, 2025.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT