# **<u>EXHIBIT B</u>**

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 24-3445
No. 25-1053

DRAKE UNIVERSITY,

*Appellee-Cross Appellant*,

v.

DES MOINES AREA COMMUNITY COLLEGE FOUNDATION and
DES MOINES AREA COMMUNITY COLLEGE,

*Appellants-Cross Appellees*

APPEAL FROM THE U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

Case No. 4:24-cv-227
HON. STEPHANIE M. ROSE

BRIEF OF APPELLEE / CROSS-APPELLANT

Joshua J. Conley
John D. Gilbertson
ZarleyConley PLC
580 Market Street, Suite 101
West Des Moines, Iowa 50266
Telephone:  (515) 558-0200
Email:  jconley@zarleyconley.com
Email:  jgilbertson@zarleyconley.com
ATTORNEYS FOR
APPELLEE/CROSS-APPELLANT,
DRAKE UNIVERSITY

# SUMMARY OF THE CASE

Appellee/Cross-Appellant ("Drake") brought suit over its standalone D, including its "Vintage D":  . The suit arose from Appellants/Cross-Appellees (collectively "DMACC")'s 2023 adoption of similar marks:  and  .

Drake sought a preliminary injunction of DMACC's "D" and variations thereof. The district court enjoined DMACC's use of (a) a block-style D with (b) any color combination of blue and white to denote their services, (c) even when paired with a house mark or other indicia of the college (the "Injunction Order").

The district court subsequently clarified the Injunction Order (the "Clarification Order") to exempt the following mark (the "Bear Paw D")  . DMACC's school team is the Bears. The Bear Paw D is a block-style "D" in a blue and white color scheme paired with an indicia of the college.

The district court summarily concluded the Bear Paw D is "visually distinct and fundamentally different" than the marks asserted by Drake. This subsumes (1) the Bear Paw D does not infringe Drake's marks, and (2) even if it did, preliminary injunctive relief was not warranted. The court provided no analysis under the applicable tests for reaching its decision, and even if it would have, the conclusions reached are in clear error, both of which are an abuse of discretion.

Drake respectfully requests 30 minutes to present oral argument on both appeals.

i

## CORPORATE DISCLOSURE STATEMENT

(a) *The following are the names of all associations, firms, partnerships, corporations, and other artificial entities that either are related to Appellee/Cross-Appellant as a parent, subsidiary, or otherwise, or have a direct or indirect pecuniary interest in the Appellee/Cross-Appellant's outcome in the case:*

None.


(b) *With respect to each entity named in response to (a), the following describes its connection to or interest in the litigation, or both:*

Not applicable.

ii

# TABLE OF CONTENTS

SUMMARY OF THE CASE........................................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF CONTENTS......................................................................... iii

TABLE OF AUTHORITIES .....................................................................v

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUE:  CROSS APPEAL..................................2

STATEMENT OF THE CASE ..................................................................3

   A.  DMACC's Appeal of the Preliminary Injunction Order ...............5

   B.  Scope of Drake's Requested Relief ..............................................7

   C.  Preliminary Injunction Order.......................................................8

   D.  Clarification Order......................................................................10

SUMMARY OF THE ARGUMENT ......................................................12

ARGUMENT ........................................................................................14

I.      STANDARD OF REVIEW ...........................................................14

II.    DMACC APPEAL..........................................................................15

   A.  Drake Does Not Carry a "Heavier Burden" in Seeking Injunctive Relief....15

   B.  Drake Established Common Law Rights in its Vintage D ...........17

       1. Third Party Rights Do Not Erode the Strength of Drake's Mark ..............17

           *a) Dartmouth* ..................................................................17

           *b) Other Educational Institutions*......................................19

           *c) Jus Tertii and Crowded Field* ......................................20

       2. Drake's Use is Current, Continuous, and Non-sporadic............22

           *a) DMACC Distorts the Applicable Legal Standards*........23

           *b) Drake's Marching Spike* ................................................23

           *c) Drake's Photographic Evidence* ....................................25

              (1)  Historic Uses of Vintage D ..................................27

              (2)  National D Club..................................................27

              (3)  Michael Admire..................................................29

Appellate Case: 24-3445    Page: 4    Date Filed: 04/01/2025 Entry ID: 5501789

     (4)  Griff II ...................................................................30

   3. Drake's Use of the Vintage D in Connection with its Mascot Gives Rise to Trademark Rights in the D ......................................................31

   4. Third-Party Use Does Not Preclude a Finding of Use in Commerce........33

   5. Drake Has Not Abandoned the Vintage D................................................35

   6. The District Court Did Not Commit Clear Error in Finding that Drake Has Trademark Rights in a Standalone Block-Style D .....................................37

   7. The District Court Compared the Entireties of the Parties' Marks...........39

 C. The Injunction is Not Overbroad.....................................................................42

   1. The District Court Did Not Abuse its Discretion by Enjoining a Single Pre-2023 Standalone D Use by DMACC ...................................................42

   2. The District Court Did Not Abuse its Discretion by Enjoining DMACC from Using a Standalone D in Conjunction with "DMACC" .................47

III.   DRAKE CROSS APPEAL ...............................................................................54

 A. Enjoining the Bear Paw D Does Not Require Specific Reference................54

 B. It is Legal Error to Find the Bear Paw D "Visually Distinct" and "Fundamentally Different" ...............................................................................58

 C. It is Legal Error to Render a Pseudo Infringement Assessment Relying on a Sole Factor .......................................................................................................60

CONCLUSION ........................................................................................................65

CERTIFICATE OF SERVICE ................................................................................67

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION, AND TYPEFACE AND TYPE-STYLE REQUIREMENTS .................................68

iv

# TABLE OF AUTHORITIES

## Cases

*A&L Indus., LLC v. Weaver Enters., Ltd.*, 2021 WL 3856745 (W.D. Wis. 2021)..26

*AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786 (6th Cir. 2004) ...............................49

*Bd. Regents Univ. of Houston Sys. v. Houston Coll. Law, Inc.*, 215 F.Supp.35 573
    (S.D. Tex., 2016) ...........................................................................................21

*Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp.
    2d 901, (W.D. Wis. 2003)..............................................................................20

*Brakebill v. Jaeger*, 932 F.3d 671 (8th Cir. 2019)..................................................14

*Cal. W. Sch. Law v. Cal. W. Univ.*, 125 Cal. App. 3d 1002 (Ct. App. 1981)..........21

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 82. 815 F.2d 500 (8th Cir.
    1987) ...............................................................................................................16

*Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F.
    Supp. 2d 622 (N.D. Tex. 2009) .....................................................................20

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) ......... 15, 17, 23

*Davis v. Walt Disney Co.*, 393 F.Supp.2d 839 (D. Minn. 2005) ..................... 38, 39

*Devose v. Herrington*, 42 F.3d 470 (8th Cir. 1994)................................................47

*Fl. Int'l Univ. Bd. of Trustees v. Fl. Nat'l Univ., Inc.*, 830 F.3d 1242 (11th Cir.
    2016) ...............................................................................................................22

*General Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647 (S.D. N.Y. 1997).........20

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27 (2d Cir. 2016)..........53

*H&R Block, Inc. v. Block, Inc.*¸ 58 F.4th 939 (8th Cir. 2023) ......................... passim

v

*Innovation Ventures, LLC v. NVE, Inc*., 2016 WL 266396 (E.D. Mich. 2016) ......20

*Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg., Inc.* 296 F.Supp.2d 983 (S.D. Iowa 2003) ..............................................................................................51

*Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530 (8th Cir. 2007).....................60

*L.F.P. IP, LLC v. Hustler Cincinnati, Inc.*, 2015 WL 13186226 (S.D. Ohio, Jan. 20, 2015) ............................................................................................55

*LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424 (6th Cir. 2016) .......... 54, 55

*Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) .49

*Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827 (8th Cir. 1999) ....................... 41, 63

*Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660 (8th Cir. 1981).... 15, 23, 41, 42

*Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998).26

*Novus Franchising, Inc. v. Dawson¸*725 F.3d 885 (8th Cir. 2013) ........................14

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188 F.Supp.3d 22 (D.D.C.) ........................................................................26

*Pres. & Trs. Of Colby College v. Colby College-N.H.*, 508 F.2d 804 (1st Cir. 1975) ....................................................................................................21

*RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F.Supp. 2d 679 (S.D. Tex. 2009) ..........................................................................................8, 46

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660 (7th Cir. 2016)....25

*SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)............................. 17, 40

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981).............................. 15, 23, 29, 31

Appellate Case: 24-3445    Page: 7    Date Filed: 04/01/2025 Entry ID: 5501789

*Vida Enter. Corp. v. Angelina Swan Collection, Inc.*, 2023 WL 2895702 (C.D. Cal. 2023) ...................................................................................................26

*WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259 (2d Cir. 1996) ............................................................................................................16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ..................24

*Zhou v. Int'l Bus. Machs. Corp.*, 167 F. Supp.3d 1008 (N.D. Iowa 2016)..............44

**Statutes**

15 U.S.C. § 1116(a) ................................................................................................24

15 U.S.C. § 1121 .......................................................................................................8

15 U.S.C. § 1127 .................................................................................................36, 41

28 U.S.C. § 1292(a)(1)..............................................................................................8

28 U.S.C. § 1331 .......................................................................................................8

U.S.C. § 1338 ............................................................................................................8

**Treatises**

1 McCarthy on Trademarks & Unfair Competition § 11:89. (5th ed.)...................25

4 McCarthy on Trademarks & Unfair Competition § 30:30 (5th ed.)....................23

McCarthy § 17:12 ...................................................................................................43

McCarthy § 18:52 ...................................................................................................41

McCarthy § 26:53 ...................................................................................................25

**Regulations**

Trademark Manual of Examining Procedure § 1213.08(a)(i) ................................32

Appellate Case: 24-3445    Page: 8    Date Filed: 04/01/2025 Entry ID: 5501789

# JURISDICTIONAL STATEMENT

The district court has original jurisdiction over Drake's Lanham Act claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, and 1338. The district court also has supplemental jurisdiction over Drake's state law claims pursuant to 28 U.S.C. § 1367.

The district court issued a preliminary injunction order on November 22, 2024. DMACC timely filed a notice of appeal on November 27, 2024. The district court issued a second order clarifying the scope of the Injunction Order on December 10, 2024. Drake timely filed a notice of appeal on January 9, 2025.

This Court has jurisdiction to review the Injunction Order and the Clarification Order pursuant to 28 U.S.C. § 1292(a)(1).

1

## STATEMENT OF THE ISSUE:  CROSS APPEAL

Whether the district court abused its discretion when it excluded DMACC's

Bear Paw D (shown below) from the scope of its preliminary injunction.



*H&R Block, Inc. v. Block, Inc.¸*
    58 F.4th 939, (8th Cir. 2023)

*Kennedy Bldg. Assocs. v. CBS Corp.*,
    476 F.3d 530 (8th Cir. 2007)

*LFP IP, LLC v. Hustler Cincinnati, Inc.*,
    810 F.3d 424 (6th Cir. 2016)

2

## STATEMENT OF THE CASE

Since at least 1902, Drake University has consistently used a standalone "D" to signify the university and its services.  R. Doc. 18-1, at 5.  Throughout its history, Drake has consistently rendered its standalone D in a block-style collegiate font, shown below (the "Vintage D"):



App. 003; R. Doc. 87, at 3; Add. 003.  Drake's school colors have always been shades of blue and white.

The record is replete with examples of the Vintage D being used in connection with Drake's educational services, athletics, and ancillary goods, a handful of which are reproduced herein:



|              1903 Drake Yearbook              |          Drake Decal          |        Drake Basketball Shorts        |
| (App. 55; R. Doc. 17 at 8) | (App. 57; R. Doc. 17 at 10) | (App. 25; R. Doc. 17 at 11) |

3

  

Drake Basketball Court          "Double D" Award          Drake's Mascot (Griff)
(App. 58; R. Doc. 17 at 11) (App. 59; R. Doc. 17 at 12) (App. 68; R. Doc. 17 at 21)

 

Drake (the rapper)                      Drake at Drake
(App. 072; R. Doc. 17 at 25)          (App. 72; R. Doc. 17 at 25)

Drake also owns three valid, enforceable, incontestable registrations featuring

standalone Ds—none of which disclaim use of the letter D:

  

"Athletic D"                    "Academic D"                    "Marching Spike"
(App. 66; R. Doc. 17 at 19) (App. 66; R. Doc. 17 at 19)  (App. 65; R. Doc. 17 at 18)

4

In late 2023, DMACC launched a rebrand which included a new standalone D (the "DMACC D") that is shown below:

 

App. 083, 098; R. Doc. 17 at 36, 51.  The rebrand departed from using a burnt orange and adopted a palette of shades of blue and white (the "New DMACC Colors"):

 

App. 083; R. Doc. 17, at 36.

Drake filed suit against alleging the DMACC D and the New DMACC Colors, and variations thereof, infringe Drake's trademarks rights, and sought preliminary injunctive relief, which was granted on November 22, 2024.  App. 001–043; R. Doc. 87; Add. 001–043.  The district court issued a subsequent order "clarifying" the scope of the injunction on December 10, 2024.  App. 044–047; R. Doc. 101; Add. 044–047.

## A.  DMACC's Appeal of the Preliminary Injunction Order

In granting the initial preliminary injunctive, the district court applied the four-factor test set forth in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th

5

Cir. 1981), and concluded that the likelihood of success on the merits, the harm the alleged infringement would cause, the balance of hardships, and the public interest in having DMACC's conduct enjoined justified preliminary injunctive relief. App. 038–043; R. Doc. 87, at 38–43; Add. 038–043. The finding of likelihood of success focused on Drake's Vintage D and was based on the lower court's determination that the record before it demonstrated (1) the mark exists, (2) the suggestive mark holds strength, (3) the DMACC D and New DMACC Colors are "remarkably similar" to it in terms of sight, sound, and commercial impression, (4) the institutions provide essentially identical goods and services, and (5) the institutions are exceedingly close in geographic proximity—DMACC's Urban Campus is located only 1.2 miles down from Drake's campus on University Avenue (named after Drake University).



App. 093; R. Doc. 17, at 46

The district court did not find that the record at this early stage supported finding an intent to infringe, actual confusion, or sophistication of the consumer worked substantially in either party's favor. App. 031–038; R. Doc. 87, at 31–38; Add. 031–038. DMACC only challenges (and addresses) the findings on two factors: (1) the existence of Drake's trademark rights, and (2) the similarity of the parties' marks.

6

**B.    Scope of Drake's Requested Relief**

To account for other unknown or not-expressly-identified infringing marks used by DMACC, Drake defines DMACC's "Infringing Marks" as "[t]he DMACC D and the New DMACC Colors **and variations thereon**." App. 097; R. Doc. 17, at 50 ¶ 215 (emphasis added). Such variations arose in DMACC's resistance to the preliminary injunction, where DMACC disclosed the following two marks:

    

App. 856; R. Doc. 23-2, at 4; *See also* App. 040; R. Doc. 87, at 40; Add. 040. Drake will refer to the mark on the left as the "Campus Recreation" mark and the mark on the right as the "Bear Paw D".

The animal paw superimposed over the Ds in both logos is a nod to DMACC's athletics team name, the Bears. DMACC relied heavily on these marks to claim that they either (1) precluded the existence of Drake's trademark rights because of prior use, or (2) precluded Drake from enforcing its rights due to an unreasonable delay in filing suit. App. 866–869; R. Doc. 23-2, at 14–17, 39–41.

Before these marks appeared in DMACC's resistance, Drake was unaware of their existence. Drake highlighted this on reply, further noting that Drake would have no reason to know of these marks, as DMACC uses them solely in connection

7

with its intramural sports and recreational activities, which by definition involve only those at DMACC.  App. 901–902; R. Doc. 40, at 3–4.

At no time in the preliminary injunction briefing or at the hearing did DMACC argue that the Campus Recreation mark and the Bear Paw D were **not** confusingly similar to Drake's marks.  Nor could they; DMACC's allegations of priority and laches require the conclusion that the marks are confusingly similar to Drake's as priority cannot be claimed if the marks are dissimilar, nor would their use start the clock on Drake's obligations to enjoin them.  *See, e.g., RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F.Supp. 2d 679, 710 (S.D. Tex. 2009) (laches begins upon plaintiff's infringing use).

In fact, DMACC alleges in its counterclaim that its rebrand *incorporates the standalone D in both the Campus Recreation mark and the Bear Paw D*.  App. 952–956; R. Doc. 52, at 32–36 ¶¶ 23–30.  By DMACC's own admission, the "D" in the Campus Recreation and Bear Paw D marks are legally similar to the marks giving rise to this dispute.  The record presented to the lower court is devoid of any argument that the marks are **not** confusingly similar.

### C.  Preliminary Injunction Order

In granting Drake's motion for preliminary injunction, the district court focused its analysis on the DMACC D and New DMACC Colors.  *See generally* App. 001–043; R. Doc. 87; Add. 001–043.  The Injunction Order discusses the Bear

8

Paw D only in relation to the irreparable harm analysis under *Dataphase*, where it was found Drake did not unreasonably delay in bringing suit.  App. 040; R. Doc. 87, at 40; Add. 040.  Although the parties did not dispute the similarity of the Bear Paw D to Drake's Vintage D , the district court concluded *sua sponte* that the Bear Paw D was "fundamentally different" from the DMACC D, and that Drake could not have been incurring harm from such a "distinct" mark, and thus any laches clock could not have begun.  App. 040; R. Doc. 87, at 40; Add. 040.  The lower court reached this conclusion without conducting analysis[1] under the trademark infringement factors set forth in *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980).  App. 001–043; R. Doc. 87; Add. 001–043.

The Injunction Order included the Bear Paw D, as it enjoined DMACC from:

> using a block-style 'D' trademark in conjunction with any color combination of white and blue to denote their educational services, athletics, or ancillary goods and services.  This includes the use of such a "D" **even when it is paired with a DMACC house mark or indicia of the college**.

App. 043; R. Doc. 87, at 43; Add. 043 (emphasis added).  The Bear Paw D is a block-style D trademark rendered in blue and white, paired with an indicia of the college

---

[1] Hence the absence of argument in DMACC's brief comparing the marks in terms of sight, sound, and meaning, but instead relies on the lower court's unexplained conclusions.

9

(i.e., a bear paw).  *See* DMACC's Appeal Brief, at 39, n. 8 ("DMACC's mascot is a bear.").



Five days after the Injunction Order was issued, DMACC filed a notice of interlocutory appeal.  App. 986; R. Doc. 90.

**D.  Clarification Order**

Approximately one week after DMACC appealed the Injunction Order, DMACC moved to extend the time for compliance with the Injunction Order, and to "clarify" the scope thereof.  App. 987–991; R. Doc. 97. (the "Clarification Motion"). For the first time, DMACC argued (without analysis) that its Bear Paw D was "fundamentally different" from its new DMACC D and should not be included within the injunction's scope.   App. 998–1000; R. Doc. 97-1, at 7–9.   In contradiction of this argument, DMACC reiterated that Drake's requested relief should be barred due to DMACC's "long-standing uses" of these marks.  *Id*.

DMACC filed its motion in the afternoon on Thursday, December 5, 2024, with Drake's resistance being due 14 days later.  S.D. Iowa Local Rule 7(e).  The next day (Friday) at 3:26 p.m., the district court accelerated this timeline, ordering Drake to resist by noon on Monday.  App. 1003; R. Doc. 98.  Drake timely resisted

and DMACC replied the same day, and the district court issued its order the following day.  App. 044; R. Doc. 101; Add. 044.  No hearing was held.

The Clarification Order granted DMACC's motion in part, holding that, despite falling within the plain meaning of the Injunction Order, the Bear Paw D is in fact excluded from its scope.  App. 046; R. Doc. 101, at 3; Add. 046.  The court cited three bases for this: (1) the Bear Paw D was not explicitly referenced in Drake's complaint or its motion for preliminary injunction, (2) the court did not conduct a *SquirtCo.* analysis on the Bear Paw D, and (3) the Bear Paw D is "visually distinct and fundamentally different" from Drake's mark.  App. 046; R. Doc. 101, at 3; Add. 046.  For the reasons that follow, these findings are incurably contradictory and an abuse of discretion in view of the applicable legal tests.

11

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in enjoining DMACC's use of a standalone D in a blue/white color scheme in connection with educational services. With regard to DMACC's marks adopted as part of its 2023 rebrand, the district court engaged in a thorough and rational weighing of all the proper factors set forth in the relevant balancing tests under *Dataphase* and *SquirtCo*. DMACC does not appeal all the factors that the lower court found weighed in Drake's favor. Instead, DMACC only challenges the existence of Drake's trademark rights and the similarity of DMACC's infringing marks. The lower court's determination that Drake possesses enforceable trademark rights in a standalone D is supported by ample evidence in the record, which is more than sufficient to meet the evidentiary burden at the preliminary injunction stage. Moreover, the lower court did not abuse its discretion in finding that the virtual identity of DMACC's marks to Drake's and the exceptionally close proximity of the institutions that a likelihood of confusion existed—particularly in terms of consumers mistakenly believing the schools are affiliated. DMACC's grievances relating to third party rights are also irrelevant, as the present conflict is between Drake and DMACC—not Drake and the world.

However, in its subsequent Clarification Order, the district court abused its discretion in summarily concluding one of DMACC's pre-rebrand trademarks did not infringe Drake's rights and exempted it from the Injunction Order. That mark,

12

the "Bear Paw D," falls squarely within the scope of the Injunction Order, yet was carved from the Clarification Order. This determination was made without analysis under any relevant legal test, and even if such analyses had been undertaken, the lower court's conclusion lacks a rational basis, as it reached the opposite conclusion on a functionally identical trademark, which DMACC admits was incorporated into its enjoined marks. Together, this represents a clear error in judgment and an abuse of discretion. Drake seeks reversal of the Clarification Order's exemption of the Bear Paw D from the Injunction Order.

13

## ARGUMENT

## I.   STANDARD OF REVIEW

Drake's cross-appeal challenges the findings in the district court's Order on Motion for Extension and Clarification (the "Clarification Order") (App. 044–047; R. Doc. 101; Add. 044–047), which "clarified" the scope of the district court's prior Order on Motion for Preliminary Injunction (the "Injunction Order") (App. 001–043; R. Doc. 87; Add. 001–043).   In substance, Drake is thus appealing the Injunction Order as clarified.

A district court's ultimate ruling on a preliminary injunction motion is reviewed by this Court for abuse of discretion.   *H&R Block, Inc. v. Block, Inc.*¸ 58 F.4th 939, 946 (8th Cir. 2023).   In a trademark infringement case, an abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing them, commits a clear error of judgment.   *Id.* (citing *Novus Franchising, Inc. v. Dawson*¸725 F.3d 885, 893 (8th Cir. 2013).

Factual findings are reviewed for clear error.   *Id.* (citing *Brakebill v. Jaeger*, 932 F.3d 671, 676 (8th Cir. 2019)).   The district court's ultimate determination on likelihood of confusion is a finding of fact, as is the court's determination on each individual factor comprising the infringement analysis.   *Id.* at 947, 949–50.

14

"[G]iven the haste that is often necessary…, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary injunction hearing."  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  The Eighth Circuit recognizes this principle, giving substantial deference to the district court's evaluation of the balance of equities, which is the fundamental issue when presented with a motion for preliminary injunctive relief.  *See Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660, 665 (8th Cir. 1981) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)).  In performing its limited review of the district court's determination, this Court views the evidence in a light most favorable to the prevailing party.  *Medtronic*, 664 F.2d at 665.

To the extent any exist in the district court's order(s), legal conclusions are reviewed *de novo*.  *H&R Block,* 58 F.4th. at 946.

## II.   DMACC APPEAL

### A.   Drake Does Not Carry a "Heavier Burden" in Seeking Injunctive Relief

DMACC cites *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939 (8th Cir. 2023) for the premise that a Drake carries a "heavier burden" to obtain preliminary injunctive relief.  Appellant's Brief, at 28.  This is not so.  *H&R Block*'s "heavier burden" language derives from *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*,

15

82. 815 F.2d 500, 503 (8th Cir. 1987) which cites 2 McCarthy on Trademarks & Unfair Competition § 4 (currently 4 McCarthy on Trademarks & Unfair Competition § 30:30 (5th ed.)). The "heavier burden," as articulated by McCarthy, is relegated to special circumstances where a preliminary injunction effectively acts as a permanent injunction. This is best illustrated by way of example.

In *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, the district court preliminarily enjoined the defendant from using the mark REAL WHEELS. 101 F.3d 259, 260–62 (2d Cir. 1996). At that time, the defendant had an intent-to-use ("ITU") application pending to federally register the trademark REAL WHEELS. On appeal, the Second Circuit vacated in part, because enjoining the defendant from all use of REAL WHEELS would prevent the requisite use to obtain registration; this would effectively—and *permanently*—terminate defendant's rights as the holder of its ITU application. *Id*. at 262.

Here, no such concerns exist, nor is one articulated by DMACC. In the trademark context, virtually all preliminary injunction motions seek to enjoin the defendant from using a trademark. *See* Lanham Act, 15 U.S.C. § 1116(a) (providing for injunctive relief for infringement). This is, temporarily, the same relief a plaintiff hopes to obtain permanently at trial. DMACC's implication is that trademark plaintiffs carry a heavier burden than usual for a preliminary injunction. This is not the standard. It is also unclear how this elevated standard would impact the

16

application of the balancing tests under *SquirtCo.*, 628 F.2d at 1091 (trademark infringement) and *Dataphase Sys.*, 640 F.2d 109 (preliminary injunctive relief).

DMACC's proffered heightened legal standard does not apply here. Drake's burden, while heavy, is no greater than a typical trademark owner seeking preliminary injunctive relief from infringement.

### B.  Drake Established Common Law Rights in its Vintage D

DMACC argues that Drake did not establish common law rights in its Vintage D because Drake's evidence does not evidence current, continuous, non-sporadic use. Appellant's Brief, at 2. In support of this contention, DMACC cites a jumble of third-party rights, photos on which the Court did not rely, and abandonment. None of these contentions are tenable.

### 1.  Third Party Rights Do Not Erode the Strength of Drake's Mark

Third-party trademark registrations are not evidence of the strength or weakness of Drake's marks. 1 McCarthy on Trademarks & Unfair Competition (hereinafter "McCarthy") § 11:89. (5th ed.). Trademark registrations are also not effective against common law trademarks that were in use before the registration date. McCarthy § 26:53 ("Federal registration does not erase senior non-registered rights.").

#### *a)  Dartmouth*

DMACC makes the following statement in its brief: "Dartmouth—not Drake–

17

–owns the federal registration for the standalone, block-style D that Drake is claiming as its own Vintage D." Appellant's Brief, at 29, n. 7. This reference to Dartmouth as a basis to dispute Drake's trademark rights lacks any merit for several reasons.

First, DMACC's statement implies to the Court that only one federal registration is available per mark. This is false; many marks are the subject of multiple federal registrations. For example, the United States Patent and Trademark Office has granted at least 28 trademark registrations for the mark MOXIE to at least 22 different owners.

Second, DMACC's statement suggests that a trademark registration trumps all other rights by any other user. This is also false. *See* McCarthy § 26:53 ("Federal registration does not erase senior non-registered rights."). The Dartmouth registration DMACC cites registered on October 12, 2004. (App. 530; R. Doc. 23-18, at 2). Drake's use of its Vintage "D" began in Des Moines in 1902—over a century earlier—thus achieving priority. (App. 053; R. Doc. 17, ¶ 19).

Third, Dartmouth's mark is only registered for use with clothing. App. 898; R. Doc. 23-18 at 2. It is thus ancillary at best, as this dispute and the preliminary injunction arise from DMACC's use of a standalone D in conjunction with post-secondary educational and athletic services.

Fourth, DMACC's own assertion of rights in the DMACC D demonstrates

18

that this position lacks credibility.  If the legal standard is as DMACC articulates, DMACC would lack any trademark rights in the DMACC D.  Yet DMACC makes no such argument.

The Dartmouth registration is thus irrelevant to any issue herein, which the district court recognized.  App. 023; R. Doc. 87, at 23; Add. 023.

### b)  *Other Educational Institutions*

DMACC cites to an exhibit it submitted in the district court consisting of 34 trademarks registered by entities incorporating a standalone D.  (App. 393–397; R. Doc. 23-11).  While the exhibit is not expressly discussed in its appeal brief, the implication is the presence of these registrations allegedly undercuts any trademark rights in a "D" which Drake could claim.  This contention also fails for multiple reasons.

First, other than Dordt University, no school on the list is located within a 593-mile radius of Drake and none are in states neighboring Iowa.  *Id*; *see also* App. 023; R. Doc. 87, at 23; Add. 023 (finding the third-party marks referenced by DMACC are "not located anywhere near Drake University.").  Dartmouth is located in Hanover, New Hampshire, which is 1,093 miles from Drake—nearly a thousand times further than DMACC.  App. 030; R. Doc. 87, at 30; Add. 030 (noting DMACC Urban Campus is less than two miles from Drake's campus).  Second, a review of Dordt's registration certificate shows that it registered in 2012—more than a century

19

after Drake began use of the Vintage D—and thus, like Dartmouth, is ineffective against Drake.  App. 908; R. Doc. 40-7.  Third, the logo shown in the Dordt registration is visually distinct from the Vintage Drake "D," and more importantly is not even in use; Dordt completely rebranded over five years ago to a stylized "DU" featuring a cross.  App. 909–911; R. Doc. 40-8.  Fourth, like the Dartmouth registration, Dordt's logo is only registered for clothing—not education.  App. 908; R. Doc. 40-7.  In fact, of the 34 marks cited, less than a third are registered in connection with educational services.

### c)  *Jus Tertii and Crowded Field*

To the extent DMACC raises a *jus tertii* defense (asserting third party rights), the Federal courts[2] and the Trademark Office have foreclosed its use. "The fact that the third persons might possess some rights in their respective marks which they could possibly assert against [plaintiff] in a proper proceeding can avail [defendant] nothing herein. . . **the conflict here is between [plaintiff] and [defendant], not [plaintiff] and the world.**"  *Krug Vins Fins de Champagne v. Rutman Wine Co.*, 197 U.S.P.Q. 572, 1977 WL 22662, at *3 (TTAB 1977) (emphasis added).

---

[2] *See, e.g., General Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647 (S.D. N.Y. 1997) (*jus tertii* cannot be a defense)*; Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009) (same); *Innovation Ventures, LLC v. NVE, Inc*., 2016 WL 266396 (E.D. Mich. 2016) (same); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, (W.D. Wis. 2003) (same).

20

DMACC's suggestion that a "crowded field" precludes enforcement is similarly untenable. *See* Appellant's Brief, at 7. Schools in geographic proximity have often been enjoined[3] from the use of similar marks, which the First Circuit notes is based on the "policy of preserving individual identities, which must be particularly important in the case of educational institutions serving the public." *Pres. & Trs. Of Colby College v. Colby College-N.H.*, 508 F.2d 804, 812 (1st Cir. 1975) (enjoining Colby College-New Hampshire from infringing Colby College in Maine).

The location of the crowded field is also highly relevant. For an example of when a crowded field argument *would* work, a case from the Eleventh Circuit is instructive. In *Fl. Int'l Univ. Bd. of Trustees v. Fl. Nat'l Univ., Inc.*, the court found that the plaintiff's mark, FLORIDA INTERNATIONAL UNIVERSITY, was weak because the plaintiff operated in close proximity to **twelve** other higher education institutions in the state of Florida which used both FLORIDA and UNIVERSITY in their names. 830 F.3d 1242, 1258 (11th Cir. 2016). The court reasoned that with such density, the terms were not capable of carrying sufficient distinction to give

---

[3] *See also, e.g.*, *Cal. W. Sch. Law v. Cal. W. Univ.*, 125 Cal. App. 3d 1002 (Ct. App. 1981) (California Western University enjoined due to California Western School of Law); *Bd. Regents Univ. of Houston Sys. v. Houston Coll. Law, Inc.*, 215 F.Supp.35 573 (S.D. Tex., 2016) (Houston College of Law enjoined due to University of Houston Law Center).

21

rise to trademark rights in that area.  *Id.*  As noted *supra*, DMACC cites no entities (other than itself) presently using a standalone D in connection with post-secondary educational services within nearly 600 miles of Drake.  DMACC has not established, nor can it, that a crowded field exists within the geographic area in which Drake is seeking to enforce its rights in a standalone D.

The lower court did not abuse its discretion is finding that the "third-party uses do not erode the strength of Drake's mark to the extent that DMACC contends." App. 025; R. Doc. 87, at 25; Add. 025.

### 2.   Drake's Use is Current, Continuous, and Non-sporadic

DMACC alleges that Drake's evidence fails to establish "current, continuous, non-sporadic" use of a Vintage D.  This is incorrect.

Drake's burden at this stage is not to conclusively prevail on the merits, but rather demonstrate that it is *likely* to.  Drake alleges in its Preliminary Injunction Brief that "[s]ince at least 1902, Drake has consistently used a standalone "D" to signify the university and denote the source of its educational services, athletics, and ancillary goods and services."  App. 751; R. Doc. 18-1, at 5.  Drake elaborates on this, noting that it has used its Vintage D since at least 1906, citing to examples.  *Id.* Drake's brief continues by alleging that Drake still uses the Vintage D today, citing to examples.  *Id.*  DMACC discounts all of these, arguing as if Drake must account for each use of the Vintage D every day since its adoption if Drake is to establish

22

that it uses the mark at all.  This is impractical and unnecessary, as Drake's burden

at this early stage is merely that it is likely to make these showings at trial

### a) *DMACC Distorts the Applicable Legal Standards*

It is well-established that a party seeking preliminary injunctive relief need

not meet the same evidentiary burden as that required for a final judgment.  *See Univ.*

*of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The Eighth Circuit adheres to this

principle giving substantial deference to the lower court's balance of equities which

is the fundamental issue when presented with a motion for preliminary injunctive

relief.  *See Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660, 665 (8th Cir.

1981) (citing *Dataphase*, 640 F.2d at 109).

The Supreme Court has said that in applying the clearly erroneous standard to

the findings of a district court sitting without a jury (as here), "appellate courts must

constantly have in mind that their function is not to decide factual issues de novo,"

and that its authority is "circumscribed by the deference it must give to decisions of

the trier of fact, who is usually in a superior position to appraise and weigh the

evidence."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123

(1969).

### b) *Drake's Marching Spike*

The Vintage D has been continuously in use since 1974 in connection with

Drake's "Marching Spike" trademark registration, seen below.  DMACC does not

dispute that Marching Spike is a current, valid, enforceable, incontestable, registered trademark, which carries with it the endorsement of the United States Patent and Trademark Office.  *See* Appellant's Brief, at 8 (*see also* App. 203; R. Doc. 1-32):



(U.S. Trademark Reg. No. 1,567,283)

DMACC also does not dispute that the Vintage "D" on Marching Spike's chest is **not** disclaimed.  (App. 203; R. Doc. 1-32).  This is significant for purposes of determining the existence or scope of rights, because if a portion of a registered mark *is* disclaimed, the legal effect is that the registrant makes no claim to the exclusive right to use the disclaimed portion.  *See* Trademark Manual of Examining Procedure ("TMEP") § 1213.08(a)(i) (setting forth standardized disclaimer format as "No claim is made to the exclusive right to use _____ apart  from  the  mark  as shown.").  Drake thus has some degree of registered trademark rights in the Vintage D by virtue of its non-disclaimed inclusion in the Marching Spike registration.  *See S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 666 (7th Cir. 2016)

24

(observing that registration of a trademark establishes a rebuttable presumption of use as of the filing date).

### c) Drake's Photographic Evidence

Drake submitted a bevy of photographs and other materials to the lower court showing its use of a standalone, block-style D in connection with its post-secondary educational services, athletics, and ancillary goods and services.  App. 53–77; R. Doc. 17, at 6–30; *see also* App. 184–243; R. Doc. 17; *see also* App. 649–673; R. Doc. 17.  DMACC objects to some of these materials as unreliable on the grounds they do not provide a precise date.  DMACC also attempts to draw a distinction between (1) use of a D by itself, and (2) use of the D in connection with Drake's live mascot, a bulldog.  It attacks the former on reliability grounds vis-à-vis undated photographs, and alleges the latter is insufficient because it does not feature a D in isolation.

From the outset, DMACC argues as if it is appealing a *final* judgment, not a preliminary one.  Indeed, all four cases it cites in support of its "undated photos" argument involve summary judgment orders, not preliminary injunctions, and none are from controlling jurisdictions.  Appellant's Brief, at 32–33.[4]

---

[4] *See Vida Enter. Corp. v. Angelina Swan Collection, Inc*., 2023 WL 2895702 (C.D. Cal. 2023) (order granting summary judgment); *A&L Indus., LLC v. Weaver Enters., Ltd.*, 2021 WL 3856745 (W.D. Wis. 2021) (order granting summary judgment); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*, 188

25

DMACC takes issue with the four photographs at paragraph 24 of Drake's Amended Complaint. (App. 057; R. Doc. 17, at ¶ 24). While these photographs do not carry precise dates, they are all given as examples of Drake's use of the Vintage D which has "continue[d] to the present day," which self-evidently indicate current use. *Id.*

Regardless, the lower court "recognize[d] the issue with Drake's reliance on the sale of merchandise through undated photographs" but found that "even if those uses are not considered, Drake has adequately established that it uses the mark in commerce." App. 018; R. Doc. 87, at 18; Add. 018. This lack of reliance explains why the district court did not ask Drake to provide the dates of the photographs depicting the t-shirts despite counsel for Drake offering to so provide at the preliminary injunction hearing. (App. 624; R. Doc. 110 76:1–10).

DMACC itself acknowledges the lower court's limited reliance on the undated photos. *See* Appellant's Brief, at 33 ("Indeed, the district court specifically excluded from consideration Drake's undated photos of merchandise with a standalone Vintage D"). The lower court's finding was instead based on the fulsome record presented to it, which included a variety of uses.

---

F.Supp.3d 22 (D.D.C.) (order on summary judgment after bench trial); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998) (appeal of summary judgment order).

### (1)    Historic Uses of Vintage D

DMACC also contests Drake's historic photographs, seen in Drake's Amended Complaint at ¶¶ 20–23.[5] (App. 055–56; R. Doc. 17, at 8–9). With the exception of Exhibit 10 (¶ 22), all photographs are dated with either a specific year (¶20) or an approximation (¶21 ["since 1906"]; ¶ 23 ["circa 1960, 1970, 1980"]). Drake of course did not cite these examples to show *current* use; they are merely to illustrate the longevity of Drake's use of a standalone D in connection with its university. DMACC derides these photographs are nothing more than evidence of abandonment, which would perhaps be true if only Drake did not also present numerous examples of current use.

### (2)    National D Club

The National D Club ("D Club") is an alumni organization of Drake University. The D Club uses the Vintage D as its logo. (App. 059; R. Doc. 17, at 12 ¶ 31). The D Club is comprised of former Drake athletic letter winners who pay

---

[5] Images and photographs play a central role in this dispute. Drake's Amended Complaint contains nearly 100 images, reproduced in-text and included as Exhibits. For the sake of brevity, many of those images were not reproduced in Drake's Motion for Preliminary Injunction or its briefing in support thereof. Instead, Drake referenced those exhibits using their corresponding docket number in a modified format for clarity (e.g., R. Doc. 1.23–1.25 refers to Complaint Exhibits 23–25). In this brief, for ease of location, Drake often refers to the exhibits as they appear in the Amended Complaint. The Court should not interpret this to mean the images were not referenced in the preliminary injunction record; all were.

27

annual dues to support Drake athletics.  (App. 059; R. Doc. 17, at 12 ¶ 30).  The D Club is currently active, and is organized and overseen by Drake.

Since 1968, The D Club administers the "Double D Award," which is presented to former Drake Athletes for achievements in their professions and community services since earning their degrees from Drake.  (App. 059; R. Doc. 17, at 12 ¶ 32).   The Double D Award is presented as a plaque that includes a pair of block-style letter Ds.  (App. 059; R. Doc. 17, at 12 ¶ 33).  The Double D Award has been presented to 257 former Drake athletic letter winners; its most recent recipient was Louis Carr, who currently serves as President of Media Sales at Black Entertainment Television (BET) Networks.  (App. 059; R. Doc. 17, at 13 ¶ 35).  Mr. Carr was presented with the award during the Drake Relays in 2024.  *Id.*

DMACC disputes none of this.  Instead, DMACC alleges only that the group's logo and a photograph of the award are undated, which is irrelevant given the undisputed facts and evidence in the record that show continuous use for nearly 60 years.   Again, Drake's burden at the preliminary injunction stage is not to conclusively prevail—only that it is likely to.   *Camenisch*, 451 U.S. at 395. Moreover, as this use of the Vintage D is in connection with Drake's collegiate athletics, for which members pay dues (and is presented at the world-famous Drake Relays, for which spectators buy tickets) it demonstrates use of the Vintage D in commerce.  *See* 15 U.S.C. § 1127 ("use in commerce" occurs when a mark "is used

28

or displayed in the sale or advertising of services and the services are rendered in commerce"); *see also* App. 059; R. Doc. 17, at 13 ¶ 35.

### (3)    Michael Admire

Michael Admire is Drake's current Director of Broadcasting. (App. 074; R. Doc. 17, at 27 ¶ 98). Mr. Admire is known as the "Face of Drake Athletics." (App. 074; R. Doc. 17, at 27 ¶ 99). Mr. Admire famously wears sweaters which prominently feature the Vintage D (akin to Marching Spike) while sitting courtside at Drake basketball games in his capacity as play-by-play radio broadcaster, a role he assumed in 2019. (App. 074–75; R. Doc. 17, at 27–28, ¶¶ 100–103).

DMACC does not contest the foregoing. While Drake admits the photos of Mr. Admire are not associated with a specific date, they evidence Mr. Admire's commonplace attire between 2019 (when Mr. Admire undisputedly began working at Drake), and July 2024 (when Drake filed the present action). The photographs are reliable examples of Drake's use of the Vintage D since 2019.

As this prominent use of the Vintage D is used both figuratively and literally in connection with Drake's collegiate athletics, for which the public purchases tickets, such use plainly demonstrates use of the Vintage D in commerce. *See* 15 U.S.C. § 1127 (defining "use in commerce").

29

### (4)    Griff II

DMACC takes issue with undated photographs of Drake's live mascot in a footnote, but these grievances are similarly untenable.

Drake presented approximately 20 photographs of Drake's live mascots. (App. 067–71; R. Doc. 17, at 20–24).  The first two depict Griff I and Griff II, explaining that Drake's current live mascot, Griff II, succeeded Griff I in 2020. (App. 067; R. Doc. 17, at 20 ¶ 71).  Griff I had substantially all-white fur, while Griff II has a prominent brown spot on the left side of his face.  *Id*.  Nearly every photograph that follows depicts Griff II, which necessarily means the photographs were taken between 2020 and when the present suit was filed.  App. 206–227; R. Doc. 17, at 20–24; *see also* R. Doc. 18-1, at 7–8.  DMACC does not dispute this. While Drake admits some of the photos of Griff II are not associated with a specific date, the surrounding circumstances plainly indicate the photos were taken during the four years between when Griff II assumed his duties and the present litigation, thereby exemplifying current use.  This is more than sufficient to show use of the Vintage D in commerce, particularly given the lighter evidentiary burden at the preliminary injunction stage. *See Camenisch*, 451 U.S. at 395.

Additionally, not all photos of Griff are undated.  Exhibit 39 to Drake's Motion for Preliminary Injunction is a photo of Griff II next to the Missouri Valley Conference Championship trophy awarded to the Drake Women's basketball team

30

in 2023.  App. 068; R. Doc. 17, at 21 ¶ 75 (*see also* App. 683; R. Doc. 5-2 ¶ 40).

Exhibit 46 to Drake's Motion for Preliminary Injunction is a photo of Griff II and

Representative Liz Cheney at Drake's Martin Bucksbaum Distinguished Lecture

Series in 2024.  App. 069; R. Doc. 17, at 22 ¶ 78 (*see also* App. 684; R. Doc. 5-2 5-

2 at ¶ 47).

### 3.  Drake's Use of the Vintage D in Connection with its Mascot Gives Rise to Trademark Rights in the D

Even if questions remained about the sufficiency of Drake's evidence of use

of the Vintage D in isolation, DMACC does not dispute that Drake has used the

Vintage D extensively in commerce in connection with its live mascot.  According

to DMACC, however, this does not give rise to *any* rights in a standalone D because

the D is not used in isolation.  (Appellant's Brief, at 36–38).  DMACC fails to cite a

single authority in support of this contention.  *Id*.  This is not surprising, as Drake's

use of the Vintage D on Griff falls squarely within the framework which the Eighth

Circuit uses to evaluate the existence of common law trademark rights, which

DMACC itself reproduces in its brief:

> "[A] common law trademark arises from the **adoption and actual use of a word, phrase, logo, or other device** to identify goods or services with a particular party." [*See First Bank v. First Bank Sys., Inc*., 84 F.3d 1040, 1044 (8th Cir. 1996);] *see also Flavor Corp. of Am. v. Kemin Indus., Inc*., 493 F.2d 275, 284 (8th Cir. 1974) (identifying "the common law concept that **trademark rights are acquired only by actual use of a mark in commerce** in connection the goods") (citation omitted). Use "in commerce" requires "bona fide use of a mark in the ordinary course of trade" for goods "**when it is placed in any manner**

31

**on the goods** or their containers or the displays associated therewith or on the tags or labels affixed thereto ... and the goods are sold or transported in commerce." 15 U.S.C. § 1127. And for services, use "in commerce" occurs "**when [a mark] is used or displayed in the sale or advertising of services** and the services are rendered in commerce." *Id*.

Appellant's Brief, at 29–30. No part of this framework precludes the finding of rights if the mark in question is used with other source indicia, such as a college mascot or a house mark. Moreover, Drake's live mascot does not always wear his letter jacket featuring the Vintage D; he wears other outfits as well, demonstrating that the two are not one in the same. *See, e.g.,* App. 076; R. Doc. 29; *see also* App. 226–227; R. Doc. 1-55, 1-56 (notably App. 226 shows Griff I in Christmas pajamas seated below a framed Vintage D).[6] Furthermore, the Vintage D's presence is not limited to a letterman's jacket, as Griff II is depicted in the record in a zip-up and sweaters emblazoned with the Vintage D. App. 222–227; R. Doc. 1-51–1-56.

The absurdity of DMACC's position that Drake has rights in a standalone D **only** if it is accompanied by a bulldog is perhaps best illustrated by the following graphic, which depicts DMACC's bear head logo[7] in place of the bulldog head on Drake's Marching Spike trademark:

---

[6] The incongruity of DMACC's position is further demonstrated by the fact that it does not fathom to argue that somehow Mr. Admire must be present in the sweaters he wears for those seeing it to know the Ds thereon stand for Drake.

[7] App. 1006; R. Doc. 109-4, at 2

32



It cannot be seriously contended that such a use would not infringe Drake's trademark rights, despite the fact that the foregoing fails to include a bulldog.

### 4. Third-Party Use Does Not Preclude a Finding of Use in Commerce

DMACC cites 15 U.S.C. § 1127 for the proposition that the use of the Vintage D by the National D Club, Michael Admire, and Drake (the rapper) are uses by third parties, and thus do not constitute "use in commerce." Appellant's Brief, at 34. This is false.

First, all of these uses are either by Drake, or arranged by Drake. The D Club is organized and overseen by Drake University. (App. 751; R. Doc. 18-1, at 5). Michael Admire is a Drake employee displaying the mark while working within the scope of his employment. (App. 075; R. Doc. 17-1, at 28 ¶ 103). Drake (the rapper)'s visit to Drake's campus and his donning of a Drake letter jacket for his Des

33

Moines concert was no accident; it was partially the result of Drake University's "Bring Drake to Drake" campaign that made international headlines.  App. 744–746; R. Doc. 8-5; *see also* App. 068; R. Doc. 5-5, at ¶ 9  The actual jacket Drake the rapper wore onstage was commissioned by Drake's University Communications and Marketing department in collaboration with Wells Fargo Arena, where the concert took place.  App. 697; R. Doc. 5-5, at ¶¶ 4-5.  All of these usages are attributable to Drake University.

Second, even if they were true third-party uses, 15 U.S.C. § 1127 contains no language requiring use of a mark to be by the mark's owner to constitute use in commerce.  This is not surprising as trademarks are frequently licensed by their owners for use by third parties.  *See* McCarthy § 18:52 (a licensee's use inures to the benefit of the licensor).  Indeed, Drake University's Instagram following doubled in the two days following Drake (the rapper)'s visit to campus and the publicity Drake University received as a result thereof.  App. 697; R. Doc. 5-5 ¶ 7.  Moreover, in the immediate aftermath of Drake (the rapper)'s social media post—which featured him in the Drake University letter jacket atop Drake University's monument signage— visits to Drake's undergraduate programs webpage tripled, traffic to Drake University's campus visit webpage doubled, and visitors to Drake University's undergraduate applications webpage more than doubled.  App. 697; R. Doc. 5-5 ¶ 8;

34

*see also* App. 072; R. Doc. 17, at 25 ¶¶ 85–86).  Thus, while the Vintage D adorned the rapper, its use inured to the benefit of the university.

### 5.  Drake Has Not Abandoned the Vintage D

DMACC notes, correctly, that a trademark is abandoned if two conditions are met, namely (1) its use has been discontinued for three years and (2) the user has an intent not to resume use.  Appellant's Brief, at 30.  DMACC fails to establish either prong.

Use of the Vintage D has not been discontinued.  The National D Club is presently in existence and has awarded the Double D Award hundreds of times since 1968.  (App. 134–135; R. Doc. 1, at 11–12).  Michael Admire wears the Vintage D regularly in his role as courtside play-by-play broadcaster for Drake basketball games.  (App. 075; R. Doc. 17, at 28 ¶ 103).  The Vintage D is frequently found on Griff's clothing, and is permanently plastered on the side of Griff II's official vehicle, the Griffmobile.  (App. 076; R. Doc. 17, at 29 ¶ 109).  Even if DMACC could establish that some of these ongoing, present uses were insufficient to demonstrate that Drake uses Vintage D in commerce, they most certainly indicate that Drake *intends* to use it, thus precluding a finding of abandonment, particularly at the preliminary injunction stage.

Moreover, it is DMACC's burden to prove that Drake has abandoned the Vintage D for non-use, and the majority of courts hold that evidence of abandonment

must be clear and convincing.  *See* McCarthy, *supra*, § 17:12.  To meet this high

threshold, DMACC attempts to infer abandonment from (1) Drake's 2005 brand

refresh in which Drake adopted two additional standalone Ds, and (2) the fact that

the Vintage D appears only once in Drake's 2020 Brand Standards and Style Guide.

Appellant's Brief, at 10–12.  This is far from clear and convincing.

For the first contention, the foregoing plainly demonstrates that Drake's use

of the Vintage D continues even after the 2005 rebrand occurred.  For the latter, the

Brand Standards and Style Guide is an internal guide for use by Drake's various

departments.  *See* App. 359; R. Doc. 23-7, at 4 (noting the contents are "guidelines"

to assist with speaking with a "unified voice" to protect Drakes "assets").  This is

why the Brand and Style Guide speaks to other Drake trademarks and the additional

steps necessary for their use.  *See* App. 372; R. Doc. 23-7, at 17.

Moreover, the use of Griff (let alone the Vintage D) is not prohibited.  Rather,

the page dedicated to Griff shows Griff I in the letterman's jacket with the Vintage

D and states "[e]veryone loves" Griff and he that "draws instant attention, both in

person and in marketing."  App. 385; R. Doc. 23-7, at 28.  Accordingly, the

guidelines implore to "[r]esist the urge" to use Griff "on everything everywhere"

and instead limit his use to informal communications.  App. 385; R. Doc. 23-7, at

28.  This is a far cry from the outright prohibition DMACC presents to this Court.

It also illustrates that Griff, by himself, resembles every other bulldog—until he dons the Vintage D and becomes Drake's mascot.

### 6.    The District Court Did Not Commit Clear Error in Finding that Drake Has Trademark Rights in a Standalone Block-Style D

To find that Drake satisfied the requisite use in commerce, the district court relied on (1) Drake's "National D Club," (2) Drake's Director of Broadcasting, Michael Admire, who wears sweaters prominently featuring the Vintage D while sitting courtside at Drake basketball games in his capacity as play-by-play radio broadcaster, (3) Drake's numerous materials depicting its live mascot, Griff, in service on behalf of Drake wearing his primary uniform which consists of a Drake letter jacket (and other attire) prominently displaying the Vintage D, and (4) Drake (the rapper)'s 2016 concert in Des Moines during which he wore a custom-made Drake University letter jacket (arranged by Drake's communications department) and posed for a photo atop Drake University's monument signage, which was subsequently posted on social media and garnered significant recognition for Drake University.  App. 19–20; R. Doc. 87, at 19–20; Add. 19–20.

DMACC cites a single case to support its contention that the aforementioned examples do not constitute use in commerce. The case— *Davis v. Walt Disney Co*., 393 F.Supp.2d 839 (D. Minn. 2005)—is wholly inapposite.  As an initial matter, like

DMACC's other authorities, *Davis* involves the evidentiary burden at summary judgment, not a preliminary injunction. *Davis,* 393 F.Supp.2d at 841.

Second, the case only speaks to the use required to establish secondary meaning—**not** use in commerce. The case involved a plaintiff who was the owner of a federal trademark registration for the mark EARTH PROTECTOR in connection with printed materials (i.e. booklets and magazines) and clothing. *Id.* at 842. The defendant, Walt Disney Co., made a television movie about a suburban family of superheroes who uncover, and thwart, a plot by a diabolical president of an environmental software company called "Earth Protectors." *Id.* at 841. The show aired for the first time in 2000. *Id.* Plaintiff sued Disney for trademark infringement in approximately 2004. *Id.*

The district court noted that Plaintiff's registration for EARTH PROTECTOR only extended to printed materials and clothing, not entertainment services, and thus the Plaintiff would have to rely on common law rights in the mark to bring an actionable claim of infringement. *Id.* at 842. To support this, plaintiff cited a series of television shows she allegedly produced that had been broadcast on local cable. *Id.* at 844. However, she had no "actual evidence" her shows aired after 1991—nine years before Defendant's movie was first broadcast. *Id.* at 842. The plaintiff further admitted to using the mark only sporadically during the 10–15 year period which preceded the lawsuit. *Id.* at 844. In granting Disney's motion for summary

38

judgment, the district court **did not find that plaintiff failed to use the mark in commerce**; rather, the court only found the evidence insufficient to demonstrate that the mark had acquired secondary meaning. *Id.* at 844.

In other words, *Davis* only stands for the notion that that plaintiff's degree of usage will preclude a finding of secondary meaning—not use in commerce. The district court found that Drake's Vintage D is inherently distinctive and thus does not require secondary meaning to be enforceable, yet found the record supported a finding of secondary meaning nonetheless. App. 015; R. Doc. 87, at 15; Add. 015 (finding Vintage D suggestive[8]); *see also* App. 015, 017, 038; R. Doc. 87, at 15, 17, 38; Add. 015, 017, 038 (finding Drake has established secondary meaning). DMACC does not challenge this on appeal, and even if it did, Drake's evidence of usage surely exceeds the threshold in *Davis*. If anything, *Davis* favors Drake's position, not DMACC's.

### 7. The District Court Compared the Entireties of the Parties' Marks

Though outside the scope of its first issue presented, DMACC alleges that the district court committed legal error by "comparing the Vintage D alone to the

---

[8] Drake asserts that the Vintage D is arbitrary, not suggestive, as a standalone D in no way alludes to or suggests a connection educational services. As both arbitrary and suggestive marks are inherently distinctive, for the limited purposes of this appeal Drake does not challenge the district court's suggestive label.

39

DMACC Rebrand Logo." Appellant's Brief, at 38–39. This assertion is fatally flawed in at least two respects.

First, comparing an asserted mark to an infringing mark (i.e., considering similarity of the marks) is one of the six likelihood of confusion factors that courts in the Eighth Circuit apply under *SquirtCo.*, 628 F.2d at 1091. A district court's determination of (1) each individual factor, and (2) the ultimate outcome of all factors are factual findings that are reviewed for clear error, not legal conclusions that are reviewed *de novo*. *See, e.g., H&R Block,* 58 F.4th at 947–949 (evaluating the district court's analysis of each *SquirtCo.* factor for clear error); *see also id.* at 947 ("The district court's determination on likelihood of confusion is a finding of fact that we review for clear error."). Thus, the district court here could not have arrived at an erroneous legal finding because the similarity determination is a factual one.

Second, DMACC argues as if the district court looked *only* at the Vintage D in a vacuum. This is not true. In finding that the similarity factor favored Drake, the district court also cited the parties' "nearly identical colors," (i.e. they look the same), the fact that they are the same letter (i.e. the sound the same) as well as the fact that both marks denote higher educational services, (i.e. they have the same meanings). App. 027–28; R. Doc. 87, at 27–28; Add. 027–28. The district court also considered visual differences in the marks, including outlining and shadows

40

using variations of DMACC's new colors.  App. 028; R. Doc. 87, at 28; Add. 028.
These are precisely the sort of observations which should be made in evaluating the
similarity factor.  *See, e.g., Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th
Cir. 1999) (evaluating the marks' sight, sound, and meaning).  The district court thus
utilized the correct test, applied it to the correct facts, and arrived at a rational
conclusion.  This is not "clear error."

Moreover, in reaching its ultimate conclusion on likelihood of confusion, the
district court *did* look to the overall impressions created by the marks, and did not
merely compare individual features.  It cited "several key factors" to support its
conclusion, including (1) the "incredibly close proximity" of the schools, (2) the
"remarkable similarity of the marks including their colors," and (3) the "identical
nature of the services provided by the parties."  App. 038–39; R. Doc. 87, at 38–39;
Add. 038–39.  As noted *supra*, the district court further found Drake's mark was
inherently distinctive and thus does not require a showing of secondary meaning, but
found that Drake had done so nonetheless.  DMACC does not challenge any of these
findings on appeal.  *See Medtronic, Inc.*, 664 F.2d at 665 (substantial deference given
to district court's ability to weigh balance of the equities).

As each consideration falls squarely into a relevant likelihood of confusion
factor and each factor was thoroughly analyzed, no clear error was committed in
evaluating the similarity factor, and the district court did not abuse its discretion in

reaching its ultimate decision. *See id.* at 665 ("[T]his court need not evaluate the movant's likelihood of success in precisely the same way in order to uphold the preliminary injunction.").

### C. The Injunction is Not Overbroad

#### 1. The District Court Did Not Abuse its Discretion by Enjoining a Single Pre-2023 Standalone D Use by DMACC

DMACC alleges the district court abused its discretion by enjoining DMACC's use of standalone Ds adopted before its 2023 rebrand, claiming such action "bears no relationship" to the lawsuit. Appellant's Brief, at 40–41. This is not quite the injustice DMACC claims, however; DMACC fails to mention that the scope of enjoined pre-2023 marks is limited to a single D on a basketball court in Boone, Iowa, which has not yet been removed:



App. 994; R. Doc. 97-1, at 3.

42

Drake was unaware of this basketball court when it filed its complaint and motion for preliminary injunction.  DMACC failed to mention it in its preliminary injunction resistance,[9] or at the preliminary injunction hearing.[10]

In fact, DMACC directly and through counsel repeatedly represented that it only used a standalone D with "DMACC" underneath or in the immediate vicinity, never alone.  App. 1007–1010.[11]  Drake and the lower court, therefore, were led to believe that Drake's complaint and request for preliminary relief were directed at all of DMACC's uses of a standalone D.

 DMACC disclosed the Boone basketball court for the first time in its motion to extend the deadline to comply with the preliminary injunction order and clarify its scope (the "Clarification Motion").  App. 994; R. Doc. 97-1, at 3.  In its Clarification Motion, DMACC cited this basketball court as a basis to obtain more time to comply with the preliminary injunction order, despite concealing it until then.  *Id.*  While the district court ultimately granted the Clarification Motion in part, it admonished DMACC for withholding evidence of this court for so long, which it

---

[9] App. 846–895; R. Doc. 23-2

[10] App. 549–634; R. Doc. 110 (preliminary injunction hearing transcript).

[11] App. 1007–1010 is an excerpt from a slide deck which Drake presented at the hearing on the preliminary injunction motion before the district court on October 15, 2024.  As such, these pages are not electronically available in the lower court record.

43

called a "conspicuous fact that goes to the heart of the litigation." App. 046–47; R. Doc. 101, at 3–4; Add. 046–47.

Simply put, Drake did not know about this basketball court, and DMACC concealed its existence until after the district court had already handed down the preliminary injunction order. It is a curious position for DMACC to take that its failure to disclose this mark should shield it from the effects of the Injunction Order.

DMACC also cites *Zhou v. Int'l Bus. Machs. Corp.*, 167 F. Supp.3d 1008 (N.D. Iowa 2016) for the general proposition that a preliminary injunction must bear some relationship to the claims and events in the complaint. Appellant's Brief, at 40–41. Drake does not dispute this, but the circumstances of *Zhou* are plainly distinguishable from the present case.

In *Zhou*, the plaintiff, an individual, filed suit against his employer and IBM for age discrimination. *Id.*, at 1009. The complaint did not request injunctive relief. *Id*. Plaintiff did not file his preliminary injunction motion until seven months later when his employment was terminated, which he claimed was retaliation by the defendants to his lawsuit. *Id.*, at 1010. In the motion, plaintiff sought money damages and order directing IBM to hire him as a direct employee. *Id.* The district court denied the motion, finding that plaintiff was seeking injunctive relief on both (a) facts outside the scope of the complaint, **and** (b) a legal theory (retaliation) which was not raised in the complaint. *Id.* at 1011–1012.

44

This is not what happened here.  Drake's complaint was in no way limited to specific stylizations of a standalone D or to a specific timeframe.  Drake's complaint seeks relief arising from DMACC's "Infringing Marks," which Drake defines as "[t]he DMACC 'D' and the New DMACC Colors **and variations thereon**."  App. 097; R. Doc. 17, at 50 ¶ 215.

Admittedly, the complaint did not expressly reference DMACC's uses of a standalone D prior to its 2023 rebrand, but this is because Drake did not know about them.  Drake learned about one of these pre-2023 uses for the first time in DMACC's preliminary injunction resistance, shown below (the "Campus Recreation" mark):



App. 857; R. Doc. 23-2, at 5; *see also* Appellant's Brief, at 4.

Importantly, DMACC did not bring the Campus Recreation mark to light in order to seek its exclusion from the scope of Drake's motion for preliminary injunction, as it does now.  In stark contrast, DMACC's purpose in raising the Campus Recreation mark at that stage was to argue that Drake should not be entitled to injunctive relief because it had waited too long to act against DMACC's Campus Recreation mark, which should bar Drake's requested relief on estoppel or laches grounds. App. 892; R. Doc. 23-2, at 40 n. 13.  DMACC made similar allegations

45

regarding the Boone basketball court in its Clarification Motion.  App. 994–995, 998–1000; R. Doc. 97-1, at 3–4, 7–9.

By raising its Campus Recreation mark and its Boone basketball court willingly as a basis to deny Drake its requested relief, DMACC demonstrates that it knew those marks fell within the scope of relief Drake was seeking, despite not being expressly referenced in the complaint.  Moreover, by arguing that the Campus Registration mark should have barred the present suit on laches grounds,[12] DMACC necessarily acknowledges that the mark infringes Drake's marks—otherwise it could not have triggered Drake's obligation to act.  *See, e.g., RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F.Supp. 2d 679, 710 (S.D. Tex. 2009) (laches begins when plaintiff obtains knowledge of defendant's infringing use).

In any event, DMACC's pre-2023 use of a standalone D fits squarely within the primary legal theory of Drake's complaint, i.e., trademark infringement involving DMACC's use of a standalone D.  It cannot seriously be contended that a district court must decline to enjoin prior uses of an infringing trademark which the moving party had no reason to know about, and which the enjoined party concealed until after the order had issued.[13]

---

[12] App. 892; R. Doc. 23-2, at 40 n. 13

[13] DMACC's reliance on *Devose v. Herrington* fails for the same reasons as *Zhou*, namely, the prison inmate plaintiff sought preliminary injunctive relief related to

46

## 2. The District Court Did Not Abuse its Discretion by Enjoining DMACC from Using a Standalone D in Conjunction with "DMACC"

DMACC essentially takes another swing at the district court's evaluation of the similarity factor under *SquirtCo.*, alleging that its DMACC "house mark" should have been given more weight in the analysis. Appellant's Brief, at 42–46. In so doing, DMACC makes several incorrect assertions.

First, DMACC argues as if the injunction prohibits its use of "DMACC." *See* Appellant's Brief, at 42 (noting, irrelevantly, that DMACC is a registered trademark). It doesn't. The order only enjoins DMACC from using **a standalone D** in connection with "DMACC;" it does not require DMACC to stop using "DMACC." App. 043; R. Doc. 87, at 43; Add. 043.

Second, DMACC alleges that Drake only sought enjoinment of a standalone D, not DMACC's "Rebrand Logo," which consists of a prominent D sitting above the word "DMACC." Appellant's Brief, at 42. This is a distinction without a difference, as Drake has always objected to the "D" in the Rebrand Logo, not "DMACC." As noted above, the district court only enjoined DMACC from using a

---

"trumped up disciplinary charges" assessed against him in response to his lawsuit alleging inadequate medical treatment under 42 U.S.C. § 1983 for a van accident while in custody. 42 F.3d 470, 471 (8th Cir. 1994). This Court correctly determined that his retaliation claims in the preliminary injunction motion bore no nexus to his claims in the complaint for denial of medical treatment. *Id.*

47

standalone D; DMACC is free to continue using "DMACC."  To the extent the injunction includes the Rebrand Logo within its scope, it plainly only pertains to DMACC's use of a prominent standalone D therein—not the Rebrand Logo as a whole.

Third, DMACC's argument assumes the Rebrand Logo is one monolithic, inseparable mark.  However, its own depiction of the Rebrand Logo in its brief includes a "TM" symbol next to the D, indicating that DMACC considers the D to be primary trademark, not DMACC.



Appellant's Brief, at 42

Relatedly, DMACC has also argued at several points before the district court that it does not use the standalone D by itself, but always uses the D in connection

48

with "DMACC."[14]  Drake has debunked this several times,[15] which the district court acknowledged in its order.  App. 026; R. Doc. 87, at 26; Add. 026 ("DMACC has represented to the Court that it never intended to utilize the D without the DMACC house mark.  However, Drake submitted a multitude of examples of DMACC doing just that.").

Fourth, DMACC argues as if house marks universally preclude a finding of likelihood of confusion analysis.  They do not.  Even if DMACC **always** used DMACC along with its standalone D (it doesn't), this would have little if any impact on the ultimate determination of likelihood of confusion.

There is no universal rule regarding how a defendant's use of its house mark affects the likelihood of confusion analysis; courts disagree on the question.  *See, e.g., AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 796–97 (6th Cir. 2004) (house marks lessen likelihood of confusion because they help clarify the source of the goods); *cf. Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir. 1986) (noting that labeling does not prevent consumers from mistakenly

[14] App. 676–677; R. Doc. 1-97, at 3, 4.  App. 824; R. Doc. 21, at 40, ¶ 28 n. 3.  App. 979; R. Doc. 52-12, at 2.

[15] App. 902–903; R. Doc. 40, at 4–5; App. 627–628; R. Doc. 110, at 79:16–80:24); *see also* n. 11, *supra*.

49

assuming the parties are somehow associated or that plaintiff had consented to defendant's use of the mark).

Here, the district court rendered the correct analysis which was to evaluate both parties' marks in their entireties, including any house marks. App. 025–029; R. Doc. 87, at 25–29; Add. 025–029. This resulted in the finding that the common dominant elements of the parties' marks, i.e., standalone Ds and "nearly identical colors," are "remarkably similar despite the inclusion of 'DMACC' in the logo." App. 028; R. Doc. 87, at 28; Add. 028. The district court expressly stated that the similarity factor would have favored Drake regardless of whether house marks were considered. App. 029; R. Doc. 87, at 29; Add. 029.

The district court ultimately determined that, in combination with the other *SquirtCo.* factors, this remarkable similarity results in a risk of confusion as to the affiliation, connection, or association between the schools, and as to the origin, sponsorship, or approval by Drake of DMACC's services. App. 029, 38–39; R. Doc. 87, at 29, 38–39; Add. 029, 38–39. This is an exceptionally reasonable conclusion given that Drake and DMACC *do* associate with each other on various academic offerings it provides to students, such as DMACC's Drake Admission Partnership Program ("DAPP") which is for DMACC students who attend DMACC for at least a year before transferring to Drake to complete their bachelor's degree. App. 095; R. Doc. 17, at 48 ¶ 209. Drake also maintains articulation agreements with Iowa

50

community colleges (including DMACC), which permit students with associate degrees from those colleges to transfer to Drake having fulfilled nearly all of Drake's general education requirements.  App. 095; R. Doc. 17, at 48 ¶ 208.

DMACC also cites *Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg., Inc.* 296 F.Supp.2d 983 (S.D. Iowa 2003) for the proposition that house marks *ipso facto* preclude an infringement finding, but conspicuously omits the marks at issue.  The plaintiff in that case, Iowa Paint, sought preliminary injunctive relief arising from Hirschfield's use of the mark PRO-WALL in connection with paint.  *Id.*, at 986. While the court denied the motion and cited the presence of house marks as a contributing factor, the limited impact of house marks is self-evident upon a review of the parties' respective labels:

51





Exhibits 2 and 4 to Plaintiff's Brief in support of Motion for Preliminary Injunction, *Iowa Paint Mfg. Co., Inc. v. Hirshfield's Paint Mfg., Inc.*, 296 F.Supp.2d 983 (S.D. Iowa 2003), Document 6.[16]

---

[16] The two images above do not appear in the *Iowa Paint* decision despite being the marks at issue in that case. They are also not part of the district court record on appeal. Drake has contemporaneously filed a motion to supplement the record with these two images.

52

Unlike the present case, the defendant's mark in *Iowa Paint* (PRO-WALL) is buried below at least three other trademarks, listed in a small font on the section of the label dedicated to describing the actual product, rather than its source.  DMACC has done the opposite here; not only has it prominently placed its standalone D *above* its "house mark," it has placed the "TM" symbol next to it, indicating that the D—not DMACC—*is* the primary (i.e. "house") mark.  This case is thus nothing like *Iowa Paint*.

DMACC's reliance on *Guthrie Healthcare Sys. v. ContextMedia, Inc.* is similarly flawed.  826 F.3d 27 (2d Cir. 2016).  In *Guthrie*, the Second Circuit not only affirmed the district court's finding of liability for trademark infringement, but *expanded* the scope of the district court's preliminary injunction order, finding the dominant portion of defendant's mark "jaw-droppingly similar" to plaintiff's mark. *Id.*, at 38, 50–51.  DMACC attempts to distinguish *Guthrie* **not** by arguing that its mark is different from Drake's, but rather obliquely invokes its flawed third-party rights argument referenced above, namely that the letter D is commonly used by universities and thus should be held to a different standards  Appellant's Brief, at 44–45.  For reasons discussed *supra*, this is not compelling.

53

## III.    DRAKE CROSS APPEAL

The lower court's decision to modify its Injunction Order to carve out DMACC's Bear Paw D is an abuse of discretion as the modification required improperly determining the Bear Paw D (1) was not explicitly raised by Drake in its complaint or motion for preliminary injunction as an "Infringing Mark"; (2) is not similar in terms of sight, sound, and meaning to at least the Vintage D even though the parties were in agreement that it is; and (3) did not constitute infringement even though the district court admittedly never conducted a *SquirtCo.* analysis.

### A.    Enjoining the Bear Paw D Does Not Require Specific Reference

In exempting the Bear Paw D from the Injunction Order, the district court stated that the Bear Paw D does not appear in Drake's complaint or its motion for preliminary injunction.  App. 045; R. Doc. 101, at 2; Add. 045.  This is inapposite to the relief requested.

The scope of an injunction can encompass infringing use, even if the use is not expressly identified in the plaintiff's complaint or identified in the request for preliminary relief.  *See LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424 (6th Cir. 2016).  For example, in a case in the Sixth Circuit, brothers Larry and Jimmy Flynt were involved in a dispute over the mark HUSTLER for adult publications and retail stores.  *Id.*  The district court enjoined Jimmy from using the mark.  *Id.* at 425. Jimmy subsequently opened a new store called "FLYNT Sexy Gifts."  *Id.* at 425.

54

Larry also owned a LARRY FLYNT trademark, and moved to expand the injunction, which the district court granted. *Id.* at 426. Nowhere in the district court or appellate decisions does it indicate that Larry's original complaint or preliminary injunction motion mentions the LARRY FLYNT trademark. *See generally, id.; see also L.F.P. IP, LLC v. Hustler Cincinnati, Inc.*, 2015 WL 13186226 (S.D. Ohio, Jan. 20, 2015). The district court ordered Jimmy to cease use of the FLYNT mark as well, which was affirmed by the Sixth Circuit. *LFP IP,* 810 F.3d, at 429. This is consistent with the equitable principle that a plaintiff who meets the exceedingly high bar to obtain preliminary injunctive relief should not be barred from enjoining trademark uses about which it did not know but otherwise fall within the scope of the enjoined conduct. This is especially true given that preliminary injunctions necessarily are undertaken without the benefit of discovery.

Notably, the injunction that was expanded in *Hustler* was a **permanent** injunction. *Id*., at 425. As noted, permanent injunctions are subject to a higher evidentiary burden than preliminary injunctions given the haste and policy considerations underlying the latter. If a permanent injunction can be modified to enjoin a mark that was never the subject of the litigation from which it sprang, there is no principled reason why a preliminary injunction cannot do the same thing, particularly when (1) the plaintiff did not know about the mark at issue, (2) both parties agreed that the mark fell within the scope of the relief sought, and (3) for

55

reasons articulated in more detail *infra*, the prior mark is nearly identical to the mark which is enjoined.

Regardless, the Bear Paw D was encompassed in the relief sought by Drake in its complaint and motion for preliminary injunction. Drake brought its allegations of infringement on the basis that it has a storied past of using a standalone D, regardless of stylization. App. 053; R. Doc. 17, at 6 ¶ 16 ("Since at least 1902, Drake has consistently used a standalone 'D' to signify the university and its services."). To account for other unknown or not expressly identified infringing marks used by DMACC, Drake defined DMACC's "Infringing Marks" as "[t]he DMACC D and the New DMACC Colors **and variations thereon**." App. 097; R. Doc. 17, at 50 ¶ 215 (emphasis added). In Drake's request for a preliminary injunction, the prayer asked that DMACC's use of a standalone "D" in a color scheme of blues and whites be enjoined. App. 255; R. Doc. 18, at 3. In sum, Drake requested relief from infringement of its standalone "D" without limitation to stylization, which necessarily includes its long-standing stylization embodied by the Vintage D.

DMACC expressly stated that the DMACC D "incorporates a 'D' in the same font as the 'D' in DMACC's [Bear Paw D mark]." App. 952–955; R. Doc. 52, at 32–35 ¶¶ 24–30. Further, DMACC admitted it uses the Bear Paw D "by itself, in blue and white, as a trademark—even marking it with the trademark symbol." App.

856; R. Doc. 23-2, at 4. Unquestionably, both parties have adopted a position that the Bear Paw D is a variation of the DMACC D.

The Bear Paw D is expressly addressed in the preliminary injunction record. DMACC disclosed its existence for the first time in its resistance, which of course came after Drake had already filed its complaint and preliminary injunction motion. App. 857–859; R. Doc. 23-2, at 5–7.  On reply, Drake pointed it was unaware of the mark and that the Bear Paw D was used only in connection with DMACC's intramural sports and recreational leagues, which by definition is an internal use. App. 901; R. Doc. 40, at 3.  Drake, however, had no reason to address the similarity of the Bear Paw D to Drake's branding given the nature of DMACC's argument subsumed this understanding.

The Bear Paw D and the Campus Recreation mark were discussed at the hearing on Drake's preliminary injunction motion.  App. 584; R. Doc. 110, at 36:3–21.  DMACC argued that if the injunction were granted, DMACC would have to abandon the Campus Recreation trademark registration.  App. 618; R. Doc. 110, at 70:18–21.  This confirms DMACC understood these marks fell within the scope of injunctive relief Drake was requesting from DMACC's infringing conduct.  Drake responded that an injunction would *not* require DMACC to abandon the Campus Recreation mark because if DMACC was only preliminarily enjoined from using it, the registration could still be maintained on the basis that any non-use resulting from

57

the injunction would be "excusable" in the eyes of the Trademark Office.  App. 631; R. Doc. 110, at 83:13–20.

The lower court thus considered and gave significant weight to the lack of express recitation of the Bear Paw D in the complaint or preliminary injunction motion, despite its relevance thereto. This is not one of the factors courts consider under the *SquirtCo.* and *Dataphase* tests.  This is an abuse of discretion requiring reversal of the Clarification Order. *H&R Block,* 58 F.4th at 946.

## B.  It is Legal Error to Find the Bear Paw D "Visually Distinct" and "Fundamentally Different"

Given the lack of analysis, the district court's conclusion that the Bear Paw D was "visually distinct and fundamentally different" from Drake's Vintage D is an abuse of discretion.  DMACC's purpose in bringing the Bear Paw D to light was to assert that the mark is so similar to Drake's Vintage D that Drake should be precluded from enforcing its trademark rights on laches and estoppel grounds.  App. 892; R. Doc. 23-2, at 40 n. 13.  As discussed, DMACC did not dispute the similarity of the marks in terms of sight, sound, or meaning.  Based on the record before the district court all parties understood the Bear Paw D is similar to Drake's Vintage D.

When discussing the similarity between Drake's Vintage D and the DMACC D (which DMACC asserts incorporates the Bear Paw D), the court found that this factor "decidedly falls in Drake's favor" and noted the "significant visual similarity between DMACC's new mark and Drake's Vintage D, particularly in the dominant

58

block-style D and bule and white color scheme, creates a likelihood of confusion." App. 26–27, 38; R. Doc. 87, at 26–27, 38; Add. 26–27, 38.  In so finding, the district court also cited the parties' "nearly identical colors," as well as the fact that both marks denote higher educational services (i.e., they have similar meanings).  App. 027–28; R. Doc. 87, at 27–28; Add. 27–28.

The question then becomes whether the Bear Paw D is **so different** from the DMACC D that it would result in **opposite conclusions** under both *SquirtCo.* and *Dataphase*.  By simply looking at them, the answer is self-evident—it would not.

 

Both marks feature the same dominant feature, namely a standalone D in block-style collegiate font, which the district court has reasoned shares a "significant visual similarity" with Drake's Vintage D that in turn "creates a likelihood of confusion." App. 38; R. Doc. 87, at 38; Add. 38.  Both Ds show the ™ symbol used next to the D, indicating DMACC's intent to claim the D as the primary element.  Both Ds are rendered in blue and white, which the lower court found to be "nearly identical" to Drake's color scheme.  App. 27–28; R. Doc. 87, at 27–28; Add. 27–28.  And both

Ds are paired with an indicia of DMACC, i.e., its name "DMACC," and a bear paw to signify its mascot.

It is critical to note that the district court believed the DMACC D was so similar to Drake's Vintage D that not even the presence of "DMACC" was sufficient to distinguish the two.  App. 027; R. Doc. 87, at 27; Add. 027 ("Even with DMACC's house mark present below the D, the marks are similar enough it could cause the public to believe the institutions are connected or affiliated.").  **If "DMACC" is not sufficient to differentiate the marks, it stands to reason a bear paw—which resembles a bulldog paw—is not either.**

Therefore, the lower court abused its discretion in reaching a clearly erroneous finding of fact that runs in direct contradiction of (1) the recognition by both Drake and DMACC that the Bear Paw D is similar to the Drake Vintage D, and (2) the lower court's own findings regarding a likelihood of confusion of DMACC's use of a block-style D in conjunction with blue and white colors even when accompanied by a house mark.  *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 534 (8th Cir. 2007) ("A district court abuses its discretion when it bases its decision on … a clearly erroneous finding of fact.") (citation omitted).

## C. It is Legal Error to Render a Pseudo Infringement Assessment Relying on a Sole Factor

The district court's "visually distinct and fundamentally different" conclusion is even more problematic when viewed in the broader context of the relevant legal

tests. This determination, combined with its *post hoc* exemption from the Injunction Order is in substance two findings, namely that (1) the Bear Paw D is not causing a likelihood of confusion with Drake's mark, and (2) injunctive relief is not appropriate under the *Dataphase* test. This is reversible error for two reasons.

The court acknowledges in the Clarification Order it did not perform a *SquirtCo.* analysis on the Bear Paw D. App. 046; R. Doc. 101, at 3; Add. 046. In reaching its conclusion that a likelihood of confusion was not present, the court at best only considered the similarity factor under *SquirtCo.*; it self-evidently did not give consideration to any others factors. Failing to consider relevant factors is an enumerated basis to find that the court abused its discretion in rendering its conclusion that the Bear Paw D is not likely to cause confusion. *H&R Block*, 58 F.4th at 46.

By crafting an injunction order that originally included the Bear Paw D within its scope (a block style D rendered in blue and white paired with an indicia of the college), and then subsequently excluding it, the necessary conclusion is that something altered the *Dataphase* analysis so substantially as to require the opposite decision than the court originally rendered. The district court cites no such change, however, and even if it did, no *Dataphase* analysis of the Bear Paw D is present in either order. Rendering a determination without considering all relevant factors is an abuse of discretion. *H&R Block*, 58 F.4th at 46.

61

Had a proper evaluation been undertaken, the district court's abuse of discretion would have been avoided. The first two *SquirtCo.* factors—existence of common law rights and strength of Drake's standalone D—both focus on Drake's mark, not DMACC's. Thus, under a hypothetical *SquirtCo.* analysis comparing Drake's standalone D to the Bear Paw D, both factors would come out the same as in the Injunction Order, namely that Drake has valid trademark rights, and the standalone D is inherently distinctive. App. 020–025; R. Doc. 87, at 20–25; Add. 020–025.

The same is true for the parties' degree of competition. No matter which marks are considered, Drake and DMACC operate in the same geographic area and offer the same post-secondary educational services. This factor was "not seriously disputed," and led to the district court to find that the parties' exceptionally close competitive and geographic proximity "greatly contributes to the likelihood of confusion in this case." App. 030–31; R. Doc. 87, at 30–31; Add. 030–31.

The same is true with respect to DMACC's intent to confuse, instances of actual confusion, and consumer sophistication, as none look at the marks themselves, but at surrounding circumstances—which have not changed. App. 031–038; R. Doc. 87, at 31–38; Add. 031–038. Therefore, the weight of these factors would apply equally to the Bear Paw D.

This leaves only the similarity of the marks discussed *supra*. The district court's analysis taken at face value only compared the visual similarities between the Bear Paw D and Drake's Vintage D; it did not take into account the "overall impression," which also includes the "aural[] and definitional attributes" of the respective marks (i.e., sound and meaning). *Luigino's*, 170 F.3d at 830. The court thus failed to fully perform the similarity analysis, which is clear error with respect to the similarity factor—this is grounds to find that the court abused its discretion on the ultimate conclusion of whether to award injunctive relief. *H&R Block*, 58 F.4th at 946.

Had similarity been considered in full, the **only** material difference between the DMACC D and the Bear Paw D (and therefore the Vintage D) is the presence of a bear paw, which, incidentally, resembles the paw of a bulldog, which is Drake's mascot. Such a minor difference cannot reasonably be a basis to reach a fundamentally different conclusion on the infringement rendered by the lower court with respect to the DMACC D under *SquirtCo*. Moreover, given the district court's finding that DMACC's use of the DMACC D is causing irreparable harm to Drake, it is without rational basis that such a minor difference would result in the opposite conclusion under the *Dataphase* test. Furthermore, if the presence of "DMACC"— which in no way alludes to Drake—is not sufficient to mitigate the risk of confusion as the district court found, an ambiguous animal paw which alludes to Drake's

63

mascot certainly cannot be either.  App. 027–029; R. Doc. 87, at 27–29; Add. 027–029 (similarity factor favors Drake "regardless of whether DMACC displays only the standalone D or utilizes its full logo, including its house mark.").

The lower court, therefore, abused its discretion by not giving significant weight (or any weight at all) to the factors the district court relied upon to find the Drake was likely to succeed on the merits in granting a preliminary injunction against the DMACC D.

64

## CONCLUSION

With regard to DMACC's appeal, the district court did not abuse its discretion in enjoining DMACC's use of a standalone D in a blue/white color scheme in connection with educational services. When evaluating DMACC's rebrand, the court engaged in a thorough and rational weighing of all the proper factors set forth in the relevant balancing tests. Its determination that Drake possesses enforceable trademark rights in a standalone D is supported by ample evidence in the record, which is more than sufficient to meet the evidentiary burden at the preliminary injunction stage. The court also correctly concluded that the present conflict is between Drake and DMACC, not Drake and the world. Drake thus respectfully requests that this Court affirm the district court's holdings in the Injunction Order (App. 001–043; R. Doc. 87; Add. 001–043).

For Drake's cross-appeal, however, the district court rendered decisions on both infringement and injunctive relief as to DMACC's Bear Paw D, but failed to undertake either of the required analyses under *SquirtCo.* and *Dataphase*. Even if it had, no logical basis exists to arrive at the opposite conclusion for the Bear Paw D as it did for the DMACC D. This failure to apply the relevant legal tests and is clear error of judgment, both of which are abuses of discretion under *H&R Block*. Drake thus respectfully requests that this Court reverse the Clarification Order (App. 044–047; R. Doc. 101; Add. 044–047) to the extent necessary to include the Bear Paw D

65

within the scope of the Injunction Order, or in the alternative vacate the Clarification

Order and remand with instructions to analyze the Bear Paw D in accordance with

the tests set forth in *SquirtCo.* and *Dataphase*.

Respectfully submitted,

Dated: March 13, 2025          **ZARLEYCONLEY PLC**

By:    /s/John D. Gilbertson
       /s/Joshua J. Conley
       John D. Gilbertson, AT0014515
       Joshua J. Conley, AT0011828
       580 Market Street, Suite 101
       West Des Moines, IA 50266
       Telephone:  (515) 558-0200
       Facsimile:   (515) 558-7790
       jgilbertson@zarleyconley.com
       jconley@zarleyconley.com
       **ATTORNEYS FOR
       APPELLEE/CROSS-APPELLANT**

66

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2025, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/John D. Gilbertson

67

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION, AND TYPEFACE AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   **X** This document contains __14,209__ words; **or**

   __ This brief uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   **X** This document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font; **or**

   ___This document has been prepared in a monospaced typeface using _____ with ____ characters per inch in ___ style.

3. The undersigned further certifies that the electronic version of this brief has been scanned for viruses and is virus-free.

Dated: March 13, 2025                    /s/John D. Gilbertson____
                                         John D. Gilbertson
                                         Attorney for Plaintiff-Appellant

Appellate Case: 24-3445    Page: 76    Date Filed: 04/01/2025 Entry ID: 5501789